*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| OSG HOLDINGS, INC., *et al.*,[1] | Case No. 23-90799 (CML) |
| Debtors. | |

## DISCLOSURE STATEMENT FOR THE
## JOINT PREPACKAGED CHAPTER 11 PLAN OF
## REORGANIZATION OF OSG HOLDINGS, INC. AND CERTAIN OF ITS
## DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**MCDERMOTT WILL & EMERY LLP**
Felicia Gerber Perlman (*pro hac vice* pending)
Bradley Thomas Giordano (*pro hac vice* pending)
Carole Wurzelbacher (*pro hac vice* pending)
444 West Lake Street
Chicago, Illinois 10036
Telephone:  (312) 372-2000
Facsimile:  (312) 984-7700
E-mail:      fperlman@mwe.com
             bgiordano@mwe.com
             cwurzelbacher@mwe.com

- and -

**MCDERMOTT WILL & EMERY LLP**
Gregg Steinman (*pro hac vice* pending)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone:  (305) 358-3500
Facsimile:  (305) 347-6500
E-mail:      gsteinman@mwe.com

**MCDERMOTT WILL & EMERY LLP**
Marcus A. Helt (Texas Bar #24052187)
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201
Telephone:  (214) 295-8000
Facsimile:  (972) 232-3098
E-mail:      mhelt@mwe.com

*Proposed Counsel for Debtors and Debtors in Possession*

Dated: October 15, 2023

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are:  Applied Information Group, Inc. (7381); Diamond Marketing Solutions Group, Inc. (3531); DoublePositive Marketing Group, Inc. (8221); E-statement.com Corp. (1974); Globalex Corporation (5365); JJT Enterprises, Inc. (7792); Mansell Group Holding Company (9354); Mansell Group, Inc. (7898); Metrogroup PD-WI Acquisition, LLC (5979); Microdynamics Corporation (0423); Microdynamics Group Nebraska, Inc. (5711); Microdynamics Transactional Mail, LLC (4060); National Business Systems, Inc. (6946); National Data Services of Chicago, Inc. (9009); NCP Solutions, LLC (5620); OSG Group Holdings, Inc. (0311); OSG Group TopCo, LLC (0904); OSG Holdings, Inc. (2036); OSG Intermediate Holdings, Inc. (1288); Output Services Group, Inc. (8044); Payments Business Corporation (5590); The Pisa Group, Inc. (6299); PPS Business Corporation (6432); SouthData, Inc. (5336); Telereach, Inc. (4444); The Garfield Group (9966); WhatCounts, Inc. (9306); and Words, Data and Images, LLC (2248).  The debtors' service address is 900 Kimberly Drive, Carol Stream, Illinois 60188.

*Solicitation Version*

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT A JOINT PREPACKAGED PLAN OF REORGANIZATION *PRIOR* TO THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE.[2] BECAUSE NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE AND SUBJECT TO THE PLAN DOCUMENTS. EXCEPT AS OTHERWISE SPECIFIED HEREIN OR AS MAY BE COMMUNICATED BY THE DEBTORS, THE SOLICITATION OF VOTES ON THE PLAN WITH RESPECT TO CLASS 3 AND CLASS 6 CLAIMS IS BEING MADE PURSUANT TO EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, INCLUDING PURSUANT TO SECTION 4(A)(2) THEREOF, AND APPLICABLE UNITED STATES STATE SECURITIES LAWS, AND ONLY FROM HOLDERS OF SUCH CLAIMS WHO ARE "ACCREDITED INVESTORS" AS DEFINED IN RULE 501(a) OF THE SECURITIES ACT ("<u>ACCREDITED INVESTORS</u>") OR A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("<u>QIB</u>"). THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

### <u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>

SOLICITATION OF VOTES ON THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF OSG HOLDINGS, INC. AND ITS DEBTOR AFFILIATES IS BEING MADE PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM THE HOLDERS OF OUTSTANDING CLAIMS IN THE FOLLOWING CLASSES:

---

[2]   Capitalized terms used but not otherwise defined in this disclosure statement (as may be amended, supplemented, or otherwise modified from time to time, this "<u>Disclosure Statement</u>") shall have the meanings ascribed to such terms in the *Joint Prepackaged Chapter 11 Plan of Reorganization of OSG Holdings, Inc. and Certain of Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>") attached hereto as **<u>Exhibit A</u>**.

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| CLASS 3 | EXISTING FIRST LIEN CLAIMS |
| CLASS 6 | OTHER GENERAL UNSECURED CLAIMS |

**IF YOU ARE HOLDER OF A CLAIM IN CLASS 3 OR 6, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU MAY BE ENTITLED TO VOTE ON THE PLAN.**

<u>**DELIVERY OF BALLOTS**</u>

**CLASS 3 AND CLASS 6 BALLOTS MAY BE (1) RETURNED IN THE PREPAID, PRE-ADDRESSED ENVELOPE ENCLOSED WITH THE BALLOT TO THE ADDRESS BELOW, (2) SUBMITTED ELECTRONICALLY ON THE SOLICITATION AGENT'S WEBSITE BELOW, OR (3) SUBMITTED TO THE BELOW EMAIL ADDRESS, SO THAT IT IS <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON NOVEMBER 13, 2023:**

<u>**HTTPS:// WWW.KCCLLC.NET/OSG**</u>

**BY REGULAR MAIL, HAND DELIVERY, OR OVERNIGHT AT:**

**OSG BALLOT PROCESSING**
**C/O KURTZMAN CARSON CONSULTANTS LLC**
**222 N. PACIFIC HIGHWAY, SUITE 300**
**EL SEGUNDO, CALIFORNIA 90245**

**EMAIL: OUTPUTSERVICESGROUPINFO@KCCLLC.COM**

**PLEASE CHOOSE ONLY <u>ONE</u> METHOD TO RETURN YOUR BALLOT**

**BALLOTS RECEIVED VIA MEANS OTHER THAN THE AFOREMENTIONED MEANS WILL <u>NOT</u> BE COUNTED.**

---

**IF YOU HAVE ANY QUESTIONS ON THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AGENT AT:**

<u>**BY TELEPHONE:**</u>
**(866) 479-8211 (DOMESTIC TOLL-FREE) OR**
**(781) 575-2037 (INTERNATIONAL TOLL)**

<u>**BY EMAIL TO:**</u>
**OUTPUTSERVICESGROUPINFO@KCCLLC.COM;**
**WITH A REFERENCE TO "OSG HOLDINGS" IN THE SUBJECT LINE**

---

Applied Information Group, Inc, Diamond Marketing Solutions Group, Inc., DoublePositive Marketing Group, Inc., E-statement.com Corporation, Globalex Corporation, JJT Enterprises, Inc., Mansell Group Holding Company, Mansell Group, Inc., Metrogroup PD-WI Acquisition, LLC, Microdynamics Corporation, Microdynamics Group Nebraska, Inc., Microdynamics Transactional Mail, LLC,  National Business Systems, Inc., National Data Services of Chicago, Inc., NCP Solutions, LLC, OSG Holdings, Inc., Output Services Group, Inc., Payments Business Corporation, The Pisa  Group, Inc., PPS Business

Corporation, SouthData, Inc., Telereach, Inc., The Garfield Group, Inc., WhatCounts, Inc., and Words, Data and Images, LLC (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>")[3] submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for use in solicitation of votes on the Plan.  The Plan is anticipated to be filed with the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>").  A copy of the Plan is attached hereto as <u>Exhibit A</u>.  This Disclosure Statement provides information regarding the Plan, which the Debtors are seeking to have confirmed by the Bankruptcy Court.  The Debtors are providing the information in this Disclosure Statement to certain Holders of Claims and Interests for purposes of soliciting votes to accept or reject the Plan.

Pursuant to the Restructuring Support Agreement, which is attached hereto as <u>Exhibit B</u>, the Plan is currently supported by the Debtors, Holders of more than 66.7% in amount of Existing First Lien Claims and the Consenting Funds.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article VIII of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

You are encouraged to read this Disclosure Statement (including "Certain Factors to Be Considered" described in Article VI of this Disclosure Statement) and the Plan in their entirety before submitting your Ballot to vote on the Plan.

The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each transaction contemplated by the Plan.

The Debtors strongly encourage Holders of Claims in Classes 3 and 6 to read this Disclosure Statement and the Plan in their entirety before voting to accept or to reject the Plan.  Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Combined Hearing.

---

[3]   OSG Group TopCo, LLC, OSG Group Holdings, Inc., and OSG Intermediate Holdings, Inc. (collectively, the "<u>Liquidating Debtors</u>") shall be separated from the Debtors pursuant to the Separation Agreement.  Holders of Claims against or Interests in any of the Liquidating Debtors will not be entitled to submit a vote to accept or reject the Plan on account of such Claim or Interest and will not receive a recovery pursuant to the Plan and on account of such Claim or Interest.

**RECOMMENDATION BY THE DEBTORS**

EACH APPLICABLE DEBTOR'S BOARD OF DIRECTORS, MEMBERS, OR MANAGERS, AS APPLICABLE, HAS APPROVED THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH SUCH DEBTOR BELIEVES THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF EACH OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO CLAIM AND INTEREST HOLDERS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED RESTRUCTURING TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES. EACH OF THE DEBTORS, THEREFORE, STRONGLY RECOMMEND THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN <u>NOVEMBER 13, 2023 AT 4:00 P.M. (PREVAILING CENTRAL TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND IN THE BALLOTS.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not be issued pursuant to a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933 (as amended, the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority, and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The Debtors are relying on exemptions from the registration requirements of the Securities Act, including section 4(a)(2) thereof and/or Regulation D promulgated thereunder, and on equivalent exemptions under Blue Sky Laws, to exempt from registration under the Securities Act and Blue Sky Laws the offer to Holders of Existing First Lien Claims of new securities prior to the Petition Date, including in connection with the solicitation of votes to accept or reject the Plan (the "Solicitation").

After the Petition Date, the Debtors will rely on section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, or other exemptions under the Securities Act to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance, and distribution of the securities described herein under the Plan. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Except to the extent publicly available, this Disclosure Statement, the Plan, and the information set forth herein and therein are confidential. This Disclosure Statement and the Plan may contain material non-public information concerning the Debtors, their subsidiaries, and their respective debt and Securities. Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling Securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such Securities and (b) is familiar with the United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act").

**DISCLAIMER**

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All Holders of Claims entitled to vote are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims or Interests reviewing this Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No Holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors. Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state under Blue Sky Laws. The Debtors are soliciting acceptances of the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The Debtors' management ("Management"), in consultation with their advisors, has prepared the financial projections attached hereto as **Exhibit D** and described in this Disclosure Statement. The financial projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of Management. Important factors that may affect actual results and cause Management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions, and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information

contained in the forecasts or that the forecasted results will be achieved. Therefore, the financial projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to Holders of Claims against or Interests in, the Debtors or any other party in interest. Please refer to Article VI of this Disclosure Statement, entitled "Certain Factors to Be Considered" for a discussion of certain risk factors that Holders of Claims and Interests voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein. If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein. When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement, including those set forth in Article VI hereof. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

*[Remainder of page intentionally left blank.]*

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ............................................................................13

ARTICLE I INTRODUCTION................................................................14

ARTICLE II THE PLAN.............................................................................17
   2.1    Treatment of Unclassified Claims. .................................17
   2.2    Treatment of Classified Claims and Interests. .............19
   2.3    Sources of Consideration for Plan Distribution............26
   2.4    Restructuring Transactions. ...........................................26
   2.5    Continued Corporate Existence.....................................27
   2.6    Corporate Action. ...........................................................28
   2.7    Vesting of Assets. ...........................................................28
   2.8    Separation Agreement. ....................................................29
   2.9    Treatment of Executory Contracts and Unexpired Leases..............29
   2.10   Indemnification Provisions in Organizational Documents. ..............30
   2.11   Cancellation of Existing Securities and Agreements. ...31
   2.12   Cancellation of Certain Existing Security Interests. ....32
   2.13   Exchange. ........................................................................32
   2.14   Approval of the New First Lien Documents and the  New Take-Back Debt Facility Documents, and Optional ABL Facility Documents..................33
   2.15   Optional ABL Facility. ...................................................34
   2.16   Issuance of the Reorganized Common Equity. .............34
   2.17   Backstop Commitment Letter. ........................................35
   2.18   Exit Capital. ....................................................................35
   2.19   Exemption from Registration Requirements. ................36
   2.20   Organizational Documents.............................................37
   2.21   Exemption from Certain Transfer Taxes and Recording Fees. ...................37
   2.22   Managers, Directors and Officers of the Reorganized Debtors. ..................38
   2.23   Management Incentive Plan.............................................38
   2.24   Liquidating Trust. ...........................................................38
   2.25   Effectuating Documents; Further Transactions. ...........40
   2.26   Restructuring Expenses....................................................40
   2.27   Retained Causes of Action. .............................................41
   2.28   Discharge of Claims and Termination of Interests;  Compromise and Settlement of Claims, Interests, and Controversies................................42
   2.29   Release, Injunction, and Related Provisions. ...............42

ARTICLE III VOTING PROCEDURES AND REQUIREMENTS ...............49
   3.1    Classes Entitled to Vote on the Plan...............................49
   3.2    Votes Required for Acceptance by a Class. ....................49
   3.3    Certain Factors to Be Considered Prior to Voting. .......50
   3.4    Classes Not Entitled To Vote on the Plan. ......................50
   3.5    Solicitation Procedures.....................................................51
   3.6    Voting Procedures............................................................52

**ARTICLE IV CORPORATE AND CAPITAL STRUCTURE** ...............................................53

    **4.1**      **Prepetition Corporate and Capital Structure.** ............................................53

**ARTICLE V CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES** ............55

    **5.1**      **Challenges Facing the Debtors' Businesses and Efforts to Address Challenges.** ...............................................................................................56

    **5.2**      **The Debtors Efforts to Address Business Challenges.** ...............................58

**ARTICLE VI CERTAIN FACTORS TO BE CONSIDERED** ...........................................61

    **6.1**      **General.** ...................................................................................................61

    **6.2**      **Risks Relating to the Plan and Other Bankruptcy Law Considerations.** ......................................................................................62

    **6.3**      **Risks Relating to the Restructuring Transactions.** .................................69

    **6.4**      **Risks Relating to the Reorganized Common Equity.** ..............................71

    **6.5**      **Risks Relating to the Debtors' Businesses.** ...........................................74

    **6.6**      **Certain Tax Implications of the Chapter 11 Cases and the Plan.** ..................75

    **6.7**      **Pension Settlement and Unresolved Controversies as of Solicitation of the Plan.** ...................................................................................................76

    **6.8**      **Disclosure Statement Disclaimer.** .........................................................76

**ARTICLE VII CONFIRMATION OF THE PLAN** ...........................................................79

    **7.1**      **The Combined Hearing.** ........................................................................79

    **7.2**      **Confirmation Standards.** .......................................................................80

    **7.3**      **Best Interests Test/Liquidation Analysis.** ..............................................80

    **7.4**      **Feasibility.** .............................................................................................81

    **7.5**      **Confirmation Without Acceptance by All Impaired Classes.** ....................81

    **7.6**      **Alternatives to Confirmation and Consummation of the Plan.** ...................82

    **7.7**      **Liquidation Analysis.** ............................................................................82

    **7.8**      **Financial Information and Projections.** ..................................................82

    **7.9**      **Valuation Analysis.** ...............................................................................83

**ARTICLE VIII IMPORTANT SECURITIES LAW DISCLOSURE** ................................83

    **8.1**      **Exemption from Registration Requirements.** .........................................83

    **8.2**      **Resales of the Reorganized Securities.** ..................................................84

**ARTICLE IX CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ...............................................................................86

    **9.1**      **Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors.** ...........................................................................88

    **9.2**      **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims.** .............................................................................................102

    **9.3**      **Information Reporting and Withholding.** .............................................107

**ARTICLE X CONCLUSION AND RECOMMENDATION** ............................................109

## <u>EXHIBITS</u>

EXHIBIT A  The Plan

EXHIBIT B  Restructuring Support Agreement

EXHIBIT C  Liquidation Analysis

EXHIBIT D  Financial Projections

EXHIBIT E  Valuation Analysis

EXHIBIT F  Corporate Organizational Chart

## EXECUTIVE SUMMARY

The Plan implements a comprehensive prepackaged restructuring agreed to among the Debtors and the Debtors' major stakeholders, including the Consenting First Lien Lenders (entitled to vote more than 66.7% of the aggregate amount of Existing First Lien Claims to accept or reject the Plan) and the Consenting Funds. The restructuring will result in a significant deleveraging of the Debtors' capital structure, as reflected in the charts below:

| Estimated Capital Structure as of October 15, 2023 | |
| --- | --- |
| Instrument | Principal Outstanding (mm) |
| Existing First Lien Revolving Credit Facility | $21.3 |
| Existing First Lien Facility Term Loans | $648.6 |
| Total | $669.9 |

| Structure Post-Emergence[4] | |
| --- | --- |
| Instrument | Principal Outstanding (mm) |
| New First Lien Facility | $50.0 |
| New Take-Back Debt Facility | $135.0 |
| Optional ABL Facility (if applicable) | $50.0 |
| Total | $235.0 |

The anticipated benefits of the prepackaged restructuring, including the Plan, include, without limitation, the following:

(a)     a DIP Facility to fund the restructuring and the Debtors' operations during these chapter 11 cases up to $50 million, which will be paid in full in Cash on the Effective Date;

(b)     approximately $50.0 million in new money advanced under the New Credit Agreement in exchange for (a) $50 million in New First Lien Loans and (b) 20% of the Reorganized Common Equity, subject to dilution by the Management Incentive Plan;

(c)     a commitment from the Backstop Parties to backstop the New First Lien Facility in exchange for the Put Option Premium;

(d)     conversion of approximately $670 million of Existing First Lien Claims to (i) $135 million in New Take-Back Debt Loans and (ii) 80% of the Reorganized Common Equity, subject to dilution by the Put Option Premium and the Management Incentive Plan;

(e)     the option for the Debtors to secure the Optional ABL Facility, consistent with the terms set forth in the Restructuring Support Agreement;

(f)     payment in full or Reinstatement of all General Unsecured Trade Claims and all General Unsecured Litigation Claims;

---

[4]     The capital structure post-emergence may vary due to, among other things, accrued interest through closing of the Restructuring Transactions.

(g)       divestment of the Debtors' equity interest in non-debtor OSG Bidco Limited, which will vest in a liquidating trust for the benefit of the Pension Trustee; and

(h)       prompt emergence from chapter 11.

The Plan provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' businesses, maximizes all creditor recoveries, and protects the jobs of the Debtors' invaluable employees, including Management.

The purpose of this Disclosure Statement is to provide Holders of Claims or Interests entitled to vote to accept or reject the Plan with adequate information about (a) the Debtors' businesses and certain historical events, (b) the chapter 11 cases (the "Chapter 11 Cases"), (c) the rights of Holders of Claims or Interests under the Plan, and (d) other information necessary to enable a hypothetical investor typical of the Holders of Claims or Interests in the Chapter 11 Cases to make an informed judgment about the Plan.

## ARTICLE I

## INTRODUCTION

The Debtors, together with their non-Debtor subsidiaries (and together with the Liquidating Debtors, collectively, the "Company"), are a digital and print communications platform, serving corporate clients throughout North America and the United Kingdom. The Company provides primarily transactional, marketing, and payment solutions to various industries, including consumer services, business-to-business markets, education, retail, property management, financial services, healthcare, and the government, both through the use of its traditional print and mail businesses, as well as through its omnichannel software-as-service (SaaS) platform. The Company also provides a comprehensive suite of complementary services to its clients, such as online payment portals and accounts receivable software, real-time reporting and data analytics, and database management services. The Company employs over 1,400 individuals and services approximately 6,000 customers across the United States.

The Company's United Kingdom-based businesses, operated by non-debtor Communisis Limited[5] and its subsidiaries (collectively, "Communisis"), operate across the U.K., Europe, the Middle East, and Africa and service some of the biggest financial and consumer goods organizations in the world with critical communications and marketing services. As further described below, Communisis is currently being marketed for sale. Communisis currently employs over 1,000 individuals and services approximately 100 customers.

Over the last 10 years, the Company has grown considerably through various strategic acquisitions designed to broaden the depth of services offered by the Company in North America and to expand the Company's capabilities. Unfortunately, while undergoing these strategic acquisitions the Company faced industry-wide headwinds caused by customer transitions to digital

---

[5]    As of the Petition Date, Communisis Limited is a wholly owned by OSG BidCo Limited.

platforms and away from traditional print services. Declining demand and pricing pressures have also led to consolidation in the outsourced communications market, leading service providers, including the Company, to explore integrating complementary digital services and platforms into their existing portfolio.

The Company anticipated these challenges and, starting in 2022, implemented a strategic plan to navigate its transition to digital platforms to better serve its customers. Included in this strategic plan was the development of a new omnichannel software-as-a-service billing and payment platform that integrates digital and traditional touchpoints to ultimately drive greater customer adoption of online payment solutions. The Company also made significant investments in technology, equipment, and its workforce to smooth the transition to digital platforms and meet increasing customer demands for digital solutions. Although these investments were necessary for the long-term success of the Company, they substantially increased near-term costs and negatively impacted liquidity and financial results.

To address these challenges, the Debtors and certain of their affiliates filed voluntary chapter 11 cases on August 6, 2022 (the "2022 Chapter 11 Cases") in the Bankruptcy Court for the District of Delaware.[6] Though the 2022 Chapter 11 Cases were a positive step toward raising needed capital and a sign of confidence from investors who supported that process, many customers reacted negatively to news of the filing and the Company lost certain customer contracts.

Upon emergence from the 2022 Chapter 11 Cases in August of 2022, at the direction of the newly appointed board of managers of OSG Group TopCo, LLC ("TopCo"), the Company's management team completed a strategic, operational, and financial assessment of the U.S. and U.K. businesses, that unfortunately, did not culminate into right-sizing the Company's balance sheet. As to the businesses in the U.S., the principal findings of this assessment were three-fold. First, the core print mail outsourcing platform had suffered from neglect, lack of investment, and historical operational focus. Second, the existing executive leadership team lacked the requisite industry knowledge to address the issues inherent in the core print mail platform. Third, the amount of debt that remained on the Company's balance sheet was not sustainable, particularly in light of the amount of investment that would be required to support the future business needs of the core print mail platform.

As to the U.K. businesses, the assessment yielded similar findings as to the state of the business. The Company's operations in the United Kingdom are focused in two primary divisions: Customer Experience and Brand Deployment. While Brand Deployment is a profitable asset, much of its cash flow has been consumed by necessary and ongoing investments to remediate Customer Experience's information technology platform. In 2023 alone, the Company estimated that Customer Experience would need approximately $35 million in additional investment, further complicating the Company's United Kingdom operations.

In addition, on September 17, 2019, Debtor Output Services Group, Inc. entered into a pension guarantee (the "Specified Guarantee"), which provides an unsecured guarantee for the

---

[6]   The 2022 Chapter 11 Cases were jointly administered under Case Number 22-10718 (Bankr. D. Del.) (JTD).

obligations under the Communisis Pension Plan in the event that the sponsoring employers[7] of the Communisis Pension Plan fail to make their required contributions.  The Company estimates that the liability associated with the Specified Guarantee is approximately $25 million to $70 million.   As a result of the significant additional investments needed to complete the remediation of Customer Experience's platform and the onerous pension obligation, the Company, with the assistance of its advisors, decided to sell its United Kingdom operations.  Beginning in early 2023, the Company sent solicitation materials to approximately 21 entities (5 with respect to a Customer Experience-only transaction and 16 for a combined or Brand Deployment-only transaction).  Of the entities that received solicitation materials, 9 entities submitted non-binding letters of intent.   Despite extensive negotiations with several interested parties, a concrete agreement for the purchase of Customer Experience and Brand Deployment did not materialize prior to the date of solicitation of this Disclosure Statement.  The Company, along with its advisors, continues to work with interested parties toward a definitive agreement for the sale of its U.K. businesses.

To address thes challenges in the U.S. business, following their emergence from the 2022 Chapter 11 Cases, the Company implemented a strategy focused on (a) continuing to invest in the long-term growth of promising digital offerings, (b) right-sizing its sales organization with a renewed focus on existing profitable products and capabilities, (c) delivering a better customer experience, including proactive customer communications and a laser focus on improving the quality of services, and (d) prudent cost management.

In addition, the Company's new management team determined that the businesses had three key needs: (a) a deleveraging of its balance sheet, (b) divestment of certain business segments and liabilities, including certain of its businesses in the United Kingdom, and (c) additional time under its existing credit agreements to finalize and implement an updated long-term business plan.  Accordingly, the Company began engaging with its key stakeholders, including the Existing First Lien Lenders and the Consenting Funds, in early 2023 to refinance or otherwise address the issues in their capital structure.  These negotiations resulted in the execution of the Restructuring Support Agreement, which provides the primary framework for the Plan and is the basis on which the acceptances of the Existing First Lien Lenders and the Holders of Other General Unsecured Claims are being solicited.

Thus, the Debtors filed these Chapter 11 Cases with the support of a majority of their stakeholders and to implement the terms of the Restructuring Support Agreement and the go-forward business plan on which the prepackaged Plan is based.  In that regard, these Chapter 11 Cases will comprehensively restructure the Debtors' prepetition debt, preserve the going-concern value of the Debtors' businesses, maximize all creditor recoveries (including by paying all General Unsecured Trade Claims and General Unsecured Litigation Claims in full and assuming all Executory Contracts and Unexpired Leases), protect the jobs of the Debtors' employees, and position the Debtors for long-term success.

---

[7]   The sponsoring employers of the Communisis Pension Plan are non-Debtor affiliates of the Company Communisis Limited and Communisis UK Limited.

# ARTICLE II

# THE PLAN

## 2.1    Treatment of Unclassified Claims.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Claims (collectively, the "Unclassified Claims") have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. The Plan provides for the following treatment of each of the Unclassified Claims:

| Claim | Plan Treatment |
|---|---|
| Administrative Claims | Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the applicable Debtor(s) or the Reorganized Debtor(s), as applicable, to less favorable treatment, to the extent an Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim in accordance with the following: (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. |

| | |
|---|---|
| Priority Tax Claims | Except to the extent that each Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or when such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy Law, or in the ordinary course of business. |
| Professional Fee Claims | On the Effective Date, the Reorganized Debtors shall establish (if not already established) and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. Subject to the last sentence of Section 2.3(b) of the Plan, the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Retained Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. Subject to the last sentence of Section 2.3(b) of the Plan, no Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account in any way. The Reorganized Debtors shall be obligated to pay Allowed Professional Fee Claims in excess of the Professional Fee Escrow Amount. The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy Court; *provided* that in the event the Professional Fee Reserve Amount is insufficient to satisfy the Professional Fee Claims, the Reorganized Debtors shall be required to satisfy the Allowed amounts of the remainder of any outstanding Professional Fee Claims. When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court or any other Entity. |

| | |
|---|---|
| DIP Claims | Notwithstanding anything to the contrary in the Plan, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, the Holders of all Allowed DIP Claims, in full and final satisfaction, settlement, release, and discharge of and in exchange for all such DIP Claims, shall receive payment in full in cash. |

**2.2    Treatment of Classified Claims and Interests.**

The Plan establishes a comprehensive classification of Claims and Interests. The table below summarizes the classification, treatment, voting rights, and estimated recoveries of the Claims and Interests, by Class, under the Plan.  Amounts in the far-right column under the heading "Estimated Plan Recovery" are estimates only.  Accordingly, recoveries actually received by Holders of Claims and Interests may differ materially from the projected recoveries listed in the table below.

| Class | Claim and Interests | Treatment | Status/ Voting Right | Voting Right | Estimated Plan Recovery |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, and except to the extent that the Holder of such Allowed Other Secured Claim agrees with the Debtors (after consultation with the Required Consenting Stakeholders) to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors, with the consent of the Required Consenting Stakeholders: (A) payment in full in Cash of the unpaid portion of its Allowed Other Secured Claim; (B) the collateral securing its Allowed Other Secured Claim; (C) Reinstatement of its Allowed Other Secured Claim; or (D) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired | No (conclusively presumed to accept) | 100% |

| 2 | Other Priority Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Priority Claim, and except to the extent that the Holder of such Allowed Other Priority Claim agrees with the Debtors (after consultation with the Required Consenting Stakeholders) to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired | No (conclusively presumed to accept) | 100% |

| 3 | Existing First Lien Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Existing First Lien Claim, and except to the extent that the Holder of such Allowed Existing First Lien Claim agrees to less favorable treatment with the consent of the Required Consenting Stakeholders, each Holder of an Allowed Existing First Lien Claim shall receive: (A) its Pro-Rata Share of the New Take-Back Debt Loans; (B) its Pro-Rata Share of the Exchange Reorganized Equity; and (C) Election Rights to provide up to its Rights Offering Share of New First Lien Loan Commitments in an aggregate principal amount equal to the Rights Offering Amount, on the terms and subject to the conditions set forth in the Rights Offering Procedures. | Impaired | Yes | 30.1% |

| 4 | General Unsecured Trade Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Trade Claim, and except to the extent that the Holder of such Allowed General Unsecured Trade Claim agrees with the Debtors (after consultation with the Required Consenting Stakeholders) to less favorable treatment, at the election of the Debtors, with the consent of the Required Consenting Stakeholders, (A) payment in full in Cash of the unpaid portion of its Allowed General Unsecured Claim paid in the ordinary course of business, or (B) Reinstatement of its General Unsecured Trade Claim. | Unimpaired | No (conclusively presumed to accept) | 100% |

| 5 | General Unsecured Litigation Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Litigation Claim, and except to the extent that the Holder of such Allowed General Unsecured Litigation Claim agrees with the Debtors (after consultation with the Required Consenting Stakeholders) to less favorable treatment, each Holder of an Allowed General Unsecured Litigation Claim shall receive (A) Reinstatement of its Allowed General Unsecured Litigation Claim and (B) payment in full in Cash in the ordinary course of business if and when finally resolved under applicable non-bankruptcy Law on the unpaid portion, if any, of its Allowed General Unsecured Claim. | Unimpaired | No (conclusively presumed to accept) | 100% |

| | | | | | |
|---|---|---|---|---|---|
| 6 | Other General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other General Unsecured Claim, and except to the extent that the Holder of such Allowed Other General Unsecured Claim agrees to less favorable treatment with the reasonable consent of the Required Consenting Stakeholders, each Holder of an Other General Unsecured Claim shall be entitled to receive its Pro-Rata Share of (A) the Liquidating Trust Assets and (B) GBP 3.0 million. | Impaired | Yes | Unknown |
| 7 | Intercompany Claims | On the Effective Date, each Holder of an Allowed Intercompany Claim shall have its Claim, at the election of the Debtors, with the consent of the Required Consenting Stakeholders, (A) Reinstated, (B) distributed, (C) contributed, (D) set off, (E) cancelled and released without any distribution on account of such Claims, or (F) otherwise addressed. | Unimpaired/ Impaired | No (conclusively presumed to accept or deemed to reject) | 100%/0% |
| 8 | Existing Interests | On the Effective Date, all Allowed Existing Interests shall be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing Interests shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing Interests. | Impaired | No (conclusively deemed reject) | 100%/0% |

| 9 | Intercompany Interests | On the Effective Date, each Holder of an Allowed Intercompany Interest shall have its Allowed Intercompany Interest, at the election of the Debtors, with the consent of the Required Consenting Stakeholders, (A) Reinstated, (B) distributed, (C) contributed, or (D) cancelled and released without any distribution on account of such Interests. | Unimpaired/ Impaired | No (conclusively presumed to accept or deemed to reject) | 100%/0% |

## 2.3    Sources of Consideration for Plan Distribution.

The Debtors shall fund distributions under the Plan with: (a) Cash on hand, including Cash from operations; (b) the proceeds of the DIP Loans; (c) the proceeds of the New Take-Back Debt Loans; (d) proceeds from the Rights Offering and the Backstop Commitment Letter; (e) the Liquidating Trust Assets; and (f) the Reorganized Common Equity. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors or the Liquidating Trustee. The Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of the Plan.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement (including, without limitation, the New Organizational Documents, the New First Lien Documents, and the New Take-Back Debt Documents), the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of managers or directors (or other applicable governing bodies), as applicable, of the applicable Reorganized Debtors deem appropriate.

## 2.4    Restructuring Transactions.

Following the Confirmation Date and subject to any applicable limitations set forth in any post-Effective Date agreements, the Debtors, the Reorganized Debtors, and the Liquidating Trustee may take all actions as may be reasonably necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan,(including any transaction described in, or contemplated by, the Restructuring Transactions Memorandum), in each case in accordance with the Restructuring Support Agreement, including: (a) the execution and delivery of appropriate agreements or other

documents of reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable Law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of conversion, formation or incorporation or consolidation with the appropriate governmental authorities pursuant to applicable Law; (d) the execution, delivery, and filing, if applicable, of the New Organizational Documents (including the A&R LLC Agreement), the Rights Offering Documents, the New First Lien Documents, the New Take-Back Debtor Documents, the Liquidating Trust Agreement, the Separation Agreement, and the Backstop Commitment Letter; (e) such other transactions that are required to effectuate the Restructuring Transactions, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; and (f) all other actions that the Reorganized Debtors reasonably determine, with the consent of the Required Consenting Stakeholders, are necessary or appropriate.  For the purposes of effectuating the Plan, none of the Restructuring Transactions contemplated herein shall constitute a "change of control"  or "assignment" (or terms with similar effect) under, or any other transaction or matter that would result in a violation, breach, or default under, or increase, accelerate, or otherwise alter any obligations, rights or liabilities of the Debtors or the Reorganized Debtors under, or result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Reorganized Debtors pursuant to, any agreement, contract, or document of the Debtors, and any consent or advance notice required under any agreement, contract, or document of the Debtors shall be deemed satisfied by Confirmation.

On the Effective Date, all Claims arising under the Existing First Lien Facility shall be satisfied in full and each Existing First Lien Lender shall receive its Pro-Rata Share of the New Take-Back Debt and the Exchange Reorganized Equity, irrespective of whether such Holders vote to accept or reject the Plan, and may provide any waivers, grants of liens or guarantees, necessary to implement the Restructuring Transactions.

**2.5**    **Continued Corporate Existence.**

Except as otherwise provided in the Plan, or as otherwise may be agreed between the Debtors and the Required Consenting First Lien Lenders, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under applicable Law and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable Law.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable Law, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing: (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the conversion of a Reorganized Debtor from one entity type to another entity type; (d) the legal name of a Reorganized Debtor to be changed; (e) the closure of a Reorganized

Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Debtor under the Law of jurisdictions other than the Law under which the Debtor currently is incorporated.

**2.6**      **Corporate Action.**

On the Effective Date, all actions contemplated by the Plan (including any transaction described in, or contemplated by, the Restructuring Transactions Memorandum) and the Restructuring Transactions shall be deemed authorized and approved in all respects, including: (a) the selection of the managers or directors, as applicable, and officers of each of the Reorganized Debtors and New TopCo; (b) the issuance and delivery of the Reorganized Common Equity and the Election Rights; (c) the execution and entry into the New Organizational Documents (including the A&R LLC Agreement), the Rights Offering Documents, the New First Lien Documents, the New Take-Back Debt Documents, and the Backstop Commitment Letter; (d) the consummation of the Rights Offering and the transactions contemplated by the Backstop Commitment Letter; and (e) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) or Restructuring Transactions, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors, the Reorganized Debtors, or New TopCo and any corporate, limited liability company or other governance action required by the Debtors, the Reorganized Debtors, or New TopCo or the Liquidating Debtors in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors, the Reorganized Debtors, New TopCo, or the Liquidating Debtors or otherwise.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors, or New TopCo, as applicable, shall be authorized and, as applicable, directed, to issue, execute, deliver, acknowledge, and/or file, as applicable, the agreements, documents, securities, certificates of conversion, certificates of formation, certificates of incorporation, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors or New TopCo, as applicable, including the New Organizational Documents (including the A&R LLC Agreement), the Rights Offering Documents, the New First Lien Documents, the New Take-Back Debt Documents, the Optional ABL Facility (if applicable), the Liquidating Trust Agreement, and the Separation Agreement, and any and all agreements, documents, securities, certificates, and instruments relating to the foregoing.

The authorizations, approvals, and directives contemplated by Section 4.5 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy Law.

**2.7**      **Vesting of Assets.**

Except as otherwise provided in the Plan, on the Effective Date, all property of the Estates of the Debtors, including all Claims, Interests, rights, and Causes of Action, and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests,

except for those Liens, Claims, charges, or other encumbrances arising from or related to the New First Lien Documents. Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Claims), Interests, and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. Notwithstanding anything to the contrary in the Plan, the Unimpaired Claims against a Debtor shall remain the obligations solely of such Debtor or such Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise.

**2.8    Separation Agreement.**

Prior to, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall enter into the Separation Agreement with TopCo. The Separation Agreement shall govern, without limitation, (i) the funding provided by the Reorganized Debtors to the Liquidating Debtors necessary for the Liquidating Debtors to liquidate, wind-down, or otherwise reorganize their estates and (ii) the Liquidating Parties' agreement to cooperate and fulfill duties to the Debtors, including, without limitation, the preparation and filing of tax returns.

**2.9    Treatment of Executory Contracts and Unexpired Leases.**

All Executory Contracts and Unexpired Leases of the Debtors, including, without limitation, the Backstop Commitment Letter, shall be assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court or any other Person or Entity, pursuant to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease (i) was previously assumed or rejected by the Debtors by prior order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms, (iii) is subject to a motion to reject such Executory Contract or Unexpired Lease filed prior to the Effective Date, or (d) appears on the Schedule of Rejected Executory Contracts and Unexpired Leases. Each Executory Contract and Unexpired Lease shall be fully enforceable by the applicable contracting Reorganized Debtor(s) in accordance with the terms thereof, except as otherwise modified by the provisions of the Plan, or by any order of the Bankruptcy Court.

The Confirmation Order shall constitute an order of the Bankruptcy Court: (i) approving the assumption or rejection, as applicable of all Executory Contracts or Unexpired Leases, as described in the Plan, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2); (ii) providing that each assumption, assumption and assignment, or rejection, as the case may be, is in the best interests of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (iii) providing that the requirements for assumption or assumption and assignment of any Executory Contract or Unexpired Lease to be assumed or assumed and assigned have been satisfied. Unless otherwise indicated, all assumptions, assumptions and assignments, or rejections of Executory Contracts or Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all

modifications, amendments, supplements, restatements, or other agreements related thereto (including any of the foregoing effected pursuant to the Plan or the Confirmation Order), and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. To the fullest extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents (or purports to restrict or prevent), or is breached or deemed breached by, or increases, accelerates or otherwise alters any obligations, rights or liabilities of the Debtors or the Reorganized Debtors as a result of, or creates or imposes any Lien upon any property or asset of the Debtors or the Reorganized Debtors as a result of, the assumption or the assumption and assignment of such Executory Contract or Unexpired Lease or the consummation of any of the Restructuring Transactions (including any "change of control" provision (or term with similar effect)), then such provision shall be deemed modified such that such assumption or assumption and assignment or the consummation of any of the Restructuring Transactions shall not result in any such occurrence or consequence. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Anything in the Plan to the contrary notwithstanding, on the Effective Date, all Specified Documents shall be automatically rejected and terminated without the need for any further action by, payment or distribution to, or notice to any Person or Entity.

## 2.10   Indemnification Provisions in Organizational Documents.

Any D&O Liability Insurance Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) pursuant to which any of the Debtors' or the Liquidating Debtors' current and former directors, officers, managers, or other employees are insured shall remain in force through the expiration of any such D&O Liability Insurance Policy (or "tail policy," as applicable).

On or before the Effective Date, to the extent not already obtained, the Debtors and the Liquidating Debtors shall obtain a "tail policy" for the existing D&O Liability Insurance Policy. The Debtors and the Liquidating Debtors shall assume (and assign to the Reorganized Debtors if necessary), pursuant to section 365(a) of the Bankruptcy Code, either by a separate motion filed with the Bankruptcy Court or pursuant to the terms of the Plan and Confirmation Order, the D&O Liability Insurance Policy.

All indemnification provisions of the Debtors that are in place as of the Petition Date (whether in the by-laws, certificates of incorporation, articles of limited partnership, limited liability company agreements, board resolutions, management agreements or employment or indemnification contracts, or otherwise) for the current directors, officers, and employees of each of the Debtors and such current directors' and officers' respective affiliates shall be assumed by the Debtors to the extent assumable and shall remain obligations of the Reorganized Debtors, irrespective of when such obligation arose, so long as such provisions do not require the Debtors to make any payments or provide any arrangements (including severance payments) to such

Persons other than indemnification payments and reimbursement and advancement of expenses. All such provisions shall be deemed and treated as Executory Contracts that are assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any Claim based on such provisions shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code or otherwise.

None of the Reorganized Debtors shall amend or restate its certificate of incorporation, bylaws, or similar organizational document after the Effective Date to terminate or materially adversely affect (a) any of the Reorganized Debtors' obligations referred to in Section 4.7 of the Plan or (b) the rights of such managers, directors, officers, employees, or agents referred to in Section 4.7 of the Plan.

**2.11    Cancellation of Existing Securities and Agreements.**

On the Effective Date, except as otherwise specifically provided for in the Plan (including in the Restructuring Transactions Memorandum), including with respect to the Existing First Lien Facility Documents: (a) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of first offer, co-sale rights, investor rights, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan, if any) shall be cancelled, terminated and of no further force or effect, without further act or action, and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of first offer, co-sale rights, investor rights, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated or assumed pursuant to the Plan, if any) shall be released and discharged.

Notwithstanding such cancellation and discharge:

a)   The Interests of the Debtors or Reorganized Debtors, as applicable, in their direct and indirect subsidiaries (other than OSG Bidco and all of its subsidiaries) shall remain unaffected by the Plan.

b)   The DIP Facility Documents shall continue in effect solely for purposes of allowing the DIP Agent to (i) receive distributions from the Debtors under the Plan and to make further distributions to the Holders of the DIP Claims on account of such DIP Claims, as set forth in Article VI of the Plan; (ii) enforce its rights, Claims, and interests with respect to the DIP Lenders; (iii) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of DIP

Claims, including any rights to priority of payment with respect to the DIP Lenders; and (iv) appear and be heard in the Chapter 11 Cases or in any other proceeding, including to enforce any obligation owed to the DIP Agent or Holders of DIP Claims under the Plan.

c) The Existing First Lien Documents shall continue in effect solely for purposes of allowing the Existing First Lien Agent to: (i) receive distributions from the Debtors under the Plan and to make further distributions to the Holders of the Existing First Lien Claims on account of such Existing First Lien Claims, as set forth in Article VI of the Plan; (ii) enforce its rights, Claims, and interests with respect to the Existing First Lien Lenders; (iii) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Existing First Lien Claims, including any rights to priority of payment with respect to the Existing First Lien Lenders; and (iv) appear and be heard in the Chapter 11 Cases or in any other proceeding, including to enforce any obligation owed to the Existing First Lien Agent or Holders of Existing First Lien Claims under the Plan.

## 2.12    Cancellation of Certain Existing Security Interests.

Upon the full payment or other satisfaction of an Allowed Other Secured Claim or promptly thereafter, the Holder of such Claims shall deliver to the Debtors, Reorganized Debtors, or Liquidating Debtors, as applicable, any collateral or other property of a Debtor or Liquidating Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Claims that may be reasonably required to terminate any related financing statements, guaranties, mortgages, mechanics' or other Liens, or *lis pendens*, or similar interests or documents.

Furthermore, upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Debtors, the Reorganized Debtors, or the Liquidating Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.

## 2.13    Exchange.

On the Effective Date, each Holder of an Allowed Existing First Lien Claim shall exchange 100% of its Allowed Existing First Lien Claim for its Pro-Rata Share of (a) the New Take-Back Debt and (b) the Exchange Reorganized Equity, subject to dilution by the Put Option Premium and the Management Incentive Plan.  Except as otherwise provided for in the Plan, on the Effective Date and upon the issuance of the New Take-Back Debt Facility, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, the obligations of the Debtors and the Liquidating Debtors under the Existing First Lien Credit Agreement shall be cancelled,

and the Reorganized Debtors, the Liquidating Debtors, and their Affiliates shall not have any continuing obligations thereunder. Further, no provisions of the Existing First Lien Credit Agreement that impose liabilities on the Debtors or Liquidating Debtors shall survive and any and all defaults or events of defaults under the Existing First Lien Credit Agreement shall be deemed permanently waived or cured, as applicable.

**2.14    Approval of the New First Lien Documents and the New Take-Back Debt Facility Documents, and Optional ABL Facility Documents.**

On the Effective Date, the Reorganized Debtors' funded debt shall include the New First Lien Facility, the New Take-Back Debt Facility, and the Optional ABL Facility (if applicable). The Reorganized Debtors may use the New First Lien Facility, the New Take-Back Debt Facility, and the Optional ABL Facility (if applicable) for any purpose permitted by the New First Lien Documents, the New Take-Back Debt Documents, and the Optional ABL Facility Documents (if applicable), including the funding of obligations under the Plan and satisfaction of ongoing working capital needs.

Confirmation of the Plan shall be deemed to constitute approval of the New First Lien Facility, the New First Lien Documents, the New Take-Back Debt Facility, the New Take-Back Debt Documents, and (if applicable) the Optional ABL Facility and Optional ABL Facility Documents (including all transactions contemplated thereby, such as any supplementation or additional syndication of the New First Lien Facility, the New Take-Back Debt Facility, or the Optional ABL Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations under the New First Lien Documents, the New Take-Back Debt Documents, and (if applicable) the Optional ABL Facility Documents, and such other documents as may be reasonably required or appropriate, in each case, in accordance therewith.

The New First Lien Documents, the New Take-Back Debt Documents, and (if applicable) the Optional ABL Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New First Lien Documents, the New Take-Back Debt Documents, and (if applicable) the Optional ABL Facility are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law.

On the Effective Date, all of the Liens and security interests granted or to be granted in accordance with the New First Lien Documents or the New Take-Back Debt Documents (including all Liens and security interests that were previously granted under the Existing First Lien Documents) shall: (a) be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New First Lien Documents and

the New Take-Back Debt Documents; (b) be deemed automatically, without any further action being required by the Debtors, the Reorganized Debtors, the New First Lien Agents, the New Take-Back Debt Agents, or any of the New First Lien Lenders or New Take-Back Debt Lenders, perfected on the Effective Date on a first-priority basis, subject only to (solely with respect to the first-priority nature of such Liens and security interests) such Liens and security interests as may be permitted to be senior thereto under the New First Lien Documents and the New Take-Back Debt Documents; and (c) not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law.  The Reorganized Debtors and the Entities granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

**2.15    Optional ABL Facility.**

The Debtors shall make reasonable best efforts to secure a revolving credit facility on or after the Effective Date and prior to the date that is six months following the Effective Date; *provided*, that the Debtors shall not enter into, or provide any commitments or other obligations for (including with respect to fees), any such revolving credit facility prior to the Effective Date without the prior written consent of the Required Consenting First Lien Lenders; *provided*, *further*, that nothing in the Plan, in the Confirmation Order, or the Restructuring Support Agreement shall require the Debtors or the Reorganized Debtors to secure the Optional ABL Facility.

**2.16    Issuance of the Reorganized Common Equity.**

Units of the Reorganized Common Equity shall be authorized under the New Organizational Documents of New TopCo.  Units of the Reorganized Common Equity shall be issued on or about the Effective Date, as further described in the Restructuring Transactions Memorandum, and delivered on the Effective Date in accordance with the Plan. All of the Reorganized Common Equity to be issued and/or delivered in accordance with the Plan, when so issued, and/or delivered shall be duly authorized, validly issued, fully paid, and non-assessable. The issuance and delivery of the Reorganized Common Equity in accordance with the Plan are authorized without the need for any further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest.

All Interests outstanding prior to Consummation (including all rights exchangeable or exercisable for shares of Interests) shall be extinguished upon Consummation and Holders thereof

shall not receive any payment or property on account of any such shares of capital stock, except in accordance with Article III of the Plan.

**2.17** **Backstop Commitment Letter.**

To provide assurance that the Debtors will receive an aggregate amount of New First Lien Loan Commitments equal to the New First Lien Facility Amount in connection with the consummation of the Plan, the Backstop Parties have provided, severally and not jointly, their respective Rights Offering Commitments, Backstop Commitments and Direct Allocation Commitments on the terms and subject to the conditions and limitations set forth in the Backstop Commitment Letter.

As consideration for the right to require each Backstop Party, severally and not jointly, to provide New First Lien Loan Commitments pursuant to such Backstop Party's Rights Offering Commitments, Backstop Commitments and Direct Allocation Commitments on the terms and subject to the conditions and limitations set forth in the Backstop Commitment Letter, on the Effective Date, the Reorganized Debtors shall pay to each Backstop Party (or, by direction of such Backstop Party, to its designee(s)) its *pro rata* share (based on their respective Commitment Percentages) of the Put Option Premium. The Reorganized Debtors shall be obligated to pay the Put Option Premium on the Effective Date in the form of Reorganized Common Equity. For purposes of determining the amount of Reorganized Common Equity that will be delivered as payment of the Put Option Premium, such determination will be made using a total equity value of New TopCo based on the midpoint valuation set forth in the Disclosure Statement. Notwithstanding the foregoing, if the Backstop Commitment Letter is terminated for any reason (other than as a result of a Specified Event (as defined in the Backstop Commitment Letter)), then the Debtors shall pay the Put Option Premium to the Backstop Parties (or, by direction, to their respective designee(s)) in full in cash no later than three Business Days following the date of any such termination.

Notwithstanding anything to the contrary in the Plan, no Backstop Party shall be required to provide New First Lien Loan Commitments pursuant to such Backstop Party's Rights Offering Commitments, Backstop Commitments and Direct Allocation Commitments in an aggregate amount (when taken together with New First Lien Loan Commitments provided by Affiliates of such Backstop Party that are not Backstop Parties (but not counting such New First Lien Loan Commitments more than once)) that exceeds the product of (i) such Backstop Party's Commitment Percentage and (ii) the New First Lien Facility Amount.

**2.18** **Exit Capital.**

Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, the Holders of all Allowed DIP Claims, in full and final satisfaction, settlement, release, and discharge of and in exchange for all such DIP Claims, shall receive payment in full in cash.

On the Effective Date, the Plan shall be implemented through (i) the provision of the New First Lien Facility, (ii) the provision of the New Take-Back Debt Facility, (iii) the payment of the Put Option Premium (which shall be in the form of Reorganized Common Equity), (iv) the issuance

and delivery of the New Money Reorganized Equity, and (v) the issuance and delivery of the Exchange Reorganized Equity. If applicable, the Restructuring may also be implemented through the Optional ABL Facility, subject to the prior written consent of the Required Consenting First Lien Lenders in their sole discretion.

Confirmation of the Plan shall be deemed approval of the exit capital contemplated in (a) and (b) of Section 4.15 of the Plan and the documents in connection with such exit capital, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors and New TopCo in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for in connection therewith, and authorization of the Reorganized Debtors and New TopCo to enter into and execute any other documents necessary to effectuate the transactions in Section 4.15 of the Plan.

**2.19    Exemption from Registration Requirements.**

The offering, issuance, delivery, and, if applicable, sale of the 1145 Securities shall be exempt from registration under the Securities Act and any other applicable securities Laws pursuant to section 1145 of the Bankruptcy Code.

All 1145 Securities (i) will not be "restricted securities" (as defined in Rule 144(a)(3) under the Securities Act), and (ii) will be freely tradable and transferable without registration under the Securities Act by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the Debtors, the Reorganized Debtors or New TopCo, subject to (x) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (y) compliance with applicable securities laws and any rules and regulations, including those of the United States Securities and Exchange Commission or state or local securities laws, if any, applicable at the time of any future transfer of such securities or instruments, and (z) any restrictions in the New Organizational Documents of New TopCo.

The 4(a)(2) Securities will be issued and/or delivered pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and subject to any restrictions in the New Organizational Documents of New TopCo. Resales of such restricted securities would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code.  Holders of restricted securities would, however, be permitted to resell Reorganized Common Equity without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act (if available) or any other registration exemption under the Securities Act, or if such securities are

registered with the Securities and Exchange Commission, in all cases subject to any restrictions in the New Organizational Documents of New TopCo.

## 2.20   Organizational Documents.

Subject to Article V of the Plan, the Reorganized Debtors and New TopCo shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan.  The New Organizational Documents will be deemed to be modified to prohibit the issuance of non-voting equity Securities, solely to the extent required under section 1123(a)(6) of the Bankruptcy Code. The New Organizational Documents for the Reorganized Debtors and New TopCo shall be in form and substance (including customary minority protections) acceptable to the Required Consenting First Lien Lenders.

As a condition to receiving the Reorganized Common Equity, Holders of Allowed Existing First Lien Claims (including Rights Offering Participants), the Backstop Parties and/or any of their respective designees for receipt of Reorganized Common Equity will be required to execute and deliver the A&R LLC Agreement.  For the avoidance of doubt, any Entity's or Person's receipt of Reorganized Common Equity under, or as contemplated by, the Plan (including pursuant to the Rights Offering or pursuant to the Backstop Commitment Letter) shall be deemed as its agreement to the A&R LLC Agreement, and such Entities and Persons shall be deemed signatories to the A&R LLC Agreement without further action required on their part (solely in their capacity as members of New TopCo).  The A&R LLC Agreement will be effective as of the Effective Date and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of Reorganized Common Equity will be bound thereby in all respects even if such holder has not actually executed and delivered a counterpart thereof.  On the Effective Date, pursuant to the terms of the A&R LLC Agreement, each unit of Reorganized Common Equity that is received by each Entity or Person under, or as contemplated by, the Plan (including pursuant to the Rights Offering or pursuant to the Backstop Commitment Letter) shall be converted into one (1) Class A Unit (as defined in the A&R LLC Agreement).

## 2.21   Exemption from Certain Transfer Taxes and Recording Fees.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, delivery, transfer, or exchange of any debt, securities, or other interest in the Debtors, the Reorganized Debtors, or New TopCo; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of indebtedness (including indebtedness under the New First Lien Facility and/or the New Take-Back Debt Facility) by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale, assignments, or other instrument of transfer in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any Stamp or Similar Tax or governmental assessment, and the Confirmation Order shall direct the appropriate federal, state, or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation

any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

**2.22    Managers, Directors and Officers of the Reorganized Debtors.**

The members of the New Board shall consist of a number of members determined by the Required Consenting First Lien Lenders in their sole discretion, which shall consist of the chief executive officer of Reorganized Output Services Group and other members appointed in a manner determined by the Required Consenting First Lien Lenders in their sole discretion and set forth in the A&R LLC Agreement.  Except to the extent that a member of the board of directors or board of managers, or the sole manager, as applicable, of a Debtor is designated in the Plan Supplement to serve as a director, manager, or sole manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or board of managers, or the sole manager, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date, and each such director, manager, or sole manager shall be deemed to have resigned or shall otherwise cease to be a director, manager, or sole manager of the applicable Debtor on the Effective Date.  Each of the directors, managers, sole managers and officers of each of the Reorganized Debtors and New TopCo shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor or New TopCo, as applicable, and may be designated, replaced, or removed in accordance with such New Organizational Documents.

**2.23    Management Incentive Plan.**

Within 90 days after the Effective Date, the New Board shall adopt the Management Incentive Plan, which shall provide for equity and equity-based grants ("*Awards*") in favor of certain directors, managers, officers and employees of the Reorganized Debtors and New TopCo and certain other eligible participants.  The form of the Awards (*i.e.*, options, restricted stock or units, appreciation rights, etc.), the participants in the Management Incentive Plan, the allocations of the Awards to such participants (including the amount of allocations and the timing of the grant of the Awards), and the terms and conditions of the Awards (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the New Board in its sole discretion.

**2.24    Liquidating Trust.**

(a)    Creation and Governance of the Liquidating Trust.   On the Effective Date, (i) the Debtors shall irrevocably transfer all of their rights, title and interest in all of the Liquidating Trust Assets to the Liquidating Trust and (ii) the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and take all steps necessary to establish the Liquidating Trust in accordance with the Plan and the beneficial interests therein.  In accordance with section 1141 of the Bankruptcy Code, the Liquidating Trust Assets shall automatically vest in the Liquidating Trust without further action by any Person or Entity, free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other Stamp or Similar Tax.  In the event of any conflict between the terms of the Plan and the

terms of the Liquidating Trust Agreement, the terms of the Plan shall govern. Upon completion of the transfer of the Liquidating Trust Assets to the Liquidating Trust, neither the Debtors nor the Reorganized Debtors shall have any further interest in the Liquating Trust Assets or the Liquidating Trust. The Liquidating Trustee shall be the exclusive administrator of the Liquidating Trust Assets. The Liquidating Trust shall be governed by the Liquidating Trust Agreement and administered by the Liquidating Trustee. The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement, among other things, take the actions set forth in Section 4.21 of the Plan. The Liquidating Trustee shall hold and distribute the Liquidating Trust Assets and any proceeds thereof in accordance with the provisions of the Plan and the Liquidating Trust Agreement. Other rights and duties of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement.

(b)     <u>Liquidating Trustee and Liquidating Trust Agreement</u>. The Liquidating Trust Agreement generally will provide for, among other things: (i) the irrevocable transfer of all of the Debtors' rights, title and interest in all of the Liquidating Trust Assets to the Liquidating Trust; (ii) the payment of certain reasonable expenses of the Liquidating Trust solely from the Liquidating Trust Assets; and (iii) distributions under the Plan to Holders of Allowed Other General Unsecured Claims as provided in the Plan and in the Liquidating Trust Agreement. The Liquidating Trust Agreement may include reasonable and customary provisions that allow for the limitation of liability of the Liquidating Trustee and its professionals, agents, and advisors, among others, and for indemnification of such Persons by the Liquidating Trust. Any such indemnification shall be the sole responsibility of the Liquidating Trust and payable solely from the Liquidating Trust Assets. The Liquidating Trustee shall be responsible for all decisions and duties with respect to the Liquidating Trust and the Liquidating Trust Assets, except as otherwise provided in the Liquidating Trust Agreement.

(c)     <u>Tax Treatment</u>. In furtherance of Section 4.21 of the Plan, other than with respect to Liquidating Trust Assets that are subject to potential disputed claims of ownership or uncertain distributions (if any), (i) the Liquidating Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d) and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the IRC with the Liquidating Trust Beneficiaries treated as the grantors and owners of the Liquidating Trust; (ii) the sole purpose of the Liquidating Trust shall be the liquidation and distribution of the Liquidating Trust Assets in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including the Debtors, the Reorganized Debtors, the Liquidating Trust Beneficiaries, and the Liquidating Trustee) shall report consistently with such treatment (including the deemed receipt of the underlying assets, subject to applicable liabilities and obligations, by the holders of Allowed Claims, as applicable, followed by the deemed transfer of such assets to the Liquidating Trust); (iv) all parties shall report consistently with the valuation of the Liquidating Trust Assets transferred to the Liquidating Trust as determined by the Liquidating Trustee (or its designee); (v) the Liquidating Trustee shall be responsible for filing returns for the Liquidating Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and (vi) the trustee of the Liquidating Trust shall annually send to each holder of an interest in the Liquidating Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.

(d)      Dissolution of the Liquidating Trust. The Liquidating Trustee and the Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) the Bidco Divestiture is effectuated and (ii) all distributions required to be made by the Liquidating Trustee under the Plan have been made.  Upon dissolution of the Liquidating Trust: any remaining Liquidating Trust Assets shall be distributed to the Liquidating Trust Beneficiaries in accordance with the Liquidating Trust Agreement.

(e)      No Obligations or Liabilities.  On the Effective Date, none of the Debtors, the Reorganized Debtors or New TopCo, any of their respective Affiliates, or any of their respective officers, directors, managers or employees shall have any obligations or liabilities with respect to, or other responsibilities for, directly, indirectly or contingently, any of the debts, liabilities or other obligations of OSG Bidco or any of its subsidiaries, or arising under, or relating to, any of their respective Equity Interests, assets, contracts, benefit plans, businesses or operations, whether accrued or fixed, known or unknown, absolute or contingent, matured or unmatured, or determined or determinable, including any debts, liabilities or other obligations of OSG Bidco or any of its subsidiaries arising under, or relating to, the Communisis Pension Plan or any debts, liabilities or other obligations under the Specified Guarantee.

## 2.25    Effectuating Documents; Further Transactions.

Prior to, on, and after the Effective Date, the Debtors, Reorganized Debtors, New TopCo, and the Liquidating Trustee and the directors, managers, officers, authorized Persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the Restructuring Support Agreement, the DIP Facility Documents, the New First Lien Documents, the New Take-Back Debt Documents, the Optional ABL Facility Documents (if applicable), the New Organizational Documents, the Separation Agreement, and any securities issued and or/delivered under or as contemplated by the Plan in the name of and on behalf of the Reorganized Debtors and/or New TopCo, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

## 2.26    Restructuring Expenses.

Subject to the terms of section 7.04 of the Restructuring Support Agreement, the Restructuring Expenses shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to the terms of the Restructuring Support Agreement (including any exhibits thereto) without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date

and such estimates shall be delivered to the Debtors at least two Business Days before the anticipated Effective Date (or such other period as the Debtors and the Required Consenting Stakeholders may agree). On or as soon as reasonably practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, subject to the terms of section 7.04 of the Restructuring Support Agreement, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation, enforcement, and defense of the Plan whether incurred before, on, or after the Effective Date.

The Consenting First Lien Lenders have expended, and will continue to expend, considerable time, effort and expense in connection with the negotiation of the Restructuring Transactions, and the Restructuring Transactions provide substantial value to, are beneficial to, and are necessary to preserve, the Debtors, and the Consenting First Lien Lenders have made a substantial contribution to the Debtors and the Restructuring Transactions. If and to the extent not previously reimbursed or paid pursuant to the terms of and in connection with section 7.04 of the Restructuring Support Agreement and Section 4.23 of the Plan, the Debtors shall reimburse or pay (as the case may be) all Restructuring Expenses pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise. The Restructuring Expenses accrued after the Petition Date are entitled to treatment as, and the Debtors shall seek treatment of such Restructuring Expenses as, Allowed Administrative Claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

## 2.27   Retained Causes of Action.

Unless any Causes of Action or Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the DIP Orders, or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action or Claims in the ordinary course, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action and Claims shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such retained Causes of Action or Claims, and may exercise any and all rights in connection therewith. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Section 4.24 of the Plan include any Claim or Cause of Action with respect to, or against, a Released Party.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**

**2.28    Discharge of Claims and Termination of Interests;**
<u>**Compromise and Settlement of Claims, Interests, and Controversies**</u>.

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Interests and Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their properties, including property of the Estates, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest is Allowed; or (c) the Holder of such Claim or Interest has accepted or rejected, or been deemed to accept or reject, the Plan. Except as otherwise provided in the Plan, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

**2.29    <u>Release, Injunction, and Related Provisions</u>.**

**a.    <u>Releases</u>.**

(f)    ***<u>RELEASES BY THE DEBTORS</u>*. TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, OTHER THAN IN THE CASE OF WILLFUL MISCONDUCT OR ACTUAL FRAUD (BUT NOT, FOR THE AVOIDANCE OF DOUBT, AVOIDANCE ACTIONS), EACH OF THE DEBTORS, THE REORGANIZED DEBTORS AND THEIR ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES, AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CAUSE OF ACTION, DIRECTLY OR DERIVATIVELY, BY, THROUGH, FOR, OR BECAUSE OF THE FOREGOING ENTITIES, SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED EACH RELEASED PARTY FROM ANY AND ALL CLAIMS, INTERESTS, DAMAGES, REMEDIES, CAUSES OF ACTION, DEMANDS, RIGHTS, DEBTS, ACTIONS, SUITS, OBLIGATIONS, LIABILITIES, ACCOUNTS, DEFENSES, OFFSETS, POWERS, PRIVILEGES, LICENSES, LIENS, INDEMNITIES, GUARANTIES, AND FRANCHISES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER EXISTING, CONTINGENT OR NON-CONTINGENT, LIQUIDATED OR

UNLIQUIDATED, SECURED OR UNSECURED, ASSERTED OR ASSERTABLE, DIRECT OR DERIVATIVE, MATURED OR UNMATURED, SUSPECTED OR UNSUSPECTED, IN CONTRACT, TORT, LAW, EQUITY, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, NEW TOPCO, OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE COMPANY (INCLUDING THE CAPITAL STRUCTURE, MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE CONSENTING FUNDS, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS OR BOARD OF MANAGERS, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE REORGANIZED DEBTORS OR NEW TOPCO, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN OR AMONG ANY OF THE DEBTORS AND ANY RELEASED PARTY, THE OWNERSHIP OR OPERATION OF THE DEBTORS BY ANY RELEASED PARTY, THE DISTRIBUTION OF ANY CASH OR OTHER PROPERTY OF THE DEBTORS TO ANY RELEASED PARTY, THE ASSERTION OR ENFORCEMENT OF RIGHTS OR REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), INTERCOMPANY TRANSACTIONS (OTHER THAN ANY INTERCOMPANY CLAIMS THAT HAVE BEEN REINSTATED AS CONTEMPLATED IN THE PLAN), THE RESTRUCTURING TRANSACTIONS, ENTRY INTO THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, ENTRY INTO, OR FILING OF, AS APPLICABLE, THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE DIP FACILITY DOCUMENTS, THE DEFINITIVE DOCUMENTS, OR ANY OTHER DOCUMENTS (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) RELATING TO ANY OF THE FOREGOING, CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE DIP FACILITY DOCUMENTS OR THE DEFINITIVE DOCUMENTS, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN ANY OBLIGATIONS OF ANY RELEASED PARTY ARISING UNDER THE PLAN, ANY

DEFINITIVE DOCUMENTS, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE CHAPTER 11 CASES.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE (A) CONSENSUAL; (B) ESSENTIAL TO CONFIRMATION OF THE PLAN; (C) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASES; (E) IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES, AND ALL HOLDERS OF CLAIMS AND INTERESTS; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE DEBTORS, REORGANIZED DEBTORS OR NEW TOPCO OR THEIR RESPECTIVE ESTATES ASSERTING ANY CLAIM, CAUSE OF ACTION, OR LIABILITY RELEASED BY THE DEBTOR RELEASES.

(g)     ***RELEASES BY THE RELEASING PARTIES.***  TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, OTHER THAN IN THE CASE OF WILLFUL MISCONDUCT OR ACTUAL FRAUD (BUT NOT, FOR THE AVOIDANCE OF DOUBT, AVOIDANCE ACTIONS), EACH OF THE RELEASING PARTIES SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, NEW TOPCO, AND EACH OTHER RELEASED PARTY FROM ANY AND ALL CLAIMS, INTERESTS, DAMAGES, REMEDIES, CAUSES OF ACTION, DEMANDS, RIGHTS, DEBTS, ACTIONS, SUITS, OBLIGATIONS, LIABILITIES, ACCOUNTS, DEFENSES, OFFSETS, POWERS, PRIVILEGES, LICENSES, LIENS, INDEMNITIES, GUARANTIES, AND FRANCHISES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER EXISTING, CONTINGENT OR NON-CONTINGENT, LIQUIDATED OR UNLIQUIDATED, SECURED OR UNSECURED, ASSERTED OR ASSERTABLE, DIRECT OR DERIVATIVE, MATURED OR UNMATURED, SUSPECTED OR UNSUSPECTED, IN CONTRACT, TORT, LAW, EQUITY, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, NEW TOPCO, EACH OTHER RELEASING PARTY OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE COMPANY (INCLUDING THE CAPITAL STRUCTURE, MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE CONSENTING FUNDS, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS OR BOARD OF MANAGERS, THE PURCHASE, SALE, OR

RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE REORGANIZED DEBTORS OR NEW TOPCO, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN OR AMONG ANY OF THE DEBTORS AND ANY RELEASED PARTY, THE OWNERSHIP OR OPERATION OF THE DEBTORS BY ANY RELEASED PARTY, THE DISTRIBUTION OF ANY CASH OR OTHER PROPERTY OF THE DEBTORS TO ANY RELEASED PARTY, THE ASSERTION OR ENFORCEMENT OF RIGHTS OR REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), INTERCOMPANY TRANSACTIONS (OTHER THAN ANY INTERCOMPANY CLAIMS THAT HAVE BEEN REINSTATED AS CONTEMPLATED IN THE PLAN), THE RESTRUCTURING TRANSACTIONS, ENTRY INTO THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, ENTRY INTO, OR FILING OF, AS APPLICABLE, THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE DIP FACILITY DOCUMENTS, THE DEFINITIVE DOCUMENTS, OR ANY OTHER DOCUMENTS (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) RELATING TO ANY OF THE FOREGOING, CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE DIP FACILITY DOCUMENTS, OR THE DEFINITIVE DOCUMENTS, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN ANY OBLIGATIONS OF ANY RELEASED PARTY ARISING UNDER THE PLAN, ANY DEFINITIVE DOCUMENTS, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE CHAPTER 11 CASES.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASES ARE (A) CONSENSUAL; (B) ESSENTIAL TO CONFIRMATION OF THE PLAN; (C) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASES; (E) IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES, AND ALL HOLDERS OF CLAIMS AND INTERESTS; (F) FAIR,

EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM, CAUSE OF ACTION, OR LIABILITY RELEASED PURSUANT TO THE THIRD-PARTY RELEASES.

   b.   <u>Exculpation and Limitation of Liability</u>.

   (h)   **UPON AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE DEBTORS AND NEW TOPCO, AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, INVESTMENT BANKERS, FINANCIAL ADVISORS, RESTRUCTURING CONSULTANTS, OTHER PROFESSIONAL ADVISORS AND AGENTS, SHALL BE DEEMED TO HAVE SOLICITED ACCEPTANCES OF THE PLAN IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING SECTION 1125(E) OF THE BANKRUPTCY CODE.**

   (i)   **EXCEPT WITH RESPECT TO ANY WILLFUL MISCONDUCT OR FRAUD AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION, AND ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, TO THE FULLEST EXTENT PERMITTED BY LAW, THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY AND ALL CLAIMS AND CAUSES OF ACTION ARISING ON OR AFTER THE PETITION DATE AND ANY AND ALL CAUSES OF ACTION RELATING TO ANY ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, SOLICITING, CONFIRMING, CONSUMMATING, ENTRY INTO, OR FILING OF, AS APPLICABLE, THE PLAN, INCLUDING THE ISSUANCE OR DELIVERY OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, THE PLAN SUPPLEMENT, THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THE DISCLOSURE STATEMENT ORDER, THE DIP FACILITY DOCUMENTS, THE CONFIRMATION ORDER, THE OPT-OUT FORM, SUCH OTHER MOTIONS, ORDERS, AGREEMENTS, AND DOCUMENTATION NECESSARY OR DESIRABLE TO CONSUMMATE AND DOCUMENT THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO AND THE PLAN, ALL OTHER FINANCING DOCUMENTS NEEDED TO EFFECTUATE THE RESTRUCTURING TRANSACTIONS, ALL OTHER MATERIAL CUSTOMARY DOCUMENTS DELIVERED IN CONNECTION WITH TRANSACTIONS OF THIS TYPE (INCLUDING, WITHOUT LIMITATION, ANY AND ALL OTHER DOCUMENTS, IMPLEMENTING, ACHIEVING, CONTEMPLATED BY, OR RELATED TO THE RESTRUCTURING TRANSACTIONS), ANY OTHER DOCUMENTS (INCLUDING ANY LEGAL OPINION IN EFFECT PRIOR TO THE EFFECTIVE DATE THAT WAS REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION,**

CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) RELATED TO ANY OF THE FOREGOING, CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR THE DIP FACILITY DOCUMENTS, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, ANY TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE DEBTORS, THE DEBTORS' BUSINESS OR CAPITAL STRUCTURE, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, OR ANY MATTERS RELATED THERETO, IN EACH CASE ARISING ON OR PRIOR TO THE EFFECTIVE DATE.

THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION, SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING WITH REGARD TO THE NEW ORGANIZATIONAL DOCUMENTS (INCLUDING THE A&R LLC AGREEMENT), THE RIGHTS OFFERING DOCUMENTS, THE NEW FIRST LIEN DOCUMENTS, THE NEW TAKE-BACK DEBT DOCUMENTS, THE LIQUIDATING TRUST AGREEMENT, THE SEPARATION AGREEMENT, AND THE BACKSTOP COMMITMENT LETTER AND DELIVERY OF REORGANIZED COMMON EQUITY, PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT AND SHALL NOT BE LIABLE AT ANY TIME FOR THE VIOLATIONS OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH CONTRIBUTIONS OR DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

    c. <u>Injunction</u>.

EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES THAT HOLD, HAVE HELD, OR MAY HOLD A CLAIM OR ANY OTHER OBLIGATION, SUIT, JUDGMENT, DAMAGES, DEBT, RIGHT, REMEDY, CAUSE OF ACTION, OR LIABILITY OF ANY NATURE WHATSOEVER, OF THE TYPES DESCRIBED IN SECTION 9.3(B) OF THE PLAN AND RELATING TO THE DEBTORS, THE REORGANIZED DEBTORS, NEW TOPCO OR ANY OF THEIR RESPECTIVE ASSETS AND PROPERTY AND/OR THE ESTATES, THE CHAPTER 11 CASES, THE PLAN, THE PLAN SUPPLEMENT, AND/OR THE DISCLOSURE STATEMENT ARE, AND SHALL BE, PERMANENTLY, FOREVER AND COMPLETELY STAYED, RESTRAINED, PROHIBITED, BARRED AND ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST ANY RELEASED PARTY OR ITS PROPERTY ON ACCOUNT OF SUCH RELEASED LIABILITIES, WHETHER DIRECTLY OR INDIRECTLY, DERIVATIVELY OR OTHERWISE, ON ACCOUNT OF OR BASED ON

THE SUBJECT MATTER OF SUCH DISCHARGED CLAIMS OR OTHER OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION OR LIABILITIES: (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING (INCLUDING, WITHOUT LIMITATION, ANY JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER PROCEEDING) IN ANY FORUM; (II) ENFORCING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR IN ANY WAY SEEKING TO RECOVER ANY JUDGMENT, AWARD, DECREE, OR OTHER ORDER; (III) CREATING, PERFECTING, OR IN ANY WAY ENFORCING IN ANY MATTER, DIRECTLY OR INDIRECTLY, ANY LIEN; (IV) SETTING OFF, SEEKING REIMBURSEMENT OR CONTRIBUTIONS FROM, OR SUBROGATION AGAINST, OR OTHERWISE RECOUPING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY AMOUNT AGAINST ANY LIABILITY OR OBLIGATION THAT IS DISCHARGED UNDER SECTION 9.2 OF THE PLAN; AND/OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY JUDICIAL, ARBITRATION OR ADMINISTRATIVE PROCEEDING IN ANY FORUM, THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN OR THE CONFIRMATION ORDER.

EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES THAT HOLD, HAVE HELD, OR MAY HOLD A CLAIM OR ANY OTHER OBLIGATION, SUIT, JUDGMENT, DAMAGES, DEBT, RIGHT, REMEDY, CAUSE OF ACTION, OR LIABILITY OF ANY NATURE WHATSOEVER, OF THE TYPES DESCRIBED IN SECTION 9.4 OF THE PLAN AND RELATING TO THE DEBTORS, THE REORGANIZED DEBTORS, NEW TOPCO OR ANY OF THEIR RESPECTIVE ASSETS AND PROPERTY AND/OR THE ESTATES, ARE, AND SHALL BE, PERMANENTLY, FOREVER AND COMPLETELY STAYED, RESTRAINED, PROHIBITED, BARRED, AND ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST ANY EXCULPATED PARTY OR ITS PROPERTY ON ACCOUNT OF SUCH RELEASED LIABILITIES, WHETHER DIRECTLY OR INDIRECTLY, DERIVATIVELY OR OTHERWISE, ON ACCOUNT OF OR BASED ON THE SUBJECT MATTER OF SUCH DISCHARGED CLAIMS OR OTHER OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, OR LIABILITIES: (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING (INCLUDING, WITHOUT LIMITATION, ANY JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER PROCEEDING) IN ANY FORUM; (II) ENFORCING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR IN ANY WAY SEEKING TO RECOVER ANY JUDGMENT, AWARD, DECREE, OR OTHER ORDER; (III) CREATING, PERFECTING, OR IN ANY WAY ENFORCING IN ANY MATTER, DIRECTLY OR INDIRECTLY, ANY LIEN; (IV) SETTING OFF, SEEKING REIMBURSEMENT OR CONTRIBUTIONS FROM, OR SUBROGATION AGAINST, OR OTHERWISE RECOUPING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY AMOUNT

**AGAINST ANY LIABILITY OR OBLIGATION THAT IS DISCHARGED UNDER SECTION 9.2 OF THE PLAN; AND/OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY JUDICIAL, ARBITRATION OR ADMINISTRATIVE PROCEEDING IN ANY FORUM, THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN OR THE CONFIRMATION ORDER.**

## ARTICLE III

### VOTING PROCEDURES AND REQUIREMENTS

**3.1**    **Classes Entitled to Vote on the Plan.**

The following Classes are entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim or Interest | Status |
|:---:|:---:|:---:|
| 3 | Existing First Lien Claims | Impaired |
| 6 | Other General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote with respect to the Plan and you will not receive Solicitation Materials (as defined below).  If you are a Holder of a Claim in the Voting Classes, you should read your ballot(s) and carefully follow the instructions included therein. Please use only the ballot(s) that accompany the applicable Solicitation Materials, if any, or the ballot(s) that the Debtors, or Kurtzman Carson Consultants LLC (the "Solicitation Agent"), on behalf of the Debtors, otherwise provided to you.

**3.2**    **Votes Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the Allowed Claims or Interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half (1/2) in number of total allowed claims that have voted and an affirmative vote of at least two-thirds (2/3) in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

**3.3**     **Certain Factors to Be Considered Prior to Voting.**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors will seek Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims or Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in the Voting Classes pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Certain Factors to Be Considered" described in Article VI of this Disclosure Statement.

**3.4**     **Classes Not Entitled To Vote on the Plan.**

Under the Bankruptcy Code, Holders of Claims and Interests are not entitled to vote if their contractual rights are Unimpaired by the proposed Plan or if they will receive no property under the Plan. Accordingly, the following Classes of Claims against and Interests in the Debtors are ***not entitled to*** vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| 2 | Other Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| 4 | General Unsecured Trade Claims | Unimpaired | No (conclusively presumed to accept) |
| 5 | General Unsecured Litigation Claims | Unimpaired | No (conclusively presumed to accept) |
| 7 | Intercompany Claims | Unimpaired/Impaired | No (conclusively presumed to accept or deemed to reject) |
| 8 | Existing Interests | Impaired | No (deemed to reject) |
| 9 | Intercompany Interests | Unimpaired/Impaired | No (conclusively presumed to accept or deemed to reject) |

**3.5**   **Solicitation Procedures.**

    **a.**   **Solicitation Agent.**

    The Debtors have retained Kurtzman Carson Consultants LLC to act as, among other things, the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

    **b.**   **Solicitation Materials.**

    The following materials constitute the solicitation materials (collectively, the "Solicitation Materials") distributed to Holders of Claims or Interests in the Voting Classes:

- a Ballot and applicable voting instructions; and

- this Disclosure Statement and all exhibits hereto, including the Plan.

c.  **Distribution of the Solicitation Materials**.

The Debtors caused the Solicitation Agent to distribute the Solicitation Materials to Holders of Claims or Interests in the Voting Classes on approximately October 13, 2023.

The Solicitation Materials (except the Ballots) may also be obtained from the Solicitation Agent by: (i) calling the Solicitation Agent at (866) 479-8211 (domestic toll-free) or (781) 575-2037 (international toll) or (ii) emailing OutputServicesGroupinfo@kccllc.com and referencing "OSG Holdings" in the subject line. After the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://www.kccllc.net/OSG, or for a fee via PACER at https://www.pacer.gov/.

**3.6**   **Voting Procedures**.

October 10, 2023 at 4:00 p.m. prevailing Central Time (the "<u>Voting Record Date</u>") is the date that was used for determining which Holders of Claims and Interests are entitled to vote to accept or reject the Plan and receive the Solicitation Materials in accordance with the solicitation procedures.

In order for the Holder of a Claim in the Voting Class to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and submitted via the e-balloting portal ballot at https://kccllc.net/OSG or via first class mail, overnight courier, or hand delivery at OSG Ballot Processing, c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, California 90245, so that such Holder's ballot is <u>actually received</u> by the Solicitation Agent <u>on or before the voting deadline (the "Voting Deadline"), which is November 13, 2023 at 4:00 p.m. (prevailing Central Time).</u>

You may receive more than one Ballot if you hold Claims or Interests through one or more affiliated funds, in which case the vote cast by each such affiliated fund will be counted separately. Separate Claims or Interests held by affiliated funds in a particular Class shall not be aggregated, and the vote of each such affiliated fund related to its Claims or Interests shall be treated as a separate vote to accept or reject the Plan, as applicable. If you hold any portion of a single Claim or Interest, you and all other Holders of any portion of such Claim or Interest will be (a) treated as a single creditor or equity holder for voting purposes and (b) required to vote every portion of such Claim or Interest collectively to either accept or reject the Plan.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE OR AS ORDERED BY THE BANKRUPTCY COURT.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR INTEREST BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM OR INTEREST IN CLASS 3 OR CLASS 6 MUST VOTE ALL OF ITS CLASS 3 OR CLASS 6 CLAIMS OR INTERESTS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.   BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM OR INTEREST HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS OR INTERESTS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM OR INTEREST AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR INTEREST IN A VOTING CLASS FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.   NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

**EXCEPT AS OTHERWISE SPECIFIED HEREIN OR AS MAY BE COMMUNICATED BY THE DEBTORS, THE SOLICITATION OF VOTES ON THE PLAN WITH RESPECT TO THE CLASS 3 AND CLASS 6 CLAIMS OR INTERESTS, AS APPLICABLE, IS BEING MADE PURSUANT TO EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, INCLUDING PURSUANT TO SECTION 4(A)(2) THEREOF, AND APPLICABLE UNITED STATES STATE SECURITIES LAWS, AND ONLY FROM HOLDERS OF SUCH CLAIMS WHO ARE ACCREDITED INVESTORS OR QIBs.**

## ARTICLE IV

## CORPORATE AND CAPITAL STRUCTURE

**4.1**     **Prepetition Corporate and Capital Structure.**

**a.**   **Corporate Structure.**

An organizational chart illustrating the corporate structure of the Debtors and their non-Debtor affiliates is annexed hereto as **Exhibit F**.

**b.**   **The Debtors' Capital Structure.**

**(1)**     **Existing First Lien Facility.**

The Amended and Restated First Lien Credit Agreement, dated as of August 31, 2022 (as amended, restated, supplemented, amended and restated or otherwise modified from time to time, the "Existing First Lien Credit Agreement"), governs both a senior secured term loan credit facility (as amended, restated, supplemented, amended and restated or otherwise modified from

time to time, the "<u>Existing First Lien Facility</u>" and the loans issued thereunder, the "<u>Existing First Lien Loans</u>") and senior secured revolving credit facility (the "<u>Existing First Lien Revolving Facility</u>" and the loans issued thereunder the "<u>Existing First Lien Revolver Loans</u>").  The Existing First Lien Facility and the Existing First Lien Revolving Facility are *pari passu* with respect to collateral.  Output Services Group is the borrower under the Existing First Lien Credit Agreement and each of the Debtors other than E-statement.com Corporation, Metrogroup PD-WI Acquisition, LLC, The Pisa Group, Inc., PPS Business Corporation, Telereach, Inc., and WhatCounts, Inc. is a guarantor under the Existing First Lien Facility.

### A.      Revolving Credit Facility.

The Existing First Lien Revolving Facility was originally issued in an aggregate principal amount of approximately $20 million.  The Existing First Lien Revolving Facility has a maturity date of June 27, 2025.  Interest on the Existing First Lien Revolving Facility accrues at SOFR plus an applicable margin of 5.00%.  As of the Petition Date, approximately $20 million in principal amount and approximately $1.3 million in accrued interest remain outstanding on the Existing First Lien Revolving Facility.

### B.      Existing First Lien Term Loans.

The Existing First Lien Loans were originally issued in an aggregate principal amount of $600 million, which was comprised of a term loan A tranche of approximately $370 million, a term loan B tranche of approximately $180 million, and a term GBP loan tranche of approximately £40 million.

Interest on the Existing First Lien Term Loans accrues at SOFR / SONIA plus an applicable margin of 5.25–5.75%.  As of the Petition Date and subject to foreign exchange rates, approximately $648.6 million remains outstanding on the Existing First Lien Term Loans, inclusive of the aggregate principal amount, accrued interest, and other fees outstanding on the Existing First Lien Term Loans.  The Existing First Lien Term Loans have a maturity date of June 27, 2026.

### (2)     Prepetition Liens, Prepetition Collateral, and United Kingdom Specified Guarantee.

### A.      Output Services Group and OSG Holdings, Inc.

Output Services Group's and Holdings' (each, a "<u>Funded Debt Grantor</u>" and together, the "<u>Funded Debt Grantors</u>") obligations under the Existing First Lien Credit Agreement are secured (a) by a continuing first-priority lien and security interest in and Lien[8] on each of the Grantor's[9] right, title and interest in and to substantially all of the property and assets of such

---

[8]     As defined in that certain Amended and Restated First Lien Security Agreement, dated as of August 31, 2022 (as amended, restated, supplemented, amended and restated or otherwise modified from time to time, the "<u>First Lien Security Agreement</u>").

[9]     As defined in the First Lien Security Agreement.

Grantor, and the proceeds thereof, whether now owned or existing or hereafter acquired or arising, regardless of where located; (b) by a grant to the Existing First Lien Agent for the benefit of itself and the other prepetition secured parties, of all of Holdings' presently existing or hereafter acquired right, title and interest in and to the Trademarks[10] and all proceeds and products thereof; (c) by a grant to the Existing First Lien Agent for the benefit of themselves and the other prepetition secured parties, of all of Holdings' presently existing or hereafter acquired right, title and interest in and to the Copyrights[11] and all proceeds and products thereof; and (d) by the Grantors' pledge, assignment, hypothecation, transfer, delivery, and grant to the Existing First Lien Agent, for the benefit of themselves and the other prepetition secured parties, of a lien on and security interest in the Pledged Collateral,[12] whether now existing or hereafter acquired, and whether consisting of investment property, accounts, payment intangibles or other general intangibles, or proceeds of any of the foregoing.

As of the Petition Date, the prepetition secured parties' security interests in the Debtors' material deposit accounts were perfected pursuant to the First Lien Security Agreement and certain deposit account control agreements.

## B.     Specified Guarantee.

On September 17, 2019, Output Services Group entered into the Specified Guarantee, which provides an unsecured guarantee for the obligations under the Communisis Pension Plan, pursuant to the terms and conditions therein, in the event that the sponsoring employers of the Communisis Pension Plan fail to make their required contributions to the Communisis Pension Plan. As of the Petition Date, no claims have been made on the Specified Guarantee as the sponsoring employers to the Communisis Pension Plan have made all required contributions to the Communisis Pension Plan.

### (3)     Interests in OSG Holdings, Inc.

As of the Petition Date, OSG Holdings, Inc. is wholly owned by OSG Intermediate Holdings, Inc.  An organizational chart illustrating the corporate structure of the Debtors and their non-Debtor affiliates is annexed hereto as **Exhibit F**.

## ARTICLE V

## CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES

The need to commence these Chapter 11 Cases arose from a number of factors, including persistent negative industry trends, increasing costs to the Debtors' businesses during its

---

[10]   As defined in that certain First Lien Trademark Security Agreement, dated as of March 27, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

[11]   As defined in that certain First Lien Copyright Security Agreement, dated as of March 27, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

[12]   As defined in the First Lien Security Agreement.

operational transitional to digital platforms, negative customer reactions to the Debtors' 2022 Chapter 11 Cases, and business integration challenges. Exacerbating the negative impacts from these factors on the business was an unsustainable capital structure and decreased operational flexibility to optimally manage the business, all of which culminated in elevated strain on the organization.

In an attempt to preserve and maximize value, in early 2023, the Debtors began implementing alterations to the business plan to ensure that the Company operates at an optimal level. However, due to the Debtors' burdensome capital structure, the Debtors have been unable to fully execute all phases of their multi-year business transformation plan. Delayed execution of the strategic business plan has limited the Debtors' ability to continue to offset industry changes and the overall decline in the industry has negatively impacted revenues.

**5.1     Challenges Facing the Debtors' Businesses and Efforts to Address Challenges.**

 **a.  Persistent Negative Industry Trends.**

Macroeconomic factors, including the introduction of new e-commerce, digital substitution for products, and other technologies, are transforming the industry. Traditional direct mail and print and mail industries have faced long-term structural decline as dependency on digital technology has increased and demand for paper-based billing products has decreased. Indeed, a key component to the Company's businesses, the North American paper industry, began to substantially contract in the mid-2000's, resulting in the closure of paper mills throughout the country. As the global economy becomes increasingly dependent on digital technology products, and as consumer preferences evolve from physical to digital, spending on traditional monthly billing and statements communications, advertising, and noticing circulation has eroded. These trends have led to an overall decline in the demand for paper products and in-turn lowered reliance on certain of the Debtors' legacy businesses. In addition, there is generally a decline in the supply of paper products in the industry, such that only a handful of paper mills control the majority of the paper supply. As a result, paper mills and other vendors that sell paper products have a large amount of leverage over their customers, including the Debtors. Specifically, due to the consolidation of the envelope suppliers in the industry, only one vendor has the available capacity to supply the envelope volume required for the Debtors to continue their operations. The roll stock required to produce the paper statements is dominated by one supplier in North America with only one other smaller option offshore creating logistics issues. Similarly, comingling of statements provides the customers with postal savings and without the predominate supplier, postal costs would likely significantly increase by approximately 5% or more.

Because of the overall decrease in demand for paper products, the Debtors and their competitors continue to operate under a highly competitive pricing environment, in which customers (most of which rely on paper products, envelopes, and specialty mailing stock) focus on reducing costs in order to preserve operating margins. Competition is based largely on price, quality, and the ability to service the special requirements of customers. Reacting to these headwinds and industry trends, the Debtors have, in the past, acquired other businesses in their industry to seek economies of scale, broaden customer relationships, geographic coverage, and product breadth to consolidate industry capacity and address pricing pressures.

### b. Historical Lack of Investment and Focus on the Core Print Mail Operations.

As described above, upon emergence from the 2022 Chapter 11 cases in August of 2022, at the direction of the newly appointed board of managers of TopCo, the Management completed a strategic, operational, and financial assessment of the U.S. and U.K. businesses. Among other things, this assessment led to the conclusion that the core print mail outsourcing platform had suffered from historical neglect and lack of investment and that the existing executive leadership team lacked the requisite industry knowledge to address the issues inherent in the core print mail platform. As a result and as further discussed below, the Company onboarded a new management team comprised of industry veterans capable of addressing the issues in and capitalizing on the Company's core print mail business. The Company also determined to divest of certain non-core businesses.

### c. Impact of Excessive Leverage.

The existing level of leverage on the Debtors' balance sheet has had a significant negative impact on the Debtors' businesses. The Debtors provide mission critical services, including billing and payment processing, and any interruption in the Debtors' operations could cause severe consequences for their customers. Given the amount of debt on the Debtors' balance sheet, existing customers are increasingly concerned about the Debtors' viability and, as a result, are developing, and in some cases implementing, contingency plans to move to alternative service providers. In addition, certain critical suppliers are withholding trading terms and in some cases ceasing or threatening to cease continuation of supplying critical goods and services. Furthermore, the Debtors' ability to attract new customers has been negatively impacted by the excessive leverage as many prospective customers have expressed concerns about the Company's future viability.

### d. The 2022 Chapter 11 Cases.

Many of the Debtors' relationships with their customers were damaged when the Company commenced the 2022 Chapter 11 Cases. Though the 2022 Chapter 11 Cases were a positive step toward raising additional needed capital and a sign of confidence from investors who supported that process, the Company's former management team failed to develop a proactive messaging strategy in advance of filing the 2022 Chapter 11 Cases and, as a result, many of the Company's customers learned about the filing for the first time from third-parties, rather than the Company. Since then, the Debtors' current Management has retained competent communication consultants and developed a comprehensive and proactive customer outreach communication plan.

### e. Increase in Costs and Transition to Digital Operations.

The Debtors' core business is its traditional print and mail business. One of the Debtors' main capital expenditures is paper and envelopes. Over the last few years, the cost of paper and envelopes increased significantly. Moreover, the Debtors experienced cost pressures resulting from increased labor costs, materials, and other capital goods.

To modernize their businesses, the Debtors are in the process of digitizing their operations and are evaluating, rationalizing, and re-sizing their footprint in the printing space to ensure continued profitable operations despite an overall industry decline. As part of the transformation to more digital operations, in late 2022 the Debtors announced the introduction of their new omnichannel SaaS platform, a single integrated system that enables clients to interact with their full suite of solutions. The platform incentivizes existing clients' use of digital solutions through its functionality and enabled the Debtors to onboard new clients faster and realize revenue quicker.

### f. **Business Integration**.

Since its inception in 1992, and especially in the last ten years, the Company has been active in acquiring complementary businesses to strengthen its portfolio of services. These businesses all had different technology, billing software, and other operations and the Company experienced difficulty, exacerbated by the lack of investment capital, integrating these various systems into its existing platform. Further, with respect to certain acquired businesses, those businesses were run by founders and once the Debtors acquired those businesses and the founders left, the Debtors struggled to maintain business volume because the strong customer relationships and implicit knowledge of the businesses left with the founders.

### g. **United Kingdom Business Operations**.

The Company's operations in the U.K. include its Customer Experience and Brand Deployment business segments. Over the last several years, the Company has devoted significant resources to remediate Customer Experience's existing information technology platform, which has not resulted in any material improvement in its outlook. Furthermore, the performance of the Company's U.K. operations were below projections in 2022 and forward-looking projections for Customer Experience's profitability are poor. In addition, the Company projected that Customer Experience would need in excess of $35 million of additional investment in 2023 alone. In light of the poor outlook for Customer Experience, among other reasons, the Debtors determined to divest their businesses in the U.K., as further discussed below.

### 5.2 **The Debtors Efforts to Address Business Challenges**.

### a. **New Management**.

In January of 2023, the Company appointed Dean Cherry to serve as Chief Executive Officer. Mr. Cherry has over 35 years of experience in the print and mail and related industries and has a successful track record of growth, profitability, improving customer experience, and building a high-performing employee culture. In August of 2022, the Company appointed Brett Shroll to serve as Chief Financial Officer. Mr. Shroll has over 25 years of experience in finance, accounting, operations, and business development across a multitude of industries. The Debtors' new management team has extensive leadership experience and a deep familiarity with the Debtors' business operations.

b. **Post-2022 Chapter 11 Cases Restructuring Efforts.**

As noted above, after emergence from the 2022 Chapter 11 Cases, the Company began a comprehensive review of its business operations in the U.S. and the U.K. The Company identified multiple opportunities to refocus their operations in the U.S., including the sale of certain of the Company's non-core businesses and a renewed emphasis on its existing profitable products and services.

After its review of its U.K. operations, the Company pursued a sale of certain of their U.K. assets (which also comprise other overseas subsidiaries of the U.K. companies). The Company's businesses in the United Kingdom are generally divided into two divisions: Customer Experience and Brand Deployment. Brand Deployment (when viewed on a standalone basis) is a potentially profit-generating asset, but its cash flow is largely consumed with costs relating to remediation and stabilization of Customer Experience given various existing shared operational interdependencies, and intercompany indebtedness owed by Brand Deployment to Customer Experience. In addition, the revenue from United Kingdom assets was approximately $49 million below projections in 2022, and, as noted above, the Debtors projected that Customer Experience would need in excess of $35 million of additional investment in 2023 alone. Given the limited availability of capital needed to fully stabilize Customer Experience, the Company decided that divesting itself of the U.K. operations was in the best interest of their businesses and stakeholders.

c. **Sale of the United Kingdom Businesses and Release of the Pension Guarantee**.

(i)     *Bidco Divestiture.*

In early 2023, the Company began exploring the possibility of selling its businesses based in the United Kingdom, with an initial focus on divesting itself of Customer Experience and its obligations under the Specified Guarantee. Subsequently, the Company decided to make Brand Deployment available for sale, both with Customer Experience and on a stand-alone basis (the sale of Customer Experience and/or Brand Deployment referred to herein as the "UK Sale"). The Company sent solicitation materials to approximately 21 entities. Of the entities that received solicitation materials, 9 entities submitted non-binding letters of intent.

For the next several months, the Company, the prospective purchasers, and their advisors engaged in extensive arms'-length negotiations to reach a definitive agreement on terms for the U.K. Sale. By late August 2023, Communisis faced a near-term liquidity crisis and it became clear that the U.K. Sale would not be completed before Communisis needed an infusion of capital or to commence insolvency proceedings in the U.K. The Company immediately began discussions with certain of its customers in the U.K. to reach a funding agreement to support the Company's U.K. operations. On September 15, 2023, Communisis and certain of its U.K. customers executed a funding agreement for the provision of approximately £10 million in incremental unsecured financing through the end of October 2023. With sufficient funding in place to sustain operations in the near-term, the Company re-focused on achieving a sale of its U.K. businesses.

Despite extensive negotiations with several interested parties, a concrete agreement for the sale of Customer Experience and/or Brand Deployment has not yet materialized. The Company,

along with its advisors, continues to work with interested parties toward a definitive agreement for the sale of its U.K. assets.

(ii)  *Negotiations with the Pension Trustee and TPR.*

In connection with the U.K. Sale, the Company, in consultation with the ad hoc group of Existing First Lien Lenders represented by Paul Hastings LLP (the "Ad Hoc Group") also began discussions with the Pension Trustee[13] and the United Kingdom Pensions Regulator ("TPR") for a release of the Specified Guarantee in exchange for an assumption of the pension obligations, which would require the acceptance of the Pension Trustee, for the proceeds of the U.K. Sale.  As noted above, certain of the Company's assets in the U.K., including Customer Experience and Brand Deployment, are subject to Liens in favor of the Existing First Lien Lenders.   Therefore, absent an acceptable assumption by a purchaser, any agreement to release the Specified Guarantee in exchange for the U.K. Sale proceeds would be subject to the consent of the Ad Hoc Group, which was informed of, and provided input to, communications and negotiations between the Company, Pension Trustee, and TPR.   Accordingly, on June 16, 2023, the Company and its advisors met with the Pension Trustee to discuss the potential U.K. Sale and, on June 27, 2023, the Company began weekly update calls with TPR, the Pension Trustee, and their advisors to provide updates on, among other things, the U.K. Sale and the Company's restructuring efforts in the U.S.

In late August 2023, following several months of negotiations, it became clear that the Company, the Pension Trustee, and TPR were unlikely to reach an agreement that would receive the requisite support of the Ad Hoc Group, for the release of the Specified Guarantee in the near term.  And, critically, the Company's deteriorating liquidity position could not support further delaying a restructuring transaction.   The Ad Hoc Group continues to negotiate with the Pension Trustee and TPR and are hopeful that a resolution will be reached in the near term.

### d.  Sale of Non-Core Businesses.

On December 15, 2022, the Debtors executed a purchase agreement for the sale of substantially all of the equity interests in Formost Data Products, Inc.  Subsequently, on March 7, 2023, the Debtors sold substantially all of the assets of WhatCounts, Inc., Applied Information Group, Inc., and certain assets of DoublePositive Marketing Group, Inc. to Zeta Global Holdings Corporation and certain other assets of DoublePositive to All American Publishing, LLC.

These assets were all non-core to the Debtors' long-term strategy.  Furthermore, WhatCounts involved heavy customer and industry concentration risk, given that 40% of its annual revenues was attributable to one single customer.  Divesting these assets has allowed the Debtors

---

[13]  "Pension Trustee" means Communisis Trustee (2011) Company Limited in its capacity as sole trustee of the Communisis Pension Plan, together with any additional or replacement trustee(s) of the Communisis Pension Plan from time to time.

to simplify their business portfolio and enable the Debtors' management team to focus on the Debtors' core, profit-generating businesses.

    **e.**   **The Restructuring Support Agreement.**

In February 2023, the Debtors began engaging with their Existing First Lien Lenders regarding a potential projected covenant default under the terms of the Existing First Lien Credit Agreement, with the goal of negotiating a comprehensive and consensual amendment to the Existing First Lien Credit Facility.

In October 2023, after months of extensive arms'-length negotiations, the Company, certain lenders entitled to vote in excess of 66.7 % of the claims arising under the Existing First Lien Facility, and the Consenting Funds (collectively, the "Consenting Stakeholders") reached a global resolution regarding the treatment of their respective claims.    Accordingly, on October 12, 2023, the Debtors and the Consenting Stakeholders executed the Restructuring Support Agreement, which is attached to this Disclosure Statement as **Exhibit B**.    The Restructuring Support Agreement contemplates a restructuring of the Debtors' capital structure through the Plan and a liquidation or other orderly winddown process of the Liquidating Debtors' estates.

## ARTICLE VI

## CERTAIN FACTORS TO BE CONSIDERED

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE IMPAIRED AND ENTITLED TO VOTE SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS, THE PLAN AND ITS IMPLEMENTATION, OR THE SECURITIES OF THE REORGANIZED DEBTORS.**

**6.1**   **General.**

The following provides a summary of various important considerations and risk factors associated with the Plan; *however*, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, Holders of Claims and Interests should read and carefully consider the factors

set forth below, as well as all other information set forth or otherwise incorporated by reference in this Disclosure Statement.

**6.2     Risks Relating to the Plan and Other Bankruptcy Law Considerations.**

    **a.   A Holder of a Claim or Interest May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created nine Classes of Claims or Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests in each such Class. However, a Holder of a Claim or Interest could challenge the Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification.  If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan. Such modification could require re-solicitation of votes on the Plan. The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

    **b.   The Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation. If the Plan does not receive the required support from Classes 3 and 6, the Debtors may elect to amend the Plan, seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation.  There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims or Interests as the Restructuring Transactions contemplated by the Plan.

    **c.   The Bankruptcy Court May Not Confirm the Plan or May Require the Debtors to Re-Solicit Votes with Respect to the Plan.**

The Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  With respect to any Impaired

Classes of Claims or Interests that do not accept the Plan or are deemed not to accept the Plan, section 1129(b) requires that the Plan be fair and equitable (including, without limitation, with respect to the "absolute priority rule") and not discriminate unfairly with respect to such classes. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code (including, without limitation, finding that the Plan satisfies the "new value" exception to the absolute priority rule, if applicable) have been met with respect to the Plan. There can be no assurance that modifications to the Plan will not be required for Confirmation, or that such modifications would not require a re-solicitation of votes on the Plan.

The Bankruptcy Court could fail to approve this Disclosure Statement and determine that the votes in favor of the Plan should be disregarded. The Debtors then would be required to recommence the solicitation process, which would include re-filing a plan of reorganization and disclosure statement. This process includes a Bankruptcy Court hearing with respect to the required approval of a disclosure statement, followed (after Bankruptcy Court approval) by solicitation of claim or equity interest holder votes for the plan of reorganization, followed by a confirmation hearing at which the Bankruptcy Court will determine whether the requirements for confirmation have been satisfied, including the requisite claim or interest holder acceptances.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims or Interests and the Debtors' analysis thereof are set forth in the unaudited Liquidation Analysis, attached hereto as **Exhibit C**. The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to creditors and interest holders than those provided for in the Plan because of:

- the likelihood that the Debtors' assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner, affecting the business as a going concern;

- additional administrative expenses involved in the appointment of a chapter 7 trustee; and

- additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

**d.  Even if the Debtors Receive All
Necessary Acceptances for the Plan to Become Effective, the Debtors
<u>May Fail to Meet All Conditions Precedent to Effectiveness of the Plan</u>.**

Although the Debtors believe that the Effective Date would occur shortly after the Confirmation Date, there can be no assurance as to such timing.

The Confirmation and Consummation of the Plan are subject to certain conditions that may or may not be satisfied. The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied. If each condition precedent to Confirmation is not met or waived, the Plan will not be confirmed, and if each condition precedent to Consummation is not met or waived, the Effective Date will not occur. In the event that the Plan is not confirmed or is not consummated, the Debtors may seek to confirm an alternative plan of reorganization.

**e.  <u>The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate</u>.**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case. Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).

Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code). While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**f.  <u>There is a Risk of Loss of Support for the Plan</u>.**

The Plan is currently supported by Holders of more than 66.6% in amount of Existing First Lien Claims and the Consenting Funds, but there is a risk that unforeseen changes in circumstances could result in the loss of support for the Plan by such stakeholders prior to Confirmation and could result in the loss of use of cash collateral by the Debtors under certain circumstances. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

### g. **The Bankruptcy Court May Dismiss Some or All of the Chapter 11 Cases.**

Certain parties in interest may contest the Debtors' authority to commence or prosecute the Chapter 11 Cases. If, pursuant to any such proceeding, the Bankruptcy Court finds that some or all of the Debtors could not commence the Chapter 11 Cases for any reason, the Debtors may be unable to consummate the transactions contemplated by the Plan. If some or all of the Chapter 11 Cases are dismissed, the Debtors may be forced to cease operations due to insufficient funding or liquidate their business in another forum to the detriment of all parties in interest.

### h. **The United States Trustee or Other Parties May Object to the Plan on Account of the Debtors' Releases, Third-Party Releases, Exculpations, or Injunction Provisions.**

Any party in interest, including the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), could object to the Plan on the grounds that, among other things, the (i) debtor release contained in Article IX of the Plan is to be given without adequate consideration, (ii) the third-party release contained in Article IX of the Plan is not given consensually or in a permissible non-consensual manner, (iii) the exculpation contained in Article IX of the Plan extends to non-estate fiduciaries, or (iv) the injunction contained in Article IX of the Plan is overly broad. In response to such an objection, the Bankruptcy Court could determine that any of these provisions are not valid under the Bankruptcy Code. If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the applicable provision. This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

### i. **The Debtors May Seek To Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation.**

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims or Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims or Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (a) all classes of adversely affected creditors and interest holders accept the modification in writing, or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change

the treatment of Holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

**j. The Cases May Have
Material Adverse Effects on the Debtors' Operations.**

The commencement of the Chapter 11 Cases could adversely affect the relationships between the Debtors and their respective customers, employees, partners, and other parties.  While the Debtors expect to continue normal operations during the Chapter 11 Cases, such adverse effects could materially impair the Debtors' operations and adversely affect the Debtors' ability to reorganize and emerge.

**k. The Debtors Cannot Predict the Amount of Time
Spent in Bankruptcy for the Purpose of Implementing the Plan, and
Lengthy Bankruptcy Cases Could Disrupt the Debtors' Business, as Well as
Impair the Prospect for Reorganization on the Terms Contained in the Plan.**

Although the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to the Debtors' business, there can be no assurance as to such timing or lack of disruptiveness.  The Chapter 11 Cases could last considerably longer than anticipated if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed.  Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' business.  There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- customers could move to the Debtors' competitors;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- suppliers, vendors, or other business partners could terminate their relationships with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' future prospects.

A lengthy bankruptcy case also would involve additional expenses and divert the attention of Management from the operation of the Debtors' business.

The disruption that the bankruptcy process would have on the Debtors' business could increase with the length of time it takes to complete the Chapter 11 Cases.  If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted

bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

**l.   Other Parties in Interest Might Be Permitted
to Propose Alternative Plans of Reorganization That May Be
<u>Less Favorable to Certain of the Debtors' Constituencies Than the Plan</u>.**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan.  Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from the Petition Date.  However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court.  If such an order were to be entered, parties in interest other than the Debtors would then have the opportunity to propose alternative plans of reorganization.

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims or Interests.

**m.   The Debtors May Be Unsuccessful in Obtaining First Day Orders
<u>To Permit Them to Continue Operating in the Ordinary Course of Business</u>.**

The Debtors have attempted to address potential concerns of their customers, vendors, employees and other key parties in interest that might arise from the filing of these Chapter 11 Cases through a variety of provisions incorporated into or contemplated by the Plan and relief to be sought at the outset of the Chapter 11 Cases, including the Debtors' intention to seek appropriate Bankruptcy Court orders to permit the Debtors to pay amounts owed to all general unsecured creditors and employee obligations consistent with their ordinary course practices.  However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' business might suffer.

**n.   The Bankruptcy Court May Not
<u>Approve the Debtors' Use of Cash Collateral or the DIP Facility</u>.**

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to enter into postpetition financing arrangements and use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the Existing First Lien Lenders under the applicable prepetition debt documents.  Such access to postpetition financing and cash collateral will provide liquidity during the pendency of the Chapter 11 Cases.  There can be no assurance that the Bankruptcy Court will approve the DIP Facility or such use of cash collateral on the terms requested.  Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral.  There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing

or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' business may be impaired materially.

**o.  Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their petitions or before confirmation of the plan of reorganization (i) would be subject to compromise or treatment under the plan of reorganization or (ii) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

**p.  The Debtors' Restructuring May Adversely Affect the Debtors' Tax Attributes.**

Under federal income tax law, a corporation is generally permitted to deduct from taxable income net operating losses ("NOLs") carried forward from prior years. Any NOLs remaining upon implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years that begin in or after 2018, thereby reducing their future aggregate tax obligations. NOLs arising before 2018 may offset 100% of future taxable income and NOLs arising in taxable years that begin 2018, 2019 or 2020 may be used to offset 100% of future taxable income, unless such NOLs are applied to a taxable year beginning on or after January 1, 2021, in which case such NOLs may be used to offset 80% of taxable income. The Debtors estimate that, as of January 1, 2023, they had approximately $29.8 million of federal NOLs.

Other significant tax attributes include capital loss carryforwards and deferred interest deductions. The Debtors believe that, as of the Effective Date, they will have approximately $305.0 million of capital loss carryforwards on account of a transaction that will have taken place in 2023. Generally, for a corporation, capital losses may only be used to offset capital gains. A corporation that has capital losses in excess of capital gains for a given tax year may carry back such unused capital losses to the three years preceding the capital loss or may carry forward such unused capital losses for the five years following the capital loss year. Thus, the Debtors' capital loss carryforwards present the opportunity for material tax savings in respect of future capital gains. The Debtors also estimate that, as of January 1, 2023, they had approximately $125.4 million of interest deductions that have been deferred under section 163(j) of the Code (the "163(j) Carryforwards"). These 163(j) Carryforwards also provide the potential for material future tax savings.

The Reorganized Debtors' ability to utilize their NOL carryforwards, capital loss carryforwards and other tax attributes to offset future taxable income and to reduce federal income tax liability will be subject to reduction on account of cancellation of debt income ("COD Income") arising in a chapter 11 case under section 108 of the Internal Revenue Code of 1986, as amended (the "IRC") and/or taxable gains recognized by the Debtors attributable to the Restructuring

Transactions. In addition, if the Debtors experience an "ownership change," as defined in section 382 of the IRC, then the Reorganized Debtors' ability to use their NOL carryforwards or other tax attributes may be substantially limited, which could have a negative impact on the Reorganized Debtors' financial position and results of operations. Generally, there is an "ownership change" if one or more stockholders owning 5 percent or more of a corporation's stock have aggregate increases in their ownership of such stock of more than 50 percentage points over the prior three-year period. Under sections 382 and 383 of the IRC, absent an applicable exception, if a corporation undergoes an "ownership change," the amount of its NOLs, capital loss carryforwards, tax credit carryforwards and 163(j) Carryforwards that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors believe that one or more "ownership changes" have occurred and currently expect that their NOL carryforwards, capital loss carryforwards and other tax attributes may be significantly further reduced, eliminated, or limited in connection with the Restructuring Transactions through a combination of one or more of the above factors.

For a detailed description of the effect Consummation of the Plan may have on the Debtors' tax attributes, see the section entitled "Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders" below.

### q. **Risk of Termination of the Restructuring Support Agreement**.

The Restructuring Support Agreement contains certain provisions that give the parties thereto the ability to terminate the applicable agreement upon the occurrence or non-occurrence of certain events, including failure to achieve certain milestones in these Chapter 11 Cases or breach of any variance or reporting covenants contemplated thereunder. Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.

### 6.3    **Risks Relating to the Restructuring Transactions**.

### a.  **The Debtors Will Be Subject to Business Uncertainties and Contractual Restrictions Prior to the Effective Date**.

Uncertainty about the effects of the Plan on employees may have an adverse effect on the Debtors. These uncertainties may impair the Debtors' ability to retain and motivate key personnel and could cause customers and others that deal with the Debtors to defer entering into contracts with the Debtors or making other decisions concerning the Debtors or seek to change existing business relationships with the Debtors. In addition, the Debtors are highly dependent on the efforts and performance of their senior management team. If key employees depart because of uncertainty about their future roles and potential complexities of the Restructuring Transactions,

the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

    **b.  There Is Inherent Uncertainty in the Debtors' Financial Projections
Such that the Reorganized Debtors May Not Be Able to Meet the Projections.**

The Financial Projections attached hereto as **Exhibit D** include projections covering the Debtors' operations through December 2027. These projections are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the Reorganized Common Equity and the ability of the Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the Debtors' boards of directors or boards of managers, as applicable, may make after reevaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation from the Financial Projections, and could result in materially different outcomes from those projected.

    **c.  Failure to Implement the Restructuring Transactions and
Confirm and Consummate the Plan Could Negatively Impact the Debtors.**

If the Restructuring Transactions are not implemented, the Debtors may consider other restructuring alternatives available at that time, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, commencement of section 363 sales of the Debtors'

assets, or any other transaction that would maximize value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

If the Plan is not confirmed and consummated, the ongoing business of the Debtors may be adversely affected and there may be various consequences, including:

- the adverse impact to the Debtors' business caused by the failure to pursue other beneficial opportunities due to the focus on the Restructuring Transactions, without realizing any of the anticipated benefits of the Restructuring Transactions;

- the incurrence of substantial costs by the Debtors in connection with the Restructuring Transactions, without realizing any of the anticipated benefits of the Restructuring Transactions;

- the possibility, for the Debtors, of being unable to repay indebtedness when due and payable; and

- the Debtors pursuing non-prepackaged chapter 11 or chapter 7 proceedings, resulting in recoveries for creditors and interest holders that are less than contemplated under the Plan, or resulting in no recovery for certain creditors and interest holders.

**d. Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks.**

The Restructuring Transactions are generally designed to reduce the amount of the Debtors' cash interest expense and improve the Debtors' liquidity and financial and operational flexibility to generate long-term growth. Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions or in the Debtors' industry. As a result of these risks and others, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

**6.4    Risks Relating to the Reorganized Common Equity.**

**a. The Value of the Reorganized Common Equity is not intended to Represent Potential Market Value, and May Become Depressed Following the Effective Date.**

Despite the Debtors' best efforts to value the Reorganized Common Equity, various uncertainties and contingencies, including market conditions, the Debtors' potential inability to

implement their business plan or lack of a market for such interests may cause fluctuations or variations in the value of the Reorganized Common Equity not fully accounted for in the Plan. All of these factors are difficult to predict. Actual market prices of such instruments at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets and other factors that generally influence the prices of similar instruments. Actual market prices of such instruments also may be affected by other factors not possible to predict. In addition, following the Effective Date, holders of such instruments may elect to engage in sales to satisfy withholding tax requirements or to obtain liquidity. Such sales and the volume of such instruments available for trading could cause the related trading prices to be depressed, particularly in the absence of established trading markets therefor.

**b. A Liquid Trading Market
  May Not Develop for the Reorganized Common Equity.**

The Reorganized Common Equity are being newly issued in connection with the Plan and, accordingly, there is currently no established public trading market therefor. The Debtors do not currently contemplate applying to list any of the foregoing instruments on any national securities exchange or to arrange for quotation on any automated dealer quotation system and, as such, make no assurance that liquid trading markets for the Reorganized Common Equity will develop. The liquidity of any market for the Reorganized Common Equity will depend, among other things, upon the amount of Reorganized Common Equity issued pursuant to the Plan, the Reorganized Debtors' financial performance, and the market for similar instruments, none of which can be determined or predicted. Therefore, the Debtors cannot assure that an active trading market will develop or, if a market develops, what the liquidity or pricing characteristics of that market will be. In addition, the New Organizational Documents may also contain restrictions on the transferability of the foregoing instruments, which may adversely affect the liquidity in any trading market.

**c. The Terms of the Reorganized Common Equity,
  and New Organizational Documents are Subject to
  Change Based on Negotiation and the Approval of the Bankruptcy Court.**

The final terms of the Reorganized Common Equity and the New Organizational Documents are subject to change based on negotiations between the Debtors and the parties to the Restructuring Support Agreement, and other Holders of Claims and Interests will not participate in these negotiations and the results of such negotiations may alter the terms of the Reorganized Common Equity or the New Organizational Documents in a material manner, and may affect the rights of equityholders in the Reorganized Debtors following the Effective Date. As a result, the final terms of the Reorganized Common Equity or the New Organizational Documents may be different than as described herein and in the Plan and Restructuring Support Agreement thereby giving rise to a potential right to termination under the Restructuring Support Agreement.

**d. Certain Holders of the Reorganized Common Equity and New
  Warrants May be Restricted in their Ability to Transfer or Sell such Interests.**

The recipients of securities of the Reorganized Debtors under the Plan who are deemed "underwriters" as defined in section 1145(b) of the Bankruptcy Code will be restricted in their

ability to transfer or sell their securities. In addition, securities issued under the Plan to affiliates of the Reorganized Debtors will be subject to restrictions on resale. These persons will be permitted to transfer or sell such securities only pursuant to an effective registration statement under the Securities Act, or pursuant to the provisions of Rule 144 under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act. These restrictions may adversely impact the value of the Reorganized Debtors' securities and make it more difficult for such persons to dispose of their securities, or to realize value on such securities, at a time when they wish to do so. The Debtors make no representation regarding the right of any holder of securities of the Reorganized Debtors to freely resell such securities. *See* Article VIII of this Disclosure Statement entitled "Important Securities Law Disclosure." In addition, the Reorganized Common Equity may be subject to restrictions on transferability pursuant to the terms of the New Organizational Documents, as applicable.

The availability of the exemption under Section 1145 of the Bankruptcy Code, Section 4(a)(2) under the Securities Act, or any other applicable exemption from securities laws will not be a condition to the occurrence of the Effective Date.

### e. A Small Number of Holders or Voting Blocks May Control the Reorganized Debtors.

Consummation of the Plan may result in a small number of holders owning a significant percentage of the outstanding Reorganized Common Equity in the Reorganized Debtors. These holders, may, among other things, exercise significant influence over the business and affairs of the Reorganized Debtors, including over the election of directors or managers and approval of significant mergers and other material corporate transactions. The interests of such holders may conflict with the interests of other stockholders.

### f. The Issuance of Reorganized Common Equity Under the Management Incentive Plan Will Dilute the Reorganized Common Equity.

On the Effective Date, a percentage of the Reorganized Common Equity will be reserved for issuance in connection with the Management Incentive Plan. If the Reorganized Debtors distribute such equity-based awards to eligible participants pursuant to the Management Incentive Plan, it is contemplated that such distributions will dilute the Reorganized Common Equity issued under the Plan and the ownership percentage represented by the Reorganized Common Equity distributed under the Plan.

### g. The Interests in Reorganized Common Equity are Equity Interests and Therefore Subordinated to the Indebtedness of the Reorganized Debtors.

In any liquidation, dissolution, or winding up of the Reorganized Debtors, the Reorganized Common Equity would rank junior to all debt claims and other liabilities against the Reorganized Debtors. As a result, holders of Reorganized Common Equity will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all of their obligations to their debt holders have been satisfied.

**6.5      Risks Relating to the Debtors' Businesses.**

  **a.  The Debtors May Not Be Able To Implement the Business Plan.**

   The Debtors may not achieve their business plan and financial restructuring strategy. In such event, the Reorganized Debtors may be unable to restructure their funded debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated in this Disclosure Statement, or become subject to further insolvency proceedings.

  **b.  The Debtors' Financial Projections Are Subject to Inherent
   Uncertainty Due to the Numerous Assumptions Upon Which They Are Based.**

   The Debtors' Financial Projections are based on numerous assumptions including: timely Confirmation and Consummation pursuant to the terms of the Plan; the anticipated future performance of the Debtors; industry performance; general business and economic conditions; and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the ability of the Debtors to make payments with respect to indebtedness following Consummation.  Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as an assurance of the actual results that will occur.  Except with respect to the projections and except as otherwise specifically and expressly stated, this Disclosure Statement does not reflect any events that may occur subsequent to the date of this Disclosure Statement.  Such events may have a material impact on the information contained in this Disclosure Statement.  The Debtors do not intend to update the Financial Projections and therefore the Financial Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

  **c.  The Debtors May Not Be Able to
   Generate Sufficient Cash to Service All of Their Indebtedness.**

   The Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control.  The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, borrowings in connection with emergence.

  **d.  Existing and Increased Competition in the
   Industry or Decreasing Demand for the Debtors' Products
   May Adversely Affect the Debtors' Business and Results of Operations.**

   The Debtors compete with numerous other companies in the industry that offer similar products and provide similar services as those offered by the Debtors.  The Debtors' competitors

may be able to adopt more aggressive pricing and promotional policies, adapt to changes in customer preferences or requirements more quickly, devote greater resources to the design, sourcing, distribution, marketing and sale of their products than the Debtors.  In addition, the Debtors' competitors may seek to emulate facets of the Debtors' business strategy, which could result in a reduction of any competitive advantage or special appeal that the Debtors might possess. An inability to overcome potential competitive disadvantages or effectively market the Debtors' products relative to the Debtors' competitors could have an adverse effect on the Debtors' business and results of operations.

### e. The Debtors' Reliance on Suppliers May Impact the Debtors' Operation and Performance.

The Debtors rely significantly on their suppliers and therefore adverse changes in any of the relationships with their suppliers, or the inability to enter into new relationships with suppliers, could negatively impact the Debtors' operations and performance.  The Debtors' current arrangements with suppliers may not remain in effect on current or similar terms, and the impact of changes to those arrangements may adversely impact the Debtors' revenue.

### f. The Debtors Must Continue to Retain and Motivate Executives and Other Key Employees, Which May Be Difficult in Light of Uncertainty Regarding the Plan, and Failure To Do So Could Negatively Affect the Debtors' Business.

The Reorganized Debtors' success will depend, in part, on the efforts of their executive officers, their management team, and other key employees. These individuals possess sales, marketing, financial, administrative, technological, and other skills that are critical to the operation of the Debtors' business.  If the Reorganized Debtors lose or suffer an extended interruption in the services of one or more of their executive officers, managers, or other key employees, the Reorganized Debtors' business, operational results, and financial condition may be negatively impacted.

### g. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.

In the future, the Debtors may become a party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

### 6.6 Certain Tax Implications of the Chapter 11 Cases and the Plan.

Holders of Allowed Existing First Lien Claims and Other General Unsecured Claims should carefully review Article IX of this Disclosure Statement, "Certain U.S. Federal Income Tax

Consequences," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors, Reorganized Debtors, and Holders of such Claims.

**6.7** **Pension Settlement and Unresolved Controversies as of Solicitation of the Plan.**

Certain issues relating to the Specified Guarantee, among others, remain outstanding as of the date of solicitation of the Plan. Specifically, the Debtors and the Pension Trustee have engaged in extensive negotiations for the release of the Specified Guarantee, but have not yet agreed on definitive terms for the release.

The Debtors are working with the Pension Trustee to resolve this issue, which may result in a settlement pursuant to Bankruptcy Rule 9019 and may be included in the Plan. A settlement with the Pension Trustee may include good and valuable consideration provided to the Liquidating Trust by the Debtors in exchange for the release of the Specified Guarantee, which shall be subject to Bankruptcy Rule 9019.

The Debtors believe that resolution of the Specified Guarantee in advance of the Confirmation Hearing will facilitate closure of these Chapter 11 Cases and a more efficient wind down of these Chapter 11 Cases. The Plan may be modified prior to the Confirmation Hearing to incorporate any number of resolutions of the unresolved controversies. Any such resolution will be negotiated at arms'-length with the advisors representing the affected parties.

**6.8** **Disclosure Statement Disclaimer.**

**a.** **Information Contained Herein Is Solely for Soliciting Votes.**

The information contained in this Disclosure Statement is for the purpose of soliciting votes to accept the Plan and may not be relied upon for any other purpose. Specifically, this Disclosure Statement is not legal advice to any Person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan and whether to object to Confirmation.

**b.** **Disclosure Statement May Contain Forward-Looking Statements.**

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the filing or pendency of the Chapter 11 Cases;

- financing plans;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected dividends;

- projected price increases;

- effect of changes in accounting due to recently issued accounting standards;

- projected and estimated liability costs;

- growth opportunities for existing products and services;

- results of litigation;

- disruption of operations;

- contractual obligations;

- projected general market conditions;

- plans and objectives of management for future operations;

- off-balance sheet arrangements;

- the Debtors' expected future financial position, liquidity, results of operations, profitability, and

- cash flows; and growth opportunities for existing products and services.

Such statements are based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of Management. Important factors that may affect whether such forward-looking statements materialize include, but are not limited to, risks and uncertainties relating to the Debtors' business (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions, and other factors, including management's forecasts of key economic variables which may be significantly impacted by, among other factors, changes in the competitive environment, prices of goods, services, and labor, regulatory changes, or a variety of other factors, including the factors listed in this Disclosure Statement.

Accordingly, statements concerning these and other matters are not guarantees of the Debtors' future performance. The reader is cautioned that all forward-looking statements are necessarily speculative. The Liquidation Analysis, the recovery projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims and Interests may be affected by many factors that cannot be predicted. Forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be

materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

**c. No Legal, Business, or Tax Advice**
**Is Provided to You by This Disclosure Statement.**

**THIS DISCLOSURE STATEMENT IS NOT LEGAL, BUSINESS, OR TAX ADVICE TO YOU.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

**d. No Admissions Made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

**e. Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. All Parties, including the Debtors, reserve the right to continue to investigate Claims and Interests and file and prosecute objections to Claims and Interests.

**f. No Waiver of Right to Object or Right to Recover Transfers and Assets.**

The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that Holder's Claim, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

**g. Information Was Provided by the Debtors**
**and Was Relied Upon by the Debtors' Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence

in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

**h. The Potential Exists for Inaccuracies
and the Debtors Have No Duty to Update.**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date. Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

**i. No Representations Outside of this Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## ARTICLE VII

## CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

**7.1 The Combined Hearing.**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Debtors will request, on the Petition Date, that the Bankruptcy Court approve the Plan and Disclosure Statement at a joint hearing. The Combined Hearing may, however, be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Combined Hearing, may put in place additional procedures governing the Combined Hearing. Subject to section 1127 of the

Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for the Combined Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to Confirmation of the Plan. An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

## 7.2    **Confirmation Standards.**

Among the requirements for Confirmation of the Plan pursuant to Bankruptcy Code section 1129 are: (a) the Plan is in the "best interests" of Holders of Claims of Interests; (b) the Plan is feasible and (c) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class or if an Impaired Class is deemed to reject, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the Class.

At the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of Bankruptcy Code section 1129. The Debtors believe that: (a) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (b) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (c) the Plan has been proposed in good faith.

## 7.3    **Best Interests Test/Liquidation Analysis.**

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Based on the unaudited Liquidation Analysis attached hereto as **Exhibit C**, the Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan. As a result, the Debtors believe Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

THE LIQUIDATION ANALYSIS HAS BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.

**7.4**  **Feasibility**.

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections, which, together with the assumptions on which they are based, are attached hereto as **Exhibit D**.  Based on such Financial Projections, the Debtors believe that they will be able to make all payments required under the Plan while conducting ongoing business operations.  Therefore, Consummation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

**7.5**  **Confirmation Without Acceptance by All Impaired Classes**.

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cram down" provisions are set forth in section 1129(b) of the Bankruptcy Code.

a.  **No Unfair Discrimination**.

The no "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

b.  **Fair and Equitable Test**.

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in the class.  As to the dissenting (or deemed rejecting) class, the test sets different standards depending upon the type of claims or equity interests in the class.  A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all. A plan is fair and equitable as to a class of interests that rejects a plan if the plan provides (a) for each holder of an interest included in the rejecting class to receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of (i) the allowed amount of any fixed liquidation preference to which such interest holder is entitled, (ii) any fixed redemption price to which such interest holder is entitled, or (iii) the value of such

interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors submit that Confirmation of the Plan pursuant to the "cramdown" provisions of Bankruptcy Code section 1129(b), if necessary, is proper, as the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## 7.6    Alternatives to Confirmation and Consummation of the Plan.

Subject to the Restructuring Support Agreement, if the Plan cannot be confirmed, the Debtors may seek to (a) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation, (b) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (c) liquidate their assets and business under chapter 7 of the Bankruptcy Code. If the Debtors were to pursue a liquidation of their assets and business in chapter 7, the Debtors would convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, and a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on creditors' recoveries and the Debtors is described in the unaudited Liquidation Analysis (as defined below) attached hereto as **Exhibit C**.

## 7.7    Liquidation Analysis.

The Debtors, with the assistance of their advisors, have prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit C** (the "Liquidation Analysis"), to assist Holders of Claims and Interests in evaluating the Plan. The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan. The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis. As set forth in the Liquidation Analysis, the Debtors believe that the Plan provides a greater recovery for Holders of Allowed Claims and Interests than they would receive in liquidation under chapter 7 of the Bankruptcy Code.

## 7.8    Financial Information and Projections.

In connection with planning and developing the Plan, the Debtors, with the assistance of their advisors, prepared projections for the four years ending 2023 to 2027, which are attached hereto as **Exhibit D** (the "Financial Projections"), including Management's assumptions related thereto. For purposes of the Financial Projections, the Debtors have assumed an Effective Date of November 30, 2023. The Financial Projections assume that the Plan will be implemented in

accordance with its stated terms.  The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects.

The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, prices of goods, services, and labor, regulatory changes, or a variety of other factors, including the factors listed in this Disclosure Statement.  Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties.  Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement.

**7.9**     **Valuation Analysis.**

The Plan provides for the distribution of the Reorganized Common Equity to certain Holders of Claims upon consummation of the restructuring transactions contemplated by the Plan. Accordingly, Houlihan Lokey performed an analysis of the estimated implied equity value of the Debtors as of the Effective Date (the "Valuation Analysis") at the Debtors' request.  Based on the Valuation Analysis which is attached hereto as **Exhibit E**, the Reorganized Debtors will have a total enterprise value within the range of approximately $260 million and $360 million, with a mid-point of approximately $310 million.

The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken, should be read in conjunction with Article ARTICLE VI of this Disclosure Statement entitled "Certain Factors to be Considered." Houlihan Lokey makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

## ARTICLE VIII

## IMPORTANT SECURITIES LAW DISCLOSURE

**8.1**     **Exemption from Registration Requirements.**

The Plan provides for the Reorganized Common Equity to be distributed to certain Holders of Claims and Interests in accordance with Article III of the Plan, as applicable.

The Debtors believe that the Reorganized Common Equity will be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue Sky Law. The Reorganized Common Equity are referred to in this Article VIII as the "Reorganized Securities".

The Debtors are relying on exemptions from the registration requirements of the Securities Act, including Section 4(a)(2) thereof, and applicable Blue Sky Laws, to exempt the offer of the

Reorganized Common Equity that may be deemed to be made pursuant to the prepetition solicitation of votes on the Plan. Accordingly, no registration statement will be filed under the Securities Act with respect to the offer of the Reorganized Common Equity that may be deemed to be made pursuant to the prepetition solicitation of votes on the Plan. To ensure that the prepetition solicitation is exempt from the registration requirements of the Securities Act, the ballots used in the prepetition solicitation of votes on the Plan include a certification that the voting Holder of the related Claims is an "accredited investor" or a "qualified institutional buyer" (each as defined under the Securities Act).

Upon consummation of the Plan, all of the Reorganized Securities issued pursuant to the Plan on account of Claims or Interests will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145(a) of the Bankruptcy Code, to the extent permitted. Section 1145 of the Bankruptcy Code provides that, except with respect to an entity that is deemed an "underwriter" (as such term is defined in section 1145(b) of the Bankruptcy Code), Section 5 of the Securities Act and any Blue Sky Law requirements for the offer and sale of a security do not apply to the offer or sale of a security of a debtor, an affiliate thereof participating in a joint plan with the debtor, or a successor of the debtor if (i) the offer or sale occurs under a plan of reorganization, (ii) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense in a case concerning, the debtor or such affiliate, and (iii) the securities are issued in exchange for a claim against, an interest in or a claim for an administrative expense in the case concerning, a debtor of such affiliate, or are issued principally in such exchange and partly for cash and property. The Debtors believe that the issuance of the Reorganized Securities in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code. Accordingly, no registration statement will be filed under the Securities Act or any Blue Sky Law with respect to the Reorganized Securities issued pursuant to the Plan on account of Claims or Interests. Recipients of the Reorganized Securities are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue Sky Law. As noted above and discussed further below, the exemptions provided for in section 1145(a) of the Bankruptcy Code do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code. If section 1145(a) of the Bankruptcy Code is unavailable because the recipient of the Reorganized Securities is such an "underwriter", such securities will be issued pursuant to Section 4(a)(2) of the Securities Act or another applicable exemption from registration under the Securities Act and any applicable Blue Sky Laws.

## 8.2    Resales of the Reorganized Securities.

Reorganized Securities issued pursuant to Section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act or other federal law or Blue Sky Laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act and similar exemptions provided by the respective laws of the several states; *provided*, *however*, that such Reorganized Securities will not be freely tradable if, at the time of transfer, the Holder thereof is an "affiliate" of the Reorganized Debtors, as defined in Rule 144(a)(1) under the Securities Act, or had been such an "affiliate" within 90 days of such transfer. In addition, as noted above and below, the exemptions

provided for in section 1145(a) of the Bankruptcy Code do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer with respect to such securities within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in rule 405 of the Securities Act, means to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of a person, whether through owning voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor may be deemed to be a "controlling person" of the debtor or successor under a plan of reorganization, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.

Reorganized Securities issued pursuant to Section 4(a)(2) of the Securities Act (including Reorganized Securities issued to entities that are deemed "underwriters") are "restricted securities" (as defined under Rule 144 of the Securities Act) and may not be resold absent an exemption from the registration requirements of the Securities Act and applicable Blue Sky Laws. Under certain circumstances, Holders of Reorganized Securities who are "underwriters" or "affiliates" may be entitled to resell their Reorganized Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.

Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell securities after a one-year holding period whether or not there is current public information regarding the issuer. An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period, if applicable, if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with certain volume limitations, manner of sale requirements and certain other conditions of Rule 144.

Whether any particular Person would be deemed to be an "underwriter" with respect to the Reorganized Securities or an "affiliate" of the Reorganized Debtors would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Reorganized Securities or an "affiliate" of the Reorganized Debtors and, in turn, whether any Person may freely resell Reorganized Securities.

**Accordingly, the Debtors recommend that potential recipients of the Reorganized Securities consult their own counsel concerning their ability to freely trade such securities without registration under the Securities Act or any applicable Blue Sky Law. In addition, the Debtors do not currently contemplate applying to list these securities on any national securities exchange. The Debtors make no representation concerning the ability of a person to dispose of or freely trade the Reorganized Securities.**

## ARTICLE IX

## CERTAIN UNITED STATES FEDERAL
## INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain United States ("U.S.") federal income tax consequences of the consummation of the Plan to the Debtors, Reorganized Debtors, and to certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the IRC, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained. The Debtors do not intend to seek a ruling from the IRS regarding the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors, Reorganized Debtors, or to certain Holders of Claims or Interests in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, former citizens or residents of the United States, persons that use the accrual method of accounting that are required to include certain amounts in income no later than the time such amounts are reflected on certain financial statements, persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in

bankruptcy, and regulated investment companies and those holding, or who will hold, Claims or Interests, or the Reorganized Common Equity or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed, nor is the 3.8% Medicare Tax on net investment income. Furthermore, this summary assumes that Holders of Claims hold only Claims in a single Class and hold Claims as "capital assets" (within the meaning of section 1221 of the IRC). In addition, this summary assumes that a Holder who is a Rights Offering Participant will be treated as having received an option pursuant to a transaction that is separately identifiable from any subsequent exercise or lapse of such option and that any exercise of such option will be respected as a transaction separate from the other Restructuring Transactions. This summary does not discuss differences in tax consequences to Holders of Claims that act as Backstop Parties or otherwise act or receive consideration in a capacity different from that of any other Holder of a Claim of the same Class or Classes, and the tax consequences of such Holders may differ materially from those described below. This summary also assumes that, except as otherwise mentioned herein, the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

The Debtors currently contemplate, and the following discussion also assumes, that (i) each of the Reorganized Debtors will be the existing Debtor corporate entity, it will not be a reincorporated entity or another entity, and it will be a member of a consolidated tax group of which OSG Holdings, Inc. ("OSG Holdings") is the common parent (and not, as noted below, a member of the consolidated tax group of which OSG Group TopCo, LLC is the common parent), and (ii) the receipt by a Holder of Reorganized Common Equity will be treated for U.S. federal income tax purposes as though the Holder received Equity Interests in OSG Holdings and then immediately exchanged such Equity Interests for the Exchange Reorganized Equity.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (as defined in section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (as defined in section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) of such entity generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims or

Interests should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**9.1    Certain U.S. Federal Income Tax <u>Consequences to the Debtors and Reorganized Debtors</u>.**

**a.   <u>In General</u>.**

Each of the Debtors is a member of an affiliated group of corporations that files consolidated federal income tax returns with OSG Group TopCo, LLC as the common parent (such consolidated group, the "<u>Current Consolidated Group</u>") or an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Current Consolidated Group. The Debtors expect that the Restructuring Transactions will be structured as a recapitalization of the existing Debtors. However, because the Restructuring Transactions contemplate the issuance of new equity in OSG Holdings to New TopCo and the cancellation of the existing equity in OSG Holdings that is currently owned by OSG Intermediate Holdings, Inc., the Restructuring Transactions will result in the Reorganized Debtors no longer being members of the Current Consolidated Group. Based on the facts as currently understood by the Debtors and except as otherwise described below, the Debtors do not currently expect this deconsolidation to result in the recognition of material taxable gain or loss to the Debtors. In addition, pursuant to Treasury Regulations under section 1502 of the IRC, the Reorganized Debtors will be severally liable for U.S. federal income taxes of the Current Consolidated Group for any year in which they were members of the Current Consolidated Group, including the year in which the Plan is consummated. Moreover, as a result of the Restructuring Transactions, the Reorganized Debtors will be subject to the application of sections 382 and 383 of the IRC, and the rules with respect to COD Income, as described below. Finally, in respect of Holders of Other General Unsecured Claims, the Debtors will be treated as transferring certain assets to a Liquidating Trust for the benefit of such holders as more fully described below under "Participation in Liquidating Trust."

**b.   <u>Effects of the Restructuring Transactions on Tax Attributes of Debtors</u>.**

**i.    <u>Preservation of Tax Attributes and Cancellation of Indebtedness Income</u>.**

The Debtors expect to realize substantial COD Income resulting from the Restructuring Transactions, although, as discussed below, the Debtors expect that such income would be excludable from income.  In general, absent an exception, a debtor will realize COD Income upon actual or deemed satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the

adjusted issue price of the indebtedness satisfied, over (b) the sum of (X) the amount of Cash paid (or deemed paid), (Y) the issue price of any new indebtedness of the debtor issued, and (Z) the fair market value of any other consideration, in each case, given in satisfaction of such indebtedness at the time of the satisfaction. For this purpose, various rules under section 108(e) of the IRC are expected to apply in determining the amount of COD Income recognized by the Debtors. Unless an exception or exclusion applies, COD Income constitutes taxable income like any other item of taxable income.

Pursuant to section 108(a)(1)(A) of the IRC, a debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of indebtedness occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108(a)(1)(A) of the IRC. In general, the tax attributes of a debtor will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) tax basis in assets (subject to the Asset Tax Basis Floor, as described below); (f) passive activity loss and credit carryforwards; and (g) foreign tax credit carryforwards. A debtor with COD Income may elect to first reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC prior to effecting any other reductions in tax attributes set forth above, though it is unlikely that the Debtors will make this election. The reduction in tax attributes occurs only after the taxable income (or loss) for the taxable year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Pursuant thereto, the tax attributes of each debtor member of an affiliated group of corporations that is excluding COD Income are first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

The aggregate tax basis of the Debtors in their assets (determined on an entity-by-entity basis, and in the case of an affiliated group of corporations, subject to the look-through rule described above) is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that the Debtors will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor"). Generally, all of an entity's obligations (including intercompany debt) that are treated as debt under general U.S. federal income tax principles are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of the COD Income (if any) that will be realized by the Debtors, and any resulting reduction in the tax attributes of the Debtors and their affiliates, will not be determinable until after the consummation of the Plan.

### ii.    Limitation of NOL Carryforwards and Other Tax Attributes Under Sections 382 and 383 of the IRC.

After giving effect to the reduction in tax attributes resulting from excluded COD Income, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

### 1.    Limitation of NOL Carryforwards and Other Tax Attributes Under Sections 382 and 383 of the IRC.

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," (as determined for purposes of those sections) the amount of its NOLs and NOL carryforwards, 163(j) Carryforwards, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) and deductions recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of sections 382 and 383 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of Reorganized Common Equity pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation under sections 382 and 383 of the IRC (in addition to any limitations in effect pursuant to such sections prior to the Restructuring) unless an exception to the general rules of sections 382 and 383 of the IRC applies.

### 2.    General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs: 3.38% for October 2023). The 382 Limitation may be increased by the amount of any net unrealized built-in gain (if any) at the time of the ownership change, to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65 (as modified by IRS

Notice 2018-30).[14] Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

Notwithstanding the rules described above, if subsequent to an ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business, or do not use a significant portion of their historic business assets in a new business, for the two years after the ownership change, the annual limitation resulting from the ownership change is zero.

### 3. **Special Bankruptcy Exceptions.**

An exception to the foregoing annual limitation rules generally applies when creditors of a debtor corporation in chapter 11 holding certain qualified indebtedness (generally, indebtedness that (i) was held by the creditor at least 18 months before the date of filing of the chapter 11 case or (ii) arose in the ordinary course of the trade or business of the debtor corporation and is held by the person who at all times held the beneficial interest in such indebtedness) receive, in respect of such qualified indebtedness, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOLs, NOL carryforwards, and 163(j) Carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety. If the Reorganized Debtors were to undergo another "ownership change" after the expiration of this two-year period, the resulting 382 Limitation would be determined under the regular rules for ownership changes.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for the 382(l)(5) Exception or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule for determining the 382 Limitation, which requires the fair market value of

---

[14] Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses for purposes of computing the 382 Limitation. However, proposed regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that was commenced prior to, or within 30 days of, the publication of the finalized new rules in this area. In each case, the applicability of these proposed regulations remains uncertain, and the proposed regulations may not become final. Accordingly, the Debtors do not expect the proposed regulations to apply to them or to the Reorganized Debtors with respect to the "ownership change" that will occur pursuant to the Plan.

a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the ownership change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception because the debtor corporation is not required to reduce its NOLs, NOL carryforwards and 163(j) Carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without automatically triggering the effective elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors do not currently know whether they are or would be eligible for the 382(l)(5) Exception, and regardless of whether the 382(l)(5) Exception is available, the Reorganized Debtors may decide to affirmatively elect out of the 382(l)(5) Exception so that the 382(l)(6) Exception instead applies. Whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, though, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

### c. Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims Entitled to Vote.

#### i. In General.

The following section discusses certain U.S. federal income tax consequences of the transactions contemplated by the Plan to U.S. Holders of Allowed Existing First Lien Claims. U.S. Holders are urged to consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated under the Plan.

The character of any gain or loss recognized by a U.S. Holder as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long term capital gain if the Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to significant limitations as discussed below.

#### ii. Consequences to Holders of Existing First Lien Claims.

The tax consequences to a U.S. Holder of Existing First Lien Claims from the exchange of such Claims for the New Take-Back Debt Loans and the Exchange Reorganized Equity will depend on whether the Existing First Lien Claims and the New Take-Back Debt Loans are treated as "securities" for U.S. federal income tax purposes.

Neither the IRC nor the Treasury Regulations define the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for

U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

### 1. Treatment of Holders of Existing First Lien Claims if such Claims are Treated as Securities.

If the Existing First Lien Claims are treated as securities, and the U.S. Holder's Pro-Rata Share of the New Take-Back Debt Loans is treated as a security, then (subject to the discussion below of accrued interest) the exchange of such Claims for New Take-Back Debt Loans and Exchange Reorganized Equity should be tax-free pursuant to sections 368, 354 and 356 of the IRC. Such U.S. Holder should obtain a tax basis in its Pro-Rata Share of the New Take-Back Debt Loans and Exchange Reorganized Equity equal to the tax basis of the Claim surrendered (to be allocated between the New Take-Back Debt Loans and Exchange Reorganized Equity on the basis of their relative fair market values). The holding period for such property should include the holding period for the exchanged Claims.

### 2. Treatment of Holders of Existing First Lien Claims if such Claims of the New Take-Back Debt Loans are Not Treated as Securities.

If, however, either or both of the Existing First Lien Claims or the New Take-Back Debt Loans are not treated as securities, then the U.S. Holder should recognize gain or loss on such exchange equal to (i) the sum of (a) the issue price of the U.S. Holder's Pro-Rata Share of the New Take-Back Debt and New First Lien Loans (determined as described below under "(vi) Certain Considerations Regarding the New Take-Back Debt Loans—(2) Issue Price"), and (b) the sum of the fair market value of the U.S. Holder's Pro-Rata Share of the Exchange Reorganized Equity, and Election Rights, received in satisfaction of its Allowed Existing First Lien Notes Claims minus (ii) the U.S. Holder's adjusted tax basis in its Existing First Lien Claim.  Such U.S. Holder should obtain a tax basis in the New Take-Back Debt Loan received equal to its issue price and a tax basis in the Exchange Reorganized Equity and Election Rights equal to its fair market value, in each case, as of the date it is distributed to the U.S. Holder. The holding period for such property should begin on the day following receipt. For the treatment of the exchange to the extent a portion of the New Take-Back Debt Loan or Exchange Reorganized Equity received is allocable to accrued but unpaid interest, original issue discount ("OID") or market discount (which differs from the treatment described above), see the sections entitled "Accrued Interest (and OID)" and "Market Discount" below.

Pursuant to the Plan, a Holder of an Existing First Lien Claim that is an "accredited investor (as such term is defined in Rule 501 under the Securities Act) (i.e., a "Rights Offering Participant") will be given, pursuant to the Rights Offering, an Election Right to provide up to its Pro-Rata Share of New First Lien Loan Commitments in an aggregate principal amount equal to the Rights

Offering Amount. The Debtors believe that this Election Right has value and expect to take the position that it represents additional consideration being paid to the Holders of Existing First Lien Claims pursuant to the Plan that will, in turn, reduce the amount of COD Income realized by the Debtors on the exchange of those Claims for New Take-Back Debt Loans and Exchange Reorganized Equity. To the extent the option provided by the Rights Offering is determined to represent additional consideration being paid to Holders that are Rights Offering Participants, the fair market value of this option may result in additional gain (or a reduced loss) to U.S. Holders of Existing First Lien Claims (as described in the preceding paragraph). U.S. Holders of Existing First Lien Claims are urged to consult their tax advisors regarding the effect of the option provided by the Rights Offering on the amount of gain or loss recognized by them on the exchange of their Claims.

### iii.  **Accrued Interest (and OID).**

To the extent that any amount received by a U.S. Holder of a surrendered Claim under the Plan is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the surrendered Claim, such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder). A U.S. Holder of a surrendered Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point. The tax basis of any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest (or OID) should equal the amount of such accrued but untaxed interest (or OID). The holding period for such non-Cash consideration should begin on the day following the receipt of such property.

The extent to which the consideration received by a U.S. Holder of a surrendered Claim will be attributable to accrued but untaxed interest on the debt constituting the surrendered Claim is unclear. Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes. While certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest, the Plan provides that amounts paid to Holders of Claims will be allocated first to unpaid principal and then to unpaid interest. The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. Holders of Claims are urged to consult their tax advisors regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

### iv.  **Market Discount.**

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Claim.

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of a Claim that was acquired with market discount should be treated as ordinary income to

the extent of the market discount that accrued thereon while such debt instruments were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include such market discount in its income as the market discount accrued). To the extent that a U.S. Holder surrendered Claims that were acquired by the U.S. Holder with market discount in exchange for other property pursuant to a tax-free or other reorganization transaction for other property, any market discount that accrued on such surrendered Claims and was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized by the U.S. Holder on the subsequent sale, exchange, redemption, or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the surrendered Claim.

###### v.   **Rights Offering**.

The characterization of the Election Rights and their exercise for U.S. federal income tax purposes is uncertain. A U.S. Holder who is a Rights Offering Participant who elects to exercise its Election Rights pursuant to the Rights Offering should be treated as purchasing, in exchange for the option received by such U.S. Holder pursuant to the Rights Offering and the amount of cash paid by the U.S. Holder to exercise such option, New First Lien Loans and New Money Reorganized Equity. Such a purchase should generally be treated as the exercise of an option under general tax principles, and such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises such option. Alternatively, the acquisition of the Election Rights and the subsequent acquisition of the underlying New First Lien Loans and New Money Reorganized Equity could be treated as an integrated transaction pursuant to which the New First Lien Loans and New Money Reorganized Equity are acquired directly in consideration for the partial satisfaction of a U.S. Holder's Existing First Lien Loan Claims and the amount of cash funded by the U.S. Holder to exercise the Election Rights. Although the issue is not free from doubt, unless otherwise noted, this discussion assumes that the Election Rights will be treated as options and the exchange of an Allowed Existing First Lien Loan Claim for the Election Rights (along with the other consideration payable under the Plan) is a separately identifiable step from the exercise of such Election Rights.

Although not free from doubt, a U.S. Holder's aggregate tax basis in the New Money Reorganized Equity and New First Lien Term Loans received and issued pursuant to the exercise of its Election Rights should equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise its Election Rights plus (ii) such U.S. Holder's tax basis in its Election Rights immediately before the option is exercised. A U.S. Holder should allocate such aggregate tax basis among such New Money Reorganized Equity and New First Lien Term Loans in accordance with their respective fair market values. A U.S. Holder's holding period in the New Money Reorganized Equity and the New First Lien Term Loans received and issued upon exercise of an Election Right generally should begin on the day following the exercise date. The determination of a U.S. Holder's aggregate tax basis in such New Money Reorganized Equity and New First Lien Term Loans is subject to uncertainty, and U.S. Holders should consult their tax advisors regarding such determination.

Assuming that the Election Rights are respected for U.S. federal income tax purposes as options to acquire New Money Reorganized Equity and New First Lien Term Loans, upon lapse

of any Election Rights unexercised, a U.S. Holder generally would recognize a loss to the extent of the U.S. Holder's tax basis in such Election Rights. In general, such loss would be a capital loss, long-term or short-term, depending upon whether the requisite holding period was satisfied. The deductibility of capital loss is subject to significant limitations. U.S. Holders are urged to consult their tax advisors as to the tax considerations of electing not to exercise their Election Rights.

### vi.   Certain Considerations Regarding the New Take-Back Debt Loans and New First Lien Loans.

#### 1.   Interest.

A portion of the interest on the New Take-Back Debt Loans will be payable in kind. Such portions of interest ("PIK Interest") will not be qualified stated interest for U.S. federal income tax purposes (even if stated interest is expected to be paid, and actually is paid, in cash). As discussed below ("Investment Unit"), the issue price of the New First Lien Loans issued and received upon exercise of the Election Rights will depend on the portion of the issue price of the Investment Unit that is allocated to such New First Lien Loan and such New First Lien Loans may be treated as being issued with OID. As a result, the New Take-Back Debt Loans, and possibly the New First Lien Loans, are expected to be treated as issued with OID for U.S. federal income tax purposes in an aggregate amount equal to the excess of the sum of all principal and stated interest payments (other than stated interest that is required to be paid in cash) provided by the New Take-Back Debt Loans or New First Lien Loans, as applicable, over the "issue price" (as described below) of such loan.

A U.S. Holder generally will be required to include OID in income before the receipt of the associated cash payment, regardless of the U.S. Holder's accounting method for U.S. federal income tax purposes. The amount of OID with respect to a New Take-Back Debt Loan or New First Lien Loan that a U.S. Holder must include in income is the sum of the "daily portions" of the OID for the loan for each day during the taxable year (or portion of the taxable year) in which the U.S. Holder held the loan. The daily portion is determined by allocating a pro rata portion of the OID for each day of the accrual period. An accrual period may be of any length and the accrual periods may vary in length over the term of the loan, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the first day of an accrual period or on the final day of an accrual period. The amount of OID allocable to an accrual period is equal to the product of the "adjusted issue price" of the loan at the beginning of the accrual period and its yield to maturity (computed generally on a constant yield method and compounded at the end of each accrual period, taking into account the length of the particular accrual period). The adjusted issue price of a loan at the beginning of any accrual period generally is the sum of the issue price of the loan plus the amount of OID allocable to all prior accrual periods reduced by any payments received on the loan that were not in the form of PIK Interest.

Any PIK Interest generally will not be treated as a payment of interest on an original loan for U.S. federal income tax purposes. Instead, any PIK Interest together with the original loan will be treated as a single debt instrument for U.S. federal income tax purposes.

Each payment (including payments of cash interest and amounts received upon disposition) under a New Take-Back Debt Loan or New First Lien Loan will be treated first as a payment of any accrued OID on the loan to the extent such accrued OID has not been allocated to prior cash payments and second as a payment of principal on the loan. U.S. Holders generally will not be required to separately include in income payments on the New Take-Back Debt Loans and New First Lien Loans to the extent such cash payments constitute payments of previously accrued OID or payments of principal.

## 2.  Issue Price.

*New Take-Back Debt Loans*

Holders of Existing First Lien Claims will receive a combination of New Take-Back Debt Loans and Exchange Reorganized Equity. The determination of the issue price of the New Take-Back Debt in these circumstances is unclear, and will depend on whether or not the New Take-Back Debt Loans are "publicly traded" for purposes of section 1273 of the IRC and the regulations thereunder (i.e., if there are one or more "firm quotes" or "indicative quotes" for the debt instrument that are available at any time during the 31-day period ending 15 days after the debt instrument is issued)  and whether or not the "investment unit" rules apply.

The Debtors may take the position that the issue price of the New Take-Back Debt Loans will be established by the amount of cash paid for the other loans issued under the New First Lien Facility under the Plan. However, because (1) the loans issued under the New First Lien Facility for cash will not be proportionate to the New Take-Back Debt Loans issued  for property to the same investors (i.e. in exchange for Existing First Lien Claims), (2) of the potential application of the "investment unit" rules described below, and (3) the New Take-Back Debt Loans may be treated as publicly traded for purposes of determining their issue price, this position is not free from doubt and the Debtors may take a different position, and the Debtors have not decided at this time which position to take. In the event that the cash issue price for the New First Lien Loans does not apply for determining the issue price, then, as a general matter, and subject to the "investment unit" rules discussed below, (a) if the New Take-Back Debt Loans are "publicly traded," then the trading value of the New Take-Back Debt Loans determines their issue price; (b) if the New Take-Back Debt Loans are not "publicly traded," but the Existing First Lien Claims exchanged therefor are "publicly traded," the trading value of the Existing First Lien Claims exchanged therefor determines the issue price of the New Take-Back Debt Loans (unless such trading values represent mere indicative quotes and a position is established that demonstrates that such indicative quote materially misrepresented the fair market value of such property); and (c) if neither the New Take-Back Debt Loans nor the Existing First Lien Claims exchanged therefor is "publicly traded," the issue price of the New Take-Back Debt Loans would be their stated principal amount.

As discussed above, the New Take-Back Debt Loans are expected to be treated as issued with OID as a result of the PIK Interest feature, and the computation of the amount of OID will also take into consideration the extent to which the issue price of the instrument is less than its stated redemption price at maturity.

*New First Lien Term Loans*

As discussed below (see "Investment Unit Rules"), the issue price of the New First Lien Term Loans issued and received upon exercise of the Election Rights will depend on the portion of the issue price of the investment unit that is allocated to such New First Lien Term Loans and such New First Lien Term Loans may be treated as being issued with OID. The rules regarding the "issue price" determination of an "investment unit" are complex and highly detailed, and U.S. Holders are urged to consult their tax advisors regarding the determination of the issue price of the New First Lien Term Loans.

### 3. **Investment Unit Rules.**

Where, as here, U.S. Holders that receive New Take-Back Debt Loans also receive other property (e.g., the Exchange Reorganized Equity) in exchange for their Claims, the "investment unit" rules may apply to the determination of the "issue price" for the New Take-Back Debt Loans received in exchange for their Claims and the amount realized with respect to the other property received. Similarly, the investment unit rules may apply to determine the issue price of the New First Lien Term Loans received along with New Money Reorganized Equity upon the exercise of Election Rights by U.S. Holders of Allowed Existing First Lien Notes Claims. The application of the investment unit rules is complex. Furthermore, it is unclear if the investment unit rules apply to circumstances where the components of the investment unit are issued by different issuers, as will be the case here.

In the event that the investment unit rules do apply, U.S. Holders that receive New Take-Back Debt Loans or New First Lien Loans and property subject to those rules will be deemed to have received, instead of such loans and property, solely for the purposes of determining the issue price of the loans and, with respect to the New Take-Back Debt Loans, the amount realized with respect to the other property that are components of the investment unit, a single debt instrument. If none of the Claims, New Take-Back Debt Loans, or New First Lien Loans or property exchanged for Claims are publicly traded for purposes of the determination of the issue price of the single debt instrument, it is unclear how to determine the issue price of that debt instrument, and the Debtors have not decided how they will determine the issue price.

In the event that some, but not all, of the property composing the investment unit is publicly traded, then the application of the investment unit rules is unclear. If the Claims being exchanged for the investment unit are publicly traded prior to the exchange, the trading value of such Claims may set the issue price for the investment unit, consistent with the rules described above. Alternatively, if the new debt instrument is publicly traded, the trading price of the new debt instrument may control the issue price of the new debt instrument, without regard to the potential application of the investment unit rules.

If a substantial portion of the investment unit is issued solely for cash, the cash price of the investment unit may control the issue price of the new debt instrument, without regard to the potential application of the investment unit rules. The issue price of an investment unit, once determined, is then allocated to each of the investment unit's components on the basis of each component's relative fair market value; and that allocation determines the issue price of the components of the investment unit. As applied to any Exchange Reorganized Equity received in a

taxable transaction and subject to the investment unit rules, the amount of gain recognized on such transaction would be based on the amount of the issue price of the investment unit allocated to the Exchange Reorganized Equity instead of solely on its fair market value.

An issuer's allocation of the issue price of an investment unit generally is binding on all U.S. Holders of the investment unit unless a U.S. Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the investment unit.

### 4. Acquisition Premium or Amortizable Bond Premium on the New Take-Back Debt Loans.

If, pursuant to the rules described above, a U.S. Holder's initial tax basis in the New Take-Back Debt Loans or the New First Lien Term Loans is greater than the issue price but less than the stated principal amount of such loans, such loans will have an "acquisition premium." Under the acquisition premium rules, the amount of OID that must be included by the U.S. Holder in its gross taxable income with respect to the applicable loans for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year. Alternatively, if a U.S. Holder's initial tax basis in the New Take-Back Debt Loans or the New First Lien Term Loans exceeds their stated principal amount, the U.S. Holder will be considered to have acquired the loans with "amortizable bond premium" and will not be required to include any OID in income. A U.S. Holder may generally elect to amortize the premium over the remaining term of such loans on a constant yield method as an offset to stated interest when includible in income under such Holder's regular accounting method. If a U.S. Holder elects to amortize bond premium, such Holder must reduce its tax basis in such loans by the amount of the premium used to offset stated interest. If a U.S. Holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss otherwise recognized on disposition of such loans. If, pursuant to the rules described above, a U.S. Holder's initial tax basis in the New Take-Back Debt Loans or New First Lien Term Loans is less than the issue price of such debt, see the above section, entitled "Market Discount."

### vii. General Tax Reporting of New TopCo and Holders of Reorganized Common Equity.

As noted above, it is intended that the receipt by a Holder of Reorganized Common Equity on the Effective Date pursuant to the Plan will be treated for U.S. federal income tax purposes as though the Holder received Equity Interests in OSG Holdings as part of the exchange of its Existing First Lien Claims or pursuant to the Rights Offering, as applicable, and then immediately exchanged such Equity Interests for the Reorganized Common Equity. Assuming that treatment is respected, the exchange by a U.S. Holder of Equity Interests in OSG Holdings for the Reorganized Common Equity will be a tax-free exchange pursuant to section 721 of the IRC (in a transaction described in Situation 2 of IRS Revenue Ruling 99-5, 1999-1 C.B. 434) and whatever tax basis and holding period a U.S. Holder would have had in such Equity Interests in OSG Holdings (see "(ii) Consequences to Holders of Existing First Lien Claims" and "(v) Rights

Offering") will become such U.S. Holder's tax basis and holding period in its Reorganized Common Equity.

Because the Reorganized Common Equity will be Equity Interests of New Topco, an entity that, absent an affirmative election otherwise, will be treated for U.S. federal income tax purposes as a partnership, a U.S. Holder receiving Reorganized Common Equity will be treated as a partner in that partnership. Accordingly, as a partnership, New TopCo will not pay U.S. federal income taxes, but each U.S. Holder will be required to report its distributive share (whether or not distributed) of New TopCo's income, gains, losses, deductions, and credits and thus such U.S. Holder will be allocated its share of any such taxable income or loss and may incur a U.S. federal income tax liability with respect to its allocable share of such taxable income even if New TopCo does not make a concurrent distribution to such U.S. Holder. Each U.S. Holder of Reorganized Common Equity will be required to include in income its allocable share of New TopCo's income, gains, losses and deductions for New TopCo's taxable year ending with or within such U.S. Holder's taxable year. However, because New TopCo's sole asset will be its Equity Interests in OSG Holdings, an entity classified as a corporation for U.S. federal income tax purposes, absent an actual distribution from OSG Holdings or a sale (or other taxable disposition) by New TopCo of any of its Equity Interests in OSG Holdings, any partner in New TopCo should not generally have any current allocations of taxable income or loss.

In general, a U.S. Holder of Reorganized Common Equity will not recognize taxable income as a consequence of receiving a distribution (whether in cash or in kind) from New TopCo, except to the extent that any cash distributed exceeds such U.S. Holder's adjusted tax basis in its Reorganized Common Equity. Any such excess will be treated as gain from the sale of such U.S. Holder's Reorganized Common Equity and will be treated as capital gain. A U.S. Holder generally will not recognize a loss for U.S. federal income tax purposes as a consequence of receiving a distribution from New TopCo, except that if a U.S. Holder receives a distribution solely of cash in complete liquidation of its interest in New TopCo, the U.S. Holder will recognize a loss equal to the excess, if any, of its adjusted tax basis in its Reorganized Common Equity over the amount of such cash.

Gain or loss recognized by a U.S. Holder on the disposition of all or any portion of its Reorganized Common Equity will generally, subject to the application of certain recharacterization rules (i.e., related to a sale of "hot assets" like unrealized receivables or inventory of the partnership) be capital gain or loss. If a U.S. Holder transfers less than all of its Reorganized Common Equity, the U.S. Holder will take into account the percentage of its adjusted tax basis in its Reorganized Common Equity that is transferred, determined by comparing the relative fair market values of the portion of the Reorganized Common Equity that is transferred and the portion of the Reorganized Common Equity that is retained.

New TopCo intends to furnish to each Holder of Reorganized Common Equity, after the close of each calendar year, specific tax information, including a Schedule K-1, which describes such Holder's allocable share of New TopCo's income, gain, loss and deductions for New TopCo's preceding taxable year. In preparing this information, New TopCo will take various accounting and reporting positions to determine each Holder's allocable share of such income, gain, loss and deductions. However, New TopCo cannot provide assurances that those positions will yield a

100

result that conforms to the requirements of the IRC, applicable Treasury Regulations or administrative interpretations of the IRS.  Furthermore, New TopCo cannot provide assurances that the IRS will not successfully contend in court that those positions are impermissible.

Pursuant to the Bipartisan Budget Act of 2015, for U.S. federal income tax purposes, any audit adjustment to New TopCo's tax items (or any partner's distributive share of such item) may result in the imposition of tax (including any applicable penalties and interest) at the New TopCo level. Generally, New TopCo will have the ability to elect to have the partners take such audit adjustment into account in accordance with their interests in New TopCo during the tax year under audit, but there can be no assurance that New TopCo will choose to make such election or that such election will be effective in all circumstances. If New TopCo is unable to have the partners take into account such audit adjustment in accordance with their interests in New TopCo during the tax year under audit, or New TopCo chooses not to do so, the partners in the year of such audit adjustment may bear some or all of the tax liability resulting from such audit adjustment (or the benefit of any tax items of loss, deduction or credit), without regard to each such partner's ownership interest in New TopCo (if any) during the tax year under audit. In addition, New TopCo may be able to reduce the amount owed by New TopCo in certain cases based on the status of the partners or if certain partners file amended returns to take into account such adjustments, but there is no assurance New TopCo will be able to obtain any such reduction. If, as a result of any such audit adjustment, New TopCo is required to make payments of taxes, penalties, and/or interest, each partner's share of such amounts shall be treated as an advance against amounts otherwise distributable to such partner or as a loan to such partner. Future regulations or other guidance may affect the application of these rules to New TopCo and the Holders of Reorganized Common Equity and, as a result, the application of these rules to New TopCo and the Holders of Reorganized Common Equity is uncertain.

### viii. <u>Sale, Redemption, or Repurchase of Non-Cash Considerations</u>.

Unless a non-recognition provision of the IRC applies, and (in the case of the New Take-Back Debt Loans and New First Lien Loans) subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of non-Cash consideration received pursuant to the Plan. Such capital gain will be long-term capital gain if, at the time of the sale, exchange, retirement, or other taxable disposition, the U.S Holder held the applicable non-Cash consideration for more than one year. Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates. Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on such dispositions of the Reorganized Common Equity as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claim or recognized an ordinary loss on the exchange of its Claim for Reorganized Common Equity.

For a description of certain limitations on the deductibility of capital losses, see the section entitled "Limitation on Use of Capital Losses" below.

### ix. <u>Limitations on Use of Capital Losses</u>.

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S.

Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 annually ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 9.2    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims.

The following discussion includes only certain U.S. federal income tax consequences of the consummation of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the Restructuring Transactions to such Non-U.S. Holder and the ownership and disposition of non-Cash consideration.

#### a.    Gain Recognition.

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year in which the exchange occurs and certain other conditions are met, or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

b. **Interest Payments; Accrued but Untaxed Interest**.

Payments to a Non-U.S. Holder that are attributable to either (a) interest on (or OID accruals with respect to) debt received under the Plan, or (b) accrued but untaxed interest on their Allowed Claim generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a United States person (as defined in section 7701(a)(30) of the IRC), unless:

- the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of OSG Holdings or Reorganized Output Services Group;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors (each, within the meaning of the IRC);

- the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

- such interest (or OID) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent), the Non-U.S. Holder (i) generally will not be subject to withholding tax, but (ii) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest under the rules described above generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on (a) interest on debt received under the Plan and (b) payments that are attributable to accrued but untaxed interest on such Non-U.S. Holder's Allowed Claim. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

c. **Holders of Other General Unsecured Claims – Participation in the Liquidating Trust**.

Pursuant to the Plan, except to the extent that a Non-U.S. Holder of an Other General Unsecured Claim agrees in writing to less favorable treatment, each Other General Unsecured

Claim shall be discharged and released, and each Non-U.S. Holder of an Other General Unsecured Claim shall receive its Pro-Rata Share of the beneficial interests in the Liquidating Trust. Such Non-U.S. Holder's tax consequences from its receipt of such beneficial interest will generally depend on the same considerations discussed above under "Gain Recognition" and "Interest Payments" as applicable.

The Liquidating Trust is intended to be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" within the meaning of sections 671 through 679 of the IRC to the Non-U.S. Holders of Other General Unsecured Claims. The Debtors intend to take the position that this treatment applies to the extent reasonably practicable. In such case, any Liquidating Trust Beneficiaries would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the Liquidating Trust Assets (subject to any obligations related to those assets and excluding Liquidating Trust Assets that are subject to potential disputed claims of ownership or uncertain distributions (if any)) and then contributed such undivided interest to the Liquidating Trust. If this treatment applies, the person or persons responsible for administering the Liquidating Trust shall, in an expeditious but orderly manner, make timely distributions to Liquidating Trust Beneficiaries pursuant to the Plan and not unduly prolong its duration. The Liquidating Trust would not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the governing documents for the Liquidating Trust.

The treatment of the deemed transfer of assets to applicable Holders of Other General Unsecured Claims prior to the contribution of such assets to the Liquidating Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

No entity-level tax should be imposed on the Liquidating Trust with respect to earnings generated by the assets held by it. In the event any tax is imposed on the Liquidating Trust, the person or persons responsible for administering the Liquidating Trust shall be responsible for payment, solely out of the Liquidating Trust Assets, of any such taxes imposed on the Liquidating Trust.

The person or persons responsible for administering the Liquidating Trust shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income. The person or persons responsible for administering the Liquidating Trust will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that the Liquidating Trust is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations. As soon as reasonably practicable after the close of each calendar year, the person or persons responsible for administering the Liquidating Trust will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and, if applicable, will instruct the Holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

### d. __Sale, Redemption, or Repurchase of Non-Cash Consideration.__

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other disposition (including a cash redemption) of the non-Cash consideration received under the Plan unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are met;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- in the case of the sale of Reorganized Common Equity, OSG Holdings (or a relevant successor thereto) is, or has been during a specified testing period, a "U.S. real property holding corporation" (a "USRPHC") for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its Reorganized Common Equity under the Foreign Investment in Real Property Tax Act ("FIRPTA"). Taxable gain from the disposition of an interest in a partnership that is treated as a "United States real property interest" (as defined in the IRC and applicable Treasury Regulations) ("USRPI") (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income pursuant to the application of the second exception described above. Further, the buyer of the Reorganized Common Equity will be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.

In general, a partnership interest is not treated as a USRPI for purposes of section 1445 of the IRC unless 50% or more of the value of the partnership's gross assets consists of USRPIs, and

90% or more of the value of its gross assets consists of USRPIs, cash, and cash equivalents ("50/90 Partnership"). An interest in a 50/90 Partnership is treated as a USRPI in its entirety. A USRPHC is a USRPI for purposes of section 1445 of the IRC.

In general, a corporation is a USRPHC as to a Non-U.S. Holder if the fair market value of the corporation's USRPIs equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition by the Non-U.S. Holder or the period of time the Non-U.S. Holder held stock of such corporation. The Debtors do not believe that OSG Holdings is or will be (as of the Effective Date or at any point in the future), a USRPHC.

**e. General Tax Reporting of New TopCo and Non-U.S. Holders of Reorganized Common Equity.**

If a non-U.S. person holds an interest in a partnership that is (directly or indirectly through one or more entities that are treated as partnerships or are disregarded for U.S. federal income tax purposes) engaged in a trade or business within the United States, such non-U.S. person is considered to be engaged in a trade or business within the United States. Because New TopCo's only asset will be its Equity Interests in OSG Holdings and New TopCo will not otherwise be engaged in any other activities, it is not expected that New TopCo will be treated as being engaged in a trade or business within the United States.

As a result, the U.S. federal income tax liability of a Non-U.S. Holder of Reorganized Common Equity generally will be limited to withholding tax on certain gross income from U.S. sources generated by New TopCo, as long as the Non-U.S. Holder undertakes no activities in the United States (determined without regard to its interest in New TopCo) that would cause that Non-U.S. Holder to be engaged in the conduct of a U.S. trade or business. Further, if New TopCo withholds and remits the proper amounts to the U.S. government, Non-U.S. Holders generally will not be required to file U.S. federal income tax returns or pay additional U.S. federal income taxes solely as a result of their interests in New TopCo.

Gain recognized upon a disposition by a non-U.S. person of an interest in a partnership generally will be treated as "effectively connected income" ("ECI") to the extent such gain is attributable to assets of the partnership that generate ECI. Because the only asset of New TopCo will be the Equity Interests in OSG Holdings, it is not anticipated that gain on the disposition by a Non-U.S. Holder of Reorganized Common Equity would be ECI.

**f. Dividends on Reorganized Common Equity.**

Certain categories of income from U.S. sources that may be realized by New TopCo upon a distribution from OSG Holdings – namely, dividends – generally will be subject to U.S. federal income tax, collected by withholding on the gross amount of that income, when included in the distributive shares of Non-U.S. Holders. A Non-U.S. Holder whose distributive share of such income is subject to this tax may be able to claim an exemption or a reduced rate of withholding

under a tax treaty or convention between the United States and that Non-U.S. Holder's country of residence. However, a Non-U.S. Holder resident in a jurisdiction with which the United States has a tax treaty may not be entitled to the benefits of that treaty with respect to that Non-U.S. Holder's distributive share of New TopCo's income and gains unless, under the law of that non-U.S. jurisdiction, New TopCo is treated as tax-transparent and certain other conditions are met. In addition, in order to claim the benefits of a tax treaty to reduce U.S. federal income tax withholding on U.S.-source income (other than interest and dividends paid on securities that are actively traded), a Non-U.S. Holder – and any direct or indirect equity owner of a Non-U.S. Holder seeking treaty benefits for itself because the Non-U.S. Holder is considered fiscally transparent in that equity owner's jurisdiction – generally will be required to provide to New TopCo either a non-U.S. tax identifying number issued by its country of residence or a U.S. taxpayer identification number that it has obtained from the IRS, along with certain other documentation.

g.  **FATCA.**

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's ownership of the Claims or the Reorganized Common Equity.

**9.3  Information Reporting and Withholding.**

The Debtors, Reorganized Debtors, Distribution Agent and applicable withholding agents will be required to withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a holder of a Claim may be subject to backup withholding (at the then-current rate) with respect to distributions or payments made pursuant to the Plan or in connection with payments made on account of consideration received pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of

perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Holders of Claims subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

# ARTICLE X

## CONCLUSION AND RECOMMENDATION

The Debtors believe that Confirmation and Consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all Holders of Claims or Interests entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots so they will be received by the Solicitation Agent no later than 4:00 p.m. (prevailing Central Time) on November 13, 2023.

Dated: October 15, 2023

Respectfully submitted,

OSG Holdings, Inc.
on behalf of itself and each of its Debtor affiliates

By:      */s/ Dean Cherry*
Name: Dean Cherry
Title:   Chief Executive Officer

*Prepared by:*

**MCDERMOTT WILL & EMERY LLP**
Felicia Gerber Perlman (*pro hac vice* pending)
Bradley Thomas Giordano (*pro hac vice* pending)
Carole Wurzelbacher (*pro hac vice* pending)
444 West Lake Street
Chicago, Illinois 10036
Telephone: (312) 372-2000
Facsimile:  (312) 984-7700
E-mail:     fperlman@mwe.com
            bgiordano@mwe.com
            cwurzelbacher@mwe.com

– and –

**MCDERMOTT WILL & EMERY LLP**
Gregg Steinman (*pro hac vice* pending)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Facsimile:  (305) 347-6500
E-mail:     gsteinman@mwe.com

**MCDERMOTT WILL & EMERY LLP**
Marcus A. Helt
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201
Telephone: (214) 295-8000
Facsimile:  (972) 232-3098
E-mail:     mhelt@mwe.com

*Proposed Counsel for Debtors and Debtors in Possession*

**Exhibit A**

**The Plan**

*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| OSG HOLDINGS, INC., *et al.*,[1] | Case No. 23-90799 (CML) |
| Debtors. | (Joint Administration Requested) |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
## OF OSG HOLDINGS, INC. AND CERTAIN OF ITS DEBTOR AFFILIATES
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**MCDERMOTT WILL & EMERY LLP**
Felicia Gerber Perlman (*pro hac vice* pending)
Bradley Thomas Giordano (*pro hac vice* pending)
Carole Wurzelbacher (*pro hac vice* pending)
444 West Lake Street
Chicago, Illinois 10036
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
E-mail: fperlman@mwe.com
       bgiordano@mwe.com
       cwurzelbacher@mwe.com

- and -

**MCDERMOTT WILL & EMERY LLP**
Gregg Steinman (*pro hac vice* pending)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Facsimile: (305) 347-6500
E-mail: gsteinman@mwe.com

**MCDERMOTT WILL & EMERY LLP**
Marcus A. Helt (Texas Bar #24052187)
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
E-mail: mhelt@mwe.com

*Proposed Counsel for Debtors and Debtors in Possession*

Dated October 15, 2023

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: Applied Information Group, Inc. (7381); Diamond Marketing Solutions Group, Inc. (3531); DoublePositive Marketing Group, Inc. (8221); E-statement.com Corp. (1974); Globalex Corporation (5365); JJT Enterprises, Inc. (7792); Mansell Group Holding Company (9354); Mansell Group, Inc. (7898); Metrogroup PD-WI Acquisition, LLC (5979); Microdynamics Corporation (0423); Microdynamics Group Nebraska, Inc. (5711); Microdynamics Transactional Mail, LLC (4060); National Business Systems, Inc. (6946); National Data Services of Chicago, Inc. (9009); NCP Solutions, LLC (5620); OSG Group Holdings, Inc. (0311); OSG Group TopCo, LLC (0904); OSG Holdings, Inc. (2036); OSG Intermediate Holdings, Inc. (1288); Output Services Group, Inc. (8044); Payments Business Corporation (5590); The Pisa Group, Inc. (6299); PPS Business Corporation (6432); SouthData, Inc. (5336); Telereach, Inc. (4444); The Garfield Group, Inc. (9966); WhatCounts, Inc. (9306); and Words, Data and Images, LLC (2248). The debtors' service address is 900 Kimberly Drive, Carol Stream, Illinois 60188.

# TABLE OF CONTENTS

Page

ARTICLE I.     DEFINED TERMS, RULES OF INTERPRETATION, AND
               COMPUTATION OF TIME ........................................................................2

Section 1.1    Defined Terms ......................................................................................2
Section 1.2    Rules of Interpretation and Computation of Time. ............................21

ARTICLE II.    UNCLASSIFIED CLAIMS ..................................................................22

Section 2.1    Administrative Claims. .......................................................................22
Section 2.2    Priority Tax Claims. ...........................................................................23
Section 2.3    Professional Fee Claims. ....................................................................23
Section 2.4    DIP Claims. .........................................................................................24
Section 2.5    Statutory Fees. ....................................................................................25

ARTICLE III.   CLASSIFICATION AND TREATMENT OF CLAIMS AND
               INTERESTS ........................................................................................25

Section 3.1    Classification of Claims. .....................................................................25
Section 3.2    Class Identification. ............................................................................25
Section 3.3    Treatment and Voting Rights of Claims and Interests. ......................26
Section 3.4    Special Provision Governing Unimpaired Claims. .............................30
Section 3.5    Voting; Presumptions; Solicitation. ....................................................30
Section 3.6    Nonconsensual Confirmation. .............................................................30
Section 3.7    Subordinated Claims. ..........................................................................31
Section 3.8    Vacant Classes. ...................................................................................31
Section 3.9    Intercompany Interests. ......................................................................31
Section 3.10   No Waiver. ..........................................................................................31

ARTICLE IV.    MEANS FOR IMPLEMENTATION OF THE PLAN ..................................31

Section 4.1    Compromise or Settlement of Controversies. .....................................31
Section 4.2    Sources of Consideration for Plan Distribution. ................................32
Section 4.3    Restructuring Transactions. ................................................................32
Section 4.4    Continued Corporate Existence ..........................................................33
Section 4.5    Corporate Action. ................................................................................33
Section 4.6    Vesting of Assets. ...............................................................................34
Section 4.7    Indemnification Provisions in Organizational Documents. ................34
Section 4.8    Cancellation of Existing Securities and Agreements. ........................35
Section 4.9    Cancellation of Certain Existing Security Interests. ..........................36
Section 4.10   The New First Lien Loan Commitments. ............................................36
Section 4.11   Optional ABL Facility. ........................................................................38
Section 4.12   Issuance of the Reorganized Common Equity. ...................................38
Section 4.13   Rights Offering. ...................................................................................39
Section 4.14   Backstop Commitment Letter. ............................................................39

ii

Section 4.15     Exit Capital. .............................................................................40
Section 4.16     Exemption from Registration Requirements..................................40
Section 4.17     Organizational Documents............................................................41
Section 4.18     Exemption from Certain Transfer Taxes and Recording Fees.........41
Section 4.19     Managers, Directors and Officers of the Reorganized Debtors. .....42
Section 4.20     Management Incentive Plan...........................................................42
Section 4.21     The Liquidating Trust. ..................................................................43
Section 4.22     Effectuating Documents; Further Transactions. ............................44
Section 4.23     Restructuring Expenses.................................................................45
Section 4.24     Retained Causes of Action. ...........................................................45

ARTICLE V.      TREATMENT OF EXECUTORY CONTRACTS AND
                UNEXPIRED LEASES ...................................................................46

Section 5.1      Assumption of Executory Contracts and Unexpired Leases.............46
Section 5.2      Cure of Defaults for Assumed Executory Contracts and Unexpired
                Leases. .........................................................................................47
Section 5.3      Claims Based on Rejection of Executory Contracts or Unexpired
                Leases. .........................................................................................48
Section 5.4      Contracts and Leases Entered Into After the Petition Date. .............48
Section 5.5      Insurance Policies..........................................................................48
Section 5.6      Reservation of Rights. ...................................................................48
Section 5.7      Nonoccurrence of Effective Date....................................................48

ARTICLE VI.     PROVISIONS GOVERNING DISTRIBUTIONS ..........................49

Section 6.1      Distribution on Account of Claims Allowed as of the Effective Date..............49
Section 6.2      Distribution on Account of Claims Allowed After the Effective Date.............49
Section 6.3      Delivery of Distributions................................................................50
Section 6.4      Minimum Distributions..................................................................51
Section 6.5      Foreign Currency Exchange Rate. ..................................................51
Section 6.6      Delivery of Distributions; Undeliverable Distributions....................52
Section 6.7      Compliance with Tax Requirements/Allocations. ............................52
Section 6.8      Surrender of Cancelled Instruments or Securities............................53
Section 6.9      Claims Paid or Payable by Third Parties..........................................53

ARTICLE VII.    PROCEDURES FOR RESOLVING DISPUTED CLAIMS OR
                INTERESTS...................................................................................54

Section 7.1      Resolution of Disputed Claims Process. ..........................................54
Section 7.2      Allowance of Claims and Interests. ................................................55
Section 7.3      Prosecution of Objections to Claims...............................................55
Section 7.4      Adjustment to Claims and Interests Without Objection. ...................55
Section 7.5      Disallowance of Certain Claims......................................................55
Section 7.6      Offer of Judgment. ........................................................................56
Section 7.7      Amendments to Claims or Interests. ...............................................56

ARTICLE VIII.   CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .........................56

Section 8.1      Conditions Precedent to the Effective Date. ..............................................56
Section 8.2      Waiver of Conditions Precedent. ...............................................................60
Section 8.3      Effect of Failure of Conditions Precedent..................................................60
Section 8.4      Substantial Consummation of Plan. ...........................................................60

ARTICLE IX.     EFFECT OF PLAN CONFIRMATION .....................................................60

Section 9.1      Binding Effect. ...........................................................................................60
Section 9.2      Discharge.....................................................................................................61
Section 9.3      Releases........................................................................................................62
Section 9.4      Exculpation and Limitation of Liability.....................................................65
Section 9.5      Injunction. ...................................................................................................67
Section 9.6      Gatekeeper Provision. .................................................................................68
Section 9.7      Setoffs and Recoupment. ............................................................................69
Section 9.8      Release of Liens. .........................................................................................69

ARTICLE X.      RETENTION OF JURISDICTION ...........................................................70

ARTICLE XI.     MISCELLANEOUS PROVISIONS ...........................................................72

Section 11.1     Immediate Binding Effect. ..........................................................................72
Section 11.2     Payment of Statutory Fees. .........................................................................73
Section 11.3     Amendments. ...............................................................................................73
Section 11.4     Revocation or Withdrawal of Plan. .............................................................73
Section 11.5     Governing Law. ...........................................................................................74
Section 11.6     Successors and Assigns.................................................................................74
Section 11.7     No Successor Liability. ................................................................................74
Section 11.8     Severability. .................................................................................................74
Section 11.9     Filing of Additional Documents. ................................................................75
Section 11.10    Reservation of Rights...................................................................................75
Section 11.11    Service of Documents. .................................................................................75
Section 11.12    Section 1125(e) of the Bankruptcy Code. ..................................................77
Section 11.13    Tax Reporting and Compliance. ..................................................................77
Section 11.14    Exhibits, Schedules, and Supplements.........................................................78
Section 11.15    Entire Agreement. ........................................................................................78
Section 11.16    Allocation of Payments. ..............................................................................78
Section 11.17    Prepayment...................................................................................................78
Section 11.18    Conflicts.......................................................................................................78
Section 11.19    Closing of Chapter 11 Cases. ......................................................................79
Section 11.20    Term of Injunctions or Stays.......................................................................79

*Solicitation Version*

> IMPORTANT: THE SOLICITATION MATERIALS ACCOMPANYING THIS JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF 11 U.S.C. § 1125(a). THE DEBTORS EXPECT TO SEEK AN ORDER OR ORDERS OF THE BANKRUPTCY COURT, AMONG OTHER THINGS: (1) APPROVING THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH 11 U.S.C. § 1126(b); AND (2) CONFIRMING THIS PLAN OF REORGANIZATION PURSUANT TO 11 U.S.C. § 1129.

### JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF OSG HOLDINGS, INC. AND CERTAIN OF ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Applied Information Group, Inc., Diamond Marketing Solutions Group, Inc., DoublePositive Marketing Group, Inc., E-statement.com Corp., JJT Enterprises, Inc., Globalex Corporation, Mansell Group Holding Company, Mansell Group, Inc., Metrogroup PD-WI Acquisition, LLC, Microdynamics Corporation, Microdynamics Group Nebraska, Inc., Microdynamics Transactional Mail, LLC, National Business Systems, Inc., National Data Services of Chicago, Inc., NCP Solutions, LLC, OSG Holdings, Inc., Output Services Group, Inc., Pisa Group, Inc., Payments Business Corporation, Metrogroup PD-WI Acquisition, LLC, SouthData, Inc., Metrogroup PD-WI Acquisition, LLC, The Garfield Group, Inc., WhatCounts, Inc., and Words, Data and Images, LLC (each a "Debtor" and, collectively, the "Debtors") propose this joint prepackaged plan of reorganization (the or this "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in this Plan and not otherwise defined have the meanings ascribed to such terms in Article I hereof.

Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. The Debtors seek to consummate the Restructuring Transactions on the Effective Date. Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III hereof shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. This Plan does not contemplate substantive consolidation of any of the Debtors.

Reference is made to the accompanying Disclosure Statement for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE STRONGLY ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

Section 1.1     *Defined Terms.*

The following terms shall have the respective meanings specified below when used in capitalized form in this Plan:

1.      "*4(a)(2) Securities*" means all of the New Money Reorganized Equity.

2.      "*1145 Securities*" means the Exchange Reorganized Equity and the Election Rights; *provided*, that if the offer, issuance or delivery, or sale of any of the Exchange Reorganized Equity or Election Rights is not exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code, then such Exchange Reorganized Equity or Election Rights, as applicable, shall constitute 4(a)(2) Securities.

3.      "*A&R LLC Agreement*" means the Amended and Restated Limited Liability Company Agreement of New TopCo to be executed on the Effective Date by and among New TopCo and the members of New TopCo, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

4.      "*Accordion*" means Accordion Partners, LLC.

5.      "*Administrative Claims*" means any and all requests for payment of costs or expenses (other than DIP Claims) of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority under section 507 of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; and (b) Bankruptcy Fees.

6.      "*Administrative Claims Bar Date*" means day that is the 30th day after the Effective Date or, if such 30th day is not a Business Day, the first Business Day immediately following such 30th day.

7.      "*Affiliate*" (means, with respect to any Person, any other Person controlled by, controlling or under common control with such Person and shall also include (a) any Related Fund of such Person and (b) any "affiliate" (as defined in section 101(2) of the Bankruptcy Code) of such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise).

8.      "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest (or portion thereof) expressly allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such

2

Claims would be allowed under applicable nonbankruptcy law; *provided*, *however*, that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

9. "***Amended and Restated Credit Agreement***" means that certain amended and restated credit agreement that governs or evidences the New First Lien Facility and the New Take-Back Debt Facility to be entered into on the Effective Date by and among Reorganized Output Services Group, the guarantors from time to time party thereto, the First Lien Agent, the New First Lien Lenders, the New Take-Back Debt Lenders, and the other Entities party thereto from time, which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement. A substantially completed draft of the Amended and Restated Credit Agreement will be included in the Plan Supplement.

10. "***Aquiline***" means Aquiline Financial Services Fund III L.P.

11. "***Backstop Commitment Letter***" means the amended and restated commitment letter, dated as of October 12, 2023, by and between the Debtors and the Backstop Parties, as may be amended, amended and restated, modified or supplemented from time to time.

12. "***Backstop Parties***" means the Persons that executed the Backstop Commitment Letter as "Backstop Parties" thereunder.

13. "***Ballot***" means a ballot accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote on this Plan shall, among other things, indicate their acceptance or rejection of this Plan in accordance with this Plan and the procedures governing the solicitation process.

14. "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended.

15. "***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas or such other court as may have jurisdiction over the Chapter 11 Cases.

16. "***Bankruptcy Fees***" means any and all fees or charges assessed against the Debtors' Estates under section 1930 of title 28 of the United States Code.

17. "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, promulgated under section 2075 of title 28 of the United States Code, the Official Bankruptcy Forms, or the local rules of the Bankruptcy Court, together with any amendments made thereto, and the general, local, and chambers rules of the Bankruptcy Court.

18. "***Bidco Divestiture***" means the full, final, unconditional and irrevocable sale, transfer, disposition, or divestment by any other means (including by way of liquidation) of all of the assets and properties or Equity Interests of OSG Bidco and all of its subsidiaries.

19. "***Business Day***" means any day, other than a Saturday, Sunday, or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

20. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

21. "*Causes of Action*" means any and all claims, interests, damages, remedies, causes of action, demands, rights, debts, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable, direct or derivative, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, including but not limited to: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) all claims against parties that are not a party to the Restructuring Support Agreement.

22. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all Debtors, the jointly-administered cases pending for the Debtors in the Bankruptcy Court collectively.

23. "*Claim*" means a claim as defined in section 101(5) of the Bankruptcy Code.

24. "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

25. "*Class*" means a group of Claims or Interests classified together pursuant to section 1122(a) of the Bankruptcy Code.

26. "*Commitment Percentage*" means, with respect to any Backstop Party, the percentage set forth opposite the name of such Backstop Party on Schedule A attached to the Backstop Commitment Letter.

27. "*Communisis Pension Plan*" means the Communisis Pension Plan governed by the Definitive Deed and Rules Communisis Pension Plan, dated as of May 15, 2007, by and among Communisis PLC and the "Trustees" party thereto.

28. "*Company*" means OSG Holdings, Inc. and all of its direct and indirect subsidiaries.

29. "*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

30. "*Confirmation Date*" means the date upon which the Confirmation Order is entered on the docket maintained by the Bankruptcy Court pursuant to Bankruptcy Rule 5003.

31.     "**Combined Hearing**" means the hearing to be held by the Bankruptcy Court to consider the adequacy of the Disclosure Statement and confirmation of this Plan under sections 1125 and 1129 of the Bankruptcy Code, respectively.

32.     "**Combined Order**" means, together, the Confirmation Order and the Disclosure Statement Order.

33.     "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

34.     "**Consenting First Lien Lenders**" means those certain Holders of Existing First Lien Claims party to the Restructuring Support Agreement.

35.     "**Consenting Funds**" means, collectively, Aquiline, the Pemberton Equity Funds, and Goldpoint, in each case, in any capacity in which they hold Claims against the Debtors or the Liquidating Debtors and Interests in OSG Group TopCo, LLC.

36.     "**Consenting Stakeholders**" means, collectively, the Consenting First Lien Lenders and the Consenting Funds.

37.     "**Consummation**" means the occurrence of the Effective Date.

38.     "**Covered Claims**" means any claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement or any contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, and Plan, the Plan Supplement, the Chapter 11 Cases, the commencement of the Chapter 11 Cases, the DIP Facility Documents, the DIP Orders, solicitation of votes on the Plan, the prepetition negotiation and settlement of claims, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or after the Petition Date and on or before the Effective Date.

39.     "**Cure Cost**" means any amount required to cure any monetary default under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by parties to an Executory Contract or Unexpired Lease) in order for such Executory Contract or Unexpired Lease to be assumed by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code.

40.     "**D&O Liability Insurance Policies**" means all insurance policies with third party insurance providers issued to or providing coverage at any time to any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date, including any "tail policy", and all agreements, documents, or instruments relating thereto.

41.     "**Debtor**" has the meaning set forth in the introductory paragraph of this Plan.

5

42. "*Debtor Releases*" means the releases given by the Debtors to the Released Parties under Section 9.3(a) hereof.

43. "*Definitive Documents*" has the meaning set forth in the Restructuring Support Agreement.

44. "*DIP Agent*" means Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents, and Acquiom Agency Services LLC, as collateral agent, in each case for the DIP Lenders under the DIP Facility Documents, or any successor agents thereunder.

45. "*DIP Claims*" means any and all Claims against any Debtor related to, arising out of, arising under, or arising in connection with the DIP Facility Documents.

46. "*DIP Credit Agreement*" means that certain credit agreement evidencing the DIP Facility, as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

47. "*DIP Facility*" means the debtor in possession secured term loan financing facility in an aggregate principal amount up to $50.0 million on the terms and conditions set forth in the DIP Term Sheet (as defined in the Restructuring Support Agreement).

48. "*DIP Facility Documents*" means the DIP Credit Agreement and the DIP Orders, together with all documentation executed or delivered in connection therewith, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms and conditions set forth therein, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

49. "*DIP Lenders*" means the Consenting First Lien Lenders or their respective Affiliates party to the DIP Credit Agreement.

50. "*DIP Orders*" means the Interim DIP Order and the Final DIP Order, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

51. "*Direct Allocation Amount*" means $25.0 million.

52. "*Disclosure Statement*" means the disclosure statement for this Plan, including all exhibits and schedules thereto, as it may be amended from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

53. "*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials, which order shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

54.    "**_Disputed_**" means, with respect to any Claim or Interest, except as otherwise provided herein, a Claim or Interest (or portion thereof) that has not been Allowed.

55.    "**_Distribution Date_**" means the date on which Holders of Claims or Interests are eligible to receive distributions under this Plan, which date shall be the Effective Date or such other date agreed to by the Debtors and the Required Parties.

56.    "**_Effective Date_**" means the date that is the first Business Day on which (a) all conditions to the effectiveness of this Plan set forth in Section 8.1 hereof have been satisfied or waived in accordance with the terms of this Plan and (b) no stay of the Confirmation Order is in effect.

57.    "*_Election Rights_*" means the "Election Rights" as defined in the Rights Offering Procedures.

58.    "**_Entity_**" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

59.    "**_Equity Interest_**" means, with respect to any Person, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, partnership interests and any other equity, ownership, beneficial, or profits interests of such Person, and options, warrants, rights, stock appreciation rights, phantom stock or units, incentives, or other securities, arrangements or agreements to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or any other equity, ownership, beneficial, or profits interests of such Person (in each case whether or not arising under or in connection with any employment agreement).

60.    "**_Estate_**" means, as to each Debtor, the estate created for the Debtor pursuant to section 541 of the Bankruptcy Code upon the commencement of the Debtor's Chapter 11 Cases.

61.    "**_Exchange Reorganized Equity_**" means 80.0% of the Reorganized Common Equity that will be issued and outstanding on the Effective Date (immediately after giving effect to the consummation of the Restructuring Transactions to occur on or as of the Effective Date, including all payments and distributions to be made on or as of the Effective Date), subject to dilution by the Put Option Premium and the Management Incentive Plan.

62.    "**_Exculpated Parties_**" means, collectively, in each case, to the fullest extent permitted by law, in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) the Liquidating Trustee; and (d) with respect to each of the foregoing Entities in clauses (a) and (b), such Entity's independent directors and managers.

63.    "**_Executory Contract_**" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.    "**_Existing First Lien Claims_**" means any and all Claims against any Debtor related to, arising out of, arising under, or arising in connection with, the Existing First Lien Documents,

including, but not limited to, the Existing First Lien Term Loan Claims and the Existing First Lien Revolving Claims.

65.     "***Existing First Lien Credit Agreement***" means that certain Amended and Restated First Lien Credit Agreement, dated as of August 31, 2022 (as may be amended, restated, amended and restated, modified or supplemented from time to time), by and among Holdings, as holdings, Output Services Group, as borrower, the guarantors party thereto, the Existing First Lien Lenders, and the First Lien Agent.

66.     "***Existing First Lien Documents***" means the Existing First Lien Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

67.     "***Existing First Lien Facility***" means, collectively, the first lien term loan facility and revolving loan financing facility reflecting the terms and conditions set forth in the Existing First Lien Documents.

68.     "***Existing First Lien GBP Term Loan Claims***" means any and all Claims against any Debtor related to, arising out of, arising under, or arising in connection with the Existing First Lien GBP Term Loans under the Existing First Lien Documents.

69.     "***Existing First Lien GBP Term Loans***" has the meaning given to the term "Amended and Restated Term GBP Loans" in the Existing First Lien Credit Agreement.

70.     "***Existing First Lien Lenders***" means the Holders of Existing First Lien Claims.

71.     "***Existing First Lien Loans***" means the loans made (or deemed made) under the Existing First Lien Credit Agreement.

72.     "***Existing First Lien Revolving Claims***" means any and all Claims against any Debtor related to, arising out of, arising under, or arising in connection with, the Existing First Lien Revolving Credit Commitments or the Existing First Lien Revolving Credit Loans under the Existing First Lien Documents.

73.     "***Existing First Lien Revolving Credit Commitments***" has the meaning given to the term "Revolving Credit Commitments" in the Existing First Lien Credit Agreement.

74.     "***Existing First Lien Revolving Credit Loans***" has the meaning given to the term "Revolving Credit Loans" in the Existing First Lien Credit Agreement.

75.     "***Existing First Lien Term A Loan Claims***" means any and all Claims against any Debtor related to, arising out of, arising under, or arising in connection with the Existing First Lien Term A Loans under the Existing First Lien Documents.

76.     "***Existing First Lien Term A Loans***" has the meaning given to the term "Amended and Restated Term A Loans" in the Existing First Lien Credit Agreement.

77.     "***Existing First Lien Term B Loan Claims***" means any and all Claims against any Debtor related to, arising out of, arising under, or arising in connection with, the Existing First Lien Term B Loans under the Existing First Lien Documents.

78.     "***Existing First Lien Term B Loans***" has the meaning given to the term "Amended and Restated Term B Loans" in the Existing First Lien Credit Agreement.

79.     "***Existing First Lien Term Loan Claims***" means, collectively, the Existing First Lien Term A Loan Claims, the Existing First Lien Term B Loan Claims, and the Existing First Lien GBP Term Loan Claims.

80.     "***Existing Interests***" means any Interest in a Debtor other than an Intercompany Interest; *provided, however*, that the common stock of Holdings issued on or about the Effective Date, as further described in the Restructuring Transactions Memorandum, shall not constitute Existing Interests.

81.     "***Federal Judgment Rate***" means the federal judgment rate in effect as of the Petition Date.

82.     "***Final DIP Order***" means an order of the Bankruptcy Court approving the DIP Facility and granting the Debtors the authority to use cash collateral and provide "adequate protection" (as such term is defined in section 361 of the Bankruptcy Code) to the Existing First Lien Lenders in the Chapter 11 Cases on a final basis, which order shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

83.     "***Final Order***" means, as applicable, an order, ruling, or judgment of the Bankruptcy Court or any other court of competent jurisdiction, as applicable, which has not been reversed, vacated, or stayed and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for reargument or rehearing is pending, or as to which any right to appeal, petition for certiorari, reargue, or rehear has been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court, or other court of competent jurisdiction (as applicable) has been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing has been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing has expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state or provincial court rules of civil procedure, may be filed with respect to such order, ruling, or judgment shall not cause an order, ruling, or judgment not to be a Final Order.

84.     "***First Lien Agent***" means Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents, and Acquiom Agency Services LLC, as collateral agent, or any successor administrative or collateral agents under the Existing First Lien Facility, the New First Lien Facility and the New Take-Back Debt Facility.

85.    "***First Lien Group***" means the group of Consenting First Lien Lenders represented by Paul Hastings LLP.

86.    "***First Lien Group Advisors***" means, collectively: (a) Paul Hastings LLP, as counsel to the First Lien Group; (b) local counsel to the First Lien Group; (c) Perella Weinberg Partners LP, as financial advisor to the First Lien Group; and (d) Arc Pensions Law, as United Kingdom counsel to the First Lien Group.

87.    "***GBP***" means the lawful currency of the United Kingdom.

88.    "***General Unsecured Claims***" means any and all unsecured Claims against any of the Debtors (other than an Administrative Claim, a Professional Fee Claim, an Intercompany Claim, a Priority Tax Claim, an Other Priority Claim, or any Claim subject to subordination under section 510(b) of the Bankruptcy Code), including (a) General Unsecured Litigation Claims, (b) General Unsecured Trade Claims, and (c) Other General Unsecured Claims.

89.    "***General Unsecured Litigation Claims***" means, other than any Other General Unsecured Claim, (a) any and all unsecured Claims against any of the Debtors asserted in or arising from any ongoing litigation or other court, administrative or similar proceedings or causes of action against any of the Debtors pending and not reduced to judgment as of the Petition Date, including damages or judgments entered against, or settlement amounts owing by a Debtor related thereto, and (b) any and all unsecured Claims against any of the Debtors for damages arising out of the rejection of Executory Contracts or Unexpired Leases under this Plan.

90.    "***General Unsecured Trade Claims***" means any and all unsecured Claims against any of the Debtors (other than an Administrative Claim, a Professional Fee Claim, an Intercompany Claim, a Priority Tax Claim, an Other Priority Claim, a General Unsecured Litigation Claim, Other General Unsecured Claims, or any Claim subject to subordination under section 510(b) of the Bankruptcy Code).

91.    "***GoldPoint***" means, collectively, GoldPoint Mezzanine Partners IV, LP and GoldPoint Private Credit Fund LP, Hanwha Global Corporate PE Strategy Private Fund 2, and Apogem Capital LLC, as the investment manager of each of the foregoing.

92.    "***Governmental Unit***" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

93.    "***Holder***" means the holder of any Claim against a Debtor or of any Interest.

94.    "***Holdings***" means OSG Holdings, Inc., a New Jersey corporation.

95.    "***Houlihan Lokey***" means Houlihan Lokey Capital, Inc., as financial advisor to the Debtors.

96.    "***Impaired***" means, with respect to a Claim or Interest, such Claim or Interest that falls within a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

97. "**Indemnification Obligation**" means a Debtor's obligations under any indemnification provisions of such Debtor described in Section 4.7(c) of this Plan.

98. "**Insurance Policies**" means all insurance policies, including all D&O Liability Insurance Policies, that have been issued at any time that provide coverage, benefits, or proceeds to any of the Debtors (or their predecessors) and all agreements, documents, or instruments relating thereto.

99. "**Intercompany Claims**" means any and all Claims held by (a) any Debtor against any other Debtor, (b) any Liquidating Debtor against a Debtor, or (c) any direct or indirect subsidiary of a Debtor against a Debtor.

100. "**Intercompany Interests**" means any and all Interests in a Debtor or a subsidiary of a Debtor that are owned or held by another Debtor; *provided, however*, that the Reorganized Common Equity issued and/or delivered on or about the Effective Date, as further described in the Restructuring Transactions Memorandum, shall not constitute Intercompany Interests.

101. "**Interests**" means any and all issued, unissued, authorized, or outstanding Equity Interests in any Debtor, whether or not transferable, and all rights arising with respect thereto.

102. "**Interim DIP Order**" means an order of the Bankruptcy Court approving the DIP Facility and granting the Debtors the authority to use cash collateral and provide "adequate protection" (as such term is defined in section 361 of the Bankruptcy Code) to the Existing First Lien Lenders in the Chapter 11 Cases on an interim basis, which order shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

103. "**Law**" means any federal, state, local, or foreign "law" (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

104. "**Lien**" means a lien as defined in section 101(37) of the Bankruptcy Code.

105. "**Liquidating Debtors**" means OSG Group TopCo, LLC, OSG Group Holdings, Inc., and OSG Intermediate Holdings, Inc.

106. "**Liquidating Trust**" means the trust established on the Effective Date that, among other things, shall effectuate the Bidco Divestiture.

107. "**Liquidating Trust Agreement**" means that certain trust agreement establishing the Liquidating Trust, by and among the Debtors and the Liquidating Trustee, which shall be included in the Plan Supplement.

108. "**Liquidating Trust Assets**" means, collectively, all of the Debtors' right, title, and interest in, to, and under OSG Bidco and all of its subsidiaries, and all of their respective Equity Interests, assets, contracts, benefit plans, businesses, and operations.

11

109.    "***Liquidating Trust Beneficiaries***" means the Holders of Allowed Claims in Class 6 that are entitled to receive distributions pursuant to the terms of the Plan.

110.    "***Liquidating Trustee***" means the Person or Persons selected by the Debtors that is identified in the Plan Supplement to serve as the trustee(s) of the Liquidating Trust, and any successor thereto.

111.    "***Management Incentive Plan***" means an equity incentive plan of New TopCo to be implemented by the New Board within 90 days after the Effective Date, which will provide for the issuance of equity and equity-based awards to certain directors, managers, officers and employees of the Reorganized Debtors and New TopCo and certain other eligible participants, on terms and subject to conditions determined by the New Board in its sole discretion.

112.    "***New Board***" means the new board of directors, board of managers or other governing body of New TopCo, as determined in accordance with the New Organizational Documents of New TopCo.

113.    "***New First Lien Documents***" means the Amended and Restated Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

114.    "***New First Lien Facility***" means the new first lien, first out term loan facility reflecting the terms and conditions set forth in the New First Lien Facility Term Sheet attached as Exhibit F to the Restructuring Support Agreement.

115.    "***New First Lien Facility Amount***" means $50.0 million.

116.    "***New First Lien Facility Term Sheet***" means the New First Lien Facility Term Sheet attached as Exhibit F to the Restructuring Support Agreement.

117.    "***New First Lien Lenders***" means the lenders party to the Amended and Restated Credit Agreement that make the New First Lien Loans.

118.    "***New First Lien Loans***" means the loans made under the New First Lien Facility pursuant to the New First Lien Documents.

119.    "***New First Lien Loan Commitments***" means commitments to make New First Lien Loans pursuant to the New First Lien Facility as set forth in the Amended and Restated Credit Agreement.

120.    "***New Money Reorganized Equity***" means Reorganized Common Equity equal to twenty percent (20.0%) of the issued and outstanding Reorganized Common Equity on the Effective Date (immediately after giving effect to the consummation of the Restructuring Transactions to occur on or as of the Effective Date, including all payments and distributions to be made on or as of the Effective Date), subject to dilution by the Management Incentive Plan.

12

121.    "***New Organizational Documents***" means, on or after the Effective Date, the organizational and governance documents for each of the Reorganized Debtors and New TopCo, including certificates of incorporation (including any certificate of designations), certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholders' agreements, and limited partnership agreements (or equivalent governing documents), as applicable, in each case, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement. For purposes of this Plan, the initial limited liability company agreement of New TopCo (which will be amended and restated, and replaced in its entirety, by the A&R LLC Agreement on the Effective Date) shall constitute a New Organizational Document.

122.    "***New Take-Back Debt Documents***" means the Amended and Restated Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

123.    "***New Take-Back Debt Facility***" means the new first lien, second out debt financing facility reflecting the terms and conditions set forth in the New Take-Back Debt Facility term sheet attached as Exhibit G to the Restructuring Support Agreement.

124.    "***New Take-Back Debt Lenders***" means the lenders party to the Amended and Restated Credit Agreement that make (or are deemed to have made) New Take-Back Debt Loans.

125.    "***New Take-Back Debt Loans***" means the loans made (or deemed made) under the New Take-Back Debt Facility pursuant to the New Take-Back Debt Documents in an aggregate initial principal amount of $135.0 million.

126.    "***New TopCo***" means a newly formed entity acceptable to the Required Consenting First Lien Lenders that will, directly or indirectly, own 100% of the Equity Interests in, or substantially all of the assets of, Reorganized Output Services Group upon consummation of the Restructuring Transactions on the Effective Date.

127.    "***Notice and Claims Agent***" means Kurtzman Carson Consultants LLC in its capacity as noticing, claims, and solicitation agent for the Debtors.

128.    "***Optional ABL Facility***" means the revolving credit facility described in Section 4.11(a) of this Plan.

129.    "***Opt-Out Form***" means the form by which all Holders of Claims against the Debtors or Interests may voluntarily opt out from becoming a Releasing Party by checking the applicable box on such form.

130.    "***OSG Bidco***" means OSG Bidco Limited, a limited company organized under the Laws of England and Wales.

131.   "***Other General Unsecured Claims***" means, collectively, Claims against any of the Debtors arising from, or otherwise relating to, (a) the Communisis Pension Plan and (b) the Specified Guarantee.

132.   "***Other Priority Claims***" means any and all Claims against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code that are not Administrative Claims or Priority Tax Claims.

133.   "***Other Secured Claims***" means any and all Secured Claims against any Debtor that are not DIP Claims, or Existing First Lien Claims.

134.   "***Output Services Group***" means Output Services Group, Inc. a New Jersey corporation.

135.   "***Outside Date***" means January 16, 2024.

136.   "***Pemberton Equity Funds***" means, collectively, Pemberton Strategic Credit Holdings Sarl, Pemberton Managed Account A Holdings Sarl, and Pemberton Managed Account B Holdings Sarl.

137.   "***Pension Trustee***" means Communisis Trustee (2011) Company Limited in its capacity as sole trustee of the Communisis Pension Plan, together with any additional or replacement trustee(s) of the Communisis Pension Plan from time to time.

138.   "***Person***" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Body, or any legal entity or association.

139.   "***Petition Date***" means the date on which the Debtors each filed a petition for relief commencing the Chapter 11 Cases.

140.   "***Plan***" means this joint prepackaged plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions, including all exhibits and schedules to this Plan, and any Plan Supplement, as they may be amended, supplemented or modified from time to time in accordance with the terms hereof, the terms of the Restructuring Support Agreement, the Bankruptcy Code, and the Bankruptcy Rules.

141.   "***Plan Supplement***" means the compilation of documents and forms and/or term sheets of documents, schedules, and exhibits to this Plan, as the same may be amended, modified, or supplemented from time to time in accordance with the terms hereof, the terms of the Restructuring Support Agreement, the Bankruptcy Code, and the Bankruptcy Rules, and including, without limitation, the following: (a) to the extent known, the identity of the known members of the New Board and the nature and compensation for any director who is an "insider" under the Bankruptcy Code; (b) certain of the New Organizational Documents, including the A&R LLC Agreement; (c) the Amended and Restated Credit Agreement; (d) the Backstop Commitment Letter; (e) the Rights Offering Procedures; (f) the Liquidating Trust Agreement; (g) the Restructuring Transactions Memorandum; (h) the Schedule of Retained Causes of Action; (i) the Schedule of Rejected Executory Contracts and Unexpired Leases; (j) the Separation Agreement;

(k) all exhibits, attachments, supplements, annexes, schedules, and ancillary documents related to each of the foregoing; and (l) any additional documents filed with the Bankruptcy Court before the Effective Date as additional documents or amendments to the Plan Supplement.

142.   "**_Priority Tax Claims_**" means any and all Claims against any Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

143.   "**_Professional Fee Claims_**" means any and all Claims of a Professional seeking a payment of compensation for services rendered or reimbursement of expenses incurred on or as of the Petition Date and through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

144.   "**_Professional Fee Escrow Account_**" means an interest-bearing escrow account in an amount equal to the Professional Fee Reserve Amount to be funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid Professional Fee Claims.

145.   "**_Professional Fee Reserve Amount_**" means the aggregate accrued and unpaid Professional Fee Claims through the Effective Date as reasonably estimated by the Retained Professionals in accordance with Article II of this Plan; _provided_ that such amount shall not, in the aggregate, exceed the amount set forth in the Initial Budget (as defined in the DIP Orders).

146.   "**_Professionals_**" means (a) any and all professionals employed in the Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code and (b) any and all professionals or other Entities seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

147.   "**_Proof of Claim_**" means a "proof of claim," as defined in Bankruptcy Rule 3001, or a motion or request for payment of fees, costs, or expenses made pursuant to section 503 of the Bankruptcy Code filed in any of the Chapter 11 Cases.

148.   "**_Pro-Rata Share_**" means with respect to any distribution on account of any Allowed Claim in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in such Class.

149.   "**_Put Option Premium_**" means a nonrefundable put option premium in an aggregate amount equal to $7.5 million.

150.   "**_Record Date_** means the date for determining which Holders of Allowed Claims are eligible to receive distributions pursuant to the Plan, which date shall be five Business Days before the Effective Date.

151.   "**_Reinstated_**" or "**_Reinstatement_**" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

152.   "**_Related Fund_**" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised or managed by (a) such Person, (b) an Affiliate of such Person

or (c) the same investment manager, advisor or subadvisor that controls, advises or manages such Person or an Affiliate of such investment manager, advisor or subadvisor.

153.     "**Related Parties**" means to the fullest extent permitted by law, with respect to any Entity, such Entity's predecessors, successors, assigns, and Affiliates (whether by operation of Law or otherwise) and subsidiaries, and each of their respective managed accounts or funds or investment vehicles, and each of their respective current and former equity holders (regardless of whether such Equity Interests are held directly or indirectly), officers, directors, managers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors, direct and indirect parent Entities, "controlling persons" (within the meaning of the federal securities law), heirs, administrators and executors, and other professionals, in each case acting in such capacity whether current or former, including in their capacity as directors of the Debtors, as applicable.

154.     "**Released Parties**" means, collectively, (a) the Consenting First Lien Lenders, (b) the Consenting Funds, (c) the Debtors, (d) New TopCo, (e) the DIP Lenders, (f) the DIP Agent, (g) the First Lien Agent, (h) the New First Lien Lenders, (i) the New Take-Back Debt Lenders, (j) the Backstop Parties, (k) each Existing First Lien Lender that is not a Consenting First Lien Lender and that does not execute and return to the Debtors the Opt-Out Form, (l) the Liquidating Debtors, and (m) the Related Parties of each of the foregoing Entities in clauses (a) through (l) of this definition to the fullest extent permitted by Law other than any such Related Party that (i) executes and returns to the Debtors the Opt-Out Form or (ii) is a Related Party to any Person that executes and returns to the Debtors the Opt-Out Form. For the avoidance of doubt, except as stated herein, Released Parties does not include any parties that are not a party to the Restructuring Support Agreement.

155.     "**Releases**" means, collectively, the Debtor Releases and the Third Party Releases.

156.     "**Releasing Parties**" means, collectively, (a) the Consenting First Lien Lenders, (b) the Consenting Funds, (c) the Debtors, (d) New TopCo, (e) the DIP Lenders, (f) the DIP Agent, (g) the First Lien Agent, (h) the New First Lien Lenders, (i) the New Take-Back Debt Lenders, (j) the Backstop Parties, (k) each Existing First Lien Lender that is not a Consenting First Lien Lender and that does not execute and return to the Debtors the Opt-Out Form, (l) all Holders of Claims against the Debtors or Interests that receive the Opt-Out Form and do not execute and return the Opt-Out Form to the Debtors, (m) the Liquidating Debtors, and (n) the Related Parties of each of the foregoing Entities in clauses (a) through (m) of this definition to the fullest extent permitted by law.  For the avoidance of doubt, each of the Releasing Parties will grant the Release on the Effective Date in all of its capacities, in accordance with the terms and conditions set forth in this Plan.  For the avoidance of doubt, except as stated herein, Releasing Parties does not include any parties that are not a party to the Restructuring Support Agreement.

157.     "**Reorganized Common Equity**" means the common Equity Interests of New TopCo authorized under the New Organizational Documents of New TopCo and issued and/or delivered on the Effective Date under or pursuant to this Plan.

16

158.   "***Reorganized Debtors***" means, collectively, each of the Debtors, as reorganized on the Effective Date pursuant to this Plan and the other Definitive Documents, or, subject to the consent of the Required Consenting First Lien Lenders, any successors or assigns thereto by merger, consolidation, conversion, division, acquisition of assets, or otherwise, on or about the Effective Date.

159.   "***Reorganized Output Services Group***" means Output Services Group, as reorganized on the Effective Date pursuant to this Plan and the other Definitive Documents, or, subject to the consent of the Required Consenting First Lien Lenders, any successors or assigns thereto by merger, consolidation, conversion, division, acquisition of assets, or otherwise, on or about the Effective Date.

160.   "***Required Consenting First Lien Lenders***" means, as of any date of determination, the Consenting First Lien Lenders who are part of the First Lien Group and own or control as of such date more than sixty percent (60.0%) of the aggregate principal amount of all outstanding Existing First Lien Loans owned or controlled by all Consenting First Lien Lenders who are part of the First Lien Group as of such date.

161.   "***Required Consenting Stakeholders***" means the Required Consenting First Lien Lenders.

162.   "***Required Parties***" means the Debtors and the Required Consenting First Lien Lenders; *provided, however*, that with respect to any approvals, consents, waivers, or other decisions to be made or given by the Required Parties under the Restructuring Support Agreement (including any determination as to whether any document or agreement (or the form and substance thereof) is acceptable to the Required Parties (including reasonably acceptable) or whether any amendment, supplement or other modification to the Restructuring Support Agreement has been approved by the Required Parties) that are, in any such case, applicable to any of the Specified Consenting Fund Matters, the term "Required Parties" shall also include the Consenting Funds.

163.   "***Restructuring Expenses***" means the reasonable and documented (with such documentation subject to redaction to preserve attorney-client, work product, or other similar privileges) prepetition and postpetition fees and out-of-pocket expenses incurred by each of the following advisors: (a) McDermott Will & Emery LLP, counsel to the Debtors; (b) the Notice and Claims Agent; (c) Houlihan; (d) Accordion; (e) BDO USA, LLP, as tax advisor to the Debtors; (f) the First Lien Group Advisors; and (g) other professional advisors to the DIP Lenders that are approved by the Required Consenting First Lien Lenders (in each case payable in accordance with the applicable fee reimbursement letters entered into by the Debtors and such professionals and to the extent not otherwise paid pursuant to the DIP Orders or DIP Facility Documents); in each case, subject to the terms set forth in Section 7.04 of the Restructuring Support Agreement and without further order of, or application to, the Bankruptcy Court by such consultant or professionals, including, the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, which shall be Allowed as an Administrative Claim upon occurrence and shall not be subject to any offset, defense, counter-claim, reduction, or credit.

164.   "***Restructuring Support Agreement***" means that certain Amended and Restated Restructuring Support Agreement, dated as of October 12, 2023, by and among the Debtors and

the "Consenting Stakeholders" party thereto, including any exhibits thereto, as may be further amended, modified, or supplemented from time to time in accordance with its terms.

165.    "**Restructuring Transactions**" means the transactions and any actions as may be necessary or appropriate to effect a restructuring of the Debtors' respective businesses and/or the organizational structure of the Debtors on the terms set forth in this Plan and the Restructuring Support Agreement, as further described in Section 4.3 hereof.

166.    "**Restructuring Transactions Memorandum**" means a document, consistent with the Restructuring Support Agreement and otherwise in form and substance acceptable to the Required Parties, to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including the steps to be taken to form New TopCo and the issuance and/or delivery of the Reorganized Common Equity.

167.    "**Retained Professional**" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to (i) sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (ii) an order entered by the Bankruptcy Court authorizing such retention; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

168.    "**Rights Offering**" means the opportunity provided to the Rights Offering Participants to exercise their respective Election Rights pursuant to the Rights Offering Procedures.

169.    "**Rights Offering Amount**" means an amount equal to (a) the New First Lien Facility Amount, minus (b) the Direct Allocation Amount.

170.    "**Rights Offering Documents**" means all agreements, instruments, certificates, forms, questionnaires, procedures, and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Rights Offering.

171.    "*Rights Offering Participant*" means the "Eligible Holders" as defined in the Rights Offering Procedures.

172.    "**Rights Offering Procedures**" means the terms and conditions agreed upon by the Debtors and the Required Consenting First Lien Lenders governing the Rights Offering.

173.    "**Rights Offering Share**" means, with respect to each Rights Offering Participant, a fraction, expressed as a percentage, (a) the numerator of which is the principal amount of Existing First Lien Loans held by such Rights Offering Participant as of the Rights Offering Record Date (as defined in the Rights Offering Procedures) and (b) the denominator of which is the aggregate principal amount of all First Lien Loans outstanding as of the Rights Offering Record Date.

174.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to this Plan.

175.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to this Plan.

176.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.

177.    "*Secured Claims*" means any and all Claims against any Debtor that are secured by a Lien on, or security interest in, property of such Debtor, or that has the benefit of rights of setoff under section 553 of the Bankruptcy Code, which Lien or right of setoff, as the case may be, is valid, perfected, and enforceable under applicable Law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, but only to the extent of the value of the Holder's interest in such Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined as provided in section 506 of the Bankruptcy Code.

178.    "*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

179.    "*Security*" has the meaning ascribed to such term in section 101(49) of the Bankruptcy Code.

180.    "*Separation Agreement*" means a separation agreement to be entered into on the Effective Date by and between Holdings and the Liquidating Debtors, which separation agreement shall provide for certain matters and arrangements relating to the separation of the Debtors from the Liquidating Debtors, including (a) arrangements relating to certain tax filings and (b) to the extent necessary and expressly subject to the terms and conditions set forth therein, the funding arrangements set forth on the term sheet attached to the Restructuring Support Agreement as **Exhibit I**.

181.    "*Solicitation Materials*" means (a) the Ballot and applicable voting instructions, (b) the Disclosure Statement and all exhibits thereto, including this Plan, and (c) any other documents necessary to effect or approve the solicitation of votes with respect to the Restructuring Transactions, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

182.    "*Specified Consenting Fund Matters*" means any term, condition, provision, portion or aspect of the Restructuring Transactions or any of the Definitive Documents that directly relates to: (a) the releases provided by or provided to the Consenting Funds under this Plan; or (b) the representations, warranties, covenants, obligations or rights of the Consenting Funds under the Restructuring Support Agreement; *provided, however*, that the Specified Consenting Fund Matters shall not include any term, condition, provision, portion or aspect of the New First Lien Facility, including the New First Lien Facility Amount.

19

183. "***Specified Documents***" means any contract, agreement, or arrangement between (a) New TopCo or any of the Debtors, on the one hand, and (b) any Specified Party, on the other hand, including any management, consulting, advisory, services, or similar agreement or arrangement; *provided*, *however*, that Specified Documents shall not include (i) any confidentiality agreement entered into between any of the Debtors, on the one hand, and any of the Specified Parties, on the other hand, (ii) the Restructuring Support Agreement or any other Definitive Document to be entered into between New TopCo or any of the Debtors, on the one hand, and any of the Specified Parties, on the other hand, as expressly contemplated by the Restructuring Support Agreement, or (iii) any other contract, agreement, or arrangement between New TopCo or any of the Debtors, on the one hand, and any of the Liquidating Debtors, any Affiliate (other than a Debtor or a Consenting Fund) of any of the Liquidating Debtors, or any director, manager, officer, or employee of any such Person, on the other hand, that the Debtors and the Required Consenting First Lien Lenders mutually agree in writing shall not constitute a Specified Document.

184. "***Specified Guarantee***" means that certain Guarantee, entered September 17, 2019, by Output Services Group in favor of the Pension Trustee.

185. "***Specified Party***" means any of the following: (a) the Consenting Funds or any of the Liquidating Debtors, (b) any Affiliate (other than a Debtor) of the Consenting Funds or any of the Liquidating Debtors, and (c) any director, manager, officer, or employee of any Person described in clause (a) or clause (b) of this definition.

186. "***Stamp or Similar Tax***" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax, privilege taxes, and other similar taxes imposed or assessed by any Governmental Unit.

187. "***Subordinated Claims***" means any Claims that are subject to (a) subordination under section 510(b) of the Bankruptcy Code or (b) equitable subordination as determined by the Bankruptcy Court in a Final Order, including, without limitation, any Claim for or arising from the rescission of a purchase, sale, issuance, or offer of a Security of any Debtor for damages arising from the purchase or sale of such a Security or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims.

188. "***Tax Code***" means the Internal Revenue Code of 1986, as amended.

189. "***Third Party Releases***" means the releases given by the Releasing Parties to the Released Parties under Section 9.3(b) hereof.

190. "***Unexpired Lease***" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

191. "***Unimpaired***" means, with respect to any Claim or Interest, such Claim or Interest that is not Impaired.

192. "***U.S. Trustee***" means the Office of the United States Trustee for the Southern District of Texas.

Section 1.2    *Rules of Interpretation and Computation of Time.*

(a)    For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified, any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided*, that, for the avoidance of doubt, any contract, instrument, release, indenture, or other agreement or document that is required by this Plan to be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement shall require that the foregoing be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement; (iii) unless otherwise specified, any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (iv) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, of this Plan; (v) the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (vi) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitations, and shall be deemed to be followed by the words "without limitation"; (vii) references to "shareholders" or "directors," shall also include "members" or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; (viii) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (ix) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (x) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (xi) references to docket numbers are references to the docket numbers of documents filed in the Chapter 11 Cases under the Bankruptcy Court's CM/ECF system.

(b)    The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein, unless otherwise provided for herein.

(c)    All references in this Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

(d)    In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control.  In the event of an inconsistency between this Plan and the Confirmation Order, the Confirmation Order shall control.

(e)    Notwithstanding anything to the contrary in the Plan, any and all consent rights set forth in Section 3.03 of the Restructuring Support Agreement with respect to any matter, including the form and substance of the Plan, all exhibits to the Plan, and the Plan Supplement, and any other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by reference (including to the

21

applicable definitions in Section 1.1 of the Plan) and be fully enforceable as if stated in full in the Plan. Failure to reference in the Plan the rights referred to in the immediately preceding sentence shall not impair such rights and obligations. In case of a conflict between the consent rights in the Plan and the consent rights in the Restructuring Support Agreement, the consent rights in the Restructuring Support Agreement shall govern.

## ARTICLE II.

## UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article II hereof.

Section 2.1    *Administrative Claims.*

(a)    Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the applicable Debtor(s) or the Reorganized Debtor(s), as applicable, to less favorable treatment, to the extent an Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim in accordance with the following: (i) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; (iii) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (iv) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

(b)    All requests for payment of an Administrative Claim (other than DIP Claims, Restructuring Expenses, or Professional Fee Claims) that accrued on or before the Effective Date that were not otherwise paid in the ordinary course of business must be filed with the Bankruptcy Court and served on the Debtors no later than the Administrative Claims Bar Date. Holders of Administrative Claims (other than DIP Claims, Restructuring Expenses, or Professional Fee Claims) that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or the Reorganized Debtors, and such Administrative Claims shall be deemed discharged, compromised, settled, and released as of the Effective Date.

(c)    The Reorganized Debtors may settle Administrative Claims (other than DIP Claims) in the ordinary course of business without further Bankruptcy Court approval. The Debtors or the Reorganized Debtors, as applicable, may also choose to object to any Administrative Claim (other than DIP Claims) no later than 45 days after the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors

or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim shall be deemed Allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Claim should be allowed and, if so, in what amount.

(d)     Anything in this Section 2.1 or elsewhere in this Plan to the contrary notwithstanding, all Restructuring Expenses of the First Lien Group Advisors and other professional advisors to the DIP Lenders that are approved by the Required Consenting First Lien Lenders that are accrued and unpaid as of the Effective Date shall be paid in full in Cash on the Effective Date, without further order of, or application to, the Bankruptcy Court, including the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and shall not be subject to any offset, defense, counter-claim, reduction, or credit.

Section 2.2     *Priority Tax Claims.*

Except to the extent that each Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or when such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy Law, or in the ordinary course of business.

Section 2.3     *Professional Fee Claims.*

(a)     All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses must be filed no later than the day that is the 45th day after the Effective Date or, if such 45th day is not a Business Day, the first Business Day immediately following such 45th day.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

(b)     On the Effective Date, the Reorganized Debtors shall establish (if not already established) and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  Subject to the last sentence of this Section 2.3(b), the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Retained Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  Subject to the last sentence of this Section 2.3(b), no Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account in any way.  The Reorganized Debtors shall be obligated to pay Allowed Professional Fee Claims in excess of the Professional Fee Escrow Amount.  The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy

Court; *provided* that in the event the Professional Fee Reserve Amount is insufficient to satisfy the Professional Fee Claims, the Reorganized Debtors shall be required to satisfy the Allowed amounts of the remainder of any outstanding Professional Fee Claims.  When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court or any other Entity.

(c)     The Retained Professionals shall reasonably estimate in good faith their accrued and unpaid Professional Fee Claims as of the Effective Date and shall deliver such estimate to the Debtors and the Consenting Stakeholders no later than three Business Days before the anticipated Effective Date; *provided* that such estimate shall not be considered an admission or limitation with respect to the accrued and unpaid Professional Fee Claims as of the Effective Date of such Retained Professional. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the accrued and unpaid Professional Fee Claims as of the Effective Date of such Retained Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the accrued and unpaid Professional Fee Claims as of the Effective Date of such Retained Professional.  The total amount estimated as of the Effective Date shall consist of the Professional Fee Reserve Amount; *provided* that the Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

(d)     On and after the Effective Date, the Reorganized Debtors shall pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors or the Reorganized Debtors (as applicable) after the Confirmation Date but prior to the Effective Date in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court except as otherwise specifically provided in this Plan. The Reorganized Debtors shall pay, within ten Business Days after submission of a detailed invoice to the Reorganized Debtors, such reasonable Claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors after the Confirmation Date but prior to the Effective Date.  If the Debtors or Reorganized Debtors (as applicable) dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  From and after the Confirmation Date but prior to the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 2.4     *DIP Claims.*

(a)     The DIP Claims shall be Allowed Claims in the full amount outstanding under the DIP Credit Agreement as of the Effective Date, including principal, interest, fees, costs, other charges, and expenses, and all other obligations related to the DIP Facility and the DIP Facility Documents.

(b)      Notwithstanding anything to the contrary herein, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, the Holders of all Allowed DIP Claims, in full and final satisfaction, settlement, release, and discharge of and in exchange for all such DIP Claims, shall receive payment in full in cash.

Section 2.5      *Statutory Fees.*

The Debtors and the Reorganized Debtors, as applicable, shall pay all quarterly fees under 28 U.S.C § 1930(a), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' or Reorganized Debtors' business, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Section 3.1      *Classification of Claims.*

(a)      This Plan constitutes a separate chapter 11 Plan of reorganization for each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. Except for the Claims addressed in Article II hereof (or as otherwise set forth herein), all Claims and Interests are placed in Classes for each of the Debtors. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Claims, as described in Article II hereof.

(b)      All Claims and Interests required to be classified pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code are set forth below. Such classification is for all purposes, including for purposes of voting, Confirmation, and distribution pursuant to this Plan.

(c)      The classification and the treatment of all Claims under this Plan take into consideration (i) the existence of guarantees or alleged guarantees by the Debtors of obligations of other Debtors or Entities; and (ii) that Debtors may be joint obligors with other Debtors or Entities with respect to the same obligation.

Section 3.2      *Class Identification.*

The following chart sets forth the classification of the Claims or Interests for each Debtor, whether that Class of Claims or Interests is Impaired, and the voting rights of the members of such Class.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| 2 | Other Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| 3 | Existing First Lien Claims | Impaired | Yes |

| Class | Claims and Interests | Status | Voting Rights |
|:---:|:---|:---:|:---|
| 4 | General Unsecured Trade Claims | Unimpaired | No (conclusively presumed to accept) |
| 5 | General Unsecured Litigation Claims | Unimpaired | No (conclusively presumed to accept) |
| 6 | Other General Unsecured Claims | Impaired | Yes |
| 7 | Intercompany Claims | Unimpaired/ Impaired | No (conclusively presumed to accept or deemed to reject) |
| 8 | Existing Interests | Impaired | No (deemed to reject) |
| 9 | Intercompany Interests | Unimpaired/ Impaired | No (conclusively presumed to accept or deemed to reject) |

Section 3.3    *Treatment and Voting Rights of Claims and Interests.*

Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest on the Effective Date or as soon as reasonably practicable thereafter, or, if payment is not then due, in accordance with its terms in the ordinary course.

(a)    *Class 1—Other Secured Claims.*

(i)    *Classification*: Class 1 consists of all Other Secured Claims.

(ii)    *Treatment:* In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, and except to the extent that the Holder of such Allowed Other Secured Claim agrees with the Debtors (after consultation with the Required Consenting Stakeholders) to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors, with the consent of the Required Consenting Stakeholders: (A) payment in full in Cash of the unpaid portion of its Allowed Other Secured Claim; (B) the collateral securing its Allowed Other Secured Claim; (C) Reinstatement of its Allowed Other Secured Claim; or (D) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iii)    *Impairment and Voting*: Class 1 is Unimpaired under this Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Thus, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject this Plan.

26

(b)    *Class 2—Other Priority Claims.*

    (i)    *Classification*: Class 2 consists of all Other Priority Claims.

    (ii)    *Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Priority Claim, and except to the extent that the Holder of such Allowed Other Priority Claim agrees with the Debtors (after consultation with the Required Consenting Stakeholders) to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

    (iii)    *Impairment and Voting*: Class 2 is Unimpaired under this Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.   Thus, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject this Plan.

(c)    *Class 3—Existing First Lien Claims.*

    (i)    *Classification*: Class 3 consists of Existing First Lien Claims.

    (ii)    *Allowed Amount:* The Existing First Lien Claims shall be Allowed in an amount not less than $669,909,735.50 of principal plus accrued and unpaid interest owed under the Existing First Lien Credit Agreement through the Petition Date.

    (iii)    *Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Existing First Lien Claim, and except to the extent that the Holder of such Allowed Existing First Lien Claim agrees to less favorable treatment with the consent of the Required Consenting Stakeholders, each Holder of an Allowed Existing First Lien Claim shall receive:  (A) its Pro-Rata Share of the New Take-Back Debt Loans; (B) its Pro-Rata Share of the Exchange Reorganized Equity; and (C) Election Rights to provide up to its Rights Offering Share of New First Lien Loan Commitments in an aggregate principal amount equal to the Rights Offering Amount, on the terms and subject to the conditions set forth in the Rights Offering Procedures.

    (iv)    *Impairment and Voting*: Class 3 is Impaired under this Plan.  Holders of Allowed Existing First Lien Claims are entitled to vote to accept or reject this Plan.

(d)    *Class 4—General Unsecured Trade Claims.*

    (i)    *Classification*: Class 4 consists of all General Unsecured Trade Claims.

(ii) *Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Trade Claim, and except to the extent that the Holder of such Allowed General Unsecured Trade Claim agrees with the Debtors (after consultation with the Required Consenting Stakeholders) to less favorable treatment, at the election of the Debtors, with the consent of the Required Consenting Stakeholders, (A) payment in full in Cash of the unpaid portion of its Allowed General Unsecured Claim paid in the ordinary course of business, or (B) Reinstatement of its General Unsecured Trade Claim.

(iii) *Impairment and Voting*: Class 4 is Unimpaired under this Plan.  Holders of Allowed General Unsecured Trade Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Thus, Holders of Allowed General Unsecured Trade Claims are not entitled to vote to accept or reject this Plan.

(e) *Class 5—General Unsecured Litigation Claims.*

(i) *Classification*: Class 5 General Unsecured Litigation Claims.

(ii) *Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed General Unsecured Litigation Claim, and except to the extent that the Holder of such Allowed General Unsecured Litigation Claim agrees with the Debtors (after consultation with the Required Consenting Stakeholders) to less favorable treatment, each Holder of an Allowed General Unsecured Litigation Claim shall receive (A) Reinstatement of its Allowed General Unsecured Litigation Claim and (B) payment in full in Cash in the ordinary course of business if and when finally resolved under applicable non-bankruptcy Law on the unpaid portion, if any, of its Allowed General Unsecured Claim.

(iii) *Impairment and Voting*: Class 5 is Unimpaired under this Plan.  Holders of Allowed General Unsecured Litigation Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Thus, Holders of Allowed General Unsecured Litigation Claims are not entitled to vote to accept or reject this Plan.

(f) *Class 6—Other General Unsecured Claims.*

(i) *Classification*: Class 6 consists of all Other General Unsecured Claims.

(ii) *Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other General Unsecured Claim, and except to the extent that the Holder of such Allowed Other General Unsecured Claim agrees to less favorable treatment with the reasonable consent of the Required Consenting Stakeholders, each Holder of an Other General

Unsecured Claim shall be entitled to receive its Pro-Rata Share of (A) the Liquidating Trust Assets and (B) GBP 3.0 million.

(iii)  *Impairment and Voting*: Class 6 is Impaired under this Plan. Holders of Other General Unsecured Claims are entitled to vote to accept or reject this Plan.

(g)  *Class 7—Intercompany Claims.*

(i)  *Classification*: Class 7 consists of all Intercompany Claims.

(ii)  *Treatment*: On the Effective Date, each Holder of an Allowed Intercompany Claim shall have its Claim, at the election of the Debtors, with the consent of the Required Consenting Stakeholders, (A) Reinstated, (B) distributed, (C) contributed, (D) set off, (E) cancelled and released without any distribution on account of such Claims, or (F) otherwise addressed.

(iii)  *Impairment and Voting*: Class 7 is either Impaired with no distribution or Unimpaired under this Plan. In either case, Holders of Allowed Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Thus, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject this Plan.

(h)  *Class 8—Existing Interests.*

(i)  *Classification*: Class 8 consists of all Existing Interests.

(ii)  *Treatment*: On the Effective Date, all Allowed Existing Interests shall be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of Allowed Existing Interests shall not receive or retain any property or distributions under this Plan on account of such Allowed Existing Interests.

(iii)  *Impairment and Voting*: Class 8 is Impaired under this Plan. Holders of Allowed Existing Interests are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Thus, Holders of Allowed Existing Interests will not be entitled to vote to accept or reject this Plan.

(i)  *Class 9—Intercompany Interests.*

(i)  *Classification*: Class 9 consists of all Intercompany Interests.

(ii)  *Treatment*: On the Effective Date, each Holder of an Allowed Intercompany Interest shall have its Allowed Intercompany Interest, at the election of the Debtors, with the consent of the Required Consenting Stakeholders,

29

(A) Reinstated, (B) distributed, (C) contributed, or (D) cancelled and released without any distribution on account of such Interests.

(iii) *Impairment and Voting*: Class 9 is either Impaired with no distribution or Unimpaired under this Plan. In either case, Holders of Allowed Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Thus, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject this Plan.

Section 3.4 *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, the DIP Orders, or the DIP Facility Documents, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

Section 3.5 *Voting; Presumptions; Solicitation.*

(a) *Acceptance by Certain Impaired Classes*. Only Holders of Allowed Claims or Interests in Classes 3 and 6 are entitled to vote to accept or reject this Plan. An Impaired Class of Claims shall have accepted this Plan if (i) the Holders of at least 66.67% in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan. Holders of Allowed Claims or Interests in Classes 3 and 6 have received Ballots containing detailed voting instructions.

(b) *Conclusively Presumed Acceptance by Unimpaired Classes*. Holders of Claims in Classes 1, 2, 4, and 5, and certain Holders of Claims in Class 7 and Interests in Class 9 are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(c) *Deemed to Reject by Certain Impaired Classes*. Certain Holders of Claims in Class 7 and Interests in Class 9, and Holders of Interests in Class 8 are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(d) *Disputes Regarding Impairment*. If a Holder of a Claim or Interest disputes the classification of such Holder's Claim or Interest, then upon the filing of an objection to the Plan by such Holder, the Bankruptcy Court shall, after notice and a hearing, determine the proper classification of such Claim or Interest on or before the Confirmation Date.

Section 3.6 *Nonconsensual Confirmation.*

Because certain Classes of Claims or Interests are deemed not to vote to accept this Plan, the Debtors will seek Confirmation of this Plan under section 1129(b) of the Bankruptcy Code.

Section 3.7    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under this Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

Section 3.8    *Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Combined Hearing shall not be deemed to have voted on this Plan for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

Section 3.9    *Intercompany Interests.*

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure of the Reorganized Debtors.

Section 3.10    *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's or Reorganized Debtor's right to object on any basis to any Claim, including after the Effective Date.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

Section 4.1    *Compromise or Settlement of Controversies.*

(a)    Other than as specifically set forth herein, this Plan shall be deemed a motion to approve the good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

(b)    Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, distributions, releases, and other benefits provided under

this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved under this Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

Section 4.2    *Sources of Consideration for Plan Distribution.*

(a)    The Debtors shall fund distributions under this Plan with: (i) Cash on hand, including Cash from operations; (ii) the proceeds of the DIP Facility; (iii) the New Take-Back Debt Loans; (iv) proceeds from the Rights Offering and the Backstop Commitment Letter; (v) the Liquidating Trust Assets; and (vi) the Reorganized Common Equity.  Cash payments to be made pursuant to this Plan will be made by the Reorganized Debtors or the Liquidating Trustee, as applicable. The Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under this Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of this Plan.

(b)    From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement (including, without limitation, the New Organizational Documents, the New First Lien Documents, and the New Take-Back Debt Documents), the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of managers or directors, as applicable (or other applicable governing bodies), of the applicable Reorganized Debtors deem appropriate.

Section 4.3    *Restructuring Transactions.*

Following the Confirmation Date and subject to any applicable limitations set forth in any post-Effective Date agreements, the Debtors, the Liquidating Trustee, and the Reorganized Debtors may take all actions as may be reasonably necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan (including any transaction described in, or contemplated by, the Restructuring Transactions Memorandum), in each case in accordance with the Restructuring Support Agreement,  including: (a) the execution and delivery of appropriate agreements or other documents of reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable Law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate certificates of conversion, formation or incorporation or consolidation with the appropriate governmental authorities pursuant to applicable Law; (d) the execution, delivery, and filing, if applicable, of the New Organizational Documents (including the A&R LLC Agreement), the Rights Offering Documents, the New First Lien Documents, the New Take-Back Debt Documents, the Liquidating Trust Agreement, the Separation Agreement, and the Backstop Commitment Letter; (e) such other transactions that are required to effectuate the Restructuring Transactions, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or

liquidations; and (f) all other actions that the Reorganized Debtors reasonably determine, with the consent of the Required Parties, are necessary or appropriate.  For the purposes of effectuating this Plan, none of the Restructuring Transactions contemplated herein shall constitute a "change of control" or "assignment" (or terms with similar effect) under, or any other transaction or matter that would result in a violation, breach, or default under, or increase, accelerate, or otherwise alter any obligations, rights or liabilities of the Debtors or the Reorganized Debtors under, or result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Reorganized Debtors pursuant to, any agreement, contract, or document of the Debtors, and any consent or advance notice required under any agreement, contract, or document of the Debtors shall be deemed satisfied by Confirmation.

Section 4.4    *Continued Corporate Existence.*

Except as otherwise provided in this Plan, or as otherwise may be agreed between the Debtors and the Required Consenting Stakeholders, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under applicable Law and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable Law.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable Law, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing: (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the conversion of a Reorganized Debtor from one entity type to another entity type; (d) the legal name of a Reorganized Debtor to be changed; (e) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Debtor under the Law of jurisdictions other than the Law under which the Debtor currently is incorporated.

Section 4.5    *Corporate Action.*

(a)    On the Effective Date, all actions contemplated by this Plan (including any transaction described in, or contemplated by, the Restructuring Transactions Memorandum) and the Restructuring Transactions shall be deemed authorized and approved in all respects, including: (i) the selection of the managers or directors, as applicable, and officers of each of the Reorganized Debtors and New TopCo; (ii) the issuance and delivery of the Reorganized Common Equity and the Election Rights; (iii) the execution and entry into of the New Organizational Documents (including the A&R LLC Agreement), the Rights Offering Documents, the New First Lien Documents, the New Take-Back Debt Documents, and the Backstop Commitment Letter; (iv) the consummation of the Rights Offering and the transactions contemplated by the Backstop Commitment Letter; and (v) all other actions contemplated by this Plan (whether to occur before, on, or after the Effective Date) or Restructuring Transactions, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.  All matters provided for in this Plan involving the corporate or limited liability company structure of

33

the Debtors, the Reorganized Debtors or New TopCo and any corporate, limited liability company or other governance action required by the Debtors, the Reorganized Debtors, New TopCo or the Liquidating Debtors in connection with this Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors, the Reorganized Debtors, New TopCo, or the Liquidating Debtors or otherwise.

(b)     On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors or New TopCo, as applicable, shall be authorized and, as applicable, directed to issue, execute, deliver, acknowledge and/or file, as applicable, the agreements, documents, securities, certificates of conversion, certificates of formation, certificates of incorporation, operating agreements, and instruments contemplated by this Plan (or necessary or desirable to effect the transactions contemplated by this Plan) in the name of and on behalf of the Reorganized Debtors or New TopCo, as applicable, including the New Organizational Documents (including the A&R LLC Agreement), the Rights Offering Documents, the New First Lien Documents, the New Take-Back Debt Documents, and the Backstop Commitment Letter, and any and all agreements, documents, securities, certificates, and instruments relating to the foregoing.

(c)     The authorizations, approvals and directives contemplated by this Section 4.5 shall be effective notwithstanding any requirements under non-bankruptcy Law.

Section 4.6     *Vesting of Assets.*

Except as otherwise provided herein, on the Effective Date, all property of the Estates of the Debtors, including all Claims, Interests, rights, and Causes of Action, and any property acquired by the Debtors under or in connection with this Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests, except for those Liens, Claims, charges, or other encumbrances arising from or related to the New First Lien Documents. Subject to the terms of this Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Claims), Interests, and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. Anything in this Plan to the contrary notwithstanding, the Unimpaired Claims against a Debtor shall remain the obligations solely of such Debtor or such Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of this Plan, the Chapter 11 Cases, or otherwise.

Section 4.7     *Indemnification Provisions in Organizational Documents.*

(a)     Any D&O Liability Insurance Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) pursuant to which any of the Debtors' or the Liquidating Debtors' current and former directors, officers, managers, or other employees are insured shall remain in force through the expiration of any such D&O Liability Insurance Policy (or "tail policy," as applicable).

34

(b)　　On or before the Effective Date, to the extent not already obtained, the Debtors and the Liquidating Debtors shall obtain a "tail policy" for the existing D&O Liability Insurance Policy.  The Debtors and the Liquidating Debtors shall assume (and assign to the Reorganized Debtors if necessary), pursuant to section 365(a) of the Bankruptcy Code, either by a separate motion filed with the Bankruptcy Court or pursuant to the terms of the Plan and Confirmation Order, the D&O Liability Insurance Policy.

(c)　　All indemnification provisions of the Debtors that are in place as of the Petition Date (whether in the by-laws, certificates of incorporation, articles of limited partnership, limited liability company agreements, board resolutions, management agreements or employment or indemnification contracts, or otherwise) for the current directors, officers, and employees of each of the Debtors and such current directors' and officers' respective affiliates shall be assumed by the Debtors to the extent assumable and shall remain obligations of the Reorganized Debtors, irrespective of when such obligation arose, so long as such provisions do not require the Debtors to make any payments or provide any arrangements (including severance payments) to such Persons other than indemnification payments and reimbursement and advancement of expenses. All such provisions shall be deemed and treated as Executory Contracts that are assumed by the Debtors under this Plan and shall continue as obligations of the Reorganized Debtors.  Any Claim based on such provisions shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code or otherwise.

Section 4.8　　*Cancellation of Existing Securities and Agreements.*

(a)　　On the Effective Date, except as otherwise specifically provided for in this Plan (including in the Restructuring Transactions Memorandum), including with respect to the Rights Offering Documents, the New First Lien Documents, the New Take-Back Debt Documents, and the Backstop Commitment Letter: (i) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of first offer, co-sale right, investor rights, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to this Plan, if any) shall be cancelled, terminated and of no further force or effect, without further act or action, and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, calls, puts, awards, commitments, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated or assumed pursuant to this Plan, if any) shall be released and discharged.

(b)    Notwithstanding such cancellation and discharge:

    (i)    The Interests of the Debtors or Reorganized Debtors, as applicable, in their direct and indirect subsidiaries (other than OSG Bidco and all of its subsidiaries) shall remain unaffected by this Plan.

    (ii)    The DIP Facility Documents shall continue in effect solely for purposes of allowing the DIP Agent to (A) receive distributions from the Debtors under this Plan and to make further distributions to the Holders of the DIP Claims on account of such DIP Claims, as set forth in Article VI hereof; (B) enforce its rights, Claims, and interests with respect to the DIP Lenders; (C) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of DIP Claims, including any rights to priority of payment with respect to the DIP Lenders; and (D) appear and be heard in the Chapter 11 Cases or in any other proceeding, including to enforce any obligation owed to the DIP Agent or Holders of DIP Claims under this Plan.

Section 4.9    *Cancellation of Certain Existing Security Interests.*

(a)    Upon the full payment or other satisfaction of an Allowed Other Secured Claim, Allowed DIP Claim, and Allowed Existing First Lien Claim or promptly thereafter, the Holder of such Claims shall deliver to the Debtors or Reorganized Debtors, as applicable, any collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Claims that may be reasonably required to terminate any related financing statements, guaranties, or *lis pendens*, or similar interests or documents.

(b)    Furthermore, upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.

Section 4.10    *The New First Lien Loan Commitments.*

(a)    The Rights Offering Participants shall have the opportunity to provide New First Lien Loan Commitments pursuant to the Rights Offering on a *pro rata* basis (based on their respective Rights Offering Shares). The New First Lien Facility shall reflect the terms set forth in the New First Lien Facility Term Sheet.

(b)    On the Effective Date, the New First Lien Lenders (or their respective designees) shall receive the New Money Reorganized Equity on a *pro rata* basis (based on the respective amounts of New First Lien Loan Commitments provided by each of the New First Lien Lenders (including any New First Lien Loan Commitments provided pursuant to any Rights Offering

Commitments (as defined in the Backstop Commitment Letter), Backstop Commitments (as defined in the Backstop Commitment Letter) or Direct Allocation Commitments (as defined in the Backstop Commitment Letter)).

(c)     On the Effective Date, Reorganized Output Services Group's funded debt shall include the New First Lien Loans in an initial aggregate principal amount equal to the New First Lien Facility Amount and the New Take-Back Debt Loans.  The Reorganized Debtors may use the New Take-Back Debt Loans and the New First Lien Loans (including any proceeds thereof) for any purpose permitted by the New Take-Back Debt Documents and the New First Lien Documents, including the funding of obligations under this Plan and satisfaction of ongoing working capital needs.

(d)     Confirmation shall be deemed to constitute approval of the New First Lien Facility, the New Take-Back Debt Facility, the New First Lien Documents, the New Take-Back Debt Documents, all of the Liens and security interests granted under the New First Lien Documents, all of the Liens and security interests granted under the New Take-Back Debt Documents, and all transactions contemplated by the New First Lien Documents and/or the New Take-Back Debt Documents (including any supplementation or additional syndication of the New First Lien Facility and the New Take-Back Debt Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations under the New First Lien Documents and the New Take-Back Debt Documents, and such other documents as may be reasonably required or appropriate, in each case, in accordance therewith.

(e)     The New First Lien Documents and the New Take-Back Debt Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New First Lien Documents, and the New Take-Back Debt Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law.

(f)     On the Effective Date, all of the Liens and security interests granted or to be granted in accordance with the New First Lien Documents and/or the New Take-Back Debt Documents (including all Liens and security interests that were previously granted under the Existing First Lien Documents) shall (or, in the case of Liens and security interests previously granted under the Existing First Lien Documents, shall continue to): (i) be granted; (ii) be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereon or therein in accordance with the terms of the New First Lien Documents and/or the New Take-Back Debt Documents; (iii) be deemed automatically, without any further action being required by the Debtors, the Reorganized Debtors, the First Lien Agent, the New First Lien Lenders or the New Take-Back Debt Lenders, perfected on the Effective Date on a first-priority basis, subject only to (solely with respect to the first-priority nature of such Liens and security interests) such Liens and

security interests as may be permitted to be senior thereto under the New First Lien Documents and/or the New Take-Back Debt Documents; and (iv) not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law. The Reorganized Debtors and the Entities granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

(g)     Any Holder of an Allowed Existing First Lien Claim may designate that all or a portion of such Holder's Pro Rata share of the New Take-Back Debt Loans to be distributed as part of the treatment of such Allowed Existing First Lien Claim, be registered in the name of, and delivered to, its designee by delivering notice thereof to counsel to the Debtors and to the Notice and Claims Agent at least five (5) Business Days prior to the Effective Date.

Section 4.11   *Optional ABL Facility.*

The Debtors shall make reasonable best efforts to secure a revolving credit facility on or after the Effective Date and prior to the date that is six months following the Effective Date; *provided*, that the Debtors shall not enter into, or provide any commitments or other obligations for (including with respect to fees), any such revolving credit facility prior to the Effective Date without the prior written consent of the Required Consenting First Lien Lenders; *provided, further*, that nothing herein, in the Confirmation Order, or the Restructuring Support Agreement shall require the Debtors or the Reorganized Debtors to secure the Optional ABL Facility.

Section 4.12   *Issuance of the Reorganized Common Equity.*

(a)     Units of the Reorganized Common Equity shall be authorized under the New Organizational Documents of New TopCo. Units of the Reorganized Common Equity shall be issued on or about the Effective Date, as further described in the Restructuring Transactions Memorandum, and delivered on the Effective Date in accordance with this Plan. All of the Reorganized Common Equity to be issued and/or delivered in accordance with this Plan, when so issued, and/or delivered shall be duly authorized, validly issued, fully paid, and non-assessable. The issuance and delivery of the Reorganized Common Equity in accordance with this Plan are authorized without the need for any further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest.

(b)     Any Holder of an Allowed Existing First Lien Claim may designate that all or a portion of such Holder's Pro Rata share of the Exchange Reorganized Equity to be distributed as part of the treatment of such Allowed Existing First Lien Claim, be registered in the name of, and delivered to, its designee by delivering notice thereof to counsel to the Debtors and to the Notice

and Claims Agent at least five (5) Business Days prior to the Effective Date. Any such designee shall be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

Section 4.13     *Rights Offering.*

(a)     Each of the Rights Offering Participants shall be offered the right to participate in the Rights Offering.

(b)     The Rights Offering shall be conducted and implemented in accordance with the Rights Offering Procedures.   The Rights Offering Procedures will require that each Rights Offering Participant complete, execute, and deliver to the agent for the Rights Offering, by the deadline date set forth in the Rights Offering Procedures or the Backstop Commitment Letter, as applicable, the accredited investor questionnaire which will be attached to the election form distributed to Rights Offering Participants in connection with the Rights Offering.   There will be no over-subscription privilege in the Rights Offering, such that any Unelected Commitments (as defined in the Backstop Commitment Letter) will not be made available to other Rights Offering Participants, but rather will be put to and provided by the Backstop Parties, subject to the terms, conditions and limitations of the Backstop Commitment Letter.

(c)     On and as of the Effective Date, the Reorganized Debtors shall consummate the Rights Offering in accordance with the Rights Offering Procedures and this Plan.   Confirmation shall be deemed (i) approval of the Rights Offering; and (ii) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the Rights Offering, in each case, without any further notice to or order of the Bankruptcy Court.

Section 4.14     *Backstop Commitment Letter.*

(a)     To provide assurance that the Debtors will receive an aggregate amount of New First Lien Loan Commitments equal to the New First Lien Facility Amount in connection with the consummation of the Plan, the Backstop Parties have provided, severally and not jointly, their respective Rights Offering Commitments, Backstop Commitments and Direct Allocation Commitments on the terms and subject to the conditions and limitations set forth in the Backstop Commitment Letter.

(b)     As consideration for the right to require each Backstop Party, severally and not jointly, to provide New First Lien Loan Commitments pursuant to such Backstop Party's Rights Offering Commitments, Backstop Commitments and Direct Allocation Commitments on the terms and subject to the conditions and limitations set forth in the Backstop Commitment Letter, on the Effective Date, the Reorganized Debtors shall pay to each Backstop Party (or, by direction of such Backstop Party, to its designee(s)) its *pro rata* share (based on their respective Commitment Percentages) of the Put Option Premium.   The Reorganized Debtors shall be obligated to pay the Put Option Premium on the Effective Date in the form of Reorganized Common Equity.   For purposes of determining the amount of Reorganized Common Equity that will be delivered as payment of the Put Option Premium, such determination will be made using a total equity value of New TopCo based on the midpoint valuation set forth in the Disclosure Statement.

Notwithstanding the foregoing, if the Backstop Commitment Letter is terminated for any reason (other than as a result of a Specified Event (as defined in the Backstop Commitment Letter)), then the Debtors shall pay the Put Option Premium to the Backstop Parties (or, by direction, to their respective designee(s)) in full in cash no later than three Business Days following the date of any such termination.

(c)       Anything herein to the contrary notwithstanding, no Backstop Party shall be required to provide New First Lien Loan Commitments pursuant to such Backstop Party's Rights Offering Commitments, Backstop Commitments and Direct Allocation Commitments in an aggregate amount (when taken together with New First Lien Loan Commitments provided by Affiliates of such Backstop Party that are not Backstop Parties (but not counting such New First Lien Loan Commitments more than once)) that exceeds the product of (i) such Backstop Party's Commitment Percentage and (ii) the New First Lien Facility Amount.

Section 4.15    *Exit Capital.*

(a)       On the Effective Date, the Plan shall be implemented through (i) the provision of the New First Lien Facility, (ii) the provision of the New Take-Back Debt Facility, (iii) the payment of the Put Option Premium (which shall be in the form of Reorganized Common Equity), (iv) the issuance and delivery of the New Money Reorganized Equity, and (v) the issuance and delivery of the Exchange Reorganized Equity.  If applicable, the Restructuring may also be implemented through the Optional ABL Facility, subject to the prior written consent of the Required Consenting First Lien Lenders in their sole discretion.

(b)       Confirmation shall be deemed approval of the transactions contemplated in Section 4.15(a) and the documents in connection with such transactions, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors and New TopCo in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for in connection therewith, and authorization of the Reorganized Debtors and New TopCo to enter into and execute any other documents necessary to effectuate the transactions in this Section 4.15.

Section 4.16    *Exemption from Registration Requirements.*

(a)       The offering, issuance, delivery, and, if applicable, sale of the 1145 Securities shall be exempt from registration under the Securities Act and any other applicable securities Laws pursuant to section 1145 of the Bankruptcy Code.

(b)       All 1145 Securities (i) will not be "restricted securities" (as defined in Rule 144(a)(3) under the Securities Act), and (ii) will be freely tradable and transferable without registration under the Securities Act by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the Debtors, the Reorganized Debtors or New TopCo, subject to (x) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (y) compliance with applicable securities laws and any rules and regulations, including those of the United States Securities and Exchange Commission or state or

local securities laws, if any, applicable at the time of any future transfer of such securities or instruments, and (z) any restrictions in the New Organizational Documents of New TopCo.

(c)     The 4(a)(2) Securities will be issued and/or delivered pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and subject to any restrictions in the New Organizational Documents of New TopCo. Resales of such restricted securities would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code.  Holders of restricted securities would, however, be permitted to resell Reorganized Common Equity without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act (if available) or any other registration exemption under the Securities Act, or if such securities are registered with the Securities and Exchange Commission, in all cases subject to any restrictions in the New Organizational Documents of New TopCo.

Section 4.17   *Organizational Documents.*

(a)     Subject to Article V of this Plan, the Reorganized Debtors and New TopCo shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of this Plan.  The New Organizational Documents will be deemed to be modified to prohibit the issuance of non-voting equity Securities, solely to the extent required under section 1123(a)(6) of the Bankruptcy Code. The New Organizational Documents for the Reorganized Debtors and New TopCo shall be in form and substance (including customary minority protections) acceptable to the Required Consenting First Lien Lenders.

(b)     As a condition to receiving the Reorganized Common Equity, Holders of Allowed Existing First Lien Claims (including Rights Offering Participants), the Backstop Parties and/or any of their respective designees for receipt of Reorganized Common Equity will be required to execute and deliver the A&R LLC Agreement.  For the avoidance of doubt, any Entity's or Person's receipt of Reorganized Common Equity under, or as contemplated by, the Plan (including pursuant to the Rights Offering or pursuant to the Backstop Commitment Letter) shall be deemed as its agreement to the A&R LLC Agreement, and such Entities and Persons shall be deemed signatories to the A&R LLC Agreement without further action required on their part (solely in their capacity as members of New TopCo).  The A&R LLC Agreement will be effective as of the Effective Date and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of Reorganized Common Equity will be bound thereby in all respects even if such holder has not actually executed and delivered a counterpart thereof. On the Effective Date, pursuant to the terms of the A&R LLC Agreement, each unit of Reorganized Common Equity that is received by each Entity or Person under, or as contemplated by, the Plan (including pursuant to the Rights Offering or pursuant to the Backstop Commitment Letter) shall be converted into one (1) Class A Unit (as defined in the A&R LLC Agreement).

Section 4.18   *Exemption from Certain Transfer Taxes and Recording Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in

connection with this Plan or pursuant to: (a) the issuance, delivery, transfer, or exchange of any debt, securities, or other interest in the Debtors, the Reorganized Debtors or New TopCo; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of indebtedness (including indebtedness under the New First Lien Facility and/or the New Take-Back Debt Facility) by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any Stamp or Similar Tax or governmental assessment, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, this Plan.

Section 4.19    *Managers, Directors and Officers of the Reorganized Debtors.*

The members of the New Board shall consist of a number of members determined by the Required Consenting First Lien Lenders in their sole discretion, which shall consist of the chief executive officer of Reorganized Output Services Group and other members appointed in a manner determined by the Required Consenting First Lien Lenders in their sole discretion and set forth in the A&R LLC Agreement.  Except to the extent that a member of the board of directors or board of managers, or the sole manager, as applicable, of a Debtor is designated in the Plan Supplement to serve as a director, manager, or sole manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or board of managers, or the sole manager, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date, and each such director, manager, or sole manager shall be deemed to have resigned or shall otherwise cease to be a director, manager, or sole manager of the applicable Debtor on the Effective Date.  Each of the directors, managers, sole managers and officers of each of the Reorganized Debtors and New TopCo shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor or New TopCo, as applicable, and may be designated, replaced, or removed in accordance with such New Organizational Documents.

Section 4.20    *Management Incentive Plan.*

Within 90 days after the Effective Date, the New Board shall adopt the Management Incentive Plan, which shall provide for equity and equity-based grants ("***Awards***") in favor of certain directors, managers, officers and employees of the Reorganized Debtors and New TopCo and certain other eligible participants.  The form of the Awards (*i.e.*, options, restricted stock or units, appreciation rights, etc.), the participants in the Management Incentive Plan, the allocations of the Awards to such participants (including the amount of allocations and the timing of the grant of the Awards), and the terms and conditions of the Awards (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the New Board in its sole discretion.

Section 4.21    *The Liquidating Trust*.

(a)    <u>Creation and Governance of the Liquidating Trust</u>.  On the Effective Date, (i) the Debtors shall irrevocably transfer all of their rights, title and interest in all of the Liquidating Trust Assets to the Liquidating Trust and (ii) the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and take all steps necessary to establish the Liquidating Trust in accordance with the Plan and the beneficial interests therein.  In accordance with section 1141 of the Bankruptcy Code, the Liquidating Trust Assets shall automatically vest in the Liquidating Trust without further action by any Person or Entity, free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other Stamp or Similar Tax.  In the event of any conflict between the terms of the Plan and the terms of the Liquidating Trust Agreement, the terms of the Plan shall govern.  Upon completion of the transfer of the Liquidating Trust Assets to the Liquidating Trust, neither the Debtors nor the Reorganized Debtors shall have any further interest in the Liquating Trust Assets or the Liquidating Trust.  The Liquidating Trustee shall be the exclusive administrator of the Liquidating Trust Assets.  The Liquidating Trust shall be governed by the Liquidating Trust Agreement and administered by the Liquidating Trustee.  The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Section 4.21.  The Liquidating Trustee shall hold and distribute the Liquidating Trust Assets and any proceeds thereof in accordance with the provisions of the Plan and the Liquidating Trust Agreement. Other rights and duties of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement.

(b)    <u>Liquidating Trustee and Liquidating Trust Agreement</u>. The Liquidating Trust Agreement generally will provide for, among other things: (i) the irrevocable transfer of all of the Debtors' rights, title and interest in all of the Liquidating Trust Assets to the Liquidating Trust; (ii) the payment of certain reasonable expenses of the Liquidating Trust solely from the Liquidating Trust Assets; and (iii) distributions under the Plan to Holders of Allowed Other General Unsecured Claims as provided herein and in the Liquidating Trust Agreement. The Liquidating Trust Agreement may include reasonable and customary provisions that allow for the limitation of liability of the Liquidating Trustee and its professionals, agents, and advisors, among others, and for indemnification of such Persons by the Liquidating Trust. Any such indemnification shall be the sole responsibility of the Liquidating Trust and payable solely from the Liquidating Trust Assets. The Liquidating Trustee shall be responsible for all decisions and duties with respect to the Liquidating Trust and the Liquidating Trust Assets, except as otherwise provided in the Liquidating Trust Agreement.

(c)    <u>Tax Treatment</u>. In furtherance of this Section 4.21, other than with respect to Liquidating Trust Assets that are subject to potential disputed claims of ownership or uncertain distributions (if any), (i) the Liquidating Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d) and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code with the Liquidating Trust Beneficiaries treated as the grantors and owners of the Liquidating Trust; (ii) the sole purpose of the Liquidating Trust shall be the liquidation and distribution of the Liquidating Trust Assets in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including

the Debtors, the Reorganized Debtors, the Liquidating Trust Beneficiaries, and the Liquidating Trustee) shall report consistently with such treatment (including the deemed receipt of the underlying assets, subject to applicable liabilities and obligations, by the holders of Allowed Claims, as applicable, followed by the deemed transfer of such assets to the Liquidating Trust); (iv) all parties shall report consistently with the valuation of the Liquidating Trust Assets transferred to the Liquidating Trust as determined by the Liquidating Trustee (or its designee); (v) the Liquidating Trustee shall be responsible for filing returns for the Liquidating Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and (vi) the trustee of the Liquidating Trust shall annually send to each holder of an interest in the Liquidating Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.

(d)     Dissolution of the Liquidating Trust. The Liquidating Trustee and the Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) the Bidco Divestiture is effectuated and (ii) all distributions required to be made by the Liquidating Trustee under the Plan have been made.  Upon dissolution of the Liquidating Trust: any remaining Liquidating Trust Assets shall be distributed to the Liquidating Trust Beneficiaries in accordance with the Liquidating Trust Agreement.

(e)     No Obligations or Liabilities.  On the Effective Date, none of the Debtors, the Reorganized Debtors or New TopCo, any of their respective Affiliates, or any of their respective officers, directors, managers or employees shall have any obligations or liabilities with respect to, or other responsibilities for, directly, indirectly or contingently, any of the debts, liabilities or other obligations of OSG Bidco or any of its subsidiaries, or arising under, or relating to, any of their respective Equity Interests, assets, contracts, benefit plans, businesses or operations, whether accrued or fixed, known or unknown, absolute or contingent, matured or unmatured, or determined or determinable, including any debts, liabilities or other obligations of OSG Bidco or any of its subsidiaries arising under, or relating to, the Communisis Pension Plan or any debts, liabilities or other obligations under the Specified Guarantee.

Section 4.22   *Effectuating Documents; Further Transactions.*

(a)     Prior to, on, and after the Effective Date, the Debtors, the Liquidating Trustee, Reorganized Debtors and New TopCo and the directors, managers, officers, authorized Persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of this Plan, the Restructuring Support Agreement, the DIP Facility Documents, the New Organizational Documents, the Rights Offering Documents, the New First Lien Documents, the New Take-Back Debt Documents, the Liquidating Trust Agreement, the Separation Agreement, and the Backstop Commitment Letter, and any securities issued and/or delivered under or as contemplated by this Plan in the name of and on behalf of the Reorganized Debtors and/or New TopCo, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to this Plan.

(b)     The Confirmation Order shall, and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may

be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

Section 4.23   *Restructuring Expenses.*

(a)      Subject to the terms of Section 7.04 of the Restructuring Support Agreement, the Debtors shall pay all Restructuring Expenses.

(b)      The Consenting First Lien Lenders have expended, and will continue to expend, considerable time, effort and expense in connection with the negotiation of the Restructuring Transactions, and the Restructuring Transactions provide substantial value to, are beneficial to, and are necessary to preserve, the Debtors, and the Consenting First Lien Lenders have made a substantial contribution to the Debtors and the Restructuring Transactions.  If and to the extent not previously reimbursed or paid pursuant to the terms of and in connection with Section 7.04 of the Restructuring Support Agreement and this Section 4.23, the Debtors shall reimburse or pay (as the case may be), subject to the limitations set forth in Section 7.04(a) of the Restructuring Support Agreement, all Restructuring Expenses pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.  The Restructuring Expenses accrued after the Petition Date and reimbursable under Section 7.04(a) of the Restructuring Support Agreement are entitled to treatment as, and the Debtors shall seek treatment of such Restructuring Expenses as, Allowed Administrative Claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

Section 4.24   *Retained Causes of Action.*

(a)      Unless any Causes of Action or Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan, the DIP Orders, or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action or Claims in the ordinary course, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action and Claims shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such retained Causes of Action or Claims, and may exercise any and all rights in connection therewith. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Section 4.24 include any Claim or Cause of Action with respect to, or against, a Released Party.

(b)      **No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.**

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 5.1     *Assumption of Executory Contracts and Unexpired Leases.*

(a)     All Executory Contracts and Unexpired Leases of the Debtors, including, without limitation, the Backstop Commitment Letter, shall be assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court or any other Person or Entity, pursuant to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease (i) was previously assumed or rejected by the Debtors by prior order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms, (iii) is subject to a motion to reject such Executory Contract or Unexpired Lease filed prior to the Effective Date, or (d) appears on the Schedule of Rejected Executory Contracts and Unexpired Leases.  Each Executory Contract and Unexpired Lease shall be fully enforceable by the applicable contracting Reorganized Debtor(s) in accordance with the terms thereof, except as otherwise modified by the provisions of this Plan, or by any order of the Bankruptcy Court.

(b)     The Confirmation Order shall constitute an order of the Bankruptcy Court: (i) approving the assumption or rejection, as applicable of all Executory Contracts or Unexpired Leases, as described in this Plan, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2); (ii) providing that each assumption, assumption and assignment, or rejection, as the case may be, is in the best interests of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (iii) providing that the requirements for assumption or assumption and assignment of any Executory Contract or Unexpired Lease to be assumed or assumed and assigned have been satisfied. Unless otherwise indicated, all assumptions, assumptions and assignments, or rejections of Executory Contracts or Unexpired Leases pursuant to this Plan are effective as of the Effective Date.

(c)     Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto (including any of the foregoing effected pursuant to this Plan or the Confirmation Order), and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  To the fullest extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan restricts or prevents (or purports to restrict or prevent), or is breached or deemed breached by, or increases, accelerates or otherwise alters any obligations, rights or liabilities of the Debtors or the Reorganized Debtors as a result of, or creates or imposes any Lien upon any property or asset of the Debtors or the Reorganized Debtors as a result of, the assumption or the assumption and assignment of such Executory Contract or Unexpired Lease or the consummation of any of the Restructuring Transactions (including any "change of control" provision (or term with similar effect)), then such provision shall be deemed modified such that such assumption or assumption and assignment or the consummation of any of the Restructuring Transactions shall not result in any such occurrence or consequence.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have

been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

(d)     Anything in this Plan to the contrary notwithstanding, on the Effective Date, all Specified Documents shall be automatically rejected and terminated without the need for any further action by, payment or distribution to, or notice to any Person or Entity.

Section 5.2     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

(a)     Unless otherwise agreed in writing by such counterparty, any monetary defaults that are required to be cured to assume an Executory Contract or Unexpired Lease shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code in the ordinary course of business.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely raise any objection that could have been raised under section 365 of the Bankruptcy Code shall be deemed to have consented to the Debtors' assumption of such Executory Contract or Unexpired Lease, to the extent any such consent is required, and such counterparty shall be forever enjoined and barred from objecting to the Debtors' assumption of such Executory Contract or Unexpired Lease for any reason.

(b)     If there is a dispute regarding (i) the amount of any Cure Cost, (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption, then the Bankruptcy Court shall retain jurisdiction in all respects to hear such disputes; *provided* that the occurrence of any such dispute shall not prevent or delay implementation of this Plan or the Effective Date; *provided further* that the Debtors or the Reorganized Debtors may settle any such dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court; *provided further* that notwithstanding anything to the contrary herein, the Debtors and the Reorganized Debtors reserve the right to either reject, or nullify the assumption of, any Executory Contract or Unexpired Lease within 30 days after the entry of a Final Order resolving an objection to assumption, determining the Cure Cost under an Executory Contract or Unexpired Lease that was subject to a dispute, or resolving any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

(c)     Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise, and the continued performance thereunder (or the payment of a Cure Cost, if any), shall result in the full release, satisfaction, and cure of any defaults thereunder, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to or on the effective date of assumption or assumption and assignment.  Any and all Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Cost has been fully paid pursuant to this Section 5.2, shall be deemed disallowed and expunged as of the Effective Date, without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

Section 5.3     *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

If the rejection by the Debtors, pursuant to this Plan or otherwise, of an Executory Contract or Unexpired Lease gives rise to a Claim, a Proof of Claim must be served upon the Debtors and their counsel within 30 days after the later of (a) notice of entry of the Confirmation Order or (b) other notice that the Executory Contract or Unexpired Lease has been rejected. Any Claims not served within such time periods will be forever barred from assertion against the Debtors, the Reorganized Debtors, the Estates, New TopCo, and their property.

Section 5.4     *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

Section 5.5     *Insurance Policies.*

All Insurance Policies issued to, or entered into by, the Debtors prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct) shall continue in effect after the Effective Date. To the extent that such Insurance Policies are considered to be Executory Contracts or Unexpired Leases, this Plan shall constitute a motion to assume or ratify such Insurance Policies, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code, the revesting of such Insurance Policies in the applicable Reorganized Debtors, and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors and their Estates.

Section 5.6     *Reservation of Rights.*

Nothing contained in this Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.

Section 5.7     *Nonoccurrence of Effective Date.*

Until the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

Section 6.1      *Distribution on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided in this Plan or a Final Order, or as agreed to by the relevant parties receiving such distributions, distributions under this Plan on account of Claims Allowed on the Record Date shall be made on the Distribution Date; *provided* that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or arising under Executory Contracts or Unexpired Leases assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, orders, course of dealing, course of business, or industry practice and (b) in accordance with Article II of this Plan, Allowed Priority Tax Claims, unless otherwise agreed, shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy Law, or in the ordinary course of business.

Section 6.2      *Distribution on Account of Claims Allowed After the Effective Date.*

(a)      *Payments and Distributions on Disputed Claims*. Except as otherwise provided in this Plan, a Final Order, or as agreed to by the relevant parties, distributions under this Plan on account of any Disputed Claim that becomes Allowed after the Effective Date shall be made on the Business Day that is 30 Business Days after the date on which such Disputed Claim becomes an Allowed Claim; *provided* that (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (ii) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date shall be treated as Allowed Priority Tax Claims in accordance with Article IX of this Plan and paid.

(b)      *Special Rules for Distributions to Holders of Disputed Claims*. Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by the relevant parties, no payments or distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or agreement among the relevant parties, or by Final Order.

(c)      *Timing and Calculation of Amounts to Be Distributed*. Except as otherwise provided herein, on the Distribution Date, each Holder of an Allowed Claim as of the Record Date shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class.  Except as otherwise provided in this Plan, or any order of the Bankruptcy Court, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions

49

provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in this Plan or the Confirmation Order, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim.

Section 6.3    *Delivery of Distributions.*

(a)    *Record Date for Distributions*. On the Record Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Record Date.

(b)    *Delivery of Distributions in General*. Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Record Date by the Reorganized Debtors at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim filed by that Holder.

(c)    *Delivery of Distributions on Account of Existing First Lien Claims*.

(i)    The First Lien Agent shall be deemed to be the Holder of the Existing First Lien Claims solely for purposes of distributions to be made hereunder, and all distributions on account of the Existing First Lien Claims in Class 3 shall be made to the First Lien Agent. As soon as practicable following compliance with the requirements set forth in Article VI hereof (as applicable), the First Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Existing First Lien Claims (or their respective designees) in Class 3 in accordance with the terms of the Existing First Lien Documents and this Plan. Notwithstanding anything in this Plan to the contrary, and without limiting the exculpation and release provisions of this Plan, the First Lien Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the First Lien Agent.

(ii)    Any Holder of an Allowed Existing First Lien Claim may designate that all or a portion of such Holder's Pro Rata share of (A) the New Take-Back Debt Loans, and/or (B) the Exchange Reorganized Equity to be distributed as part of the treatment of such Allowed Existing First Lien Claim, be registered in the name of, and delivered to, its designee by delivering notice thereof to counsel to the Debtors and to the Notice and Claims Agent at least five (5) Business Days prior to the Effective Date.

(d)    *Delivery of Distributions on Account of DIP Claims*. The DIP Agent shall be deemed to be the Holder of all DIP Claims for purposes of distributions to be made hereunder, and all distributions on account of such DIP Claims shall be made to the DIP Agent. As soon as

practicable following compliance with the requirements set forth in Article VI hereof (as applicable), the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of DIP Claims in accordance with the terms of the DIP Facility Documents, subject to any modifications to such distributions in accordance with the terms of this Plan.  Notwithstanding anything in this Plan to the contrary, and without limiting the exculpation and release provisions of this Plan, the DIP Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Agent.

Section 6.4   *Minimum Distributions.*

No fractional units of Reorganized Common Equity shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to this Plan on account of an Allowed Existing First Lien Claim would otherwise result in the issuance of a number of units of Reorganized Common Equity that is not a whole number, the actual distribution of units of Reorganized Common Equity shall be rounded as follows: (a) fractions of one-half ($1/2$) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half ($1/2$) shall be rounded to the next lower whole number with no further payment therefor.  For purposes of determining whether any distribution pursuant to this Plan on account of an Allowed Existing First Lien Claim would otherwise result in the delivery of a number of units of Reorganized Common Equity that is not a whole number, the total amount of Reorganized Common Equity to be delivered to the applicable Holder and its designees for receipt of Reorganized Common Equity under or as contemplated by this Plan (including pursuant to the Rights Offering and the Backstop Commitment Letter) shall be aggregated.  The Debtors and the Required Consenting First Lien Lenders may determine by mutual agreement to round certain allocations of Reorganized Common Equity and make such further adjustments as necessary so that the total amount of Reorganized Common Equity outstanding on the Effective Date (immediately after giving effect to the consummation of the Restructuring Transactions to occur on or as of the Effective Date, including all payments and distributions to be made on or as of the Effective Date) is equal to the number as determined by the Required Consenting First Lien Lenders.

Section 6.5   *Foreign Currency Exchange Rate.*

(a)    Except as otherwise provided in a Final Order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date; provided, however, that all Existing First Lien GBP Term Loan Claims shall be automatically deemed converted to the equivalent U.S. value using the exchange rate published by Bloomberg at approximately 11:00 a.m. (London time) three (3) Business Days immediately prior to the Effective Date; *provided further* that the distribution forth in Section 3.3(f)(ii)(B) of this Plan to Other General Unsecured Claims in Class 6 shall be made in GBP.

(b)    Notwithstanding the foregoing, all Existing First Lien Claims denominated in any currency other than United States dollars shall be automatically deemed converted to the equivalent U.S. value using the exchange rate at which such currency may be exchanged into United States dollars, as published by Bloomberg at approximately 11:00 a.m. (London time) three

(3) Business Days immediately prior to the Effective Date.  In the event that such rate is not published by Bloomberg, the rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Required Consenting First Lien Lenders and the Debtors or, in the absence of such agreement, such rate shall instead be the arithmetic average of the spot rates of exchange of the First Lien Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 10:00 a.m. (New York time) on such date for the purchase of United States dollars for delivery two (2) Business Days later.

Section 6.6     *Delivery of Distributions; Undeliverable Distributions.*

(a)     Distributions to Holders of Allowed General Unsecured Claims, Allowed General Unsecured Litigation Claims and Allowed Other General Unsecured Claims shall be made by the Reorganized Debtors at the address set forth in the Reorganized Debtors' books and records. Distributions to Holders of Allowed Existing First Lien Claims shall be made by the First Lien Agent at the address set forth in the First Lien Agent's system.  If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Reorganized Debtors or the First Lien Agent, as applicable, is notified of such Holder's then current address, at which time all missed distributions shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and any Claim or Interest of any Holder related to such property shall be discharged and forever barred. After such date, (i) any unclaimed or un-deliverable distribution of Cash to Holders of Claims shall become property of the Reorganized Debtors free of any restrictions thereon and (ii) any unclaimed or un-deliverable distribution of Reorganized Common Equity shall be cancelled and of no further force or effect, in each case notwithstanding any federal or state escheat laws to the contrary. Nothing contained in this Plan shall require the Reorganized Debtors, New TopCo or the First Lien Agent to attempt to locate any Holder of an Allowed Claim.

(b)     *Failure to Present Checks*. Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within 90 days after the issuance of such check.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 90 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the Reorganized Debtors, New TopCo or their property.  Within 90 days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment Laws, all such distributions shall revert to the Reorganized Debtors. Nothing contained herein shall require the Reorganized Debtors or New TopCo to attempt to locate any Holder of an Allowed Claim.

Section 6.7     *Compliance with Tax Requirements/Allocations.*

In connection with this Plan, to the extent applicable, the Reorganized Debtors, the DIP Agent, and the Existing First Lien Agent shall comply with all tax withholding and reporting

requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, the Reorganized Debtors, the DIP Agent, and the Existing First Lien Agent shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Each Holder of an Allowed Claim that is to receive a distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.  No distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations.  All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  The Reorganized Debtors, the DIP Agent, and the Existing First Lien Agent reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances, and such distributions shall be treated as if distributed to the applicable Holder of the Allowed Claim.

Section 6.8    *Surrender of Cancelled Instruments or Securities.*

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or Interest that is discharged by this Plan shall be deemed to have surrendered such certificate or instrument to the Reorganized Debtors.  Except as otherwise expressly provided in this Plan, such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and Reorganized Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interests, which shall continue in effect.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under this Plan.

Section 6.9    *Claims Paid or Payable by Third Parties.*

(a)    *Claims Paid by Third Parties*. The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim

as of the date of any such distribution under this Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

(b)     *Claims Payable by Insurance*. No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to any of the Debtors' Insurance Policies, if any, until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policies. To the extent that one or more of the Debtors' insurers satisfies or agrees to satisfy in full or in part a Claim, if any, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)     *Applicability of Insurance Policies*. Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS OR INTERESTS

Section 7.1     *Resolution of Disputed Claims Process.*

(a)     Except as provided otherwise in this Plan or by order of the Bankruptcy Court, Holders of Claims shall not be required to file Proofs of Claim with the Bankruptcy Court. The amount and validity of any disputed, contingent or unliquidated Claim shall be determined, resolved or adjudicated, as the case may be, in the manner in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced and all of the Debtors' legal and equitable rights in respect of any such Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced, except that (unless expressly waived pursuant to this Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. All Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure Cost pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

(b)     For the avoidance of doubt, there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under the Plan, except to the extent a Claim arises on account of rejection of an Executory Contract or Unexpired

54

Lease in accordance with Section 5.2.  Notwithstanding the foregoing, Entities must file Cure Cost objections as set forth in Section 5.2 of the Plan to the extent such Entity disputes the amount of the Cure Cost paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.2     *Allowance of Claims and Interests.*

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.   The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

Section 7.3     *Prosecution of Objections to Claims.*

Except as otherwise specifically provided in this Plan or order of the Bankruptcy Court, and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Reorganized Debtors shall have the sole authority: (a) to file, withdraw, or litigate to judgment objections to Claims or Interests; (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, except that the Reorganized Debtors shall consult with and seek consent from the First Lien Agent (such consent not to be unreasonably withheld) regarding the settlement or compromise of any Disputed Claim in which the amount in dispute is in excess of $250,000; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to the Plan.

Section 7.4     *Adjustment to Claims and Interests Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.5     *Disallowance of Certain Claims.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may

not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or an order of the Bankruptcy Court with respect thereto has been entered and all sums due have been turned over or paid to the Reorganized Debtors. All Proofs of Claim filed on account of an Indemnification Obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to this Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.6    *Offer of Judgment.*

The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Claim or Interest must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.7    *Amendments to Claims or Interests.*

On or after the Effective Date, except as provided herein, a Claim or Interest may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim or Interest filed shall be deemed disallowed in full and expunged without any further action.

# ARTICLE VIII.

# CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

Section 8.1    *Conditions Precedent to the Effective Date.*

The consummation of the Restructuring Transactions shall be subject to the satisfaction (or waiver as set forth in Section 8.2 of the Plan) of all of the following conditions on or prior to the Effective Date:

(a)    each of the Definitive Documents (including, without limitation, the New Organizational Documents (including the A&R LLC Agreement), the Rights Offering Documents, the New First Lien Documents, the New Take-Back Debt Documents, the Liquidating Trust Agreement, the Backstop Commitment Letter, the Separation Agreement, and the DIP Facility Documents) shall (i) have been executed, delivered, acknowledged and/or filed, as applicable, by the Entities and Persons intended to be parties thereto, (ii) be consistent with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Required Parties, and (iii) be in full force and effect and not subject to any unfulfilled conditions or contingencies;

(b)      all of the actions set forth in the Restructuring Transactions Memorandum shall have been completed and implemented;

(c)      the Reorganized Common Equity to be issued and/or delivered on the Effective Date (as set forth in this Plan) shall have been validly issued by New TopCo, shall be fully paid and non-assessable, and shall be free and clear of all taxes, Liens and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the A&R LLC Agreement;

(d)      the Restructuring Support Agreement shall not have been terminated in accordance with its terms (and no event shall have occurred that purports to terminate the Restructuring Support Agreement (even if such termination does not occur as a result of the automatic stay of section 362 of the Bankruptcy Code or otherwise)), and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting Stakeholders to terminate the Restructuring Support Agreement in accordance with its terms upon the expiration of such time;

(e)      any and all requisite regulatory approvals, KYC requirements, and any other material authorizations, consents, rulings, waivers, filings, or documents required to implement and effectuate the Restructuring Transactions (including any of the foregoing the failure of which to obtain or make would violate applicable Law, any material Permit (as defined in the Restructuring Support Agreement) or material contract) shall have been obtained or made, not be subject to unfulfilled conditions or contingencies, and be in full force and effect;

(f)      the Restructuring Expenses that are reimbursable under Section 7.04 of the Restructuring Support Agreement shall have been paid in accordance with this Plan;

(g)      (i) the satisfaction or waiver of all of the conditions to the effectiveness of, and any funding required on the Effective Date under, the New First Lien Facility set forth in the New Credit Agreement (other than the occurrence of the Effective Date), (ii) the satisfaction or waiver of the conditions to the effectiveness of the New Take-Back Debt Facility set forth in the New Credit Agreement (other than the occurrence of the Effective Date), and (iii) any funding required under the New First Lien Facility to be made on the Effective Date shall have occurred substantially contemporaneously with consummation of the Restructuring Transactions, in each case, in accordance with the terms thereof and hereof in all respects;

(h)      (i) the Bankruptcy Court shall have entered each of the Interim DIP Order, the Final DIP Order, the Disclosure Statement Order and the Confirmation Order, (ii) each of the Interim DIP Order, the Final DIP Order, the Disclosure Statement Order and the Confirmation Order shall be consistent with the Restructuring Support Agreement and otherwise in form and substance acceptable to the Required Parties, and (iii) each of the Interim DIP Order, the Final DIP Order, the Disclosure Statement Order and the Confirmation Order shall not have been stayed, reversed, dismissed or vacated;

(i)      as of the Effective Date, all Specified Documents shall have been rejected under this Plan and the Debtors and the Reorganized Debtors shall have no further obligations or

liabilities under the Specified Documents, all without any payment or other transfer of value therefor;

(j)        as of the Effective Date, no temporary restraining order, preliminary or permanent injunction, judgment or other order preventing the Restructuring Transactions or any of the transactions contemplated by any of the Definitive Documents shall have been entered, issued, rendered or made, nor shall any Proceeding (as defined in the Restructuring Support Agreement) seeking any of the foregoing be commenced or pending; nor shall any Proceeding seeking any of the foregoing be threatened by a Governmental Body (as defined in the Restructuring Support Agreement); nor shall there be any Law promulgated, enacted, entered, enforced or deemed applicable to any of the parties to the Restructuring Support Agreement which makes the consummation of the Restructuring Transactions or any of the transactions contemplated by any of the Definitive Documents illegal, void or rescinded;

(k)        on the Effective Date (after giving effect to the consummation of the Restructuring Transactions), other than (i) the Reorganized Common Equity issued and/or delivered to the Holders of Allowed Existing First Lien Claims pursuant to the Plan, (ii) the Reorganized Common Equity issued and/or delivered to certain of the Rights Offering Participants and/or their respective Rights Offering Designees (as defined in the Rights Offering Procedures) in connection with New First Lien Loan Commitments provided by such Rights Offering Participants and/or their respective Rights Offering Designees pursuant to the Rights Offering, (iii) the Reorganized Common Equity issued and/or delivered to the Backstop Parties and/or their respective Backstop Designees (as defined in the Backstop Commitment Letter) in connection with New First Lien Loan Commitments provided by the Backstop Parties and/or their respective Backstop Designees pursuant to the Backstop Commitment Letter on account of their respective Backstop Commitments and Direct Allocation Commitments, (iv) the Reorganized Common Equity issued and/or delivered to the Backstop Parties and/or their respective Backstop Designees pursuant to the Backstop Commitment Letter in satisfaction of the Put Option Premium, and (v) Equity Interests of a subsidiary of New TopCo owned solely by New TopCo or another subsidiary of New TopCo, no (A) Equity Interests of New TopCo or any of its subsidiaries, (B) pre-emptive rights, rights of first refusal, subscription rights and/or similar rights to acquire any Equity Interests of New TopCo or any of its subsidiaries, or (C) voting trusts, proxies, shareholder agreements, limited liability company agreements, or other agreements or understandings with respect to the voting, ownership, registration or transfer of any Equity Interests of New TopCo or any of its subsidiaries (except, in the case of sub-clauses (B) and (C), any such rights or agreements with respect to Reorganized Common Equity that are expressly set forth in the A&R LLC Agreement), in any such case will be issued, outstanding or in effect;

(l)        counsel to the Consenting First Lien Lenders shall have received evidence of (i) an effective officers' and directors' liability insurance and fiduciary liability insurance policy that covers New TopCo and all of its subsidiaries, which evidence shall demonstrate that such policy shall be in effect as of the Effective Date and (ii) an effective "tail" officers' and directors' liability insurance and fiduciary liability insurance policy that covers each of the Debtors, the Reorganized Debtors and the Liquidating Debtors, which evidence shall demonstrate that such policy shall be in effect as of the Effective Date;

(m)     the Consenting First Lien Lenders shall have received a properly completed and duly executed certificate complying with Section 1445 of the Tax Code and Treasury Regulation Sections 1.1445-2(c)(3) and 1.897-2(h) certifying that Holdings or Output Services Group, as applicable, is not and was not a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Tax Code at any time during the five (5)-year period ending on the Effective Date;

(n)     each of the offers, issuances, sales, and/or deliveries of Reorganized Common Equity in connection with the Restructuring Transactions shall be exempt from the registration and prospectus delivery requirements of the Securities Act, no Proceeding by any Governmental Body or other Entity or Person that alleges that any such offer, issuance, sale and/or delivery is not exempt from the registration and prospectus delivery requirements of the Securities Act shall be pending on the Effective Date, and no such Proceeding shall be threatened by any Governmental Body on or prior to the Effective Date;

(o)     (i) the Backstop Commitment Letter shall not have been terminated and shall remain in full force and effect (and no event shall have occurred that purports to terminate the Backstop Commitment Letter (even if such termination does not occur as a result of the automatic stay of section 362 of the Bankruptcy Code or otherwise)), and (ii) there shall not be any continuing cure period with respect to any event, occurrence or condition that would permit the Required Backstop Parties (as defined in the Backstop Commitment Letter) to terminate the Backstop Commitment Letter in accordance with its terms;

(p)     (i) the Debtors shall have assumed the Backstop Commitment Letter pursuant to section 365 of the Bankruptcy Code and (ii) the Bankruptcy Court shall have entered the Confirmation Order that authorizes and approves such assumption of the Backstop Commitment Letter and the performance of the transactions contemplated thereby (including the payment of the Put Option Premium, the payment and/or reimbursement of the Backstop Parties' expenses, and the indemnification, advancement, reimbursement and contribution provisions in favor of the indemnified parties set forth therein);

(q)     (i) the Rights Offering shall have been conducted and, concurrently with the Effective Date, consummated in accordance with the Restructuring Support Agreement and the Backstop Commitment Letter, and (ii) Reorganized Output Services Group shall have received (or concurrently with the Effective Date will receive) New First Lien Loan Commitments provided pursuant to the Rights Offering and the Backstop Commitment Letter in an aggregate amount of not less than the New First Lien Facility Amount; and

(r)     such other conditions as mutually agreed by the Debtors and the Required Parties.

For the avoidance of doubt, any condition that requires any agreement, order or document to be in full force and effect, or entered by the Bankruptcy Court, as applicable, shall include a requirement that such agreement, order or document is consistent with the Restructuring Support Agreement and otherwise in form and substance as set forth in the Restructuring Support Agreement.

Section 8.2    *Waiver of Conditions Precedent.*

The Debtors or the Reorganized Debtors, as applicable, with the prior written consent of the Required Parties, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm this Plan.  The failure of the Debtors or Reorganized Debtors, as applicable, to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

Section 8.3    *Effect of Failure of Conditions Precedent.*

If the Effective Date does not occur prior to or on the Outside Date (as may be waived or extended by agreement of the Required Consenting First Lien Lenders in accordance with the Restructuring Support Agreement), then: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (c) nothing contained in this Plan, the Confirmation Order, or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

Section 8.4    *Substantial Consummation of Plan.*

Substantial consummation of this Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.  The Debtor shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date on the Effective Date or as soon as practicable thereafter.

## ARTICLE IX.

## EFFECT OF PLAN CONFIRMATION

Section 9.1    *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind and inure to the benefit of the Debtors, the Reorganized Debtors, New TopCo, the Consenting Stakeholders, and each Holder of a Claim against any Debtor or an Interest and inure to the benefit of and be binding on such Debtor's, Reorganized Debtor's, New TopCo's, the Consenting Stakeholders', and such Holder's respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under this Plan and whether such Holder has accepted or rejected this Plan or is deemed to have accepted or rejected this Plan. Except as expressly provided otherwise in the Plan, all agreements, instruments, and other documents filed in connection with this Plan shall be given full force and effect, and shall bind all parties referred to therein as of the Effective Date, whether or not such agreements are actually

issued, delivered, or recorded on the Effective Date or thereafter and whether or not a party has actually executed such agreement.

Section 9.2    *Discharge.*

(a)    <u>Discharge of Claims and Termination of Interests</u>.  Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Interests and Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, and rights against the Debtors, the Reorganized Debtors or any of their properties, including property of the Estates, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest is Allowed; or (c) the Holder of such Claim or Interest has accepted or rejected, or been deemed to accept or reject, this Plan. Except as otherwise provided herein, any default or event of default by the Debtors or their Affiliates with respect to any Claim or Interest that exists on or prior to the Effective Date, including as a result of the filing of the Chapter 11 Cases, shall be deemed cured (and no longer continuing) on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in this Plan.

(b)    <u>Discharge Injunction</u>.  As of the Effective Date, except as otherwise expressly provided in this Plan or the Confirmation Order, all Entities (other than Holders of Reinstated Claims solely in their capacities as such) shall be precluded from asserting against the Debtors, the Reorganized Debtors and New TopCo, their respective assets and property, and the Estates, any other or further Claims (other than those Reinstated under this Plan), or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, relating to the Debtors, Reorganized Debtors or New TopCo or any of their respective assets and property or the Estates, based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as expressly provided in this Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all non-Reinstated Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Reorganized Debtors, New TopCo or their respective assets, property and Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability.  Except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons or Entities who have held, hold or may hold Claims against any Debtor or Interests that arose prior to the Effective Date and all other parties-in-interest, along with their respective present or former employees, agents, officers, directors, principals, representatives and Affiliates, are permanently enjoined, from and after the Effective Date, from (a) commencing

61

or continuing in any manner any action or other proceeding of any kind with respect to any such Claim (including a Section 510(b) Claim) or Interest, other than to enforce any right to a distribution pursuant to the Plan, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Reorganized Debtors or New TopCo or the property of the Reorganized Debtors or New TopCo with respect to any such Claim or Interest, other than to enforce any right to a distribution pursuant to this Plan, (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Reorganized Debtors or New TopCo or against the property or interests in property of the Reorganized Debtors or New TopCo with respect to any such Claim or Interest, other than to enforce any right to a distribution pursuant to this Plan or (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Reorganized Debtors or New TopCo or against the property or interests in property of the Reorganized Debtors or New TopCo with respect to any such Claim or Interest. Such injunction shall extend to any successors or assignees of the Reorganized Debtors or New TopCo and their respective properties and interest in properties.  For the avoidance of doubt, the provisions of this Section 9.2(b) shall not apply with respect to Claims that are Reinstated under this Plan.

Section 9.3    *Releases.*

(a)    ***RELEASES BY THE DEBTORS.*** **TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, OTHER THAN IN THE CASE OF WILLFUL MISCONDUCT OR ACTUAL FRAUD (BUT NOT, FOR THE AVOIDANCE OF DOUBT, AVOIDANCE ACTIONS), EACH OF THE DEBTORS, THE REORGANIZED DEBTORS AND THEIR ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES, AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CAUSE OF ACTION, DIRECTLY OR DERIVATIVELY, BY, THROUGH, FOR, OR BECAUSE OF THE FOREGOING ENTITIES, SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED EACH RELEASED PARTY FROM ANY AND ALL CLAIMS, INTERESTS, DAMAGES, REMEDIES, CAUSES OF ACTION, DEMANDS, RIGHTS, DEBTS, ACTIONS, SUITS, OBLIGATIONS, LIABILITIES, ACCOUNTS, DEFENSES, OFFSETS, POWERS, PRIVILEGES, LICENSES, LIENS, INDEMNITIES, GUARANTIES, AND FRANCHISES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER EXISTING, CONTINGENT OR NON-CONTINGENT, LIQUIDATED OR UNLIQUIDATED, SECURED OR UNSECURED, ASSERTED OR ASSERTABLE, DIRECT OR DERIVATIVE, MATURED OR UNMATURED, SUSPECTED OR UNSUSPECTED, IN CONTRACT, TORT, LAW, EQUITY, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, NEW TOPCO, OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE COMPANY (INCLUDING THE CAPITAL STRUCTURE, MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE CONSENTING**

**FUNDS, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS OR BOARD OF MANAGERS, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE REORGANIZED DEBTORS OR NEW TOPCO, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN OR AMONG ANY OF THE DEBTORS AND ANY RELEASED PARTY, THE OWNERSHIP OR OPERATION OF THE DEBTORS BY ANY RELEASED PARTY, THE DISTRIBUTION OF ANY CASH OR OTHER PROPERTY OF THE DEBTORS TO ANY RELEASED PARTY, THE ASSERTION OR ENFORCEMENT OF RIGHTS OR REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), INTERCOMPANY TRANSACTIONS (OTHER THAN ANY INTERCOMPANY CLAIMS THAT HAVE BEEN REINSTATED AS CONTEMPLATED IN THE PLAN), THE RESTRUCTURING TRANSACTIONS, ENTRY INTO THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, ENTRY INTO, OR FILING OF, AS APPLICABLE, THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE DIP FACILITY DOCUMENTS, THE DEFINITIVE DOCUMENTS, OR ANY OTHER DOCUMENTS (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) RELATING TO ANY OF THE FOREGOING, CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE DIP FACILITY DOCUMENTS OR THE DEFINITIVE DOCUMENTS, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN ANY OBLIGATIONS OF ANY RELEASED PARTY ARISING UNDER THE PLAN, ANY DEFINITIVE DOCUMENTS, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE CHAPTER 11 CASES.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THIS PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE (A) CONSENSUAL; (B) ESSENTIAL TO CONFIRMATION OF THE PLAN; (C) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A**

GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASES; (E) IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES, AND ALL HOLDERS OF CLAIMS AND INTERESTS; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE DEBTORS, REORGANIZED DEBTORS OR NEW TOPCO OR THEIR RESPECTIVE ESTATES ASSERTING ANY CLAIM, CAUSE OF ACTION, OR LIABILITY RELEASED BY THE DEBTOR RELEASES.

(b)     ***RELEASES BY THE RELEASING PARTIES.***  TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, OTHER THAN IN THE CASE OF WILLFUL MISCONDUCT OR ACTUAL FRAUD (BUT NOT, FOR THE AVOIDANCE OF DOUBT, AVOIDANCE ACTIONS), EACH OF THE RELEASING PARTIES SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, NEW TOPCO, AND EACH OTHER RELEASED PARTY FROM ANY AND ALL CLAIMS, INTERESTS, DAMAGES, REMEDIES, CAUSES OF ACTION, DEMANDS, RIGHTS, DEBTS, ACTIONS, SUITS, OBLIGATIONS, LIABILITIES, ACCOUNTS, DEFENSES, OFFSETS, POWERS, PRIVILEGES, LICENSES, LIENS, INDEMNITIES, GUARANTIES, AND FRANCHISES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER EXISTING, CONTINGENT OR NON-CONTINGENT, LIQUIDATED OR UNLIQUIDATED, SECURED OR UNSECURED, ASSERTED OR ASSERTABLE, DIRECT OR DERIVATIVE, MATURED OR UNMATURED, SUSPECTED OR UNSUSPECTED, IN CONTRACT, TORT, LAW, EQUITY, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, NEW TOPCO, EACH OTHER RELEASING PARTY OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE COMPANY (INCLUDING THE CAPITAL STRUCTURE, MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE CONSENTING FUNDS, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS OR BOARD OF MANAGERS, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE REORGANIZED DEBTORS OR NEW TOPCO, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN OR AMONG ANY OF THE DEBTORS AND ANY RELEASED PARTY, THE OWNERSHIP OR OPERATION OF THE DEBTORS BY ANY RELEASED PARTY, THE DISTRIBUTION OF ANY CASH OR OTHER PROPERTY OF THE DEBTORS TO ANY RELEASED PARTY, THE ASSERTION OR ENFORCEMENT OF RIGHTS OR REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR

DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), INTERCOMPANY TRANSACTIONS (OTHER THAN ANY INTERCOMPANY CLAIMS THAT HAVE BEEN REINSTATED AS CONTEMPLATED IN THE PLAN), THE RESTRUCTURING TRANSACTIONS, ENTRY INTO THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, ENTRY INTO, OR FILING OF, AS APPLICABLE, THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE DIP FACILITY DOCUMENTS, THE DEFINITIVE DOCUMENTS, OR ANY OTHER DOCUMENTS (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) RELATING TO ANY OF THE FOREGOING, CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE DIP FACILITY DOCUMENTS, OR THE DEFINITIVE DOCUMENTS, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN ANY OBLIGATIONS OF ANY RELEASED PARTY ARISING UNDER THE PLAN, ANY DEFINITIVE DOCUMENTS, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE CHAPTER 11 CASES.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THIS PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASES ARE (A) CONSENSUAL; (B) ESSENTIAL TO CONFIRMATION OF THE PLAN; (C) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASES; (E) IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES, AND ALL HOLDERS OF CLAIMS AND INTERESTS; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM, CAUSE OF ACTION, OR LIABILITY RELEASED PURSUANT TO THE THIRD-PARTY RELEASES.

Section 9.4    *Exculpation and Limitation of Liability.*

(a)    UPON AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE DEBTORS AND NEW TOPCO, AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, INVESTMENT BANKERS, FINANCIAL ADVISORS, RESTRUCTURING CONSULTANTS, OTHER PROFESSIONAL ADVISORS AND AGENTS, SHALL BE DEEMED TO HAVE SOLICITED ACCEPTANCES OF THIS

PLAN IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING SECTION 1125(E) OF THE BANKRUPTCY CODE.

(b)      EXCEPT WITH RESPECT TO ANY WILLFUL MISCONDUCT OR FRAUD AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION, AND ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THIS PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, TO THE FULLEST EXTENT PERMITTED BY LAW, THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY AND ALL CLAIMS AND CAUSES OF ACTION ARISING ON OR AFTER THE PETITION DATE AND ANY AND ALL CAUSES OF ACTION RELATING TO ANY ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, SOLICITING, CONFIRMING, CONSUMMATING, ENTRY INTO, OR FILING OF, AS APPLICABLE, THIS PLAN, INCLUDING THE ISSUANCE OR DELIVERY OF SECURITIES PURSUANT TO THIS PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THIS PLAN OR ANY OTHER RELATED AGREEMENT, THE PLAN SUPPLEMENT, THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THE DISCLOSURE STATEMENT ORDER, THE DIP FACILITY DOCUMENTS, THE CONFIRMATION ORDER, THE OPT-OUT FORM, SUCH OTHER MOTIONS, ORDERS, AGREEMENTS, AND DOCUMENTATION NECESSARY OR DESIRABLE TO CONSUMMATE AND DOCUMENT THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO AND THIS PLAN, ALL OTHER FINANCING DOCUMENTS NEEDED TO EFFECTUATE THE RESTRUCTURING TRANSACTIONS, ALL OTHER MATERIAL CUSTOMARY DOCUMENTS DELIVERED IN CONNECTION WITH TRANSACTIONS OF THIS TYPE (INCLUDING, WITHOUT LIMITATION, ANY AND ALL OTHER DOCUMENTS, IMPLEMENTING, ACHIEVING, CONTEMPLATED BY, OR RELATED TO THE RESTRUCTURING TRANSACTIONS), ANY OTHER DOCUMENTS (INCLUDING ANY LEGAL OPINION IN EFFECT PRIOR TO THE EFFECTIVE DATE THAT WAS REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THIS PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THIS PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) RELATED TO ANY OF THE FOREGOING, CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT AND THE TERM SHEETS ANNEXED THERETO, THE DISCLOSURE STATEMENT, THIS PLAN, THE PLAN SUPPLEMENT, OR THE DIP FACILITY DOCUMENTS, THE ADMINISTRATION AND IMPLEMENTATION OF THIS PLAN, ANY TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE DEBTORS, THE DEBTORS' BUSINESS OR CAPITAL STRUCTURE, THE

66

RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, OR ANY MATTERS RELATED THERETO, IN EACH CASE ARISING ON OR PRIOR TO THE EFFECTIVE DATE.

(c)     THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION, SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING WITH REGARD TO THE NEW ORGANIZATIONAL DOCUMENTS (INCLUDING THE A&R LLC AGREEMENT), THE RIGHTS OFFERING DOCUMENTS, THE NEW FIRST LIEN DOCUMENTS, THE NEW TAKE-BACK DEBT DOCUMENTS, THE LIQUIDATING TRUST AGREEMENT, THE SEPARATION AGREEMENT, AND THE BACKSTOP COMMITMENT LETTER AND DELIVERY OF REORGANIZED COMMON EQUITY, PURSUANT TO THIS PLAN AND, THEREFORE, ARE NOT AND SHALL NOT BE LIABLE AT ANY TIME FOR THE VIOLATIONS OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THIS PLAN OR SUCH CONTRIBUTIONS OR DISTRIBUTIONS MADE PURSUANT TO THIS PLAN.

Section 9.5     *Injunction.*

(a)     EXCEPT AS EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES THAT HOLD, HAVE HELD, OR MAY HOLD A CLAIM OR ANY OTHER OBLIGATION, SUIT, JUDGMENT, DAMAGES, DEBT, RIGHT, REMEDY, CAUSE OF ACTION, OR LIABILITY OF ANY NATURE WHATSOEVER, OF THE TYPES DESCRIBED IN SECTION 9.3(B) OF THIS PLAN AND RELATING TO THE DEBTORS, THE REORGANIZED DEBTORS, NEW TOPCO OR ANY OF THEIR RESPECTIVE ASSETS AND PROPERTY AND/OR THE ESTATES, THE CHAPTER 11 CASES, THIS PLAN, THE PLAN SUPPLEMENT, AND/OR THE DISCLOSURE STATEMENT ARE, AND SHALL BE, PERMANENTLY, FOREVER AND COMPLETELY STAYED, RESTRAINED, PROHIBITED, BARRED AND ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST ANY RELEASED PARTY OR ITS PROPERTY ON ACCOUNT OF SUCH RELEASED LIABILITIES, WHETHER DIRECTLY OR INDIRECTLY, DERIVATIVELY OR OTHERWISE, ON ACCOUNT OF OR BASED ON THE SUBJECT MATTER OF SUCH DISCHARGED CLAIMS OR OTHER OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION OR LIABILITIES:  (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING (INCLUDING, WITHOUT LIMITATION, ANY JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER PROCEEDING) IN ANY FORUM; (II) ENFORCING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR IN ANY WAY SEEKING TO RECOVER ANY JUDGMENT, AWARD, DECREE, OR OTHER ORDER; (III) CREATING, PERFECTING, OR IN ANY WAY ENFORCING IN ANY MATTER, DIRECTLY OR INDIRECTLY, ANY LIEN; (IV) SETTING OFF, SEEKING REIMBURSEMENT OR CONTRIBUTIONS FROM, OR SUBROGATION AGAINST, OR OTHERWISE RECOUPING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY

**AMOUNT AGAINST ANY LIABILITY OR OBLIGATION THAT IS DISCHARGED UNDER SECTION 9.2 OF THIS PLAN; AND/OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY JUDICIAL, ARBITRATION OR ADMINISTRATIVE PROCEEDING IN ANY FORUM, THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THIS PLAN OR THE CONFIRMATION ORDER.**

**(b)      EXCEPT AS EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES THAT HOLD, HAVE HELD, OR MAY HOLD A CLAIM OR ANY OTHER OBLIGATION, SUIT, JUDGMENT, DAMAGES, DEBT, RIGHT, REMEDY, CAUSE OF ACTION, OR LIABILITY OF ANY NATURE WHATSOEVER, OF THE TYPES DESCRIBED IN SECTION 9.4 OF THIS PLAN AND RELATING TO THE DEBTORS, THE REORGANIZED DEBTORS, NEW TOPCO OR ANY OF THEIR RESPECTIVE ASSETS AND PROPERTY AND/OR THE ESTATES, ARE, AND SHALL BE, PERMANENTLY, FOREVER AND COMPLETELY STAYED, RESTRAINED, PROHIBITED, BARRED, AND ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST ANY EXCULPATED PARTY OR ITS PROPERTY ON ACCOUNT OF SUCH RELEASED LIABILITIES, WHETHER DIRECTLY OR INDIRECTLY, DERIVATIVELY OR OTHERWISE, ON ACCOUNT OF OR BASED ON THE SUBJECT MATTER OF SUCH DISCHARGED CLAIMS OR OTHER OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEBTS, RIGHTS, REMEDIES, CAUSES OF ACTION, OR LIABILITIES:  (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING (INCLUDING, WITHOUT LIMITATION, ANY JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER PROCEEDING) IN ANY FORUM; (II) ENFORCING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR IN ANY WAY SEEKING TO RECOVER ANY JUDGMENT, AWARD, DECREE, OR OTHER ORDER; (III) CREATING, PERFECTING, OR IN ANY WAY ENFORCING IN ANY MATTER, DIRECTLY OR INDIRECTLY, ANY LIEN; (IV) SETTING OFF, SEEKING REIMBURSEMENT OR CONTRIBUTIONS FROM, OR SUBROGATION AGAINST, OR OTHERWISE RECOUPING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY AMOUNT AGAINST ANY LIABILITY OR OBLIGATION THAT IS DISCHARGED UNDER SECTION 9.2 OF THIS PLAN; AND/OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY JUDICIAL, ARBITRATION OR ADMINISTRATIVE PROCEEDING IN ANY FORUM, THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THIS PLAN OR THE CONFIRMATION ORDER.**

Section 9.6      *Gatekeeper Provision.*

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Claim or Cause of Action of any kind against any of the Debtors, Reorganized Debtors, New TopCo or the other Released Parties that arose or arises from or is related to any Covered Claim without first (i) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such

Claim or Cause of Action represents a colorable claim against a Debtor, a Reorganized Debtor, New TopCo or anther Released Party, as applicable, and is not a Claim that was released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (ii) obtaining from the Bankruptcy Court specific authorization for such party to bring such Claim or Cause of Action against a Debtor, Reorganized Debtor, New TopCo or another Released Party, as applicable. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

Section 9.7    *Setoffs and Recoupment.*

(a)    Except as otherwise provided herein or in the DIP Orders, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy Law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan, a Final Order or otherwise); *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.

(b)    In no event shall any Holder of Claims be entitled to set off or recoup any Claim against any Claim, right, or Cause of Action of a Debtor or a Reorganized Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XI, Section 11.11 hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

Section 9.8    *Release of Liens.*

(a)    Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

(b)    To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly

69

any Liens or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation or extinguishment of such Liens or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

<div align="center">

**ARTICLE X.**

**RETENTION OF JURISDICTION**

</div>

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)  allow, disallow, determine, liquidate, classify, estimate, or establish the priority, nature, validity, amount, or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance, priority, or amount of Claims or Interests;

(b)  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or this Plan;

(c)  resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Costs arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

(d)  ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes from, or relating to distributions under, the Plan;

(e)  adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(f)  adjudicate, decide, or resolve any and all matters related to Causes of Action against, brought by or otherwise relating to the Debtors or these Chapter 11 Cases;

(g)  adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h)      resolve any and all avoidance or recovery actions under sections 105, 502(d), 542 through 551, and 553 of the Bankruptcy Code;

(i)      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

(j)      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan or the Disclosure Statement;

(k)      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(l)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan;

(m)      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

(n)      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

(o)      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the Liquidating Trust, including with respect to the operation and formation thereof;

(p)      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated, or if distributions pursuant to this Plan are enjoined or stayed;

(q)      determine any other matters that may arise in connection with or relating to this Plan, the Disclosure Statement, the Confirmation Order, the Disclosure Statement Order, the Combined Order, the Restructuring Support Agreement, or any other order, contract, instrument, release, indenture, or other agreement or document created or entered in connection with this Plan or the Disclosure Statement;

(r)      enter an order or final decree concluding or closing the Chapter 11 Cases;

(s)      adjudicate any and all disputes arising from or relating to distributions under this Plan;

(t)      consider any modifications of this Plan before or after the Effective Date, including to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(u)    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan (other than any dispute arising after the Effective Date under, or directly with respect to, the New Organizational Documents, the New First Lien Documents, the New Take-Back Debt Documents, the Separation Agreement, and the Management Incentive Plan, which such disputes shall be adjudicated in accordance with the terms of the New Organizational Documents, the New First Lien Documents, the New Take-Back Debt Documents, the Separation Agreement, and the respective documents evidencing the Management Incentive Plan, respectively);

(v)    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(w)    hear and determine any issues arising under, or violations of, section 525 of the Bankruptcy Code;

(x)    hear and determine all disputes involving the existence, nature, scope or enforcement of the Debtors' exculpations, discharges, injunctions, and releases granted in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(y)    hear and determine all matters related to the property of the Estates from and after the Confirmation Date;

(z)    hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code;

(aa)    enforce all orders previously entered by the Bankruptcy Court; and

(bb)    hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XI.

## MISCELLANEOUS PROVISIONS

Section 11.1    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, New TopCo and any and all Holders (irrespective of whether any such Holder is deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.  The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

Section 11.2    *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of Title 28 of the U.S. Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code or as agreed to by the U.S. Trustee and Reorganized Debtors, shall be paid when due and payable for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

Section 11.3    *Amendments.*

(a)    *Plan Modifications.* Subject to the limitations contained in this Plan, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules: (i) to amend or modify this Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (ii) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan; *provided* that any amendment or modification pursuant to this Section 11.3(a) shall be acceptable to the Required Parties.

(b)    *Effect of Confirmation on Modifications.* Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof and that were acceptable to the Required Consenting Stakeholders are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

(c)    *Certain Technical Amendments.* Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court.

Section 11.4    *Revocation or Withdrawal of Plan.*

Subject to the conditions to the Effective Date and subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan, including the right to revoke or withdraw this Plan for any Debtor or all Debtors, prior to the entry of the Confirmation Order and to file subsequent plans of reorganization. If the Debtors revoke or withdraw this Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (a) this Plan with respect to such Debtor or Debtors shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant hereto shall be deemed null and void with respect to such Debtor or Debtors; and (c) nothing contained in this Plan with respect to such Debtor or Debtors shall: (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors or any other Entity.

Section 11.5    *Governing Law.*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules, or other federal Law, rule, or regulation is applicable, or to the extent that an exhibit, supplement, or other document related to this Plan (including, without limitation, the DIP Facility Documents, the New Organizational Documents, the Rights Offering Documents, the New First Lien Documents, the New Take-Back Debt Documents, the Liquidating Trust Agreement, the Separation Agreement, the Backstop Commitment Letter, and the Management Incentive Plan), provides otherwise, this Plan shall be governed by and construed in accordance with the Laws of the State of New York, without giving effect to the principles of conflict of Laws thereof that would require application of the Law of another jurisdiction.

Section 11.6    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, Affiliate, assign, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

Section 11.7    *No Successor Liability.*

Except as otherwise expressly provided in this Plan and the Confirmation Order, the Reorganized Debtors and New TopCo (a) are not, and shall not be deemed to assume, agree to perform, pay or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors on or prior to the Effective Date, (b) are not, and shall not be, a successor to the Debtors by reason of any theory of Law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date and (c) shall not have any successor or transferee liability of any kind or character.

Section 11.8    *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors and with the consent of the Required Consenting Stakeholders, shall have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remaining terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

Section 11.9   *Filing of Additional Documents.*

Subject to the terms of the Restructuring Support Agreement, on or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  Subject to the terms of the Restructuring Support Agreement, the Debtors or Reorganized Debtors, as applicable, and all Holders receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

Section 11.10   *Reservation of Rights.*

This Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan or the Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or the Existing First Lien Lenders with respect to the Holders of Claims or any other matter prior to the Effective Date.

Section 11.11   *Service of Documents.*

After the Effective Date, any pleading, notice, or other document required by this Plan to be served on or delivered to the Reorganized Debtors shall also be served on:

        Output Services Group, Inc.
        900 Kimberly Drive
        Carol Stream, IL 60188
        Attention:    Dean Cherry
                      Ron Lambert
                      Brett Shroll
        E-mail:       Dean.Cherry@everview.io
                      Ron.Lambert@everview.io
                      Brett.Shroll@everview.io

        with copies to:

        McDermott Will & Emery LLP
        2501 N. Harwood Street, Suite 1900
        Dallas, TX 75201
        Attention:    Marcus A. Helt
        Email:        mhelt@mwe.com

        and

        McDermott Will & Emery LLP

75

444 West Lake Street, Suite 4000
Chicago, Illinois 60602
Attention:      Bradley Thomas Giordano;
                Felicia Gerber Perlman;
                Carole Wurzelbacher
E-mail:         bgiordano@mwe.com;
                fperlman@mwe.com;
                cwurzelbacher@mwe.com

and

McDermott Will & Emery LLP
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131
Attention:      Gregg Steinman
E-mail:         gsteinman@mwe.com


*Proposed Counsel to the Debtors*

and

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention:      Jayme Goldstein
                Christopher Guhin
                Matthew Micheli
                Caroline Diaz
E-mail:         jaymegoldstein@paulhastings.com
                chrisguhin@paulhastings.com
                mattmicheli@paulhastings.com
                carolinediaz@paulhastings.com

*Counsel to the Consenting First Lien Lenders*

and

Aquiline Capital Partners, LLC
535 Madison Avenue
New York, NY 10222
Attn:   Nick Seibert

E-mail:nseibert@aquiline.com
        legalnotices@aquiline.com

with copies to:

76

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attn:   Jeffrey R. Poss
           Brian S. Lennon
           Larissa R. Marcellino
E-mail: jposs@willkie.com
           blennon@willkie.com
           lmarcellino@willkie.com

*Counsel to Aquiline*

and

Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, TX 77002
Attn:   Ha Nguyen
           Alicia Barcomb
Email:   Ha.Nguyen@usdoj.gov
            Alicia.Barcomb@usdoj.gov

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities informing them that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Section 11.12  *Section 1125(e) of the Bankruptcy Code.*

As of the Confirmation Date, (a) the Debtors shall be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy Law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and the Released Parties shall be deemed to have participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance and delivery of any securities under this Plan, and, therefore, are not, and on account of such offer, issuance, delivery and solicitation shall not be, liable at any time for any violation of any applicable Law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or the offer, issuance and delivery of any securities under this Plan.

Section 11.13  *Tax Reporting and Compliance.*

The Reorganized Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for

any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

Section 11.14  *Exhibits, Schedules, and Supplements.*

All exhibits, schedules, and supplements to this Plan are incorporated into and are a part of this Plan as if fully set forth herein.

Section 11.15  *Entire Agreement.*

Except as otherwise indicated, on the Effective Date, this Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

Section 11.16  *Allocation of Payments.*

To the extent that any Allowed Claim entitled to distribution hereunder is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all U.S. federal income tax purposes, be allocated to the principal amount of such Claim first, and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim representing accrued but unpaid interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

Section 11.17  *Prepayment.*

Except as otherwise provided in the Plan or the Confirmation Order, the Debtors shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time; *provided*, *however*, that any such prepayment shall not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

Section 11.18  *Conflicts.*

In the event of a conflict or inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of a conflict between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order); *provided* that in the event any such conflict is a material conflict with the treatment of the Existing First Lien Claims in Class 3 and Other General Unsecured Claims in Class 6 of the type that would require the Debtors to re-solicit the votes of Holders of Claims and Interests in Classes 3 or 6 under section 1127 of the Bankruptcy Code, this Plan shall control solely with respect to such provision giving rise to such material conflict. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of this Plan and shall control and take precedence.

Section 11.19  *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; *provided*, as of the Effective Date, the Reorganized Debtors may submit separate orders to the Bankruptcy Court under certification of counsel closing each of the closing cases and changing the caption of the Chapter 11 Cases accordingly, *provided further* that matters concerning Claims may be heard and adjudicated in a remaining case regardless of whether the applicable Claim is against a Debtor in a closing case.

Section 11.20  *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

Respectfully submitted, as of October 15, 2023,

Applied Information Group, Inc.
Diamond Marketing Solutions Group, Inc.
DoublePositive Marketing Group, Inc.
E-statement.com Corp.
JJT Enterprises, Inc.
Globalex Corporation
Mansell Group Holding Company
Mansell Group, Inc.
Metrogroup PD-WI Acquisition, LLC
Microdynamics Corporation
Microdynamics Group Nebraska, Inc.
Microdynamics Transactional Mail, LLC
National Business Systems, Inc.
National Data Services of Chicago, Inc.
NCP Solutions, LLC
National Data Services of Chicago, Inc.
OSG Holdings, Inc.
Output Services Group, Inc.
Payments Business Corporation
Pisa Group, Inc.
PPS Business Corporation
SouthData, Inc.
Telereach, Inc.
The Garfield Group, Inc.
WhatCounts, Inc.
Words, Data and Images, LLC

By:      */s/ Dean Cherry*
Name     Dean Cherry
Title     Chief Executive Officer

# EXHIBIT B

## Restructuring Support Agreement

**EXECUTION**

THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT

This AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 16.02 hereof, this "**Agreement**")[1] is made and entered into as of October 12, 2023 (the "**Execution Date**"), by and among the following Persons (each of the Persons described in clauses (i) through (iii) of this preamble and any Person that subsequently becomes a party hereto by such Person's execution and delivery to counsel to the Company and counsel to each of the Consenting Stakeholders of a Joinder, collectively, the "**Parties**" and each, a "**Party**"):

　　　　i.　　The Persons listed on **Exhibit A** attached hereto (collectively, the "**Debtors**," the "**Company**," or the "**Company Parties**");

　　　　ii.　　The beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, First Lien Claims that (A) have executed and delivered counterpart signature pages to the Original RSA (as defined below) or a Joinder (as defined in the Original RSA), or (B) have executed and delivered counterpart signature pages to this Agreement or a Joinder (the Persons described in this clause (ii), each, a "**Consenting First Lien Lender**" and, collectively, the "**Consenting First Lien Lenders**"); and

　　　　iii.　　The following Persons (collectively, the "**Consenting Funds**"): (A) Pemberton Strategic Credit Holdings Sarl, Pemberton Managed Account A Holdings Sarl, and Pemberton Managed Account B Holdings Sarl (the Persons listed in this sub-clause (A), collectively, the "**Pemberton Equity Funds**"); (B) GoldPoint Mezzanine Partners IV LP, GoldPoint Private Credit Fund LP, Hanwha Global Corporate PE Strategy Private Fund 2, and Apogem Capital LLC, as the investment manager of each of the foregoing (the Persons listed in this sub-clause (B), collectively, "**GoldPoint**"); and (C) Aquiline Financial Services Fund III L.P.  For the avoidance of doubt, no Affiliate of the Pemberton Equity Funds (including, without limitation, any Debt Fund Affiliate (as defined in the Existing First Lien Credit Agreement) thereof) shall be deemed to be or treated as a Consenting Fund hereunder.

## *RECITALS*

**WHEREAS**, on August 7, 2023, the Company Parties and the Consenting Stakeholders party thereto entered into that certain Restructuring Support Agreement (as amended, restated, supplemented or otherwise modified from time to time prior to the Execution Date, the "**Original RSA**"), pursuant to which the parties agreed to take certain actions to implement certain restructuring and recapitalization transactions with respect to the Company Parties on the terms and subject to the conditions set forth therein;

---

[1]　Capitalized terms used but not defined in the preamble or recitals to this Agreement have the meanings ascribed to them in Section 1 hereof.

**WHEREAS**, since the execution of the Original RSA, the Company and the Consenting Stakeholders have in good faith and at arm's length negotiated certain modifications to the restructuring and recapitalization transactions contemplated by the Original RSA, and have agreed to pursue and implement certain restructuring and recapitalization transactions with respect to the Company Parties, on the terms and subject to the conditions set forth in this Agreement and in the joint prepackaged plan of reorganization to be filed by the Debtors under chapter 11 of the Bankruptcy Code attached as **Exhibit B** hereto (including all exhibits and schedules to the Plan, and any Plan Supplement, as they may be amended, supplemented or modified from time to time in accordance with the terms agreed to by the Required Parties, the "**Plan**"), the debtor in possession financing term sheet attached hereto as **Exhibit C** (the "**DIP Term Sheet**"), the New First Lien Facility term sheet attached hereto as **Exhibit F** (the "**New First Lien Facility Term Sheet**"), and the New Take-Back Debt Facility term sheet attached hereto as **Exhibit G** (the "**New Take-Back Debt Facility Term Sheet**," and collectively with the DIP Term Sheet and the New First Lien Facility Term Sheet, the "**Term Sheets**" and the restructuring and recapitalization transactions contemplated by this Agreement, the Plan and the Term Sheets, the "**Restructuring**");

**WHEREAS**, the Parties intend to implement the Restructuring pursuant to this Agreement and the other Definitive Documents through the consummation of the Plan by having the Debtors commence voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"), on the terms and subject to the conditions set forth in this Agreement (including the Plan and the Term Sheets);

**WHEREAS**, on the Execution Date, the Consenting First Lien Lenders would be entitled to vote in excess of sixty-six and seven-tenths percent (66.7%) of the aggregate amount of the outstanding First Lien Claims to accept or reject the Plan;

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring on the terms, subject to the conditions, and in reliance on the representations and warranties set forth in this Agreement (including the Plan and the Term Sheets);

**WHEREAS**, Section 15 of the Original RSA provides that, subject to certain exceptions that are not relevant to this Agreement, the Original RSA may be modified, amended, or supplemented only in a writing signed by the "Required Parties" (as defined in the Original RSA) (the "**Original Required Parties**");

**WHEREAS**, the Original Required Parties desire to amend, restate and replace in its entirety the Original RSA with this Agreement effective as of the Agreement Effective Date; and

**WHEREAS**, the Original Required Parties are executing and delivering this Agreement on the Execution Date.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.     Definitions and Interpretation.**

1.01     <u>Definitions</u>.  The following terms shall have the following definitions:

2

"**Affiliate**" means, with respect to any Person, any other Person controlled by, controlling or under common control with such Person and shall also include any Related Fund of such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise).

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits (including the Plan and the Term Sheets), annexes, and schedules hereto in accordance with Section 16.02 of this Agreement.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2.01 of this Agreement have been satisfied.

"**Agreement Effective Period**" means, with respect to a Party, the period from (a) the later of (i) the Agreement Effective Date and (ii) the date such Party becomes a Party to this Agreement, to (b) the Termination Date applicable to such Party.

"**Alternative Restructuring Proposal**" means any written or verbal inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, financing (debt or equity, other than the Optional ABL Facility), including any debtor in possession financing, use of cash collateral, joint venture, partnership, liquidation, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction or series of transactions involving the Company, or the debt, equity, or other interests in the Company other than the Restructuring.

"**Amended and Restated Restructuring Support Agreement Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit E**.

"**Applicable Period**" means (a) with respect to any Variance Report delivered on a day when an Updated Budget is required to be delivered, the two weeks beginning with the third Monday prior to the date on which such Variance Report is delivered and (b) with respect to any Variance Report delivered on a day when an Updated Budget is not required to be delivered, the one week period beginning with the second Monday prior to the date on which such Variance Report is delivered.

"**Backstop Commitment Letter**" means the amended and restated commitment letter, dated as of October 12, 2023, by and between the Debtors and the Backstop Parties, as may be amended, amended and restated, modified or supplemented from time to time.

"**Backstop Parties**" means the Persons that executed the Backstop Commitment Letter as "Backstop Parties" thereunder.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Business Day**" means any day that is a U.S. Business Day or a RFR Business Day (as defined in the Existing First Lien Credit Agreement).

"**Causes of Action**" means any and all claims, interests, damages, remedies, causes of action, demands, rights, debts, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable, direct or derivative, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, including but not limited to: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 4.01(b) hereof.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Communisis Pension Plan**" means the Communisis Pension Plan governed by the Definitive Deed and Rules Communisis Pension Plan, dated as of May 15, 2007, by and among Communisis PLC and the "Trustees" party thereto.

"**Company**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, any reference to the term "Company" shall mean and be a reference to each of the Company Parties individually or collectively, as the context may require.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means (a) an executed confidentiality agreement with a Company Party, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with the Restructuring, and (b) those confidentiality provisions contained in the Existing First Lien Credit Agreement.

"**Confirmation**" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Order and the Disclosure Statement Order may be combined into one order of the Bankruptcy Court.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement. For the avoidance of doubt, any Consenting Fund that is a beneficial holder of, or an investment advisor, sub-advisor, or manager of discretionary accounts or funds that beneficially hold, First Lien Claims shall be a Consenting First Lien Lender solely in its capacity as a beneficial holder of, or an investment advisor, sub-advisor, or manager of discretionary accounts or funds that beneficially hold, First Lien Claims.

"**Consenting Fund**" has the meaning set forth in the preamble to this Agreement.

4

"**Consenting Stakeholders**" means, collectively, the Consenting First Lien Lenders and the Consenting Funds.

"**Debtor Relief Law**" means the Bankruptcy Code or any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning set forth in the preamble to this Agreement.

"**Definitive Documents**" has the meaning set forth in Section 3.02 hereof.

"**DIP Agent**" means an administrative and collateral agent for the DIP Lenders under the DIP Facility Documents to be selected by the Required Consenting First Lien Lenders, or any successor agents thereunder.

"**DIP Credit Agreement**" means that certain credit agreement evidencing and implementing the DIP Facility, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith, and as may be amended, modified, or supplemented from time to time in accordance with the terms thereof.

"**DIP Facility**" means the new debtor in possession secured term loan financing facility in an aggregate principal amount up to $50.0 million, on the terms and conditions set forth in the DIP Term Sheet.

"**DIP Facility Documents**" means the DIP Credit Agreement and the DIP Orders, together with all documentation executed or delivered in connection therewith, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms and conditions set forth therein.

"**DIP Lenders**" means the Consenting First Lien Lenders or their respective Affiliates party to the DIP Credit Agreement.

"**DIP Orders**" means the Interim DIP Order and Final DIP Order.

"**DIP Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Direct Allocation Amount**" means $25.0 million.

"**Disclosure Statement**" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as it may be amended from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law.

"**Disclosure Statement Order**" has the meaning set forth in Section 3.02 hereof.  The Disclosure Statement Order and the Confirmation Order may be combined into one order of the Bankruptcy Court.

"**Effective Date**" means the date that is the first Business Day on which (a) all conditions to the effectiveness of the Plan set forth therein have been satisfied or waived in accordance with the terms of the Plan (which conditions, for the avoidance of doubt, shall include the conditions set forth in Section 2.02 hereof) and (b) no stay of the Confirmation Order is in effect.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

5

"**Equity Interest**" means, with respect to any Person, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, partnership interests and any other equity, ownership, beneficial, or profits interests of such Person, and options, warrants, rights, stock appreciation rights, phantom stock or units, incentives, or other securities, arrangements or agreements to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or any other equity, ownership, beneficial, or profits interests of such Person (in each case whether or not arising under or in connection with any employment agreement).

"**Event**" means any event, change, effect, occurrence, development, circumstance, condition, result, state of fact or change of fact, or the worsening of any of the foregoing.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Existing First Lien Credit Agreement**" means that certain Amended and Restated First Lien Credit Agreement, dated as of August 31, 2022 (as may be amended, restated, amended and restated, modified or supplemented from time to time), by and among Holdings, as holdings, Output Services Group, as borrower, the guarantors party thereto, the First Lien Lenders, and the First Lien Agent.

"**Existing First Lien Documents**" means the Existing First Lien Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"**Existing Mezz Credit Agreement**" means that certain Credit Agreement, dated as of August 31, 2022 (as may be amended, restated, amended and restated, modified or supplemented from time to time), by and among OSG Group Holdings, Inc., as group holdings, Intermediate, as borrower, the lenders party thereto, and the administrative agent for such lenders.

"**Existing Mezz Documents**" means the Existing Mezz Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"**Existing TopCo Common Interests**" means any of the issued, unissued, authorized, or outstanding Equity Interests in TopCo (other than any of the Existing TopCo Preferred Interests) (including the "Common Units" (as defined in the Existing TopCo LLC Agreement)), whether or not transferable, and all rights arising with respect thereto.

"**Existing TopCo LLC Agreement**" means the Amended and Restated Limited Liability Company Agreement of OSG Group TopCo, LLC, dated as of August 31, 2022, by and among TopCo and the members of TopCo party thereto, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"**Existing TopCo Preferred Interests**" means any of the issued, unissued, authorized, or outstanding Equity Interests in TopCo that have rights, preferences, privileges or powers which are senior to any of the rights, preferences, privileges or powers of the other Equity Interests in TopCo, including with respect to distribution rights, rights of redemption, voting rights, and rights upon a liquidation, dissolution or winding up of TopCo (including the "Preferred Units" (as defined in the Existing TopCo LLC Agreement)), whether or not transferable, and all rights arising with respect thereto.

"**Fiduciary Out**" has the meaning set forth in Section 8.01 hereof.

6

"**Final DIP Order**" means an order of the Bankruptcy Court approving the DIP Facility and granting the Debtors the authority to use cash collateral and provide "adequate protection" (as such term is defined in sections 361 and 363 of the Bankruptcy Code) to the First Lien Lenders in the Chapter 11 Cases on a final basis.

"**First Lien Agent**" means Acquiom Agency Services LLC, the administrative agent for the First Lien Lenders under the Existing First Lien Documents, or any successor administrative agents thereunder.

"**First Lien Claims**" means any and all Claims on account of the First Lien Loans or related to, arising out of, arising under, or arising in connection with, the Existing First Lien Documents.

"**First Lien Forbearance Agreement**" means the Forbearance Agreement and First Amendment to First Lien Credit Agreement, entered into as of June 7, 2023, by and among the Company Parties party thereto and the First Lien Lenders party thereto, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"**First Lien Group**" means the Consenting First Lien Lenders represented by Paul Hastings.

"**First Lien Lenders**" means the holders of First Lien Loans.

"**First Lien Loans**" means the loans made pursuant to the Existing First Lien Credit Agreement.

"**GoldPoint**" has the meaning set forth in the preamble to this Agreement.

"**Governance Documents**" means the organizational and governance documents for each of the Reorganized Debtors and New TopCo, including certificates of incorporation (including any certificate of designations), certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholders' agreements, and limited partnership agreements (or equivalent governing documents), as applicable.

"**Governmental Body**" means any U.S. or non-U.S. federal, state, municipal, or other government, or other department, commission, board, bureau, agency, public authority, or instrumentality thereof, or any other U.S. or non-U.S. court or arbitrator.

"**Holdings**" means OSG Holdings, Inc., a New Jersey corporation.

"**Houlihan**" has the meaning set forth in Section 7.04(a) hereof.

"**Interim DIP Order**" means an order of the Bankruptcy Court approving the DIP Facility and granting the Debtors the authority to use cash collateral and provide "adequate protection" (as such term is defined in sections 361 and 363 of the Bankruptcy Code) to the First Lien Lenders in the Chapter 11 Cases on an interim basis.

"**Interest**" means any and all issued, unissued, authorized, or outstanding Equity Interests in any Debtor, whether or not transferable, and all rights arising with respect thereto.

"**Intermediate**" means OSG Intermediate Holdings, Inc. a Delaware corporation.

"**Joinder**" means an Amended and Restated Restructuring Support Agreement Joinder or Transfer Agreement Joinder, as applicable.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Body of competent jurisdiction (including the Bankruptcy Court).

"**Liquidating Entities**" means, collectively, (a) TopCo, (b) Intermediate, and (c) OSG Group Holdings, Inc., a Delaware corporation.

"**Liquidity Report Deadline**" has the meaning set forth in Section 7.01(j)(ii) hereof.

"**Milestone**" has the meaning set forth in Section 4.01 hereof.

"**New Board**" means the new board of directors, board of managers or other governing body of New TopCo.

"**New First Lien Agents**" means the administrative and collateral agent and the syndication agent under the New First Lien Documents, or any successor administrative agents thereunder.

"**New First Lien Credit Agreement**" means the credit agreement governing or evidencing the New First Lien Facility to be entered into on the Effective Date by and among Reorganized Output Services Group, the guarantors from time to time party thereto, the New First Lien Lenders, the New First Lien Agents, and the other Entities party thereto from time to time. The New First Lien Credit Agreement and the New Take-Back Debt Credit Agreement may be one combined credit agreement.

"**New First Lien Documents**" means the New First Lien Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"**New First Lien Facility**" means the first lien, first out term loan financing facility reflecting the terms and conditions set forth in the New First Lien Facility Term Sheet.

"**New First Lien Facility Amount**" means $50.0 million.

"**New First Lien Facility Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**New First Lien Lenders**" means the lenders party to the New First Lien Credit Agreement.

"**New First Lien Loans**" means the loans made under the New First Lien Facility pursuant to the New First Lien Documents.

"**New First Lien Loan Commitments**" means commitments to make New First Lien Loans pursuant to the New First Lien Facility as set forth in the New First Lien Credit Agreement.

"**New Take-Back Debt Agent**" means the administrative agent for the New Take-Back Debt Lenders under the New Take-Back Debt Documents, or any successor administrative agents thereunder.

"**New Take-Back Debt Credit Agreement**" means the credit agreement governing or evidencing the New Take-Back Debt Facility to be entered into on the Effective Date by and among Reorganized Output Services Group, the guarantors from time to time party thereto, the New Take-Back Debt Lenders, the New Take-Back Debt Agent, and the other Entities party thereto from time to time. The New Take-Back Debt Credit Agreement and the New First Lien Credit Agreement may be one combined credit agreement.

"**New Take-Back Debt Documents**" means the New Take-Back Debt Credit Agreement, together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"**New Take-Back Debt Facility**" means the new first lien, second out debt financing facility reflecting the terms and conditions set forth in the New Take-Back Debt Facility Term Sheet.

"**New Take-Back Debt Facility Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**New Take-Back Debt Lenders**" means the lenders party to the New Take-Back Debt Credit Agreement.

"**New Take-Back Debt Loans**" means the loans made (or deemed made) under the New Take-Back Debt Facility pursuant to the New Take-Back Debt Documents in an aggregate initial principal amount of $135.0 million.

"**New TopCo**" means a newly formed entity acceptable to the Required Consenting First Lien Lenders that will, directly or indirectly, own 100% of the Equity Interests in, or substantially all of the assets of, Reorganized Output Services Group upon consummation of the Restructuring.

"**No Recourse Party**" has the meaning set forth in Section 16.23 hereof.

"**Opt-Out Form**" means the form by which all holders of Claims against, or Interests in, the Debtors may voluntarily opt out from becoming a Releasing Party by checking the applicable box on such form.

"**Original RSA**" has the meaning set forth in the recitals to this Agreement.

"**Output Services Group**" means Output Services Group, Inc., a New Jersey corporation.

"**Outside Date**" means January 16, 2024.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Paul Hastings**" has the meaning set forth in Section 7.04(a) hereof.

"**Pemberton Equity Funds**" has the meaning set forth in the preamble to this Agreement.

"**Permits**" means any license, permit, registration, authorization, approval, certificate of authority, accreditation, qualification or similar document or authority issued or granted by any Governmental Body.

"**Permitted Transferee**" means each transferee of any First Lien Claim who meets the requirements of Section 9.01 hereof.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Body, or any legal entity or association.

"**Petition Date**" means the first date any of the Debtors commences a Chapter 11 Case.

"**Plan**" has the meaning set forth in the recitals to this Agreement.

9

"**Plan Solicitation**" means the solicitation of votes in favor of the Plan.

"**Plan Supplement**" means the compilation of documents and forms and/or term sheets of documents, schedules, and exhibits to the Plan that will be filed by the Company with the Bankruptcy Court.

"**Proceeding**" means any action, claim, complaint, petition, suit, arbitration, mediation, alternative dispute resolution procedure, hearing, audit, examination, investigation or other proceeding by or before any Governmental Body.

"**Professional Fees**" has the meaning set forth in Section 7.04(a) hereof.

"**Put Option Premium**" means a nonrefundable put option premium in an aggregate amount equal to $7,500,000.

"**Qualified Marketmaker**" means an Entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers any Claim against the Company (or enter with customers into long and short positions in the Claims against the Company), in its capacity as a dealer or market maker in Claims against the Company and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Related Fund**" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised or managed by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, advisor or subadvisor that controls, advises or manages such Person or an Affiliate of such investment manager, advisor or subadvisor.

"**Reorganized Common Equity**" means the common Equity Interests of New TopCo authorized under the Governance Documents of New TopCo and issued and/or delivered on the Effective Date under or pursuant to the Plan.

"**Reorganized Debtors**" means, collectively, each of the Debtors, as reorganized on the Effective Date pursuant to the Definitive Documents, or, subject to the consent of the Required Consenting First Lien Lenders, any successors or assigns thereto by merger, consolidation, conversion, division, acquisition of assets, or otherwise, on or about the Effective Date.

"**Reorganized Output Services Group**" means Output Services Group, as reorganized on the Effective Date pursuant to the Definitive Documents, or, subject to the consent of the Required Consenting First Lien Lenders, any successors or assigns thereto by merger, consolidation, conversion, division, acquisition of assets, or otherwise, on or about the Effective Date.

"**Required Consenting First Lien Lenders**" means, as of any date of determination, the Consenting First Lien Lenders who are part of the First Lien Group and own or control as of such date more than sixty percent (60.0%) of the aggregate principal amount of all outstanding First Lien Loans owned or controlled by all Consenting First Lien Lenders who are part of the First Lien Group as of such date.

"**Required Consenting Funds**" means, as of any date of determination, the Consenting Fund(s) who own or control as of such date a majority of the Existing TopCo Common Interests, assuming that all Existing TopCo Preferred Interests had been converted into Existing TopCo Common Interests as of such date in accordance with the Existing TopCo LLC Agreement, owned or controlled by all Consenting Funds as of such date.

"**Required Consenting Stakeholders**" means the Required Consenting First Lien Lenders.

"**Required Parties**" means the Debtors and the Required Consenting First Lien Lenders; *provided, however*, that with respect to any approvals, consents, waivers, or other decisions to be made or given by the Required Parties hereunder (including any determination as to whether any document or agreement (or the form and substance thereof) is acceptable to the Required Parties (including reasonably acceptable) or whether any amendment, supplement or other modification to this Agreement has been approved by the Required Parties) that are, in any such case, applicable to any of the Specified Consenting Fund Matters, the term "Required Parties" shall also include the Required Consenting Funds.

"**Restructuring**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions Memorandum**" means a document, consistent with this Agreement and otherwise in form and substance acceptable to the Required Parties, to be included in the Plan Supplement that will set forth the material components of the Restructuring, including the steps to be taken to form New TopCo and the issuance and/or delivery of the Reorganized Common Equity.

"**Rights Offering**" means the opportunity provided to the Rights Offering Participants to exercise their respective Election Rights (as defined in the Rights Offering Procedures) pursuant to the Plan and the Rights Offering Procedures.

"**Rights Offering Documents**" means all agreements, instruments, certificates, forms, questionnaires, procedures, and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Rights Offering, including the Rights Offering Procedures.

"**Rights Offering Participants**" means the "Eligible Holders" as defined in the Rights Offering Procedures.

"**Rights Offering Procedures**" means the procedures for conducting the Rights Offering attached hereto as **Exhibit H**.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Separation Agreement**" means a separation agreement to be entered into on the Effective Date by and between Holdings and the Liquidating Entities, which separation agreement shall provide for certain matters and arrangements relating to the separation of the Debtors from the Liquidating Entities, including (a) arrangements relating to certain tax filings and (b) to the extent necessary and expressly subject to the terms and conditions set forth therein, the funding arrangements set forth on the term sheet attached hereto as **Exhibit I**.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan.

"**Specified Documents**" means any contract, agreement, or arrangement between (a) New TopCo or any of the Debtors, on the one hand, and (b) any Specified Party, on the other hand, including any management, consulting, advisory, services, or similar agreement or arrangement; *provided*, *however*, that Specified Documents shall not include (i) any confidentiality agreement entered into between any of the Debtors, on the one hand, and any of the Specified Parties, on the other hand, (ii) this Agreement or any other Definitive Document to be entered into between New TopCo or any of the Debtors, on the one hand, and any of the Specified Parties, on the other hand, as expressly contemplated by this Agreement, or (iii) any other contract, agreement, or arrangement between New TopCo or any of the Debtors, on the one hand, and

11

any of the Liquidating Entities, any Affiliate (other than a Debtor or a Consenting Fund) of any of the Liquidating Entities, or any director, manager, officer, or employee of any such Person, on the other hand, that the Company Parties and the Required Consenting First Lien Lenders mutually agree in writing shall not constitute a Specified Document.

"**Specified Fees**" has the meaning set forth in Section 7.04(a) hereof.

"**Specified Party**" means any of the following: (a) any of the Consenting Funds or any of the Liquidating Entities, (b) any Affiliate (other than a Debtor) of any of the Consenting Funds or any of the Liquidating Entities, and (c) any director, manager, officer, or employee of any Person described in clause (a) or clause (b) of this definition.

"**Specified Consenting Fund Matters**" means any term, condition, provision, portion or aspect of the Restructuring or any of the Definitive Documents that directly relates to:  (a) the treatment of the Equity Interests held by the Consenting Funds in connection with the Restructuring, as expressly contemplated by this Agreement; (b) the releases provided by or provided to the Consenting Funds under the Plan; or (c) the representations, warranties, covenants, obligations or rights of the Consenting Funds under this Agreement (including the payment of the Professional Fees of the advisors of the Consenting Funds as specifically set forth in Section 7.04(a) hereof); *provided, however*, that the Specified Consenting Fund Matters shall not include any term, condition, provision, portion or aspect of the New First Lien Facility, including the New First Lien Facility Amount.

"**Subsidiary**" means, as of any time of determination and with respect to any specified Person, any limited liability company, partnership, limited partnership, joint venture, association, or other Entity (a) more than a majority of the aggregate voting power of the voting securities of which is, as of such time, directly or indirectly owned by such Person, or (b) in which such Person, directly or indirectly, owns more than fifty percent (50.0%) of the equity economic interest thereof.

"**Term Sheets**" has the meaning set forth in the recitals to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 12 hereof.

"**TopCo**" means OSG Group TopCo, LLC, a Delaware limited liability company.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

"**Transfer Agreement Joinder**" means a transfer agreement joinder substantially in the form attached hereto as **Exhibit D**.

"**Updated Budget**" has the meaning set forth in Section 7.01(j)(i) hereof.

"**Updated Budget Deadline**" has the meaning set forth in Section 7.01(j)(i) hereof.

"**U.S. Business Day**" means any day, other than a Saturday, Sunday, or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

"**Variance Report**" has the meaning set forth in Section 7.01(j)(iii) hereof.

"**Voting Deadline**" means the date by which each Party (other than Aquiline Financial Services Fund III L.P.) must submit a vote to accept the Plan, which date shall be no later than November 13, 2023.

1.02    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(c)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(d)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(e)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(f)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(g)    the use of "include" or "including" is without limitation, whether stated or not; and

(h)    (i) the phrase "counsel to each of the Consenting Stakeholders" or "counsel to the Consenting Stakeholders" refers in this Agreement to each respective counsel specified in Section 16.10 other than counsel to the Company, (ii) the phrase "counsel to the Company" refers in this Agreement to counsel specified in Section 16.10(a), (iii) the phrase "counsel to the Required Consenting Stakeholders" refers in this Agreement to counsel specified in Section 16.10(b), and (iv) the phrase "counsel to the Consenting First Lien Lenders" refers in this Agreement to counsel specified in Section 16.10(b).

**Section 2.    Effectiveness of this Agreement and the Restructuring.**

2.01    Effectiveness of this Agreement.  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., New York time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    the Original Required Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company and counsel to each of the Consenting Stakeholders;

(b)    the Consenting Funds shall have executed and delivered to counsel to the Company and counsel to each of the Consenting First Lien Lenders counterpart signature pages of this Agreement;

(c)       subject to each Parties' respective fee letters and Section 7.04(a) of this Agreement, the Company shall have paid all accrued and unpaid Professional Fees as of the Agreement Effective Date payable to the advisors in clauses (xi), (xii) and (xiii) for which an invoice has been received by the Company on or before the date that is one (1) Business Day prior to the Agreement Effective Date; *provided*, that the amount of such Professional Fees shall be subject to the conditions and limitations set forth in Section 7.04(a) hereof;

(d)       counsel to the Company shall have given notice to counsel to each of the Consenting Stakeholders in the manner set forth in Section 16.10 of this Agreement (by e-mail or otherwise) that the conditions to the Agreement Effective Date set forth in this Section 2.01 have occurred; and

(e)       (i) the board of directors of each of Holdings and Output Services Group shall have authorized, approved and established a special restructuring committee (each, a "Restructuring Committee") of each such board of directors to have the sole and exclusive power and authority to manage, oversee, negotiate, amend and modify the terms and conditions of, implement, and otherwise handle and address all aspects of the Restructuring, each such Restructuring Committee to be comprised of one (1) director from each such board of directors that is disinterested with respect to the Restructuring and has substantial restructuring experience, and (ii) the Company shall have delivered to counsel to each of the Consenting First Lien Lenders a true, complete and accurate copy of the resolutions (or written consent) of each such board of directors authorizing, approving and establishing each Restructuring Committee.

2.02    Effectiveness of the Restructuring.  The consummation of the Restructuring shall be subject to the satisfaction (or waiver as set forth in the last paragraph of this Section 2.02) of all of the following conditions on or prior to the Effective Date:

(a)       [reserved];

(b)       [reserved];

(c)       each of the applicable Definitive Documents shall (i) have been executed, delivered, acknowledged and/or filed, as applicable, by the Persons intended to be parties thereto, (ii) be consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Required Parties, and (iii) be in full force and effect and not subject to any unfulfilled conditions or contingencies;

(d)       all of the actions set forth in the Restructuring Transactions Memorandum shall have been completed and implemented;

(e)       the Reorganized Common Equity to be issued and/or delivered on the Effective Date (as set forth in the Plan) shall have been validly issued by New TopCo, shall be fully paid and non-assessable, and shall be free and clear of all taxes, liens and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the Governance Documents of New TopCo;

(f)       this Agreement shall not have been terminated (and no event shall have occurred that purports to terminate this Agreement (even if such termination does not occur as a result of the automatic stay of section 362 of the Bankruptcy Code or otherwise)), and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting Stakeholders to terminate this Agreement in accordance with its terms upon the expiration of such time; *provided, however*, that, other than the foregoing, it is not a condition precedent to the Restructuring that a termination event that permits the Required Consenting Stakeholders to terminate this Agreement does not exist;

14

(g)　　　any and all requisite regulatory approvals, KYC requirements, and any other material authorizations, consents, rulings, waivers, filings, or documents required to implement and effectuate the Restructuring (including any of the foregoing the failure of which to obtain or make would violate applicable Law, any material Permit or material contract) shall have been obtained or made, not be subject to unfulfilled conditions or contingencies, and be in full force and effect;

(h)　　　the Professional Fees shall have been paid in accordance with Section 7.04 hereof;

(i)　　　(i) the satisfaction or waiver of all of the conditions to the effectiveness of, and any funding required on the Effective Date under, the New First Lien Facility set forth in the New First Lien Credit Agreement (other than the occurrence of the Effective Date), (ii) the satisfaction or waiver of the conditions to the effectiveness of the New Take-Back Debt Facility set forth in the New Take-Back Debt Credit Agreement (other than the occurrence of the Effective Date), and (iii) any funding required under the New First Lien Facility to be made on the Effective Date shall have occurred substantially contemporaneously with consummation of the Restructuring, in each case, in accordance with the terms thereof and hereof in all respects;

(j)　　　(i) the Bankruptcy Court shall have entered each of the Interim DIP Order, the Final DIP Order, the Disclosure Statement Order and the Confirmation Order, (ii) each of the Interim DIP Order, the Final DIP Order, the Disclosure Statement Order and the Confirmation Order shall be consistent with this Agreement and otherwise in form and substance acceptable to the Required Parties, and (iii) each of the Interim DIP Order, the Final DIP Order, the Disclosure Statement Order and the Confirmation Order shall not have been stayed, reversed, dismissed or vacated;

(k)　　　as of the Effective Date, all Specified Documents shall have been rejected under the Plan and the Debtors shall have no further obligations or liabilities under the Specified Documents, all without any payment or other transfer of value therefor;

(l)　　　as of the Effective Date, no temporary restraining order, preliminary or permanent injunction, judgment or other order preventing the Restructuring or any of the transactions contemplated by any of the Definitive Documents shall have been entered, issued, rendered or made, nor shall any Proceeding seeking any of the foregoing be commenced or pending; nor shall any Proceeding seeking any of the foregoing be threatened by a Governmental Body; nor shall there be any Law promulgated, enacted, entered, enforced or deemed applicable to any of the Parties which makes the consummation of the Restructuring or any of the transactions contemplated by any of the Definitive Documents illegal, void or rescinded;

(m)　　　on the Effective Date (after giving effect to the consummation of the Restructuring), other than (i) the Reorganized Common Equity issued and/or delivered to the First Lien Lenders pursuant to the Plan, (ii) the Reorganized Common Equity issued and/or delivered to certain of the Rights Offering Participants and/or their respective Rights Offering Designees (as defined in the Rights Offering Procedures) in connection with New First Lien Loan Commitments provided by such Rights Offering Participants and/or their respective Rights Offering Designees pursuant to the Rights Offering, (iii) the Reorganized Common Equity issued and/or delivered to the Backstop Parties and/or their respective Backstop Designees (as defined in the Backstop Commitment Letter) in connection with New First Lien Loan Commitments provided by the Backstop Parties and/or their respective Backstop Designees pursuant to the Backstop Commitment Letter on account of their respective Backstop Commitments (as defined in the Backstop Commitment Letter) and Direct Allocation Commitments (as defined in the Backstop Commitment Letter), (iv) the Reorganized Common Equity issued and/or delivered to the Backstop Parties and/or their respective Backstop Designees pursuant to the Backstop Commitment Letter in satisfaction of the Put Option Premium, and (v) Equity Interests of a Subsidiary of New TopCo owned solely by New

15

TopCo or another Subsidiary of New TopCo, no (A) Equity Interests of New TopCo or any of its Subsidiaries, (B) pre-emptive rights, rights of first refusal, subscription rights and/or similar rights to acquire any Equity Interests of New TopCo or any of its Subsidiaries, or (C) voting trusts, proxies, shareholder agreements, limited liability company agreements, or other agreements or understandings with respect to the voting, ownership, registration or transfer of any Equity Interests of New TopCo or any of its Subsidiaries (except, in the case of sub-clauses (B) and (C), any such rights or agreements with respect to Reorganized Common Equity that are expressly set forth in the Governance Documents of New TopCo), in any such case will be issued, outstanding or in effect;

(n)     counsel to the Consenting First Lien Lenders shall have received evidence of (i) an effective officers' and directors' liability insurance and fiduciary liability insurance policy that covers New TopCo and all of its Subsidiaries, which evidence shall demonstrate that such policy shall be in effect as of the Effective Date and (ii) an effective "tail" officers' and directors' liability insurance and fiduciary liability insurance policy that covers each of the Debtors, the Reorganized Debtors and the Liquidating Entities, which evidence shall demonstrate that such policy shall be in effect as of the Effective Date;

(o)     the Consenting First Lien Lenders shall have received a properly completed and duly executed certificate complying with Section 1445 of the Code and Treasury Regulation Sections 1.1445-2(c)(3) and 1.897-2(h) certifying that New TopCo, Holdings or Output Services Group, as applicable, is not and was not a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code at any time during the five (5)-year period ending on the Effective Date;

(p)     each of the offers, issuances, sales, and/or deliveries of Reorganized Common Equity in connection with the Restructuring shall be exempt from the registration and prospectus delivery requirements of the Securities Act, no Proceeding by any Governmental Body or other Person that alleges that any such offer, issuance, sale and/or delivery is not exempt from the registration and prospectus delivery requirements of the Securities Act shall be pending on the Effective Date, and no such Proceeding shall be threatened by any Governmental Body on or prior to the Effective Date;

(q)     [reserved];

(r)     (i) the Backstop Commitment Letter shall not have been terminated and shall remain in full force and effect, and (ii) there shall not be any continuing cure period with respect to any event, occurrence or condition that would permit the Required Backstop Parties (as defined in the Backstop Commitment Letter) to terminate the Backstop Commitment Letter in accordance with its terms;

(s)     (i) the Debtors shall have assumed the Backstop Commitment Letter pursuant to section 365 of the Bankruptcy Code and (ii) the Bankruptcy Court shall have entered the Confirmation Order that authorizes and approves such assumption of the Backstop Commitment Letter and the performance of the transactions contemplated thereby (including the payment of the Put Option Premium, the payment and/or reimbursement of the Backstop Parties' expenses, and the indemnification, advancement, reimbursement and contribution provisions in favor of the indemnified parties set forth therein);

(t)     (i) the Rights Offering shall have been conducted and, concurrently with the Effective Date, consummated in accordance with this Agreement and the Backstop Commitment Letter, and (ii) Reorganized Output Services Group shall have received (or concurrently with the Effective Date will receive) New First Lien Loan Commitments provided pursuant to the Rights Offering and the Backstop Commitment Letter in an aggregate amount of not less than the New First Lien Facility Amount;

(u)     [reserved]; and

(v)      such other conditions as mutually agreed by the Required Parties.

Any of the foregoing conditions may be waived by the Required Consenting First Lien Lenders.

**Section 3.      Definitive Documents.**

3.01      [Reserved].

3.02      The definitive documents governing the Restructuring shall consist of this Agreement and the following (together with this Agreement, collectively, the "**Definitive Documents**"): (a) the Governance Documents; (b) the Rights Offering Documents; (c) the New First Lien Documents; (d) the New Take-Back Debt Documents; (e) the Separation Agreement; (f) the Backstop Commitment Letter; (g) the Plan; (h) the Confirmation Order; (i) the Disclosure Statement; (j) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials (together, the "**Disclosure Statement Order**"); (k) any additional documents or exhibits comprising the Plan Supplement; (l) the DIP Facility Documents, including for the avoidance of doubt, the DIP Orders; (m) the Opt-Out Form; (n) the Solicitation Materials; (o) such other motions, orders, agreements, and documentation necessary or desirable to consummate and document the transactions contemplated by the Plan; (p) the Restructuring Transactions Memorandum; (q) to the extent not included in (a) through (p), all financing documents needed to effectuate the Restructuring; and (r) all other material customary documents delivered in connection with transactions that are of a similar type to the Restructuring (including any and all other documents implementing, achieving, contemplated by or relating to the Restructuring).

3.03      The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion and shall be in all respects consistent with this Agreement, including the Plan and the Term Sheets annexed hereto, and shall be otherwise in form and substance reasonably acceptable to the Required Parties.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring shall contain terms, conditions, representations, warranties, and covenants consistent in all respects with this Agreement, and shall be otherwise in form and substance reasonably acceptable to the Required Parties. Notwithstanding anything to the contrary in this Agreement, if this Agreement requires that any Definitive Document (including the form and substance thereof) be "reasonably acceptable" to any Party or Parties (including any Party or Parties included within the definition of "Required Parties" in the particular instance) and any term, provision, condition, representation, warranty or covenant in such Definitive Document is either (a) not consistent with this Agreement or (b) not addressed in this Agreement and is material, then (in either case) such term, provision, condition, representation, warranty or covenant of such Definitive Document must be acceptable (and not just reasonably acceptable) to such Party or Parties.

**Section 4.      Milestones; Consummation of Restructuring.**

4.01      On and after the Agreement Effective Date, the Company Parties shall comply with the following milestones (each, a "**Milestone**," and together, the "**Milestones**") unless extended or waived in writing by the Required Consenting First Lien Lenders; *provided*, that the Milestones herein shall supersede any milestones in Section 4(t) of the First Lien Forbearance Agreement, all of which milestones shall be of no further force or effect as of the Agreement Effective Date:

(a)      [reserved];

(b)      no later than October 13, 2023, delivery by the Debtors to counsel to the Consenting Stakeholders of drafts of all the "second-day" pleadings, motions and applications, in each case that the Debtors contemplate filing no later than ten (10) day after the Petition Date in the Chapter 11 Cases;

(c) no later than October 13, 2023, the Debtors shall commence the Rights Offering and the Plan Solicitation;

(d) no later than October 15, 2023, the Petition Date shall have occurred;

(e) no later than October 30, 2023, delivery by the Debtors to counsel to the Consenting Stakeholders of drafts of the Confirmation Order, the Disclosure Statement Order, and all documents or exhibits comprising the Plan Supplement, including the Restructuring Transactions Memorandum;

(f) no later than November 20, 2023, delivery by the Debtors to counsel to the Consenting Stakeholders of a report certifying the results of the Rights Offering and the Plan Solicitation;

(g) no later than one (1) Business Day after the Petition Date, the Debtors shall have filed with the Bankruptcy Court the Plan, the Disclosure Statement, and the Solicitation Materials;

(h) no later than five (5) Business Days after the Petition Date and subject to the availability of the Bankruptcy Court, entry of the Interim DIP Order by the Bankruptcy Court;

(i) no later than forty-five (45) days after the Petition Date and subject to the availability of the Bankruptcy Court, entry of the Final DIP Order, the Disclosure Statement Order and the Confirmation Order by the Bankruptcy Court; and

(j) no later than the Outside Date, the Restructuring shall have been implemented and the Effective Date shall have occurred.

**Section 5. Commitments of the Consenting Stakeholders.**

5.01 <u>General Commitments, Forbearances, and Waivers</u>.

(a) During the Agreement Effective Period, each Consenting Stakeholder agrees (and with respect to (iv) and (vi) below, only the Consenting First Lien Lenders agree; and with respect to (vii), (viii), and (ix) below, only the Consenting Funds agree), severally and not jointly and severally, in respect of all of its Claims against, or Equity Interests in, the Company, to:

(i) timely vote (to the extent required to vote) to accept the Plan and use commercially reasonable efforts to support and exercise any powers or rights available to it (including, subject to the other terms of this Agreement, in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in favor of any matter requiring approval to the extent necessary to effectuate the Restructuring and the Plan, and to implement the terms of the Term Sheets in accordance with this Agreement; *provided* that no Consenting Stakeholder shall be obligated to (x) waive (to the extent waivable by such Consenting Stakeholder) any condition to the consummation of any part of the Restructuring set forth in this Agreement or (y) approve any Definitive Document that is not in form and substance acceptable or reasonably acceptable, as applicable, to such Consenting Stakeholder if such Definitive Document is required to be in form and substance acceptable or reasonably acceptable, as applicable, to such Consenting Stakeholder pursuant to this Agreement, including pursuant to Section 3.03;

(ii) at the reasonable request of the Company, reasonably cooperate with and assist the Company in obtaining additional support for the Restructuring and the Plan from the Company's other stakeholders;

(iii)     negotiate in good faith and, to the extent it is contemplated to become a party thereto, execute and deliver the applicable Definitive Documents;

(iv)     give any notice, order, instruction, or direction to the First Lien Agent necessary to give effect to the Restructuring on the Effective Date;

(v)     consent to the treatment of Claims and Interests set forth in the Plan;

(vi)     forbear from exercising any Creditor Rights and Remedies (as defined in the First Lien Forbearance Agreement) against the Borrower (as defined in the Existing First Lien Credit Agreement) and the other Obligors (as defined in the Existing First Lien Credit Agreement), subject to the terms, conditions, scope and other provisions contained in the First Lien Forbearance Agreement; *provided*, *however*, that nothing in this clause (vi) shall require the Consenting First Lien Lenders to waive any default or event of default, or any of the obligations arising under, or liens or other encumbrances created by, any of the Existing First Lien Documents;

(vii)     provide all notices, consents, approvals, amendments and waivers under any contract or organizational document of any of the Company Parties or applicable Law (including the Delaware Limited Liability Company Act or the New Jersey Business Corporation Act) that are necessary, required or advisable (in the opinion of the Company or the Required Consenting First Lien Lenders) to facilitate, authorize, approve and implement the Restructuring;

(viii)     use its commercially reasonable efforts to support and take all actions reasonably requested by the Company Parties or the Required Consenting First Lien Lenders to facilitate the Restructuring;

(ix)     assist (and/or cause its Affiliates to assist) the Company Parties and the Consenting First Lien Lenders in implementing the Restructuring in a tax efficient manner as determined by the Company Parties and the Required Consenting First Lien Lenders; and

(x)     support the filing of a customary stock trading order that restricts (A) the accumulation and disposition of stock by Persons who beneficially own (directly or indirectly as determined for tax Law purposes), or would beneficially own, more than approximately 4.75% of the equity of any Debtor during the pendency of the Chapter 11 Cases, and (B) the claiming of a worthlessness deduction under Section 165 of the Code with respect to the equity of any Debtor.

(b)     During the Agreement Effective Period, each Consenting Stakeholder agrees (and with respect to (viii) below, only the Consenting Funds agree), severally and not jointly and severally, in respect of all of its Claims against, or Equity Interests in, the Company, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring;

(ii)     solicit, propose, file, support, vote for, or consent to any Alternative Restructuring Proposal or engage in any discussions or negotiations with any Person related to an Alternative Restructuring Proposal;

(iii)     file any motion, pleadings, or other document with any court (including any modification or amendments to any motion, pleadings, or other document with any court) that, in whole or in part, is not consistent in all material respects with this Agreement;

19

(iv)      exercise or direct any other Person (including, with respect to the Consenting First Lien Lenders, the First Lien Agent) to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims against, or Equity Interests in, the Company; *provided* that nothing in this Agreement shall prevent any Consenting Stakeholder from (A) filing a proof of claim in the Chapter 11 Cases on behalf of its respective Claims or (B) enforcing this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)      initiate, or have initiated on its behalf, any litigation or other Proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Restructuring against the Company or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(vi)      object to, delay, impede, or take any other action to interfere with the Company's ownership and possession of its assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code;

(vii)      object to or take any other action to interfere with the treatment of Claims or Interests set forth in the Plan; or

(viii)      without the prior written consent of the Required Consenting First Lien Lenders, (A) claim (or permit any of its Affiliates to claim) a worthlessness deduction under Section 165 of the Code for the equity of TopCo, or for an interest in any other Entity if doing so could result in an "ownership change" of any Debtor under Section 382(g)(4)(D) of the Code, in either case with respect to any taxable year ending on or prior to the Effective Date, or (B) Transfer (or permit the Transfer of) the equity of any Entity in a manner that could result in an "ownership change" of any Debtor for purposes of Section 382 of the Code.

5.02      <u>Commitments with Respect to Chapter 11 Cases</u>.  During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(a)      [reserved];

(b)      (i) vote each of its Claims against and Interests in the Debtors to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot, but in no event later than the Voting Deadline, and (ii) not "opt out" of any releases under the Plan (it being understood that such Consenting Stakeholder entitled to vote on the Plan shall decline to opt out of the releases under the Plan by timely delivering its duly executed and completed ballot designating that it does not opt out of the releases); and

(c)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) the vote or election referenced in Section 5.02(b); *provided*, *however*, that nothing in this Agreement shall prevent any party from changing, withdrawing, amending, or revoking (or causing the same) its consent or vote with respect to the Plan if this Agreement has been terminated (it being understood that any termination of the Agreement Effective Period with respect to any Consenting Stakeholder shall entitle such Consenting Stakeholder to change its vote in accordance with section 1127(d) of the Bankruptcy Code, and the Solicitation Materials with respect to the Plan shall be consistent with this proviso).

20

5.03     Additional Commitments of Consenting Funds.  Each of the Consenting Funds hereby agrees that:

(a)     during the Agreement Effective Period, such Consenting Fund shall use its commercially reasonable efforts to cause each of the Liquidating Entities to comply with, and abide by, the covenants and obligations set forth in Sections 5.01 and 5.02 as if the Liquidating Entities were "Consenting Stakeholders" hereunder;

(b)     during the Agreement Effective Period, such Consenting Fund shall not enter into any amendment, supplement or other modification with respect to, or cancel, discharge or terminate any indebtedness, liabilities or other amounts under, the Existing Mezz Documents on or prior to the Effective Date; and

(c)     such Consenting Fund hereby irrevocably and unconditionally grants all waivers, consents, approvals and authorizations that may be necessary or required under the organizational documents of any of the Debtors or any of the Liquidating Entities (including under Sections 6.13, 6.14 and 6.15 of the Existing TopCo LLC Agreement, as applicable) or under applicable Law to permit the consummation of the Restructuring.

**Section 6.     Additional Provisions Regarding the Consenting Stakeholders' Commitments.**

Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall:

(a)     affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company, or any other party in interest in the Chapter 11 Cases regarding the Restructuring;

(b)     limit or impair the ability of a Consenting First Lien Lender to purchase, Transfer or enter into any transactions regarding its Claims against the Company, subject to the terms hereof, including, for the avoidance of doubt, Section 9 hereof;

(c)     impair or waive the rights of any Consenting Stakeholder to assert or raise any objection not prohibited by this Agreement in connection with the Restructuring;

(d)     impair or waive the rights of any Consenting Stakeholder under the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not prohibited by this Agreement;

(e)     prevent any Consenting Stakeholder from enforcing this Agreement or any other Definitive Document or asserting or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any other Definitive Document;

(f)     require any Consenting Stakeholder to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Stakeholder other than as expressly described in this Agreement;

(g)     prevent any Consenting Stakeholder from protecting and preserving its rights, remedies, and interests, including its Claims against, or Equity Interests in, the Company to the extent not inconsistent with this Agreement;

(h)      limit any right or remedy of any Consenting First Lien Lender under any of the Existing First Lien Documents, including enforcing any such right or remedy upon the occurrence of any default or event of default arising thereunder, except as expressly contemplated by Section 5.01(a)(vi);

(i)      other than as expressly set forth herein, limit the rights or obligations of any Consenting First Lien Lender under, or constitute a waiver or amendment of any term or provision of, the Existing First Lien Credit Agreement;

(j)      constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company that secure the obligations under the Existing First Lien Credit Agreement; or

(k)      require or obligate any Consenting Stakeholder to (i) waive (to the extent waivable by such Consenting Stakeholder) any condition to the consummation of any part of the Restructuring set forth in this Agreement (including Section 2.02) or any other Definitive Document, or (ii) approve any Definitive Document that is not in form and substance acceptable or reasonably acceptable, as applicable, to such Consenting Stakeholder if such Definitive Document is required to be in form and substance acceptable or reasonably acceptable to such Consenting Stakeholder pursuant to this Agreement, including pursuant to Section 3.03.

**Section 7.      Commitments of the Company.**

7.01      <u>Affirmative Commitments</u>.  Except as set forth in Section 8 or unless otherwise modified or waived in writing by the Required Consenting First Lien Lenders (except solely with respect to Section 7.01(m), which may only be otherwise modified or waived in writing by a Consenting Fund solely with respect to such Consenting Fund), during the Agreement Effective Period, the Company agrees to:

(a)      support and take all steps reasonably necessary to consummate the Restructuring in accordance with this Agreement and within the timeframes outlined herein;

(b)      use commercially reasonable efforts to obtain, file, submit, or register any and all required Governmental Body and/or third-party approvals, filings, registrations, or notices that are necessary or advisable (in the opinion of the Required Consenting First Lien Lenders) for the implementation or consummation of the Restructuring;

(c)      comply with the Milestones set forth in Section 4.01 of this Agreement (as may be extended by written agreement of the Company and the Required Consenting First Lien Lenders);

(d)      use commercially reasonable efforts to actively and timely oppose and object to the efforts of any Person seeking in any manner to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring (including, if applicable, the Debtors' timely filing of objections or written responses in the Chapter 11 Cases) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring after consultation with the Required Consenting First Lien Lenders;

(e)      negotiate in good faith and execute and deliver the Definitive Documents and any other agreements necessary or desirable to effectuate and consummate the Restructuring as contemplated by this Agreement;

(f)      use commercially reasonable efforts to seek additional support for the Restructuring from their other material stakeholders to the extent reasonably prudent;

22

(g)     upon reasonable request of any Consenting Stakeholder, inform counsel to such Consenting Stakeholder as to: (i) the status and progress of the Restructuring, including progress in relation to the negotiations of the Definitive Documents; and (ii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Consenting Stakeholder, any competent judicial body, Governmental Body, banking, taxation, supervisory, or regulatory body, or any stock exchange;

(h)     operate the business of the Company in the ordinary course of its business in a manner that is consistent with its past practices and in a manner that is in compliance with this Agreement and applicable Law, and use reasonable efforts to preserve intact the Company's business organization and relationships with third parties (including suppliers, distributors, customers, and Governmental Bodies) and employees in the ordinary course consistent with past practices and in a manner that is in compliance with this Agreement and applicable Law;

(i)     provide reasonably prompt written notice to counsel to the Consenting Stakeholders (and in any event within two (2) Business Days after the executive officers of the Company obtain actual knowledge thereof) of:

(i)     the initiation, institution or commencement of any Proceeding by a Governmental Body or other Person (or communications indicating that the same may be contemplated or threatened) (A) involving any of the Company Parties (including any assets, contracts, Permits, businesses, operations or activities of any of the Company Parties) or any of their respective current or former officers, employees, managers, directors, members or equity holders (in their capacities as such), or (B) challenging the validity of the transactions contemplated by this Agreement or any other Definitive Document or seeking to enjoin, restrain or prohibit this Agreement or any other Definitive Document or the consummation of the transactions contemplated hereby or thereby;

(ii)     any breach by any of the Company Parties of any of its representations, warranties, covenants or material obligations set forth in this Agreement;

(iii)     the happening or existence of any Event that shall have made any of the conditions precedent to any Party's obligations set forth in (or to be set forth in) any of the Definitive Documents incapable of being satisfied prior to the Outside Date; and/or

(iv)     the receipt of notice from any Governmental Body or other Person alleging that the consent or approval of such Person is or may be required under any organizational document of the Company, contract, Permit, Law or otherwise in connection with the consummation of any material part of the Restructuring;

(j)     each of the following:

(i)     Not later than 5:00 p.m. Eastern Time on every second Friday (commencing with Friday, September 29, 2023) (the "**Updated Budget Deadline**"), the Company shall deliver to the Consenting First Lien Lenders a supplement to the "Updated Budget" that was most-recently delivered by the Company pursuant to the First Lien Forbearance Agreement prior to the Execution Date (each such supplement, an "**Updated Budget**"), covering the 13-week period that commences with Friday of the calendar week immediately preceding such Updated Budget Deadline, consistent with the form and level of detail previously provided to each of the Consenting First Lien Lenders pursuant to the First Lien Forbearance Agreement, and including a forecasted unrestricted cash balance of the North American segment as well as a line-item report setting forth the estimated aggregate receipts and aggregate disbursements of the North American segment and estimated fees and expenses to be incurred by each professional advisor on a biweekly basis;

23

(ii)    Not later than 5:00 p.m. Eastern Time every Wednesday (commencing with Wednesday, September 27, 2023) (each such Wednesday, a "**Liquidity Report Deadline**"), the Company shall deliver to the Consenting First Lien Lenders a report setting forth Liquidity (North America) (as defined in the Existing First Lien Credit Agreement) as of the Friday of the calendar week immediately preceding such Liquidity Report Deadline, as well as any cash and cash equivalents excluded from either definition by the terms of the Existing First Lien Credit Agreement;

(iii)    Not later than 5:00 p.m. Eastern Time every Friday (commencing with Friday, September 29, 2023), the Company shall deliver to the Consenting First Lien Lenders a variance report (each, a "**Variance Report**") in form reasonably acceptable to the Required Consenting First Lien Lenders, showing the difference between (A) Liquidity (North America), as well as any cash and cash equivalents excluded from such definition by the terms of the Existing First Lien Credit Agreement, in each case, as budgeted in the Updated Budget, and the actual Liquidity (North America), as well as any cash and cash equivalents excluded from such definition by the terms of the Existing First Lien Credit Agreement, and (B) receipts and disbursements of the North American segment, in each case, as budgeted in the Updated Budget, and actual receipts and disbursements of the North American segment, in each case, for the Applicable Period, together with a reasonably detailed explanation of any material variance. Together with each Variance Report, the Company shall report to the Consenting First Lien Lenders actual professional fees directly or indirectly incurred by the Company with respect to the period applicable to such Variance Report;

(iv)    deliver to the Consenting Stakeholders any additional diligence regarding cash flows and working capital as requested by the Required Consenting Stakeholders; and

(v)    conduct weekly conference calls and/or video calls among the chief restructuring officer of the Company, relevant members of the Company's management, Houlihan, the Company, and the financial advisors of the Required Consenting First Lien Lenders to discuss all financial information and restructuring initiatives;

(k)    timely file a formal objection (after consultation with counsel to the Consenting First Lien Lenders) to any motion, application or Proceeding challenging (i) the amount, validity, allowance, character, enforceability or priority of any First Lien Claims, or (ii) the validity, enforceability or perfection of any lien or other encumbrance securing any First Lien Claims;

(l)    file a customary stock trading order that imposes procedures regarding (i) the accumulation and disposition of equity by Persons who beneficially own (directly or indirectly as determined for tax Law purposes), or would beneficially own, more than approximately 4.75% of the equity of any Debtor during the pendency of the Chapter 11 Cases and (ii) the claiming of a worthlessness deduction under Section 165 of the Code with respect to the equity of any Debtor;

(m)    to the extent commercially reasonable and only upon the reasonable request of a Consenting Fund, (i) provide such Consenting Fund with information and copies of materials related to the Communisis Pension Plan as reasonably requested by such Consenting Fund or such Consenting Fund's counsel, and (ii) reasonably cooperate with such Consenting Fund in connection with any asserted or potential claims and Causes of Action arising from or related to the Communisis Pension Plan; *provided, however*, in no event shall the Company be required to (A) share information or materials, or provide cooperation, if doing so would reasonably be expected to (x) jeopardize or impair the ability of any of the Company Parties to take advantage of any privilege, including, but not limited to, the attorney client privilege or the work product doctrine, (y) violate any Law, contract (including any confidentiality

24

agreement) or obligation of any of the Company Parties or to which any of the Company Parties is subject to or bound, or (z) be prejudicial to any of the Company Parties or create a conflict of interest for any of the Company Parties, or (B) incur, assume, become liable in respect of or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to any of the Company Parties, in connection with or as a result of sharing any such information or providing any such cooperation; and

(n)    use reasonable best efforts to secure a revolving credit facility for the Debtors on or after the Effective Date and prior to the date that is six (6) months following the Effective Date; *provided*, that the Debtors shall not enter into, or provide any commitments or other obligations for (including with respect to fees), any such revolving credit facility (the "**Optional ABL Facility**") without the prior written consent of the Required Consenting First Lien Lenders in their sole discretion.

7.02    The Company acknowledges, agrees, and shall not dispute that after the commencement of the Chapter 11 Cases and/or any voluntary cases under chapter 11 of the Bankruptcy Code relating to the Liquidating Entities, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the extent legally possible, the applicability of the automatic stay to the giving of such notice); *provided*, that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

7.03    Negative Commitments.  Except as set forth in Section 8 or unless otherwise approved, modified or waived in writing by the Required Consenting First Lien Lenders, during the Agreement Effective Period, the Company shall not directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring or otherwise commence any Proceeding opposing any of the terms of this Agreement or any of the other Definitive Documents;

(b)    take any action, or encourage any other Person to take any action, that is inconsistent in any material respect with, or is intended or would reasonably be expected to frustrate or impede approval, implementation, and consummation of the Restructuring;

(c)    seek, solicit, support, encourage, propose, consent to, vote for, or enter into any agreement regarding any Alternative Restructuring Proposal;

(d)    (i) seek discovery in connection with, prepare, or commence an avoidance action or other Proceeding that challenges (A) the amount, validity, allowance, character, enforceability, or priority of any Claims against, or Equity Interests in, the Company of any of the Consenting Stakeholders, or (B) the validity, enforceability, or perfection of any lien or other encumbrance securing (or purporting to secure) any Claims against, or Equity Interests in, the Company of any of the Consenting Stakeholders, or (ii) support any Person in connection with any of the acts described in clause (i) hereof;

(e)    execute, deliver and/or file any agreement, instrument, certificate, pleading, order, form and other document that is utilized to implement or effectuate, or that otherwise relates to, this Agreement, the Plan and/or the Restructuring (including any amendment, supplement or modification of, or any waiver to, any of the foregoing) that, in whole or in part, is not consistent in all material respects with this Agreement;

(f)    (i) amend or change any of their respective organizational documents, (ii) authorize, create, issue, sell or grant any additional Equity Interests or transfer or dispose of any Equity Interests, or (iii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on or make any distribution on any Equity Interests;

(g)    enter into any contract (other than the Rights Offering Documents, the DIP Facility Documents, the New First Lien Documents, the New Take-Back Debt Documents, the Separation Agreement, and (if applicable and subject to the prior written consent of the Required Consenting First Lien Lenders in their sole discretion) the contracts entered into in connection with the Optional ABL Facility) with respect to debtor-in-possession financing, cash collateral usage, exit financing and/or other financing arrangements;

(h)    grant or agree to grant (including pursuant to a key employee retention or incentive plan or other similar agreement or arrangement) any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance or other compensation or benefits (including in the form of any vested or unvested Equity Interests of any kind or nature) of any (i) executive employee of any of the Company Parties or (ii) other Person that is an employee of, or retained or engaged by, any of the Company Parties with an annual compensation (including salary, bonus, commissions, or other direct or indirect remuneration) of $200,000 or more, in each case except as required by applicable Law;

(i)    enter into, adopt or establish any new compensation or benefit plans or arrangements (including severance agreements or policies, employment agreements and any retention, success or other bonus plans), or amend or terminate any existing compensation or benefit plans or arrangements (including severance agreements or policies, employment agreements and any retention, success or other bonus plans), except as required by applicable Law;

(j)    make or change any material tax election, file any amended tax return, enter into any closing agreement with respect to taxes, consent to any extension or waiver of the limitations period applicable to any tax claim or assessment, enter into any installment sale transaction, adopt or change any material accounting methods, practices or periods for tax purposes, make or request any tax ruling, enter into any tax sharing or similar agreement or arrangement, or settle any tax claim or assessment;

(k)    except as expressly contemplated by the Plan, take or permit any action that would result in a (i) change of ownership of any Company Party under Section 382 of the Code, (ii) disaffiliation of any Company Party from a consolidated income tax group which currently includes the Debtors under Section 1502 of the Code or (iii) realization of any taxable income outside the ordinary course of the Company Parties' business;

(l)    file any motion, pleading, or other document with any court (including any modification or amendments to any motion, pleadings, or other document with any court) that, in whole or in part, is not consistent with this Agreement in any material respect;

(m)    make any loans, advances or capital contributions to, extend any credit, guarantees or other support for the benefit of, make any investments in, purchase or otherwise acquire any assets, properties, indebtedness or securities of, or transfer any cash or any other value to, OSG Bidco Limited or any of its Subsidiaries, or any other non-U.S. Subsidiary of any Company Party;

(n)    enter into any amendment, supplement or other modification with respect to, or cancel, discharge or terminate any indebtedness, liabilities or other amounts under, the Existing Mezz Documents on or prior to the Effective Date; or

(o)     (i) dissolve, terminate or disband either Restructuring Committee, (ii) limit, diminish, reduce or invalidate any of the powers or authorities of either Restructuring Committee, (iii) appoint any member to either Restructuring Committee that is not disinterested with respect to the Restructuring or does not have substantial restructuring experience, or (iv) take any action to impede, delay or frustrate the purpose of any action taken by either Restructuring Committee.

7.04    Professional Fees.

(a)     In accordance with the terms set forth in this Agreement, the Company shall pay the reasonable and documented (with such documentation subject to redaction to preserve attorney-client, work product, or other similar privileges) fees and out-of-pocket expenses of each of the following advisors (collectively, the "**Professional Fees**"): (i) McDermott Will & Emery LLP, counsel to the Company; (ii) one (1) local counsel to the Company, if necessary; (iii) Houlihan Lokey Capital, Inc. ("**Houlihan**"), as financial advisor to the Company; (iv) Accordion Partners, LLC; (v) BDO USA, LLP, as tax advisor to the Company; (vi) one (1) claims, noticing, and solicitation agent for the Debtors; (vii) Paul Hastings LLP ("**Paul Hastings**"), as counsel to the First Lien Group; (viii) Perella Weinberg Partners LP, as financial advisor to the First Lien Group; (ix) one (1) local counsel to the First Lien Group; (x) Arc Pensions Law, as U.K. pension counsel to the First Lien Group; (xi) Willkie Farr & Gallagher LLP, as counsel to Aquiline Financial Services Fund III L.P.; (xii) one (1) local counsel to Aquiline Financial Services Fund III L.P.; (xiii) Herbert Smith Freehills LLP, as UK counsel to Aquiline Financial Services Fund III L.P.; (xiv) Latham & Watkins LLP, as counsel to the Pemberton Equity Funds, and one (1) local counsel to the Pemberton Equity Funds; (xv) Akin Gump Strauss Hauer & Feld LLP, as former counsel to GoldPoint; (xvi) Eversheds Sutherland (US) LLP, as counsel to GoldPoint, and one (1) local counsel to GoldPoint; (xvii) Sackers & Partner LLP, as U.K. pension counsel to GoldPoint; (xviii) Lincoln International LLC, as financial advisor to GoldPoint; and (xix) other professional advisors to the DIP Lenders that are approved by the Required Consenting First Lien Lenders (in each case in clauses (vii) to (xix), the "**Specified Fees**"), to the extent applicable, in accordance with the relevant fee reimbursement letters, if applicable, entered into by the Company and such advisors; *provided, however*, that (and subject to the additional conditions and limitations set forth in the immediately succeeding proviso, to the extent applicable) (A) the Professional Fees payable to the advisors in clauses (xi), (xii), and (xiii) above that have accrued and remain unpaid prior to the Petition Date shall be paid in full in cash no later than the Business Day prior to the Petition Date, (B) the Professional Fees payable to the advisors in clauses (vii), (viii), (ix), (x) and (xix) above that have accrued and remain unpaid prior to the Petition Date shall be paid in full in cash upon the Company's receipt of the proceeds of the DIP Facility as adequate protection for the applicable Consenting First Lien Lenders' First Lien Claims, (C) the Professional Fees payable to the advisors in clauses (xiv), (xv), (xvi), (xvii) and (xviii) above shall be paid in full in cash upon the date on which the Bankruptcy Court enters the Final DIP Order and pursuant to the DIP Orders as adequate protection for the applicable Consenting First Lien Lenders' First Lien Claims, (D) upon termination of this Agreement (other than a termination of this Agreement pursuant to Section 12.06, which is addressed in sub-clause (E) of this Section 7.04(a)), all Professional Fees payable to the advisors in clauses (vii), (viii), (ix), (x) and (xix) above that have accrued and remain unpaid as of the termination of this Agreement shall be paid in full in cash promptly (but in any event within five (5) Business Days) following receipt of reasonably detailed invoices; and (E) upon termination of this Agreement pursuant to Section 12.06, all accrued and unpaid Specified Fees (excluding any Specified Fees payable to the advisors of any Party that is not a party to this Agreement immediately prior to the termination of this Agreement pursuant to Section 12.06) as of the date of such termination shall be paid in full in cash on such termination date against receipt of reasonably detailed invoices; *provided*, *further* that, (I) solely with respect to the Professional Fees payable to the advisors in clauses (xi), (xii), and (xiii) above, (X) in no event shall such Professional Fees (inclusive of any such Professional Fees paid by the Company pursuant to Section 2.01(c) of the Original RSA and Section 2.01(c) of this Agreement) exceed $125,000 in the aggregate and (Y) the Company's obligation to pay such Professional Fees shall terminate on the Petition Date and, for the avoidance of doubt, on and after the

Petition Date any fees and out-of-pocket expenses of the advisors in clauses (xi), (xii), and (xiii) above shall no longer be deemed "Professional Fees" or "Specified Fees" hereunder or entitled to payment hereunder, (II) solely with respect to the Professional Fees payable to the advisors in clause (xiv) above, in no event shall (X) such Professional Fees exceed $600,000 in the aggregate, (Y) the Company be required to pay such Professional Fees in the event that (1) the Pemberton Equity Funds have breached in any material respect any of their representations, warranties or covenants set forth in this Agreement, (2) the Pemberton Equity Funds received written notice of such breach from the Company, any member of the First Lien Group or counsel to the Consenting First Lien Lenders not less than five (5) Business Days prior to entry of the Final DIP Order and (3) such breach has not been cured as of the date on which the Bankruptcy Court enters the Final DIP Order, or (Z) the Company be required to pay such Professional Fees in the event that the Required Consenting Funds terminate this Agreement pursuant to Section 12.02, and (III) solely with respect to the Professional Fees payable to the advisors in clauses (xv), (xvi), (xvii), and (xviii) above, in no event shall (X) such Professional Fees exceed $600,000 in the aggregate, (Y) the Company be required to pay such Professional Fees in the event that (1) GoldPoint has breached in any material respect any of its representations, warranties or covenants set forth in this Agreement, (2) GoldPoint received written notice of such breach from the Company, any member of the First Lien Group or counsel to the Consenting First Lien Lenders not less than five (5) Business Days prior to the entry of the Final DIP Order and (3) such breach has not been cured as of the date on which the Bankruptcy Court enters the Final DIP Order, or (Z) the Company be required to pay such Professional Fees in the event that the Required Consenting Funds terminate this Agreement pursuant to Section 12.02.

(b)    The terms set forth in this Section 7.04 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement are consummated.  The Company hereby acknowledges and agrees that the Consenting Stakeholders have expended, and will continue to expend, considerable time, effort and expense in connection with this Agreement and the negotiation of the Restructuring, and that this Agreement provides substantial value to, is beneficial to, and is necessary to preserve, the Company, and that the Consenting Stakeholders have made a substantial contribution to the Company and the Restructuring.  If and to the extent not previously reimbursed or paid in connection with the foregoing, subject to the approval of the Bankruptcy Court and the conditions and limitations set forth in Section 7.04(a) hereof, the Debtors shall reimburse or pay (as the case may be) all Professional Fees pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise. The Company hereby acknowledges and agrees that the Professional Fees accrued after the Petition Date and reimbursable under Section 7.04(a) are of the type that should be entitled to treatment as, and the Debtors shall seek treatment of such Professional Fees as, administrative expense claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

**Section 8.    Additional Provisions Regarding Company's Commitments & Alternative Transaction.**

8.01    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company, or the board of directors, board of managers, or similar governing body of the Company to take any action or to refrain from taking any action with respect to the Restructuring to the extent it determines in good faith that the taking or failing to take such action, including the pursuit of an Alternative Restructuring Proposal, would be inconsistent with applicable Law or its fiduciary obligations under applicable Law (such determination, a "**Fiduciary Out**"), and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement; *provided, however*, that (a) no such action or inaction shall be deemed to prevent any of the Consenting First Lien Lenders from taking actions that they are permitted to take as a result of such actions or inactions, including terminating their obligations hereunder to the extent permitted hereunder, and (b) if (and on each occasion) the Company or the board of directors, board of managers, or similar governing body of the Company desires to exercise the Fiduciary Out in accordance with this Section 8.01, the Company shall use commercially

28

reasonable efforts to provide written notice of such exercise to counsel to the Consenting Stakeholders at least one (1) Business Day prior to such exercise of such Fiduciary Out, and, in any event, shall provide written notice of such exercise to counsel to the Consenting Stakeholders no later than contemporaneously therewith.  If the Company receives any Alternative Restructuring Proposal, then the Company shall, subject to any confidentiality agreements or provisions to which the Company is a party or otherwise bound, (i) within two (2) Business Days after receiving such Alternative Restructuring Proposal, provide counsel to each of the Consenting Stakeholders with a summary of the key terms of such Alternative Restructuring Proposal; (ii) provide counsel to each of the Consenting Stakeholders with regular updates as to the status and progress of such Alternative Restructuring Proposal; and (iii) respond promptly to reasonable information requests and questions from counsel to each of the Consenting Stakeholders relating to such Alternative Restructuring Proposal.

8.02    Notwithstanding anything to the contrary in this Agreement, but subject in all respects to Section 8.01, the Company and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall not: (a) seek, solicit, support, encourage, propose, consent to, vote for, or enter into any agreement regarding any Alternative Restructuring Proposal, (b) provide access to non-public information concerning the Company to a Person that provides an Alternative Restructuring Proposal or requests such information; (c) discuss any Alternative Restructuring Proposal with such proposing party; or (d) enter into or continue discussions or negotiations with holders of Claims against, or Equity Interests in, the Company or any other Person, regarding the Restructuring other than to the extent set forth herein.

8.03    Nothing in this Agreement shall: (a) impair or waive the rights of the Company to assert or raise any objection permitted under this Agreement in connection with the Restructuring; or (b) prevent the Company from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.        Transfer of Interests and Securities.**

9.01    During the Agreement Effective Period, no Consenting First Lien Lender shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Claims against, or Equity Interests in, the Company to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)    the transferee is either (i) a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act), (ii) a non-U.S. person in an "offshore transaction" (as defined under Regulation S under the Securities Act), (iii) an "accredited investor" (as defined by Rule 501 of the Securities Act), or (iv) a Consenting First Lien Lender; and

(b)    either (i) the transferee executes and delivers to counsel to the Company and counsel to each of the Consenting Stakeholders, at or before the time of the proposed Transfer, a Transfer Agreement Joinder; or (ii) the transferee is a Consenting First Lien Lender and the transferee provides notice of such Transfer (including the amount of First Lien Claims transferred) to counsel to the Company and counsel to each of the Consenting Stakeholders at or before the time of the proposed Transfer.

9.02    During the Agreement Effective Period, the Consenting Funds shall not Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Claims under the Existing Mezz Documents or any Equity Interests in the Liquidating Entities to any Person, including any party in which it may hold a direct or indirect beneficial interest.

9.03    Upon compliance with the requirements of Section 9.01 of this Agreement, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred First Lien Claims, and the transferee shall be deemed a "Consenting First Lien Lender" and a "Party" under this Agreement.  Any Transfer in violation of Section 9.01 or Section 9.02 shall be void *ab initio*.

9.04    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Claims against, or Equity Interests in, the Company; *provided* that (a) such additional Claims against, or Equity Interests in, the Company shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company or counsel to each of the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Claim against, or Equity Interest in, the Company acquired) to counsel to the Company and counsel to each of the Consenting Stakeholders promptly following such acquisition.

9.05    This Section 9 shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Claims against, or Equity Interests in, the Company.  Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreement.

9.06    Notwithstanding Section 9.01 of this Agreement, a Qualified Marketmaker that acquires any Claims against the Company with the purpose and intent of acting as a Qualified Marketmaker for such Claims against the Company shall not be required to execute and deliver a Transfer Agreement Joinder in respect of such Claims against the Company if: (a) such Qualified Marketmaker subsequently transfers such Claims against the Company (by purchase, sale, assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a transferee that is an Entity that is not an affiliate, affiliated fund, or affiliated Entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 9.01; and (c) the Transfer otherwise is permitted under Section 9.01.

9.07    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any Claims against, or Equity Interests in, the Company in favor of a bank or broker-dealer holding custody of such Claims or Equity Interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such Claims or Equity Interests.

9.08    In addition, a Person that owns or controls First Lien Claims may become a party hereto as a Consenting First Lien Lender by executing and delivering to counsel to the Company and counsel to each of the Consenting Stakeholders an Amended and Restated Restructuring Support Agreement Joinder, in which event such Person shall be deemed to be a Consenting First Lien Lender hereunder to the extent of the First Lien Claims owned and controlled by such Person.

**Section 10.    Representations and Warranties of Consenting Stakeholders.**  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement, an Amended and Restated Restructuring Support Agreement Joinder, or a Transfer Agreement Joinder:

(a)    it is the beneficial or record owner of the Claims against, or Equity Interests in, the Company or is the nominee, investment manager, or advisor for beneficial holders of the Claims against,

or Equity Interests in, the Company reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Claims against, or Equity Interests in, the Company other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Joinder, as applicable;

(b)      it has the full power and authority to act on behalf of, vote and consent to matters concerning, and if applicable Transfer, such Claims against, or Equity Interests in, the Company or such Party has agreed to purchase such Claims and Equity Interests and will become the sole beneficial owner of such Claims and Equity Interests when such trades have settled, at which time such party will have sole power and authority to take all actions described herein;

(c)      such Claims against, or Equity Interests in, the Company are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has made no prior assignment, sale, participation, grant, conveyance, or other Transfer of, and has not entered into any agreement to assign, sell, participate, grant, convey or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any Claims against, or Equity Interests in, the Company held as of the date such Consenting Stakeholder executes and delivers this Agreement or a Joinder, as applicable;

(e)      it is a sophisticated party with respect to the subject matter of this Agreement and the transactions contemplated hereby and has been represented by counsel during the negotiations and drafting of this Agreement;

(f)      it (i) has access to adequate information regarding the terms of this Agreement to make an informed and knowledgeable decision with regard to entering into this Agreement and (ii) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision with respect hereto;

(g)      it has not relied upon any other Party in deciding to enter into this Agreement and has instead made its own independent analysis and decision to enter into this Agreement; and

(h)      (i) it is either (A) a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act), (B) not a "U.S. person" (as defined in Regulation S of the Securities Act), or (C) an "accredited investor" (as defined by Rule 501 of the Securities Act); *and* (ii) any securities acquired by such Consenting Stakeholder in connection with the Restructuring will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

It is understood and agreed that the representations and warranties made by a Consenting Stakeholder that is an investment manager, advisor, or subadvisor of a beneficial owner of Claims against, or Equity Interests in, the Company are made with respect to, and on behalf of, such beneficial owner and not such investment manager, advisor, or subadvisor, and, if applicable, are made severally (and not jointly) with respect to the investment funds, accounts, and other investment vehicles managed by such investment manager, advisor, or subadvisor.  Any reference to the term "Company" in this Section 10 shall be deemed to include the Liquidating Entities.

**Section 11.      Mutual Representations, Warranties, and Covenants**.  Each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executes

and delivers this Agreement, an Amended and Restated Restructuring Support Agreement Joinder, or a Transfer Agreement Joinder:

(a)    it is validly existing and in good standing under the Laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)    except as expressly provided in this Agreement or, if applicable, the Bankruptcy Code, no registration or filing with, consent or approval of, or notice to, or other action is required by any other Person in order for it to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement;

(c)    the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other applicable constitutional documents;

(d)    it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement;

(e)    it is not party to any Alternative Restructuring Proposal, restructuring or similar agreement or arrangement with any of the other Parties or any other Person that have not been disclosed to all Parties; and

(f)    as to the Company, it is not soliciting, encouraging, or initiating any offer or proposal from, or considering entry into any agreement with, or engaging in any discussion or negotiations with any Person concerning an Alternative Restructuring Proposal, and from the Agreement Effective Date, it will comply with its obligations under this Agreement with respect to any Alternative Restructuring Proposal.

**Section 12.    Termination Events.**

12.01    <u>Required Consenting First Lien Lender Termination Events</u>.  This Agreement may be terminated with respect to all Parties by the Required Consenting First Lien Lenders prior to the Effective Date by the delivery to counsel to the Company of a written notice in accordance with Section 16.10 of this Agreement upon the occurrence of any of the following events; *provided* that this Agreement shall be automatically terminated, without the requirement of any notice to, or other action on the part of, any Person, upon the occurrence of any of the events described in Section 12.01(j):

(a)    the breach in any material respect by the Company or any Consenting Stakeholder (other than a terminating Consenting Stakeholder) of any of the representations, warranties, or covenants of the Company or such Consenting Stakeholder set forth in this Agreement that (i) that is materially adverse to the terminating Party, and (ii) remains uncured (to the extent curable) for five (5) Business Days after delivery of a written notice to the Company detailing such breach in accordance with Section 16.10 of this Agreement;

(b)    [reserved];

(c)    the issuance, promulgation or enactment by any Governmental Body, including any regulatory authority or court of competent jurisdiction, of any statute, regulation or final, non-appealable

ruling or order that (i) enjoins the consummation of a material portion of the Restructuring, and (ii) remains in effect for five (5) Business Days after the Required Consenting First Lien Lenders deliver a written notice to the Company notifying the Company of such issuance in accordance with Section 16.10 of this Agreement; *provided* that this termination right may not be exercised by any Consenting First Lien Lender that sought or requested such ruling or order;

(d)      the Bankruptcy Court grants relief that is inconsistent with this Agreement in any material respect or enters an order denying Confirmation of the Plan and such order remains in effect for five (5) Business Days after entry of such order;

(e)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by the Company seeking an order, (i) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases, (iii) approving an Alternative Restructuring Proposal, or (iv) rejecting this Agreement;

(f)      [reserved];

(g)      the Company's exercise of a Fiduciary Out or the Company's entry into a definitive agreement with respect to implementation of an Alternative Restructuring Proposal (for the avoidance of doubt, not including any confidentiality agreements);

(h)      the Debtors' withdrawal of the Plan;

(i)      the Company's execution, delivery, amendment, modification, or filing of a pleading seeking approval of, or authority to amend or modify, any Definitive Document that, in any such case, is not consistent with this Agreement or otherwise reasonably acceptable or acceptable, as the case may be as set forth in Section 3.03, to the Required Consenting First Lien Lenders;

(j)      unless consented to in writing by the Required Consenting First Lien Lenders or unless as expressly contemplated by this Agreement, the Company commences any voluntary, or is the subject of any involuntary, proceeding under any Debtor Relief Law that, in the case of any such involuntary proceeding, is not dismissed within ten (10) days of the commencement of such proceeding;

(k)      the breach by the Company of any of the covenants, agreements or other obligations set forth in Section 8.02;

(l)      termination of the DIP Facility or acceleration of the obligations under the DIP Facility;

(m)      the failure of the Effective Date to have occurred on or prior to the Outside Date;

(n)      during the Agreement Effective Period, there shall be any amendment, restatement, supplement or modification to any of the Existing First Lien Documents without the prior written consent of the Required Consenting First Lien Lenders;

(o)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by the Company seeking an order, avoiding, invalidating, disallowing, subordinating, recharacterizing, or limiting any of the First Lien Claims or any of the liens or other encumbrances that secure (or purport to secure) the First Lien Claims;

(p)      the Backstop Commitment Letter is terminated in accordance with its terms;

33

(q)     the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company having an aggregate fair market value in excess of $2,500,000;

(r)     the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization;

(s)     after entry by the Bankruptcy Court of the Interim DIP Order, the Final DIP Order, the Disclosure Statement Order or the Confirmation Order, any such order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended without the written consent of the Required Consenting First Lien Lenders;

(t)     any of the Milestones (as may have been extended with the approval of the Required Consenting First Lien Lenders) has not been achieved, except where such Milestone has been waived by the Required Consenting First Lien Lenders; or

(u)     the entry of an order by the Bankruptcy Court or any other court of competent jurisdiction, or the filing of a motion or application by the Company with the Bankruptcy Court or any other court of competent jurisdiction seeking an order, that (i) dissolves, terminates or disbands either Restructuring Committee, (ii) limits, diminishes, reduces or invalidates any of the powers or authorities of either Restructuring Committee, (iii) appoints any member to either Restructuring Committee that is not disinterested with respect to the Restructuring or does not have substantial restructuring experience, or (iv) otherwise impedes, delays or frustrates the purpose of any action taken by either Restructuring Committee.

12.02   <u>Consenting Fund Termination Events</u>.  This Agreement may be terminated solely with respect to all Consenting Funds by the Required Consenting Funds by the delivery to counsel to the Company and counsel to the Required Consenting Stakeholders prior to the Effective Date of a written notice in accordance with Section 16.10 of this Agreement upon the occurrence of any of the following events; *provided* that this Agreement shall be automatically terminated, without the requirement of any notice to, or other action on the part of, any Person, upon the occurrence of any of the events described in Section 12.02(f):

(a)     the breach in any material respect by the Company or any Consenting First Lien Lender of any of the representations, warranties, or covenants of the Company or such Consenting First Lien Lender set forth in this Agreement that (i) is materially adverse to the Consenting Funds, and (ii) remains uncured (to the extent curable) for five (5) Business Days after delivery of a written notice to the Company or the applicable Consenting First Lien Lender detailing such breach in accordance with Section 16.10 of this Agreement; *provided* that (A) the Company's breach of its commitments set forth in Section 4.01 and 7.01(c) shall not constitute a termination event with respect to the Required Consenting Funds and (B) this Agreement cannot be terminated pursuant to this Section 12.02(a) as a result of a breach of this Agreement by any of the Consenting First Lien Lenders if the non-breaching Consenting First Lien Lenders own or control 66.7% or more in aggregate principal amount of all of the outstanding First Lien Loans;

(b)     the issuance, promulgation or enactment by any Governmental Body, including any regulatory authority or court of competent jurisdiction, of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring and (ii) remains in effect for five (5) Business Days after the Required Consenting Funds deliver a written notice to the Company notifying the Company of such issuance in accordance with Section 16.10 of this Agreement; *provided* that this termination right may not be exercised by any Consenting Fund that sought or requested such ruling or order;

(c)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by the Company seeking an order, (i) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases, or (iii) rejecting this Agreement;

(d)     the Company's exercise of a Fiduciary Out to implement an Alternative Restructuring Proposal or the Company's entry into a definitive agreement with respect to implementation of an Alternative Restructuring Proposal (for the avoidance of doubt, not including any confidentiality agreements);

(e)     the Debtors' withdrawal of the Plan;

(f)     unless consented to in writing by the Required Consenting First Lien Lenders or unless as expressly contemplated by this Agreement, the Debtors commence any voluntary, or are the subject of any involuntary, proceeding under any Debtor Relief Law that, in the case of any such involuntary proceeding, is not dismissed within ten (10) days of the commencement of such proceeding;

(g)     the failure of the Effective Date to have occurred on or prior to the Outside Date; and

(h)     the entry of an order by the Bankruptcy Court or any other court of competent jurisdiction, or the filing of a motion or application by the Company with the Bankruptcy Court or any other court of competent jurisdiction seeking an order, that (i) dissolves, terminates or disbands either Restructuring Committee, (ii) limits, diminishes, reduces or invalidates any of the powers or authorities of either Restructuring Committee, (iii) appoints any member to either Restructuring Committee that is not disinterested with respect to the Restructuring or does not have substantial restructuring experience, or (iv) otherwise impedes, delays or frustrates the purpose of any action taken by either Restructuring Committee.

12.03    [Reserved].

12.04    Company Termination Events.  The Company may terminate this Agreement as to all Parties by the delivery to counsel to the Consenting Stakeholders prior to the Effective Date of a written notice in accordance with Section 16.10 of this Agreement upon the occurrence of any of the following events:

(a)     the breach in any material respect by one or more of the Consenting First Lien Lenders of any provision set forth in this Agreement (i) that is materially adverse to the Company and (ii) that remains uncured for a period of five (5) Business Days after the Company delivers to the Consenting Stakeholders a written notice detailing such breach in accordance with Section 16.10 of this Agreement; *provided*, that this Agreement cannot be terminated pursuant to this Section 12.04(a) as a result of a breach of this Agreement by Consenting First Lien Lenders if the non-breaching Consenting First Lien Lenders own or control 66.7% or more in aggregate principal amount of all of the outstanding First Lien Loans;

(b)     the Bankruptcy Court grants relief that is inconsistent with this Agreement in any material respect or enters an order denying Confirmation of the Plan and such order remains in effect for five (5) Business Days after entry of such order;

(c)     the entry of an order by the Bankruptcy Court (i) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases, or (iii) rejecting this Agreement;

(d)        the determination in good faith by the board of directors, board of managers, or any similar governing body of the Company (i) that proceeding with the Restructuring would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(e)        the issuance, promulgation or enactment by any Governmental Body, including any regulatory authority or court of competent jurisdiction, of any statute, regulation, or final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring and (ii) remains in effect for seven (7) Business Days after the Company delivers a written notice to the Consenting Stakeholders in accordance with Section 16.10 of this Agreement detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by the Company if it sought or requested such ruling or order; or

(f)        the failure of the Effective Date to have occurred on or prior to the Outside Date.

12.05     Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting First Lien Lenders, (b) the Required Consenting Funds, and (c) the Company.

12.06     Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately upon the Effective Date.

12.07     Effect of Termination.  After the occurrence of the Termination Date as to any Party, this Agreement shall be of no further force and effect as to such Party and such Party shall, except as otherwise expressly provided in this Agreement, be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action; *provided, however*, that in no event shall any such termination relieve a Party from (i) liability for its willful breach or non-performance of its obligations under this Agreement prior to the applicable Termination Date or (ii) obligations under this Agreement which by their terms expressly survive termination of this Agreement.  Nothing in this Agreement shall be construed as prohibiting the Company or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict: (a) any right of the Company or the ability of the Company to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder; and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against the Company or any other Consenting Stakeholder.  No Party may terminate this Agreement on account of a termination event if the occurrence of such termination event was primarily caused by, or primarily resulted from, such Party's own action (or failure to act) in breach of the terms of this Agreement, except a termination pursuant to Section 12.04(d).  Nothing in this Section 12.07 shall restrict the Company's right to terminate this Agreement in accordance with Section 12.04(d).  If this Agreement has been terminated in accordance with this Section 12 at a time when permission of the Bankruptcy Court shall be required for a Consenting Stakeholder to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Debtors shall consent to any attempt by such Consenting Stakeholder to change or withdraw (or cause to change or withdraw) such vote at such time.

**Section 13.        [Reserved].**

**Section 14.**     **[Reserved].**

**Section 15.**     **Amendments and Waivers.**

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement hereof may be waived, in any manner except in accordance with this Section 15.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, only in a writing signed by the Required Parties; *provided* that (i) any modification or amendment to the definition of Required Consenting First Lien Lenders shall also require the written consent of each Consenting First Lien Lender, (ii) with respect to any modification, amendment, waiver, or supplement that materially and adversely affects the rights or proposed treatment of (A) any Consenting First Lien Lender (in its capacity as a beneficial holder of, or an investment advisor, sub-advisor, or manager of discretionary accounts or funds that beneficially hold, First Lien Claims) in a manner that is different or disproportionate in any material respect from the effect such modification, amendment, supplement or waiver has on the Required Consenting First Lien Lenders (in their capacities as beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, First Lien Claims), then the reasonable consent of each such affected Consenting First Lien Lender shall also be required to effectuate such modification, amendment, supplement or waiver, or (B) any Consenting Fund (in its capacity as a holder of Equity Interests in TopCo) in a manner that is different or disproportionate in any material respect from the effect such modification, amendment, supplement or waiver has on the other Consenting Funds (in their capacities as holders of Equity Interests in TopCo), then the reasonable consent of each such affected Consenting Fund shall also be required to effectuate such modification, amendment, supplement or waiver, (iii) if the provisions of this Agreement provide that any term, covenant or condition (including the compliance therewith or the satisfaction thereof) may be waived by any particular Party or Parties, then such term, covenant or condition (including the compliance therewith or the satisfaction thereof) may be waived by such Party or Parties; and (iv)(A) any modification or amendment to clause (xiv) of Section 7.04(a), subclause (C) of the first proviso set forth in Section 7.04(a) or subclause (II) of the second proviso set forth in Section 7.04(a) shall also require the written consent of each of the Pemberton Equity Funds, (B) any modification or amendment to clauses (xv) through (xviii) of Section 7.04(a), subclause (C) of the first proviso set forth in Section 7.04(a) or subclause (III) of the second proviso set forth in Section 7.04(a) shall also require the written consent of GoldPoint, and (C) any modification or amendment to clauses (xi) through (xiii) of Section 7.04(a), subclause (A) of the first proviso set forth in Section 7.04(a) or subclause (I) of the second proviso set forth in Section 7.04(a) shall also require the written consent of Aquiline Financial Services Fund III L.P.

(c)     Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 15 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

(e)     Where a written consent, acceptance, approval, extension, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.03, Section 4.01, Section 7, this Section 15, or

otherwise, including a written approval by the Company or the Consenting Stakeholders, such written consent, acceptance, approval, extension, or waiver shall be deemed to have occurred if such consent, acceptance, approval, extension, or waiver is given or made by the applicable Party(ies) or counsel to the applicable Party(ies) to the other applicable Party(ies) or counsel to the other applicable Party(ies) by electronic mail.

## Section 16.    Miscellaneous.

16.01    <u>Acknowledgement</u>.    Notwithstanding any other provision of this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

16.02    <u>Exhibits Incorporated by Reference; Conflicts</u>.    Each of the exhibits (including the Plan and the Term Sheets), annexes, signature pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits (including the Plan and the Term Sheets), annexes, signature pages, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (including the Plan and the Term Sheets, but without reference to the exhibits, annexes, and schedules thereto) shall govern.  In the event of a conflict between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the Term Sheets, the Term Sheets shall control.  In the event of a conflict between the Plan and this Agreement (without reference to the exhibits, annexes, and schedules hereto) or the Term Sheets, the Plan shall control.

16.03    <u>Further Assurances</u>.    Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring, as applicable.

16.04    <u>Complete Agreement</u>.    Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes all prior negotiations, understandings, and agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement; *provided, however*, that nothing herein shall be deemed to supersede, override, replace, discharge, alter, change or otherwise modify any covenants, commitments, undertakings, liabilities or other obligations of the Company under any of the Existing First Lien Documents (including the First Lien Forbearance Agreement).

16.05    <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES OF THIS AGREEMENT.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, in the State of New York, County of New York, Borough of Manhattan, except, upon the filing of the Chapter 11 Cases and to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of any such court; (b) waives any objection to laying venue in any such action or proceeding in any such court; and (c) waives any objection that any such court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.

16.06   <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07   <u>Execution of Agreement</u>.   This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.08   <u>Rules of Construction</u>.   This Agreement is the product of negotiations among the Company and the Consenting Stakeholders, and in the enforcement or interpretation of this Agreement, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.  The Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.09   <u>Successors and Assigns; Third Parties</u>.   This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, except that each No Recourse Party shall be a third party beneficiary of Section 16.23.  The rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person, except in accordance with Section 9 of this Agreement.

16.10   <u>Notices</u>.   All notices hereunder shall be deemed given if in writing and delivered, by electronic mail ("**e-mail**"), courier, or registered or certified mail (return receipt requested), to the following addresses or e-mail addresses (or at such other addresses or e-mail addresses as shall be specified by like notice):

(a)   if to the Company, to:
Output Services Group, Inc.
900 Kimberly Drive
Carol Stream, IL 60188

Attention:   Dean Cherry
Ron Lambert
Brett Shroll
E-mail:   Dean.Cherry@everview.io
Ron.Lambert@everview.io
Brett.Shroll@everview.io

with copies to:

McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60602

Attention:   Bradley Thomas Giordano
Felicia Perlman
Carole Wurzelbacher
E-mail:   bgiordano@mwe.com

39

fperlman@mwe.com
cwurzelbacher@mwe.com

– and –

McDermott Will & Emery LLP
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131
Attention:     Gregg Steinman
E-mail:        gsteinman@mwe.com

(b)     if to the Consenting First Lien Lenders,

To each Consenting First Lien Lender at the addresses or e-mail addresses set forth below the Consenting First Lien Lender's signature page to this Agreement (or to the signature page to an Amended and Restated Restructuring Support Agreement Joinder or Transfer Agreement Joinder as the case may be).

with copies to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention:     Jayme Goldstein
               Matthew A. Schwartz
               Christopher Guhin
E-mail:        jaymegoldstein@paulhastings.com
               mattschwartz@paulhastings.com
               chrisguhin@paulhastings.com

(c)     if to Aquiline Financial Services Fund III L.P., to:

Aquiline Capital Partners, LLC
535 Madison Avenue
New York, NY 10222
Attention:     Nick Seibert

E-mail:        nseibert@aquiline.com
               legalnotices@aquiline.com

with copies to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention:     Jeffrey R. Poss
               Brian S. Lennon
               Larissa R. Marcellino
E-mail:        jposs@willkie.com
               blennon@willkie.com
               lmarcellino@willkie.com

(d)     if to the Pemberton Equity Funds, to:

Pemberton Capital Advisors LLP
5 Howick Place
London SW1P 1WG
United Kingdom
Attention:      Robin Challis
E-mail:          robin.challis@pembertonam.com

with copies to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:      Adam J. Goldberg
                Liza L. Burton
E-mail:          adam.goldberg@lw.com
                Liza.burton@lw.com

-and-

Latham & Watkins LLP
99 Bishopsgate
London EC2M 3XF
United Kingdom
Attention:      James Chesterman
E-mail:          james.chesterman@lw.com

(e)     if to GoldPoint, to:

Apogem Capital
227 West Monroe St., Suite 5400
Chicago, IL 60606
Attention:      Stephanie Slavkin
E-mail:          Stephanie.Slavkin@apogemcapital.com

with copies to:

Eversheds Sutherland (US) LLP
1114 6th Avenue
New York, NY 10036
Attention:      Renée M. Dailey
E-mail:          ReneeDailey@eversheds-sutherland.com

Any notice given by delivery, mail, or courier shall be effective when received, and any notice delivered or given by electronic mail shall be effective when sent.

16.11   _Independent Due Diligence and Decision Making._  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of

41

the operations, businesses, financial, and other conditions, and prospects of the Company and it has been represented by counsel or other advisors (or has had ample opportunity to seek representation or advice from counsel or other advisors) in connection with this Agreement and the Restructuring.

16.12   <u>Waiver</u>.  Except as otherwise expressly provided in this Agreement by reference to the irrevocable nature of an agreement or other action, if the Restructuring is not consummated, or if this Agreement is terminated for any reason, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties fully reserve any and all of their rights, remedies, claims, and defenses.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any Proceeding other than a Proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.13   <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

16.14   <u>Several, Not Joint, Claims; Relationship Among Parties</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

16.15   <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.16   <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect of this Agreement at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy of this Agreement by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.17   <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this Agreement on account of all Claims against, or Equity Interests in, the Company and the Liquidating Entities that it owns, holds or controls (directly or through discretionary accounts that it manages or advises).  For the avoidance of doubt, and notwithstanding any language herein that provides that certain covenants or other obligations of the Consenting Stakeholders shall only apply to a certain subset or group of Consenting Stakeholders, each of the Consenting Funds hereby expressly acknowledges and agrees that (a) such Consenting Fund has entered into this Agreement on account of all Claims against the Company Parties or the Liquidating Entities and all Equity Interests in TopCo that such Consenting Fund owns, holds, or controls (directly or through discretionary accounts that it manages or advises), and (b) the covenants and other obligations of the Consenting Stakeholders set forth in this Agreement shall apply in respect of all Claims against the Company Parties or the Liquidating Entities and all Equity Interests in TopCo that such Consenting Fund owns, holds, or controls (directly or through discretionary accounts that it manages or advises), and in respect of such Consenting Fund's capacity(ies) as a holder of such Claims and Equity Interests, by applying such covenants and other obligations (to the extent necessary) *mutatis mutandis* (such that all changes and modifications to the defined terms and other terminology used in such covenants and other obligations shall be made so that such covenants and other obligations can be applied in a logical

manner to such Claims against the Company Parties or Liquidating Entities or Equity Interests in TopCo and to such Consenting Fund in its capacity(ies) as a holder of such Claims and Equity Interests).

16.18   [Reserved].

16.19   Survival.  Notwithstanding (a) any Transfer of any Claim against, or Equity Interest in, the Company, in accordance with Section 9 of this Agreement or (b) the termination of this Agreement with respect to all Parties in accordance with its terms, the terms, provisions, agreements and obligations set forth in Sections 1.02, 6, 7.01(m), 7.04, 12, 15, and 16 (other than 16.03 in the event of a termination of this Agreement other than pursuant to Section 12.06), the proviso in Section 5.02(c), and any defined terms used in any of the forgoing Sections or proviso (solely to the extent used therein), shall survive such transfer or termination and shall continue in full force and effect in accordance with the terms hereof; *provided*, *however*, that Section 7.01(m) shall not survive the termination of this Agreement if this Agreement is terminated (i) by any Party as a result of the breach of any of the representations, warranties or covenants of any of the Consenting Funds set forth in this Agreement or (ii) by the Required Consenting Funds.  For the avoidance of doubt, notwithstanding the termination of this Agreement, the Company will comply with their obligations to pay the Professional Fees set forth in Section 7.04.

16.20   Consideration.  Each Party hereby acknowledges that no consideration, other than that specifically described herein or in the Plan, shall be due or paid to any Consenting Stakeholder for its agreement (subsequent to proper disclosure and solicitation) to vote to accept the Plan or to otherwise support and take actions to effectuate the Restructuring in accordance with the terms and conditions of this Agreement, other than each of the Parties' representations, warranties, and agreements with respect to their commitments hereunder regarding the consummation of the Restructuring and the Confirmation and consummation of the Plan.

16.21   Tax Matters.   Each Party hereby acknowledges and agrees that the terms of the Restructuring shall be structured, to the maximum extent possible, in a manner that (a) eliminates or minimizes any cash taxes payable by the Debtors as a result of the consummation of the Restructuring and (b) optimizes the tax efficiency (including, but not limited to, by way of the preservation or enhancement of favorable tax attributes) of the Restructuring to the Debtors and the holders of Reorganized Common Equity as a result of the consummation of the Restructuring, in each case as determined by the Required Consenting First Lien Lenders.

16.22   Publicity; Confidentiality.  The Company shall submit drafts to counsel to each of the Consenting Stakeholders of any press releases or other public statements that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) Business Days prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith.  Except as required by Law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Stakeholder, no Party or its advisors shall (a) use the name of any Consenting First Lien Lender in any public manner (including in any press release) with respect to this Agreement, the Restructuring or any of the Definitive Documents or (b) disclose to any Person (including, for the avoidance of doubt, any other Party), other than counsel to the Company, the principal amount or percentage of any Claims against, or Equity Interests in, the Company held by any individual Consenting First Lien Lender, without such Consenting First Lien Lender's prior written consent (it being understood and agreed that each Consenting First Lien Lender's signature page to this Agreement or Joinder, as applicable, shall be redacted to remove the name of such Consenting First Lien Lender and the amount and/or percentage of Claims against, or Equity Interests in, the Company held by such Consenting First Lien Lender); *provided*, *however*, that (i) if such disclosure is required by Law, subpoena, or other process or regulation, the disclosing Party shall afford the relevant Consenting First Lien Lender a

reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure, and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Claims against, or Equity Interests in, the Company held by all the Consenting First Lien Lenders, collectively.  Notwithstanding the provisions in this Section 16.22, (x) any Party may disclose the identities of the other Parties in any action to enforce this Agreement or in any action for damages as a result of any breaches hereof, and (y) any Party may disclose, to the extent expressly consented to in writing by a Consenting First Lien Lender, such Consenting First Lien Lender's identity and individual holdings.

16.23   No Recourse.  This Agreement may only be enforced against the named parties hereto and Permitted Transferees (and then only to the extent of the specific obligations undertaken by such parties in this Agreement).  All claims or other Causes of Action (whether in contract, tort, equity or any other theory) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement, may be made only against the Persons that are expressly identified as parties hereto (and then only to the extent of the specific obligations undertaken by such parties herein).  No past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, affiliate, controlling person, agent, attorney or other representative of any Party (including any person negotiating or executing this Agreement on behalf of a Party), nor any past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, affiliate, controlling person, agent, attorney or other representative of any of the foregoing (other than any of the foregoing that is a Party) (any such person, a "**No Recourse Party**"), shall have any liability with respect to this Agreement or with respect to any proceeding (whether in contract, tort, equity or any other theory that seeks to "pierce the corporate veil" or impose liability of an entity against its owners or affiliates or otherwise) that may arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.

16.24   Exchange Rate.  All First Lien Loans denominated in any currency other than United States dollars shall be exchanged for New Take-Back Debt Loans and Reorganized Common Equity in the Restructuring based on the Dollar Equivalent (as defined in the Existing First Lien Credit Agreement) of the amount of such First Lien Loans at the rate at which such currency may be exchanged into United States dollars, as published by Bloomberg at approximately 11:00 a.m. (London time) three (3) Business Days immediately prior to the Effective Date.  In the event that such rate is not published by Bloomberg, the rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Required Consenting First Lien Lenders and the Company, or, in the absence of such agreement, such rate shall instead be the arithmetic average of the spot rates of exchange of the First Lien Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 10:00 a.m. (New York time) on such date for the purchase of United States dollars for delivery two (2) Business Days later.

16.25   Implementation Steps.  The means for implementing the Restructuring, which will be described in detail in the Restructuring Transactions Memorandum, shall be accomplished through such transactions, steps and actions, and which transactions, steps and actions shall be in such form, manner and sequencing, that are consistent with this Agreement and otherwise acceptable to the Required Parties.

[*Remainder of page intentionally left blank.*]

**Company Parties' Signature Page to
the Amended and Restated
Restructuring Support Agreement**

OSG HOLDINGS, INC.
OUTPUT SERVICES GROUP, INC.
JJT ENTERPRISES, INC.
WORDS, DATA AND IMAGES, LLC
SOUTHDATA, INC.
DOUBLEPOSITIVE MARKETING GROUP, INC.
NATIONAL BUSINESS SYSTEMS, INC.
NCP SOLUTIONS, LLC
THE GARFIELD GROUP, INC.
MANSELL GROUP HOLDING COMPANY
MANSELL GROUP, INC.
GLOBALEX CORPORATION
DIAMOND MARKETING SOLUTIONS GROUP, INC.
NATIONAL DATA SERVICES OF CHICAGO, INC.
APPLIED INFORMATION GROUP, INC.
PAYMENTS BUSINESS CORP. (F/K/A PAYBOX CORP.)
MICRODYNAMICS CORPORATION
MICRODYNAMICS GROUP NEBRASKA, INC.
MICRODYNAMICS TRANSACTIONAL MAIL, LLC

By _____
Name: Dean Cherry
Title: Chief Executive Officer

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

[*Consenting Stakeholders' signature pages on file with the Company Parties*]

## EXHIBIT A

**COMPANY PARTIES**

OSG HOLDINGS, INC.

OUTPUT SERVICES GROUP, INC.

JJT ENTERPRISES, INC.

WORDS, DATA AND IMAGES, LLC

SOUTHDATA, INC.

DOUBLEPOSITIVE MARKETING GROUP, INC.

NATIONAL BUSINESS SYSTEMS, INC.

NCP SOLUTIONS, LLC

THE GARFIELD GROUP, INC.

MANSELL GROUP HOLDING COMPANY

MANSELL GROUP, INC.

GLOBALEX CORPORATION

DIAMOND MARKETING SOLUTIONS GROUP, INC.

NATIONAL DATA SERVICES OF CHICAGO, INC.

APPLIED INFORMATION GROUP, INC.

PAYMENTS BUSINESS CORP. (F/K/A PAYBOX CORP.)

MICRODYNAMICS CORPORATION

MICRODYNAMICS GROUP NEBRASKA, INC.

MICRODYNAMICS TRANSACTIONAL MAIL, LLC

**<u>EXHIBIT B</u>**

**PLAN**

**<u>EXHIBIT C</u>**

**DIP TERM SHEET**

**Output Services Group, Inc.**

**Term Loan DIP Facility Term Sheet**

This term sheet (together with all annexes, exhibits and schedules attached hereto, this "**DIP Term Sheet**") sets forth certain material terms of the proposed DIP Facility (as defined below). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the DIP Facility Commitment Letter, dated as of October 6, 2023 (together with all annexes, exhibits and schedules attached thereto, in each case, as amended, supplemented or modified in accordance with its terms, the "**DIP Commitment Letter**"), to which this DIP Term Sheet is attached, and, if not defined therein, the DIP Credit Agreement (as defined below) or that Restructuring Support Agreement, dated as of August 7, 2023, by and among the Company Parties, the Commitment Parties, certain other Consenting First Lien Lenders (as defined therein) and the Sponsors (as defined therein), as amended, amended and restated, supplemented or otherwise modified from time to time, including pursuant to the Specified RSA Amendment (as defined below) (the "**RSA**"), as applicable.

| | |
|---|---|
| **Borrower** | Output Services Group, Inc., a New Jersey corporation (the "**Borrower**"), in its capacity as a debtor and debtor-in-possession. |
| **Guarantors** | OSG Holdings, Inc., a New Jersey corporation ("**Holdings**"), in its capacity as a debtor and debtor-in-possession, and each of the Borrower's direct and indirect domestic subsidiaries that are Company Parties, each in their respective capacities as debtors and debtors-in-possession (collectively with Holdings, the "**Guarantors**" and, together with the Borrower, the "**Loan Parties**") in the Chapter 11 Cases. |
| **Administrative Agent and Collateral Agent** | The administrative agent and the collateral agent for the Term DIP Lenders (as defined below) with respect to the DIP Facility (in such capacities, the "**DIP Agent**") shall be a financial institution selected by, and qualified to perform the duties customarily associated with such roles as determined by, the Required DIP Lenders (as defined below), which shall be reasonably acceptable to the Borrower (it being understood that Acquiom Agency Services LLC and Seaport Loan Products LLC are acceptable to the Borrower). |
| **Term DIP Lenders** | The Commitment Parties and such other financial institutions or entities that are a party to the RSA (or their affiliated designees) who become party to the DIP Credit Agreement in accordance with its terms shall be lenders as of the Closing Date (as defined below) (each a "**Term DIP Lender**", and collectively, the "**Term DIP Lenders**"); provided, that any Term DIP Lender must be a party to the RSA. |
| **Permitted Liens** | Any valid liens ("**Permitted Prior Liens**") that are (1) in existence on the Petition Date, (2) either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code and (3) senior in priority to the liens securing the Existing First Lien Credit Agreement (the "**First Lien Credit Agreement Liens**") either under the Existing First Lien Credit Agreement or by operation of applicable non-bankruptcy law (excluding for the avoidance of doubt, First Lien Credit Agreement Liens and other liens in favor of the First Lien Secured Parties (as defined below) in their capacities as such). |

| | |
|---|---|
| **Interim and Final DIP Orders** | The order approving the DIP Facility on an interim basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Loan Parties and the Required DIP Lenders (as defined below) (the "**Interim DIP Order**"), shall authorize and approve, among other matters, (i) the Loan Parties' entry into the DIP Facility Documents, (ii) the making of the Term DIP Loans, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets in accordance with the DIP Facility Documents, respectively, with respect to the DIP Collateral (as defined below), (iv) the use of cash collateral, and (v) the granting of adequate protection to the First Lien Agent and First Lien Lenders (collectively, the "**First Lien Secured Parties**"). |
| | The order approving the DIP Facility on a final basis shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Loan Parties and the Required DIP Lenders (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"). |
| **Adequate Protection** | As adequate protection against the risk of any diminution in the value of the respective First Lien Credit Agreement Liens in all collateral securing the First Lien Claims (the "**Prepetition First Lien Collateral**"), which is as a result of, or arises from, or is attributable to, the imposition of the automatic stay, or the use, sale or lease of such Prepetition First Lien Collateral, or the grant of a lien under section 364 of the Bankruptcy Code and applicable case law interpreting the same (any such diminution, "**Diminution in Value**"), the First Lien Secured Parties shall be granted the following adequate protection, subject in all cases to the Carve-Out, the Term DIP Liens, Term DIP Superpriority Claims, and Permitted Prior Liens: |
| | (A) to the extent of any Diminution in Value of the First Lien Credit Agreement Liens in Prepetition First Lien Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**First Lien Adequate Protection Liens**"), which adequate protection liens shall have the priority set forth on **Annex II** attached hereto, as applicable; |
| | (B) to the extent of any Diminution in Value of the First Lien Credit Agreement Liens in Prepetition First Lien Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall have priority over any and all administrative expense claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 1113 and 1114 of the Bankruptcy Code (other than the Carve-Out) (the "**First Lien Adequate Protection Claims**"), which claims shall be subject to the priorities set forth on **Annex II** attached hereto, as applicable; |
| | (C) the payment of the reasonable and documented out-of-pocket fees and expenses of the First Lien Agent and the Consenting First Lien Lenders; provided, however, that the foregoing shall be limited to the prepetition and post-petition fees and expenses of (i) Paul Hastings, LLP, as counsel to the Consenting First Lien Lenders, and (ii) Perella Weinberg Partners, as financial advisor to the Consenting First Lien Lenders, (iii) one local counsel to the Consenting First Lien Lenders in each required jurisdiction, and (iv) any other attorneys, financial advisors or professionals retained by the Consenting First |

Lien Lenders with the consent of the Company (such consent not to be unreasonably withheld) (collectively clauses (i) through (iv), the "**Lender Advisors**");

(D) the payment, upon the date on which the Bankruptcy Court enters the Final DIP Order, of the reasonable and documented out-of-pocket fees and expenses of the following advisors: (i) Latham & Watkins LLP, as counsel to the Pemberton Equity Funds (as defined in the RSA), in an amount not to exceed $600,000; provided, that no such amounts shall be paid by the Borrower or any of its subsidiaries, directly or indirectly, if any of the Pemberton Equity Funds has breached in any material respect any of its representations, warranties or covenants set forth in the RSA and such breach has not been cured as of the date on which the Bankruptcy Court enters the Final DIP Order; and (ii) fees and expenses of Akin Gump Strauss Hauer & Feld LLP, as former counsel to GoldPoint (as defined in the RSA); Eversheds Sutherland (US) LLP, as counsel to GoldPoint; Sackers & Partner LLP, as U.K. pension counsel to GoldPoint; and Lincoln International LLC, as financial advisor to GoldPoint, in an amount not to exceed $600,000 in the aggregate for all such counsel and advisors; provided, that no such amounts shall be paid by the Borrower or any of its subsidiaries, directly or indirectly, if GoldPoint has breached in any material respect any of its representations, warranties or covenants set forth in the RSA and such breach has not been cured as of the date on which the Bankruptcy Court enters the Final DIP Order; and

(E) delivery of certain financial reporting, including the following:

- Updated Budget: bi-weekly delivery of the Updated Budget, covering the 13-week period commencing with Friday of the immediately preceding calendar week;

- Liquidity Report: weekly delivery of a liquidity report setting forth Liquidity (North America) (as defined in the Existing First Lien Credit Agreement), as well as any cash and cash equivalents excluded from either definition by the terms of the Existing First Lien Credit Agreement, as of the Friday of the immediately preceding calendar week;

- Variance Report: weekly delivery of a Variance Report, showing the difference between (i) (a) amounts budgeted in the Updated Budget for Liquidity (North America), as well as any cash and cash equivalents excluded from either definition by the terms of the Existing First Lien Credit Agreement, and (b) the actual Liquidity (North America) and any cash and cash equivalents excluded from either definition by the terms of the Existing First Lien Credit Agreement, and (ii) receipts and disbursements in the North American segment for the Applicable Period, together with a reasonably detailed explanation of any material variance; and

- Other Information: delivery of (i) supporting information reasonably requested by the First Lien Group and/or the Lender Advisors and (ii) such other financial reporting reasonably acceptable to the First Lien Group and the Loan Parties.

| Carve-Out | The First Lien Credit Agreement Liens, the liens on and security interests in the DIP Collateral, the adequate protection liens, and all super-priority administrative expense claims granted under the DIP Orders, shall be subject and subordinate to the Carve-Out. |
|---|---|
| | For purposes hereof, "**Carve-Out**" means an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court under section 156(c) of title 28 of the United States Code and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the applicable statutory rate (without regard to the notice set forth in (iii) below) (collectively, the "Statutory Fees"), which Statutory Fees shall not be subject to any budget; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee allowed and payable by the Loan Parties to Houlihan Lokey Capital, Inc. pursuant to that certain engagement letter dated February 10, 2023 and excluding any other restructuring, sale, success, or other transaction fee of any other investment bankers or financial advisors of the Loan Parties or any Official Committee) (collectively, "**Allowed Professional Fees**") incurred by (a) persons or firms retained by the Loan Parties pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and, (b) subject to the budget approved for variance testing, persons or firms retained by any statutory committee appointed in the Chapter 11 Cases (each, an "**Official Committee**") pursuant to sections 327, 328, or 1103 of the Bankruptcy Code (collectively, the "**Committee Professionals**" and together with the Debtor Professionals, the "**Professional Persons**"), at any time before or on the second (2nd) business day following delivery by the DIP Agent of the Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery by the DIP Agent of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2.25 million incurred after the second (2nd) business day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**"). |
| | For purposes of the foregoing, the "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) to the Loan Parties, their lead restructuring counsel, the U.S. Trustee, and counsel to the Official Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below) and acceleration of the Term DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked; <u>provided</u> that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (i), (ii), (iii) or (iv) above on any grounds. |
| **Type and Amount** | Senior secured super-priority debtor-in-possession term loan credit facility (the "**DIP Facility**", and the loans outstanding thereunder, the "**Term DIP Loans**"), |

| | |
|---|---|
| **of the DIP Facility** | in an aggregate principal amount of commitments of $50 million (the "**DIP Commitments**"), pursuant to which the Term DIP Lenders shall provide new money term loans in a single borrowing on the Closing Date.<br><br>Term DIP Loans that are repaid or prepaid may not be reborrowed. |
| **Use of Proceeds** | Solely in accordance with and subject to the credit agreement governing the terms of the DIP Facility (the "**DIP Credit Agreement**", and together with all security and collateral agreements related thereto, the "**DIP Facility Documents**"), the proceeds of the DIP Facility may be used only (i) to make adequate protection payments as required in the DIP Facility Documents and the DIP Orders, (ii) to pay the administrative costs of the Chapter 11 Cases, (iii) for general corporate purposes, and (iv) to pay any and all amounts contemplated by the Plan, in each case, in accordance with and subject to the DIP Facility Documents and the DIP Orders (including the budget approved for variance testing), subject to permitted variances). |
| **Closing Date** | The first business day on which, after entry of the Interim DIP Order, the Conditions Precedent to Closing have been satisfied (or waived) in accordance with Section 3 of the DIP Commitment Letter (the "**Closing Date**"). |
| **Maturity** | The DIP Facility will mature on the earliest to occur of:<br><br>(i)    ninety-one (91) days after the Petition Date;<br><br>(ii)    the effective date of a chapter 11 plan of any Loan Party, which has been confirmed by an order entered by the Bankruptcy Court in any of the Chapter 11 Cases;<br><br>(iii)    dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code;<br><br>(iv)    the acceleration of the Term DIP Loans and the termination of the commitments under the DIP Facility; and<br><br>(v)    the closing of a sale of all or substantially all assets or equity of the Loan Parties (other than to another Loan Party). |
| **Amortization** | None. |
| **Payments and Interest Rates** | As set forth on **Annex I** attached hereto. |
| **Mandatory Prepayments** | Subject to payment of the unpaid portion of the Upfront Payment, mandatory prepayments of the Term DIP Loans shall be required in an amount equal to (i) 100% of net cash proceeds of any event of loss or condemnation, (ii) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted by the DIP Credit Agreement, (iii) 100% of net cash proceeds from the issuance of any equity of the Borrower or Holdings or any subsidiary thereof, and (iv) 100% of the net cash proceeds of any sale of assets of any of the Loan Parties or their subsidiaries (other than asset sales in the ordinary course of business), in each case, subject to the Documentation Principles (as defined below). |

| | |
|---|---|
| **Voluntary Prepayments** | Permitted, in whole or in part, subject to limitations as to minimum amounts of prepayments (and customary SOFR breakage), subject to payment of the unpaid portion of the Upfront Payment. |
| **Collateral and Priority** | Subject to the Carve-Out, as security for the prompt payment and performance of all amounts due under the DIP Facility, including, without limitation, all principal, interest, premiums, payments, fees, costs, expenses, indemnities or other amounts (collectively, the "**Term DIP Obligations**"), effective as of the Petition Date, the DIP Agent, for the benefit of itself and the Term DIP Lenders, shall be granted automatically and properly perfected liens and security interests ("**Term DIP Liens**") in all assets and properties of each of the Loan Parties and their bankruptcy estates, whether tangible or intangible, real, personal or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of the Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, including, without limitation, all of the Loan Parties' rights, title and interests in (1) all Prepetition First Lien Collateral, (2) all money, cash and cash equivalents; (3) all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time); (4) all accounts and other receivables (including those generated by intercompany transactions); (5) all contracts and contract rights; (6) all instruments, documents and chattel paper; (7) all securities (whether or not marketable); (8) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures; (9) all real property interests; (10) all interests in leaseholds, (11) all franchise rights; (12) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses and all other intellectual property; (13) all general intangibles, tax or other refunds, or insurance proceeds; (14) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (15) all investment property; (16) all supporting obligations; (17) all letters of credit and letter of credit rights; (18) all commercial tort claims; (19) all claims and causes of action arising under Chapter 5 of the Bankruptcy Code ("**Avoidance Actions**") and the proceeds of or property recovered, whether by judgment, settlement or otherwise, from Avoidance Actions ("**Avoidance Action Proceeds**"); (20) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (21) to the extent not covered by the foregoing, all other goods, assets or properties of the Loan Parties, whether tangible, intangible, real, personal or mixed; and (22) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Loan Party from time to time with respect to any of the foregoing (collectively, the "**DIP Collateral**"); <u>provided</u> that DIP Collateral shall exclude other assets to be mutually agreed among the Borrower and the Required DIP Lenders,  but shall include any and all proceeds and products of such excluded assets, unless such proceeds and products otherwise separately constitute excluded assets.<br><br>The Term DIP Liens shall have the following priorities (subject in all cases to |

| | the Carve-Out): |
|---|---|
| | i. *First Liens on Unencumbered Property*. Pursuant to Section 364(c)(2) of the Bankruptcy Code, the Term DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to Permitted Prior Liens (collectively, "**Unencumbered Property**"), including Avoidance Actions and Avoidance Action Proceeds. |
| | ii. *Priming DIP Liens and Liens Junior to Certain Other Liens*. Pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, the Term DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected in all DIP Collateral (other than as described in clause (i) above), which Term DIP Liens (a) shall be subject and subordinate only to the (1) Carve-Out and (2) Permitted Prior Liens, (b) shall be senior to any and all other liens and security interests in DIP Collateral, including, without limitation, all liens and security interests in any DIP Collateral that would otherwise be subject to the First Lien Credit Agreement Liens (including, without limitation, any First Lien Adequate Protection Liens), and (c) shall otherwise be subject to the priorities set forth in **Annex II** attached hereto. |
| | iii. *Liens Senior to Other Liens*. Except to the extent expressly permitted hereunder, subject to the Carve-Out, the Term DIP Liens and the Term DIP Superpriority Claims (as defined below) (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Loan Parties, (B) any lien or security interest that is avoided or preserved for the benefit of the Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate claim, lien or security interest of the Loan Parties or their affiliates, or (D) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof. |
| **Guarantees** | Each Loan Guarantor shall unconditionally guarantee, on a joint and several basis, all Term DIP Obligations arising under or in connection with the DIP Facility. |
| **Term DIP Superpriority Claims** | Subject to the Carve-Out, the Term DIP Obligations shall be allowed super-priority administrative expense claims under Section 364(c) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claims shall have priority over any and all administrative expense claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 1113 and 1114 of the Bankruptcy Code, with recourse against all DIP Collateral (the "**Term DIP Superpriority Claims**"), which Term DIP Superpriority Claims |

| | |
|---|---|
| | shall be subject to the priorities set forth in **Annex II** attached hereto. |
| **Milestones** | The Loan Parties shall comply with the Milestones, which Milestones shall be incorporated into the DIP Credit Agreement. |
| **Documentation** | The DIP Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) a credit agreement, negotiated in good faith, in form and substance acceptable to the Borrower and the Required DIP Lenders, which shall (i) reflect the terms set forth herein, (ii) reflect the terms of the Interim DIP Order or the Final DIP Order, as applicable, (iii) have usual and customary provisions for debtor-in-possession provisions of this kind and provisions that are necessary to effectuate the financing contemplated hereby and (iv) be mutually agreed among the Borrower and the Required DIP Lenders, (b) the Interim DIP Order, (c) the Final DIP Order, and (d) as applicable, the related security agreements, collateral agreements, pledge agreements, guarantees, mortgages and other legal documentation or instruments as are, in each case, usual and customary for debtor-in-possession financings of this type and/or reasonably necessary to effectuate the financing contemplated hereby, as determined by the Loan Parties and the Required DIP Lenders (this paragraph, the "**Documentation Principles**"). |
| **Representations and Warranties** | The DIP Facility Documents will contain usual and customary representations and warranties, subject to the Documentation Principles. |
| **Cash Flow Reporting; Variance Reporting; Variance Testing** | The DIP Credit Agreement shall provide for cash flow and variance reporting that is substantially consistent with the reporting set forth in the RSA; provided, that the Borrower shall not permit actual receipts (the "**Actual Receipts**") to be less than 85% of budgeted receipts (the "Budgeted Receipts" and together with Actual Receipts, the "**Receipts**") for any four-week rolling period or actual disbursements (the "**Actual Disbursements**") to exceed 110% of budgeted disbursements (the "**Budgeted Disbursements**" and together with Actual Disbursements, the "**Disbursements**") for any four-week rolling period; provided, further, that postage disbursements shall be excluded from Disbursements; provided, further, that the Borrower shall require consent from Required DIP Lenders for any amendments to any prior budget, or any future budget, with respect to which the variance covenant is tested. |
| **Financial Covenant** | The Borrower shall not permit Liquidity (to be defined as Liquidity (North America) (as defined in the Existing First Lien Credit Agreement)) to be less than $10 million at any time. |
| **Affirmative and Negative Covenants** | The DIP Facility Documents will contain usual and customary affirmative and negative covenants for facilities of this type, subject to the Documentation Principles; provided that, without limitation, the DIP Facility Documents shall require:<br><br>(i)    two (2) Business Days' advance delivery of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Loan Parties in the Chapter 11 Cases to the Lender Advisors, unless not reasonably practicable under the circumstances (in which case, as soon as reasonably practicable prior to filing); |

| | |
|---|---|
| | (ii) weekly conference calls and/or video calls with the Loan Parties' chief restructuring officer and relevant senior management, the Loan Parties' advisors, the Lender Advisors and the Term DIP Lenders, which update calls may cover the Loan Parties' financial performance, the latest budget approved for variance testing, the Loan Parties' variance reports, and the other documentation provided pursuant to the reporting covenant described above; |
| | (iii) compliance with the Milestones; |
| | (iv) delivery of period financial statements (*i.e.*, for each of the 13 reporting periods per year), including a income statement for such period, balance sheet as of the end of such period and a cash flow statement for such period, within thirty (30) days after the end of each reporting period; |
| | (v) delivery of a rolling thirteen-week cash flow reporting delivered on a bi-weekly basis; and |
| | (vi) delivery of a rolling budget-to-actual variance report of professional fees consistent with the reporting set forth in the RSA. |
| **Conditions Precedent to Closing and the Initial Borrowing** | The Closing Date under the DIP Facility, and the initial borrowing thereunder, shall be subject only to the following conditions to closing: |
| | (i) no later than five (5) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, and the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Commitment Parties; |
| | (ii) the preparation, authorization and execution of the DIP Facility Documents with respect to the DIP Facility, with appropriate insertions and attachments (including proper financing statements (Form UCC-1 or equivalent)), in form and substance consistent with this DIP Term Sheet and otherwise acceptable to the Loan Parties, the Commitment Parties and the DIP Agent; |
| | (iii) the delivery of a 13-week cash flow projection (the "**Initial DIP Budget**") in form and substance acceptable to the Commitment Parties, reflecting (i) the Loan Parties' anticipated cash receipts and disbursements for each calendar week during the period from the week in which the Petition Date occurs through and including the end of the thirteenth calendar week thereafter and (ii) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by professionals retained by the Loan Parties, any Official Committee (if any) (as defined below) appointed in the Chapter 11 Cases, and other professionals during the thirteen week period; |
| | (iv) the delivery of (i) a secretary's (or other officer's) certificate of the Borrower and each of the other Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments, (ii) a customary closing officer's certificate of the Borrower and (iii) a customary Perfection Certificate; |

9

(v)     all premiums (including the applicable portion of the Put Option Premium set forth in the Commitment Letter), payments, fees, costs and expenses (including, without limitation, the fees and expenses of the Lender Advisors and all other counsel, financial advisors and other professionals of the Commitment Parties and DIP Agent (whether incurred before or after the Petition Date) to the extent earned, due and owing, and including estimated fees and expenses through the Closing Date) shall have been paid; provided that any such fees and expenses of the Lender Advisors and all other counsel, financial advisors and other professionals of the Commitment Parties and DIP Agent to be paid on the Closing Date must be invoiced at least one (1) calendar day prior to the Closing Date;

(vi)    the Term DIP Lenders shall have received from the Borrower and each of the Loan Parties, at least three (3) Business Days prior to the Closing Date, to the extent requested in writing at least eight (8) Business Days prior to the Closing Date, (a) documentation and other information requested by any Commitment Party that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and (b) if the Borrower qualifies as a "legal entity customer" under the beneficial ownership regulations, the Term DIP Lenders shall have received from the Borrower, at least one Business Day prior to the Closing Date, a beneficial ownership certification in relation to the Borrower;

(vii)   the DIP Agent shall have valid, binding, enforceable, non-avoidable, and automatically and fully perfected liens on, and security interests in, the DIP Collateral to the extent required by the DIP Facility Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order;

(viii)  the Closing Date shall have occurred on or before the date that is three (3) calendar days after the date of entry of the Interim DIP Order;

(ix)    the RSA shall have been amended in a manner acceptable to the Commitment Parties and the Loan Parties (such amendment, the "**Specified RSA Amendment**"), and the RSA (as amended pursuant to the Specified RSA Amendment) shall have been executed and be in full force and effect, and no breach, default or event of default shall have occurred and be continuing thereunder;

(x)     the delivery of a borrowing notice;

(xi)    the delivery of a note executed by the Borrower in favor of each Lender that has requested a note at least two (2) Business Days in advance of the Closing Date;

(xii)   since the date of the DIP Commitment Letter, there shall have been no event, development or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect (to be defined in a manner mutually agreed);

(xiii)  the representations and warranties of each Loan Party set forth in the DIP Credit Agreement and in each other Loan Document shall be true



|  | and correct in all material respects on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; <u>provided</u> that, any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates; |
|--|--|
|  | (xiv) all first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance reasonably satisfactory to the Commitment Parties; and |
|  | (xv) no Default or Event of Default shall exist or would result from the initial borrowing or from the application of the proceeds therefrom. |
| **Events of Default** | The DIP Facility Documents will contain usual and customary events of default for facilities of this type, subject to the Documentation Principles (including grace periods and materiality qualifiers), including, without limitation (the "**Events of Default**")

(i) the Loan Parties' failure to pay professional fees when due under the DIP Facility Documents or DIP Orders, subject to a five (5) calendar day grace period;

(ii) the Closing Date shall not have occurred within five (5) Business Days of the Petition Date;

(iii) the RSA shall have been terminated; and

(iv) the Loan Parties' failure to satisfy any of the Milestones.

Upon the occurrence and during the continuation of an Event of Default, without further order from or application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent, acting at the request of the Required DIP Lenders, to (A) deliver to the Borrower a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the commitments under the DIP Facility, (C) declare the Term DIP Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Loan Parties to use any Cash Collateral, (E) terminate the DIP Facility, (F) charge the default rate of interest under the DIP Facility, (G) freeze all monies in any deposit accounts of the Loan Parties, (H) exercise any and all rights of setoff, (I) exercise any right or remedy with respect to the DIP Collateral or the Term DIP Liens, or (J) take any other action or exercise any other right or remedy permitted under the DIP Facility Documents, the DIP Orders or applicable law; <u>provided</u>, <u>however</u>, that in the case of the enforcement of rights against the DIP Collateral pursuant to <u>clauses (G)</u>, <u>(H)</u>, <u>(I)</u> and <u>(J)</u> above, (i) the DIP Agent, acting at the request of the Required DIP Lenders, shall provide counsel to the Loan Parties, counsel to the Official Committee (if any) and the Office of the United States Trustee with three (3) Business Days' prior written notice (such period, the "**Remedies** |

| | |
|---|---|
| | <u>Notice Period</u>"), and (ii) during the Remedies Notice Period, the Loan Parties and/or any Official Committee (if any) shall be permitted to request an emergency hearing before the Bankruptcy Court (which request must be made prior to the conclusion of the Remedies Notice Period and shall seek consideration of such request on an expedited basis) solely to consider on an expedited basis whether (a) an Event of Default has occurred or is continuing and (b) any appropriate relief relating to the nonconsensual use of Cash Collateral; <u>provided</u>, <u>further</u>, that in any such hearing following such notice, the only issue that may be raised by any party in opposition to the actions proposed or available to be taken by the DIP Agent shall be whether, in fact, an Event of Default has occurred and is continuing or the appropriate relief relating to the nonconsensual use of Cash Collateral; <u>provided</u>, <u>further</u>, that during the Remedies Notice Period, the Loan Parties are permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Loan Parties' businesses, as determined by the Required DIP Lenders. |
| **Stipulations, Waivers, Releases and Protections** | Upon entry of the Interim DIP Order: <br><br> 1. The Loan Parties shall stipulate to the extent, validity, security, enforceability, priority and perfection of the First Lien Credit Agreement Liens and the First Lien Claims, and that all cash of the Loan Parties constitutes "cash collateral" of the First Lien Secured Parties for purposes of section 363 of the Bankruptcy Code ("**Cash Collateral**") (subject to a challenge period for the Official Committee acceptable to the Required DIP Lenders). <br><br> 2. The Loan Parties shall waive any right to surcharge pursuant to section 506(c) of the Bankruptcy Code the DIP Collateral with respect to the Term DIP Lenders and the Prepetition First Lien Collateral with respect to the First Lien Secured Parties. <br><br> 3. The Loan Parties shall waive the equitable doctrine of "marshalling" against the DIP Collateral with respect to the Term DIP Lenders, and the Prepetition First Lien Collateral with respect to the First Lien Secured Parties. <br><br> 4. The First Lien Secured Parties shall be entitled to the benefit of section 552(b) of the Bankruptcy Code, and the Loan Parties shall waive the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the First Lien Secured Parties. <br><br> 5. The Loan Parties shall waive and forever release and discharge any and all claims and causes of action against each of the Term DIP Lenders and First Lien Secured Parties (and their respective related parties and representatives) as of the date of the applicable DIP Order. <br><br> 6. No Cash Collateral, proceeds of the DIP Facility, or any cash or other amounts may be used to (a) investigate, challenge, object to or contest the extent, validity, enforceability, security, perfection or priority of any of the Term DIP Liens, First Lien Credit Agreement Liens, Term DIP Obligations or First Lien Claims, (b) investigate or initiate any claim or cause of action against any of the Term DIP Lenders or First Lien Secured Parties, (c) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the Term DIP Lenders or the First Lien Secured |

|  | Parties, or (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the DIP Facility Documents and the DIP Orders) that are senior to or *pari passu* with the Term DIP Liens, Term DIP Superpriority Claims, the adequate protection liens or claims granted hereunder, or the First Lien Credit Agreement Liens. |
|  | 7. The Term DIP Secured Parties shall have the unqualified right to credit bid all DIP Obligations and, subject to section 363(k) of the Bankruptcy Code, the First Lien Secured Parties shall have the unqualified right to credit bid all Prepetition Secured Obligations. |
|  | 8. The Term DIP Lenders and the First Lien Secured Parties shall be entitled to good faith protection under Section 364(e) of the Bankruptcy Code. |
| **Expenses and Indemnification** | The DIP Credit Agreement shall provide for the payment of all costs and expenses of the DIP Agent and the Term DIP Lenders, including, without limitation, the payment of all reasonable and documented fees and expenses of the Lender Advisors.<br><br>The DIP Credit Agreement shall also provide for customary indemnification by each of the Loan Parties, on a joint and several basis, of each of the Term DIP Lenders (together with their related parties and representatives). |
| **Assignments** | The DIP Credit Agreement shall contain assignment provisions that are usual and customary for financings of this type and as determined in accordance with the Documentation Principles, and shall also require that each assignee or participant shall become a party to the RSA prior to or concurrently with acquiring any Term DIP Loans. |
| **Amendments** | Usual and customary for facilities of this type requiring the consent of the Required DIP Lenders, except for amendments customarily requiring approval by affected Term DIP Lenders under the DIP Facility.<br><br>"**Required DIP Lenders**" shall mean Term DIP Lenders holding greater than 50% of the aggregate amount of commitments in respect of the DIP Facility and/or Term DIP Loans. |
| **Governing Law** | This DIP Term Sheet and the DIP Facility Documents will be governed by the laws of the State of New York (except as otherwise set forth therein). During the pendency of the Chapter 11 Cases, the Bankruptcy Court shall maintain exclusive jurisdiction with respect to the interpretation and enforcement of the DIP Facility Documents and the exercise of the remedies by the Term DIP Lenders and preservation of the value of the DIP Collateral. |
| **Counsel to the Term DIP Lenders** | Paul Hastings LLP. |

**Annex I**

Interest and Certain Payments

| | |
|---|---|
| Interest Rate: | The Term DIP Loans shall be subject to one-month interest periods and bear interest at a rate per annum equal to the Adjusted SOFR Rate (subject to a floor of 3.50%) <u>plus</u> a Term SOFR Adjustment <u>plus</u> 8.00% per annum. |
| | "**Term SOFR Adjustment**" means an amount equal to 11.448 basis points. |
| Interest Payment Dates: | Interest shall be payable in arrears, with respect to any Adjusted SOFR rate borrowings, on the last day of the interest period in effect for such Adjusted SOFR rate borrowing (which shall be no longer than one month) and, with respect to any base rate borrowing, on the last business day of each month, upon any prepayment due to acceleration and at final maturity. |
| Upfront Payment: | The Borrower shall pay to the Term DIP Lenders a non-refundable upfront payment equal to 3.00% of aggregate principal amount of the DIP Facility, 1.50% of which shall be fully earned, due and payable in cash on the Closing Date and 1.50% of which shall be fully earned, due and payable in cash on the earlier of (x) any repayment of the Term DIP Loans, whether by optional prepayment, mandatory prepayment, acceleration or otherwise (it being understood that such amount shall only be paid on the Term DIP Loans so prepaid or accelerated) and (y) the Effective Date (it being understood that such amount shall apply to all Term DIP Loans upon the Effective Date). |
| Default Rate: | During the continuance of an event of default, principal, overdue interest, overdue premium and fees and other overdue amounts shall bear interest at 2.00% per annum above the rate otherwise applicable to such obligations. |
| Rate and Payment Basis: | All per annum rates shall be calculated on the basis of a year of 360 days. All amounts payable under this DIP Term Sheet will be made in Dollars. |

\*       \*       \*       \*

**Annex II**

| Priority | DIP Collateral (other than Unencumbered Assets)[1] | Unencumbered Assets | Claims |
|---|---|---|---|
| ***First*** | Carve-Out and Permitted Prior Liens | Carve-Out and Permitted Prior Liens | Carve-Out |
| ***Second*** | Term DIP Liens | Term DIP Liens | Term DIP Superpriority Claims |
| ***Third*** | First Lien Adequate Protection Liens | First Lien Adequate Protection Liens | First Lien Adequate Protection Claims |
| ***Fourth*** | First Lien Credit Agreement Liens | | |

---

[1]   "**Unencumbered Assets**" means any property or assets of the Loan Parties that is not subject to a First Lien Credit Agreement Lien.

**EXHIBIT D**

**FORM OF TRANSFER AGREEMENT JOINDER**

## FORM OF TRANSFER AGREEMENT JOINER

### Transfer Agreement Joinder

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Amended and Restated Restructuring Support Agreement, dated as of October 12, 2023 (the "**Agreement**"),[2] by and among the Company Parties and the Consenting Stakeholders, including the transferor to the Transferee of any Claims against, or Interests in, the Company (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions of the Agreement to the extent the Transferor was thereby bound, and shall be deemed a "**Consenting Stakeholder**" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of (or other actions taken in support of the Restructuring by) the Transferor if such vote was cast (or other action taken) before the effectiveness of the Transfer discussed herein.

Date Executed:

[**TRANSFEREE**]

_____
Name:
Title:

Address:

Attn:

E-mail address(es): [•]

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Loans | $[●] |

---

[2] Capitalized terms used but not otherwise defined herein shall having the meanings ascribed to such terms in the Agreement.

## **EXHIBIT E**

**FORM OF AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT JOINDER**

**FORM OF AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT
JOINER**

**Amended and Restated Restructuring Support Agreement Joinder**

This joinder (this "**Amended and Restated Restructuring Support Agreement Joinder**") to the Amended and Restated Restructuring Support Agreement, dated as of October 12, 2023 (the "**Agreement**"),[3] by and among the Company Parties and the Consenting Stakeholders, is executed and delivered by [●] (the "**Joining Party**") as of [●].

1.      _Agreement to be Bound_. The Joining Party hereby acknowledges that it has read and understands the Agreement and agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Amended and Restated Restructuring Support Agreement Joinder as _Annex A_ (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the Entities comprising the Consenting Stakeholders, as applicable.

2.      _Representations and Warranties_. The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the debt or equity interest identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations, warranties and covenants set forth in Section 11 hereof to each other Party.

3.      _Governing Law_. This Amended and Restated Restructuring Support Agreement Joinder shall be governed by the governing law set forth in the Agreement.

4.      _Notice_. All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]

[ADDRESS]

Attn: [●]

E-mail address(es): [●]

---

[3]      Capitalized terms used but not otherwise defined herein shall having the meanings ascribed to such terms in the Agreement.

IN WITNESS WHEREOF, the Joining Party has caused this Amended and Restated Restructuring Support Agreement Joinder to be executed as of the date first written above.

[**JOINING PARTY**]

By:_____
Name: [●]
Title: [●]

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Loans | $[●] |

**<u>EXHIBIT F</u>**

**NEW FIRST LIEN FACILITY TERM SHEET**

**Output Services Group, Inc.**

**New First Lien Facility Term Sheet**
**Term Sheet**

This term sheet (together with all annexes, exhibits and schedules attached hereto, this "**New First Lien Facility Term Sheet**") sets forth certain material terms of the proposed New First Lien Facility (as defined below). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Restructuring Support Agreement, dated as of August 7, 2023 (together with all annexes, exhibits and schedules attached thereto, including the Restructuring Term Sheet (as defined therein) attached thereto, in each case, as amended, supplemented or modified in accordance with its terms, the "**RSA**"), to which this New First Lien Facility Term Sheet is attached.

| | |
|---|---|
| **Facility** | Senior secured term loan credit facility (the "**New First Lien Facility**" and the loans thereunder, the "**New First Lien Loans**") in an aggregate principal amount of $50,000,000. The New First Lien Loans shall be drawn in full, subject to the conditions herein and in the New First Lien Credit Agreement (as defined below). |
| **Lenders** | Holders of First Lien Claims who elect to participate in the New First Lien Facility and the Backstop Parties, in each case, or their designees (the "**New First Lien Lenders**"). |
| **Facility Backstop** | The New First Lien Facility shall be backstopped by the Backstop Parties pursuant to the Backstop Commitment Letter. |
| **Borrower** | Output Services Group, Inc., a New Jersey corporation (the "**Borrower**"). |
| **Guarantors** | OSG Holdings, Inc., a New Jersey corporation ("**Holdings**") and all direct and indirect subsidiaries of Holdings (together with Holdings, the "**Guarantors**"; and together with the Borrower, the "**Loan Parties**"), subject to exceptions consistent with the Documentation Precedent, subject to the Documentation Principles, and other exceptions to be agreed among the New First Lien Lenders holding a majority of commitments in respect of the New First Lien Loans (the "**Required Consenting First Lien Lenders**") and the Borrower. |
| **Administrative Agent and Collateral Agent** | An entity to be appointed by the Required Consenting First Lien Lenders (as defined below), and reasonably acceptable to the Borrower, will act as sole and exclusive administrative agent and collateral agent with respect to the New First Lien Facility and will perform the duties customarily associated with such roles (in such capacities, the "**Agent**"). |
| **Collateral** | The New First Lien Facility will be secured by substantially all of the assets of the Borrower and the Guarantors, including 100% of the capital stock of first-tier non-Loan Parties, subject to exceptions consistent with the Documentation Precedent, subject to the Documentation Principles, and other exceptions to be agreed among the Required Consenting First Lien Lenders and the Borrower (the "**Collateral**"). |

|  | The New First Lien Facility shall be senior to the New Take-Back Facility, which shall be documented in the New First Lien Credit Agreement, pursuant to a payment waterfall and other terms in form and substance acceptable to the Required Consenting First Lien Lenders.<br><br>In the event that the Company secures an Optional ABL Facility, the liens securing the New First Lien Facility on the Collateral shall be junior to the liens on the Collateral consisting of inventory, receivables and other assets that customarily secure asset-based lending facilities to the extent securing the Optional ABL Facility and senior with respect to the other Collateral securing the Optional ABL Facility, pursuant to a customary "crossing-lien" intercreditor agreement to be entered into by and among the Loan Parties, the Agent and the agent for the Optional ABL Facility, which shall be in form and substance reasonably acceptable to the Required Lenders. |
|---|---|
| **Maturity** | 4.5 years from the Effective Date. |
| **Amortization** | None. |
| **Interest Rate** | The New First Lien Facility shall accrue interest at a rate equal to Term SOFR (subject to a 1.00% floor) <u>plus</u> the Term SOFR Adjustment <u>plus</u> 8.00% per annum.<br><br>"**Term SOFR Adjustment**" means an amount equal to (i) 11.448 basis points in the case of any interest period of one month, (ii) 26.161 basis points in the case of any interest period of three months and (iii) 42.826 basis points in the case of any interest period greater than three months.<br><br>During the continuance of event of default, principal, overdue interest, overdue premium and fees and other overdue amounts shall bear interest at 2.00% per annum above the rate otherwise applicable to such obligations. |
| **Commitment Payment** | The Borrower shall pay the New First Lien Lenders a non-refundable commitment payment equal to 20.00% of the Reorganized Common Equity, subject to dilution by the New Warrants and the Management Incentive Plan, which shall be payable to the New First Lien Lenders on a *pro rata* basis and which shall be fully earned, due and payable on the Effective Date. |
| **Use of Proceeds** | The proceeds from the New First Lien Loans shall be used (i) to pay fees and expenses related to the Restructuring Transactions and (ii) for general corporate purposes. |
| **Mandatory Prepayments** | The Borrower shall prepay the New First Lien Loans:<br><br>• in an amount equal to 100% of the net cash proceeds of asset sales outside the ordinary course of business consistent with the Documentation Precedent, subject to the Documentation Principles; |

|  | |
|---|---|
| | • in an amount equal to 100% of the net cash proceeds of loss events consistent with the Documentation Precedent, subject to the Documentation Principles; |
| | • in an amount equal to 50% of excess cash flow (to be defined in a manner acceptable to the Required Consenting First Lien Lenders and the Borrower), payable annually; and |
| | • in an amount equal to 100% of the net cash proceeds from certain incurrences of impermissible indebtedness consistent with the Documentation Precedent, subject to the Documentation Principles. |
| **Voluntary Prepayments** | The Borrower may prepay the New First Lien Loans, in whole or in part, together with the call protection below, subject to limitations as to minimum amounts of prepayments (and customary SOFR breakage). |
| **Call Protection** | Upon any optional prepayment or repayment or refinancing of all or a portion of the New First Lien Loans, the Borrower shall pay to the New First Lien Lenders, with respect to the New First Lien Loans subject to such event, a premium equal to: |
| | • if such event occurs from the Effective Date to, but excluding, the second anniversary thereof, a customary T + 50 "make-whole" premium; and |
| | • if such event occurs on or after the second anniversary of the Effective Date, 0%. |
| | The New First Lien Credit Agreement shall include language providing that the call protection is payable upon any acceleration or insolvency or bankruptcy proceeding or event. |
| | Notwithstanding the foregoing, in the event the Borrower enters into the Optional ABL Facility having an aggregate principal amount of commitments of not less than $25 million no later than six months following the Effective Date, the Borrower may voluntarily prepay up to $15 million in aggregate principal amount of the New First Lien Loans, subject to a prepayment premium equal to the amount of interest that would accrue from the date of such prepayment through the date that is the one-year anniversary of the Effective Date. The Borrower may not prepay the New Take-Back Loans with the proceeds of the Optional ABL Facility. |
| **Financial Covenants** | The Borrower shall maintain Liquidity (as defined below) at all times of at least $10 million (the "**Liquidity Covenant**"). The Borrower shall certify as to compliance with such minimum Liquidity Covenant on a quarterly basis. |
| | "**Liquidity**" shall mean the sum of "Liquidity (North America)" and "Liquidity (EMEA)" (each as defined in the Existing First Lien Credit Agreement). |
| | The Borrower shall be subject to a quarterly first lien net leverage financial covenant (the "**Leverage Covenant**"), to be agreed among the Required Consenting First Lien Lenders and the Borrower. |
| | Each of the Liquidity Covenant and the Leverage Covenant shall be subject to customary equity cures on the terms set forth in the Credit Agreement; provided, |

| | |
|---|---|
| | that there shall be no more than five (5) cures total with respect to the Liquidity Covenant and the Leverage Covenant in the aggregate and no more than two (2) cures with respect to the Liquidity Covenant and the Leverage Covenant in the aggregate in any four-fiscal quarter period. |
| **Rating** | The Borrower shall obtain a private rating from each of Moody's and S&P with respect to the New First Lien Facility (but no specific rating) no later than sixty (60) calendar days following the Effective Date. |
| **Affirmative and Negative Covenants** | The New First Lien Credit Agreement will contain affirmative and negative covenants that are consistent with the Documentation Precedent, subject to the Documentation Principles, with other such exceptions to be agreed among Borrower and the Required Consenting First Lien Lenders, including, without limitation, the ability to incur an asset-based revolving credit facility in an aggregate principal amount not less than $25 million. |
| **Conditions Precedent** | The New First Lien Credit Agreement will contain conditions precedents that are usual and customary for transactions of this type and satisfactory to the Borrower and the Required Consenting First Lien Lenders. |
| **Representations and Warranties** | The New First Lien Credit Agreement will contain representations and warranties that are consistent with the Documentation Precedent, subject to the Documentation Principles, with other such exceptions to be agreed among Borrower and the Required Consenting First Lien Lenders. |
| **Events of Default** | The New First Lien Credit Agreement will contain events of default that consistent with the Documentation Precedent, subject to the Documentation Principles, with other such exceptions to be agreed among Borrower and the Required Consenting First Lien Lenders. |
| **Voting** | Subject to usual and customary "sacred" rights to be agreed among the Borrower and the Required Lenders (as defined below), amendments shall require the consent of (i) New First Lien Lenders holding a majority in aggregate principal amount of the sum of unused commitments in respect of New First Lien Loans *plus* New First Lien Loans and (ii) New First Lien Lenders and New Take-Back Lenders holding a majority in aggregate principal amount of the sum of unused commitments in respect of New First Lien Loans, *plus* unused commitments in respect of New Take-Back Loans, *plus* New First Lien Loans *plus* New Take-Back Loans (such lenders referenced in clause (i) and (ii), "**Required Lenders**"); provided, that there shall not be any limitation on voting by affiliates of the Borrower; provided, further, that (a) amendments affecting only the New First Lien Facility shall only require the consent of New First Lien Lenders holding a majority in aggregate principal amount of the sum of unused commitments in respect of New First Lien Loans *plus* New First Lien Loans and (b) amendments affecting only the New Take-Back Facility shall only require the consent of New Take-Back Lenders holding a majority in aggregate principal amount of the sum of unused commitments in respect of New Take-Back Loans *plus* New Take-Back Loans. |

| | |
|---|---|
| | New First Lien Loans may not be exchanged for Indebtedness of the Borrower or its Subsidiaries or repaid from Indebtedness of the Borrower or its Subsidiaries (other than a repayment in full), unless each New First Lien Lender is offered an opportunity to participate in such exchange or refinancing on substantially the same terms. |
| | New First Lien Loans may not be subordinated in right of payment (including via any payment waterfall) and the liens securing the New First Lien Loans may not be subordinated, except (i) in connection with a debtor-in-possession financing, (ii) with respect to certain operational liens, such as liens securing capital leases and (iii) in a transaction in which each New First Lien Lender is offered an opportunity to participate in such senior financing on substantially the same terms. |
| **Documentation** | The New First Lien Facility will be evidenced by a credit agreement (the "**New First Lien Credit Agreement**"), and the related notes (if any), security agreements, pledge agreements, control agreements, guarantees, mortgages and other legal documentation or instruments required to be delivered in connection with the foregoing by the Required Consenting First Lien Lenders (collectively, the "**New First Lien Documents**"), in each case, based on the Existing First Lien Credit Agreement and other Existing First Lien Documents (the "**Documentation Precedent**"), in each case, after giving effect to the terms of this New First Lien Facility Term Sheet and in form and substance acceptable to the Loan Parties and the Required Consenting First Lien Lenders.<br><br>The New First Lien Documents shall contain terms and conditions customary for senior secured financing agreements of this size and industry and consistent with this New First Lien Facility Term Sheet and shall otherwise be in form and substance satisfactory to the Agent, the Required Consenting First Lien Lenders, and the Borrower.<br><br>The New First Lien Documents will be negotiated in good faith within a reasonable time period to be determined based on the expected date on which the Restructuring is to be consummated. The agreements set forth in this section are, collectively, the "**Documentation Principles**".<br><br>The New First Lien Facility shall be documented in the same credit agreement as the New Take-Back Facility. |
| **Governing Law** | New York |
| **Counsel to the Agent and the Lenders** | Paul Hastings LLP |

**EXHIBIT G**

**NEW TAKE-BACK DEBT FACILITY TERM SHEET**

**Output Services Group, Inc.**

**New Take-Back Debt Term Sheet**

This term sheet (together with all annexes, exhibits and schedules attached hereto, this "**New Take-Back Debt Term Sheet**") sets forth certain material terms of the proposed New Take-Back Facility (as defined below). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Credit Agreement and the Restructuring Support Agreement, dated as of August 7, 2023 (together with all annexes, exhibits and schedules attached thereto, including the Restructuring Term Sheet (as defined therein) attached thereto, in each case, as amended, supplemented or modified in accordance with its terms, the "**RSA**"), to which this New Take-Back Debt Term Sheet is attached.

| | |
|---|---|
| **Facility** | Senior secured term loan credit facility (the "**New Take-Back Facility**" and the loans thereunder, the "**New Take-Back Loans**") in an aggregate principal amount of $135,000,000, which shall be issued on the Effective Date to holders of First Lien Claims (or their designees) on a *pro rata* basis. |
| **Lenders** | Holders of First Lien Claims (or their designees) as of the Effective Date (the "**New Take-Back Lenders**"). |
| **Borrower** | "Borrower" as defined in the New First Lien Facility Term Sheet. |
| **Guarantors** | "Guarantors" as defined in the New First Lien Facility Term Sheet. |
| **Administrative Agent and Collateral Agent** | "Agent" as defined in the New First Lien Facility Term Sheet. |
| **Collateral** | The New Take-Back Facility will be secured by the same collateral as the New First Lien Facility (the "**Collateral**"). <br><br> The New Take-Back Facility shall be junior to the New First Lien Facility, which shall be documented in the New Take-Back Credit Agreement pursuant to a payment waterfall and other terms in form and substance acceptable to the Required Consenting Second Out Lenders. <br><br> In the event that the Company secures an Optional ABL Facility, the liens securing the New Take-Back Facility on the Collateral shall be junior to the liens on the Collateral consisting of inventory, receivables and other assets that customarily secure asset-based lending facilities to the extent securing the Optional ABL Facility and senior with respect to the other Collateral securing the Optional ABL Facility, pursuant to a customary "crossing-lien" intercreditor agreement to be entered into by and among the Loan Parties, the Agent and the agent for the Optional ABL Facility, which shall be in form and substance reasonably acceptable to the Required Lenders. |
| **Maturity** | 5 years from the Effective Date. |

| | |
|---|---|
| **Amortization** | None. |
| **Interest Rate** | The New Take-Back Facility shall accrue interest at a rate equal to Term SOFR (subject to a 1.00% floor) <u>plus</u> the Term SOFR Adjustment <u>plus</u> 6.25% per annum; <u>provided</u>, that the Borrower may elect to pay interest accruing at 4.75% per annum in kind by increasing the aggregate principal amount of the New Take-Back Loans.<br><br>"**Term SOFR Adjustment**" means an amount equal to (i) 11.448 basis points in the case of any interest period of one month, (ii) 26.161 basis points in the case of any interest period of three months and (iii) 42.826 basis points in the case of any interest period greater than three months.<br><br>During the continuance of event of default, principal, overdue interest, overdue premium and fees and other overdue amounts shall bear interest at 2.00% per annum above the rate otherwise applicable to such obligations. |
| **Mandatory Prepayments** | • Same as the New First Lien Credit Agreement, subject to payment in full of the New First Lien Facility. |
| **Voluntary Prepayments** | The Borrower may prepay the New Take-Back Loans, in whole or in part, together with the call protection below, subject to limitations as to minimum amounts of prepayments (and customary SOFR breakage). |
| **Call Protection** | Upon any optional prepayment or repayment or refinancing of all or a portion of the New Take-Back Loans, the Borrower shall pay to the New Take-Back Lenders, with respect to the New Take-Back Loans subject to such event, a premium equal to:<br><br>• if such event occurs from the Effective Date to, but excluding, the second anniversary thereof, a customary T + 50 "make-whole" premium; and<br><br>• if such event occurs on or after the second anniversary of the Effective Date, 0%.<br><br>The New Take-Back Credit Agreement shall include language providing that the call protection is payable upon any acceleration or insolvency or bankruptcy proceeding or event.<br><br>The New Take-Back Loans shall not be prepaid from the proceeds of the Optional ABL Facility. |
| **Financial Covenants** | Same as the New First Lien Credit Agreement. |
| **Rating** | The Borrower shall obtain a private rating from each of Moody's and S&P with respect to the New Take-Back Facility (but no specific rating) no later than sixty (60) calendar days following the Effective Date. |
| **Affirmative and Negative** | Same as the New First Lien Credit Agreement. |

| | |
|---|---|
| **Covenants** | |
| **Conditions Precedent** | Same as the New First Lien Credit Agreement. |
| **Representations and Warranties** | Same as the New First Lien Credit Agreement. |
| **Events of Default** | Same as the New First Lien Credit Agreement. |
| **Voting** | Subject to usual and customary "sacred" rights to be agreed among the Borrower and the Required Lenders (as defined below), amendments shall require the consent of (i) New First Lien Lenders holding a majority in aggregate principal amount of the sum of unused commitments in respect of New First Lien Loans *plus* New First Lien Loans and (ii) New First Lien Lenders and New Take-Back Lenders holding a majority in aggregate principal amount of the sum of unused commitments in respect of New First Lien Loans, *plus* unused commitments in respect of New Take-Back Loans, *plus* New First Lien Loans *plus* New Take-Back Loans (such lenders referenced in clause (i) and (ii), "**Required Lenders**"); <u>provided</u>, that there shall not be any limitation on voting by affiliates of the Borrower; <u>provided</u>, <u>*further*</u>, that (a) amendments affecting only the New First Lien Facility shall only require the consent of New First Lien Lenders holding a majority in aggregate principal amount of the sum of unused commitments in respect of New First Lien Loans *plus* New First Lien Loans and (b) amendments affecting only the New Take-Back Facility shall only require the consent of New Take-Back Lenders holding a majority in aggregate principal amount of the sum of unused commitments in respect of New Take-Back Loans *plus* New Take-Back Loans. <br><br> New Take-Back Loans may not be exchanged for Indebtedness of the Borrower or its Subsidiaries or repaid from Indebtedness of the Borrower or its Subsidiaries (other than a repayment in full), unless each New Take-Back Lender is offered an opportunity to participate in such exchange or refinancing on substantially the same terms. <br><br> New Take-Back Loans may not be subordinated in right of payment (including via any payment waterfall) and the liens securing the New Take-Back Loans may not be subordinated, except (i) in connection with a debtor-in-possession financing, (ii) with respect to certain operational liens, such as liens securing capital leases and (iii) in a transaction in which each New Take-Back Lender is offered an opportunity to participate in such senior financing on substantially the same terms. |
| **Documentation** | The New Take-Back Facility shall be documented in the same credit agreement as the New First Lien Facility and shall contain terms and conditions customary for senior secured financing agreements of this size and industry and consistent with this New Take-Back Debt Term Sheet and shall otherwise be in form and substance satisfactory to the Agent, the Required Consenting Second Out Lenders, and the Borrower. |

| | The foregoing documents will be negotiated in good faith within a reasonable time period to be determined based on the expected date on which the Restructuring is to be consummated. The agreements set forth in this section are, collectively, the "**Documentation Principles**". |
|---|---|
| **Governing Law** | New York |
| **Counsel to the Agent and the Lenders** | Paul Hastings LLP |

# EXHIBIT H

**RIGHTS OFFERING PROCEDURES**

## RIGHTS OFFERING PROCEDURES

To Eligible Holders:

**1.    Introduction**

Output Services Group, Inc. ("OSG") and certain of its subsidiaries (together with OSG, each, a "Company Entity" and, collectively, the "Company Entities") have entered into that certain Amended and Restated Restructuring Support Agreement, dated as of October 12, 2023, by and among the Company Entities, certain affiliates of the Company Entities party thereto, and the "Consenting Stakeholders" (as defined therein) party thereto from time to time (together with any schedules, exhibits and annexes thereto, the "Restructuring Support Agreement"). Capitalized terms used in these Rights Offering Procedures (as may be amended from time to time in accordance with the terms set forth herein and in the Restructuring Support Agreement, these "Rights Offering Procedures") and not defined in these Rights Offering Procedures shall have the meanings given to such terms in the Restructuring Support Agreement.

Pursuant to the Restructuring Support Agreement, the Company Parties and the Consenting Stakeholders agreed, among other things, to pursue and implement a restructuring and recapitalization transaction with respect to the Company Entities through the consummation of the Plan (such restructuring and recapitalization transaction, as further defined in the Restructuring Support Agreement, the "Restructuring") by having the Company Entities commence voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "Chapter 11 Cases"), on the terms and subject to the conditions set forth in the Restructuring Support Agreement (including the Plan and the Term Sheets). In connection with, and as part of, the Restructuring, the Company Entities are conducting the Rights Offering, on the terms and subject to the conditions set forth in these Rights Offering Procedures. Please be advised that there can be no assurance that the Restructuring will be implemented at all.

The Plan and the Disclosure Statement are being distributed in connection with the Company Entities' solicitation of votes to accept or reject the Plan, and those documents set forth important information, including risk factors, that should be carefully read and considered by each of the Eligible Holders (as defined below) prior to making a decision to participate in the Rights Offering. Additional copies of the Plan, the Disclosure Statement, the Restructuring Support Agreement and these Rights Offering Procedures are available upon request from Kurtzman Carson Consultants LLC (the "Solicitation Agent").

Upon the filing of the Chapter 11 Cases, the Rights Offering is expected to be deemed to be conducted by the Company Entities in good faith and in compliance with the Bankruptcy Code. In accordance with section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.

1

## 2.     The Rights Offering

Pursuant to the Restructuring Support Agreement, each holder of First Lien Claims as of October 10, 2023 (the "Rights Offering Record Date") that is an "accredited investor" within the meaning of Rule 501 of the Securities Act (an "Accredited Investor") (each, an "Eligible Holder" and, collectively, the "Eligible Holders") is hereby offered the right to participate in the Rights Offering in accordance with the terms and subject to the conditions set forth in these Rights Offering Procedures.

Prior to the consummation of the Restructuring, each Eligible Holder will receive rights to elect (the "Election Rights") to provide up to its *pro rata* share of New First Lien Loan Commitments in an aggregate amount equal to $25.0 million (the "Rights Offering Amount") and, in connection therewith, to receive its *pro rata* share of twenty percent (20.0%) of the Reorganized Common Equity that will be issued and outstanding on the Effective Date (immediately after giving effect to the consummation of the transactions contemplated by Restructuring to occur on or as of the Effective Date, including all payments and distributions to be made on or as of the Effective Date) (the "New Money Reorganized Equity"), subject to dilution by the Management Incentive Plan. An Eligible Holder may elect to provide all or any portion of such Eligible Holder's *pro rata* share of the Rights Offering. An Eligible Holder's "*pro rata*" share of the Rights Offering, the Rights Offering Amount, or the New First Lien Loan Commitments that such Eligible Holder can elect to provide by timely and validly exercising its Election Rights in the Rights Offering shall be equal to the proportion that the aggregate principal amount of such Eligible Holder's First Lien Loans as of the Rights Offering Record Date bears to the aggregate principal amount of all outstanding First Lien Loans as of the Rights Offering Record Date (whether held by such Eligible Holder or otherwise). An Eligible Holder's "*pro rata*" share of the New Money Reorganized Equity that such Eligible Holder will receive in connection with the timely and valid exercise of its Election Rights in the Rights Offering shall be equal to the proportion that the New First Lien Loan Commitments that such Eligible Holder elects to provide pursuant to such exercise bears to the New First Lien Facility Amount (*i.e.*, $50.0 million).

To validly participate in the Rights Offering, Eligible Holders must (a) deliver (i) a properly completed and duly executed Election Form attached hereto as Annex C (the "Election Form"), (ii) properly completed and duly executed signature pages to each of (A) the New Credit Agreement (as defined in the Plan), a copy of which will be included with the Plan Supplement and (B) the A&R LLC Agreement (as defined in the Plan), a copy of which will be included with the Plan Supplement (collectively, the "Execution Documents"), (iii) a properly completed and duly executed Accredited Investor Questionnaire (a form of which is attached as Exhibit D to the Election Form) (an "AI Questionnaire"), and (iv) a properly completed and duly executed IRS Form W-9 or an appropriate IRS Form W-8, as applicable, in each case to the Solicitation Agent so that all of the foregoing are *actually received* by the Solicitation Agent no later than the Election Deadline (as defined below), and (b) fund, or cause to be funded, such Eligible Holder's Aggregate Commitment Amount (as defined below) to the Solicitation Agent by wire transfer of immediately available funds in accordance with the instructions included in the Election Form so that such Aggregate Commitment Amount is *actually received* by the Solicitation Agent no later than the Funding Deadline (as defined below). For your convenience, signature pages to the Execution Documents are attached as Exhibit C to the Election Form. Notwithstanding anything to the contrary herein, each Eligible Holder that is a Backstop Related Party (as defined below) must

fund, or cause to be funded, its Aggregate Commitment Amount no later than the deadline for such funding set forth in the Backstop Commitment Letter.  Please see Section 7 of <u>Annex B</u> attached hereto for additional requirements related to Rights Offering Designees (as defined below).

There will be no over-subscription privilege in the Rights Offering.  Any New First Lien Loan Commitments made available in the Rights Offering that are not provided by Eligible Holders or their Rights Offering Designees in the Rights Offering (such New First Lien Loan Commitments, as further defined in the Backstop Commitment Letter, the "<u>Unelected Commitments</u>") will not be made available to other Eligible Holders, but rather will be put to and provided by (on a several and not joint basis) the Backstop Parties, subject to the terms, conditions and limitations of the Backstop Commitment Letter.

**The delivery to the Solicitation Agent of an Eligible Holder's executed Election Form (including the elections set forth therein) and executed signature pages to the Execution Documents shall be irrevocable <u>unless</u> the Restructuring Support Agreement is terminated in accordance with its terms (other than a termination that occurs upon the occurrence of the consummation of the Restructuring) or the Restructuring Support Agreement would have terminated in accordance with its terms but for the automatic stay of section 362 of the Bankruptcy Code.  The Execution Documents may be modified or changed after the date hereof and prior to the Effective Date upon mutual agreement between the Company Entities and the Required Consenting First Lien Lenders, subject to the terms and conditions of the Restructuring Support Agreement.  If any of the Execution Documents is modified or changed after the date hereof and prior to the Effective Date, then the Company Entities will use reasonable efforts to notify Eligible Holders in writing of such modification or change; *provided, however*, that no such modification or change shall permit an Eligible Holder to revoke its executed and delivered Election Form (including the elections set forth therein) and signature pages to the Execution Documents (all of which shall remain irrevocable, except as set forth above).  The terms of this paragraph shall apply equally and in the same manner to Rights Offering Designees, to the extent applicable.**

On the Effective Date, without any further action on the part of, or notice to, any Person, (<u>x</u>) an Eligible Holder's executed signature pages to the Execution Documents shall be deemed automatically released and attached to the Execution Documents, (<u>y</u>) the Execution Documents shall be dated as of the Effective Date, all matters of fact or other informational matters called for by, or to be included in, any of the Execution Documents shall be inserted therein, and the Execution Documents shall become effective, and (<u>z</u>) an Eligible Holder that has executed signature pages to the Execution Documents shall become a party to the Execution Documents and be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the Execution Documents as a party thereto.  The terms of this paragraph shall apply equally and in the same manner to Rights Offering Designees, to the extent applicable.

### 3.    The Backstop

The Rights Offering will be backstopped by the Backstop Parties pursuant to the terms of the Backstop Commitment Letter.  Pursuant to the Backstop Commitment Letter, each of the Backstop Parties has agreed, severally and not jointly, to provide OSG with the right to require each Backstop Party to provide (or cause to be provided), on the Effective Date, New First Lien Loan Commitments in an amount equal to such Backstop Party's Commitment Percentage (as

3

defined in the Backstop Commitment Letter) of all Unelected Commitments, subject to the terms, limitations and conditions set forth in the Backstop Commitment Letter.

As consideration for the right to require each Backstop Party, severally and not jointly, to provide (or cause to be provided), on the Effective Date, New First Lien Loan Commitments pursuant to the Backstop Commitment Letter, OSG shall be required to pay (or cause to be paid) to each Backstop Party (or, by direction of such Backstop Party, to its Backstop Designee(s) (as defined in the Backstop Commitment Letter)) its *pro rata* share of a nonrefundable put option premium in an aggregate amount equal to $7,500,000 (such amount, the "Put Option Premium"). OSG shall be obligated to pay (or cause to be paid) the Put Option Premium on the Effective Date in the form of Reorganized Common Equity by delivering to the Backstop Parties (and/or their respective Backstop Designees) a portion of such Reorganized Common Equity to which the Backstop Parties are entitled to receive pursuant to the Backstop Commitment Letter. For purposes of determining the amount of Reorganized Common Equity that will be delivered as payment of the Put Option Premium, such determination will be made using a total equity value of New TopCo equal to the midpoint valuation set forth in the Disclosure Statement (the "Assumed Equity Value"). Notwithstanding the foregoing, if the Backstop Commitment Letter is terminated for any reason (other than as a result of a Specified Event (as defined in the Backstop Commitment Letter)), then the Company Entities shall pay the Put Option Premium to the Backstop Parties (or, by direction, to their respective Backstop Designee(s)) in full in cash no later than three (3) Business Days following the date of any such termination.

**4.    Aggregate Commitment Amount**

Subject to the terms and conditions set forth in these Rights Offering Procedures, each Eligible Holder is entitled to elect to provide New First Lien Loan Commitments in an aggregate amount of up to the amount equal to the product of (a) such Eligible Holder's *pro rata* share of the Rights Offering and (b) the Rights Offering Amount. The aggregate amount of New First Lien Loan Commitments that an Eligible Holder elects to provide in accordance with these Rights Offering Procedures shall be referred to as such Eligible Holder's "Aggregate Commitment Amount".

An Eligible Holder (other than a Backstop Related Party) that elects to provide New First Lien Loan Commitments by timely and validly exercising its Election Rights must fund, or cause to be funded, its Aggregate Commitment Amount to the Solicitation Agent no later than the Funding Deadline. An Eligible Holder that is a Backstop Related Party that elects to provide New First Lien Loan Commitments by timely and validly exercising its Election Rights must fund, or cause to be funded, its Aggregate Commitment Amount to the Solicitation Agent no later than the deadline for such funding set forth in the Backstop Commitment Letter. The Company Entities agree that the provisions of Section 1(d) of the Backstop Commitment Letter shall apply to all Backstop Related Parties with respect to the funding of their respective Aggregate Commitment Amounts. A "Backstop Related Party" means (i) a Backstop Party, (ii) an Affiliate of any Backstop Party, or (iii) any Person who (A) is a holder of First Lien Claims as of the Rights Offering Record Date, (B) is an Accredited Investor, and (C) has entered into any trade, agreement or other arrangement to sell or otherwise transfer any First Lien Loans to a Backstop Party or an Affiliate of a Backstop Party and exercises the related Election Rights in the name of such Person, but on behalf of such Backstop Party or such Affiliate, solely in such Person's capacity as described in this clause (iii).

4

For additional information, please review the following timeline of important dates related to the Rights Offering (attached hereto as <u>Annex A</u>), as well as the additional steps and procedures applicable to the Rights Offering (attached hereto as <u>Annex B</u>).

**5.     Pro Forma Ownership**

Subject to the provisions in <u>Annex B</u> attached hereto relating to fractional units of Reorganized Common Equity, an Eligible Holder that elects to provide New First Lien Loan Commitments by timely and validly exercising its Election Rights shall receive, on the Effective Date, its *pro rata* share of the New Money Reorganized Equity.

On the Effective Date (immediately after giving effect to the consummation of the transactions contemplated by the Restructuring to occur on or as of the Effective Date, including all payments and distributions to be made on or as of the Effective Date), the issued and outstanding Reorganized Common Equity will be owned as follows:  (<u>a</u>) an aggregate of ten percent (10.0%) of the issued and outstanding Reorganized Common Equity will be owned by (<u>i</u>) Eligible Holders (and/or their respective Rights Offering Designee(s)) that elect to provide New First Lien Loan Commitments pursuant to the timely and valid exercise of their respective Election Rights in the Rights Offering and (<u>ii</u>) the Backstop Parties (and/or their respective Backstop Designee(s)) on account of New First Lien Loan Commitments provided by the Backstop Parties (and/or their respective Backstop Designee(s)) pursuant to their respective Backstop Commitments (as defined in the Backstop Commitment Letter) under the Backstop Commitment Letter, (<u>b</u>) an aggregate of ten percent (10.0%) of the issued and outstanding Reorganized Common Equity will be owned by the Backstop Parties (and/or their respective Backstop Designee(s)) on account of New First Lien Loan Commitments provided by the Backstop Parties (and/or their respective Backstop Designee(s)) pursuant to their respective Direct Allocation Commitments (as defined in the Backstop Commitment Letter) under the Backstop Commitment Letter, (<u>c</u>) a percentage of Reorganized Common Equity equal to the quotient obtained by dividing the Put Option Premium by the Assumed Equity Value will be owned by the Backstop Parties (and/or their respective Backstop Designee(s)) on account of the Put Option Premium, and (<u>d</u>) a percentage of Reorganized Common Equity equal to one hundred percent (100.0%) minus the sum of the percentages set forth in <u>clauses (a)</u> through <u>(c)</u> of this sentence will be owned by the holders of First Lien Claims as of the Effective Date (and/or their respective designee(s)), in each case subject to dilution by the Management Incentive Plan.

Prior to the Effective Date, the Company Entities and the Requisite Parties (as defined below) will work together in good faith to determine and/or calculate (<u>A</u>) the total number of units of Reorganized Common Equity that will be issued and outstanding on the Effective Date (immediately after giving effect to the consummation of the transactions contemplated by the Restructuring to occur on or as of the Effective Date, including all payments and distributions to be made on or as of the Effective Date), and (<u>B</u>) any other amount or figure that is relevant to the Rights Offering.  As soon as reasonably practicable after such determinations and/or calculations are made and agreed upon between the Company Entities and the Requisite Parties, the Company Entities shall deliver a written notice thereof to all Eligible Holders that participated in the Rights Offering.  The term "<u>Requisite Parties</u>" shall mean, as of any time of determination, the Required Consenting First Lien Lenders and the Required Backstop Parties as of such time.

**6.      Certain Transfer and Resale Restrictions**

The Rights Offering is being conducted without registration under the Securities Act, in reliance upon (to the extent applicable) Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder (or another applicable exemption under the Securities Act) and in compliance with any applicable state or local laws pursuant to registration or exemption therefrom. Please be advised that New Money Reorganized Equity will be subject to dilution following the Effective Date by, among other things, Reorganized Common Equity issued under the Management Incentive Plan.

None of the Election Rights or the New Money Reorganized Equity issuable upon exercise of the Election Rights have been or will be registered under the Securities Act, or any state or local law requiring registration for offer and sale of a security. Accordingly, each book-entry interest evidencing Election Rights or New Money Reorganized Equity and each book-entry interest issued in exchange for or upon the transfer, sale or assignment of any such securities, shall include a restrictive notation or legend in substantially the following form or containing substantively similar language:

THE OFFER AND SALE OF THIS SECURITY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND THIS SECURITY MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED, OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER AND APPLICABLE STATE SECURITIES LAWS.

Further, the New Money Reorganized Equity may be deemed "restricted securities" (as defined in Rule 144(a)(3) under the Securities Act). Resale restrictions are discussed in more detail in Article VIII of the Disclosure Statement, entitled "Important Securities Law Disclosure."

**7.      Important Dates; Additional Procedures**

Please review the following timeline of important dates related to the Rights Offering (attached hereto as Annex A), as well as the additional steps and procedures applicable to the Rights Offering (attached hereto as Annex B). Each Eligible Holder should also carefully review and strictly follow the Election Form, including completing the AI Questionnaire.

Questions relating to the Rights Offering should be directed to the Solicitation Agent via email to OutputServices@kccllc.com.

## ANNEX A

### IMPORTANT DATES

Eligible Holders should note the following important dates and times relating to the Rights Offering when considering whether or not to participate in the Rights Offering:

| Date | Calendar Date | Event |
|---|---|---|
| Rights Offering Record Date……………… | October 10, 2023. | The date for the determination of the holders of First Lien Claims that may be entitled to participate in the Rights Offering. |
| Election Commencement Date……. | October 13, 2023. | The date for the commencement of the Rights Offering (the "Election Commencement Date"). |
| Election Deadline………... | 5:00 p.m., Eastern Time, on November 13, 2023, unless extended as described herein. | The deadline for Eligible Holders to elect to provide New First Lien Loan Commitments by exercising Election Rights (the "Election Deadline"). The properly completed and duly executed Election Form (together with signature pages to the Execution Documents, an AI Questionnaire, and an IRS Form W-9 or an appropriate IRS Form W-8, as applicable) of an Eligible Holder must be *actually received* by the Solicitation Agent no later than the Election Deadline. |
| Funding Deadline………... | 5:00 p.m., Eastern Time, on November 13, 2023, unless extended as described herein. | The deadline by which an Eligible Holder (other than a Backstop Related Party) that elects to provide New First Lien Loan Commitments by exercising Election Rights must fund, by wire transfer of immediately available funds, its Aggregate Commitment Amount to the Solicitation Agent (the "Funding Deadline"). An Eligible Holder that **is** a Backstop Related Party and elects to provide New |

| Date | Calendar Date | Event |
|------|---------------|-------|
| | | First Lien Loan Commitments by exercising Election Rights must fund, by wire transfer of immediately available funds, its Aggregate Commitment Amount to the Solicitation Agent no later than the deadline for such funding set forth in the Backstop Commitment Letter. |
| Settlement Date………….. | Substantially contemporaneously with the Effective Date. | The date on which Eligible Holders that participate in the Rights Offering (and/or their respective Rights Offering Designee(s)) will be deemed to have made the New First Lien Loans to OSG and receive their respective *pro rata* shares of the New Money Reorganized Equity. |

## ANNEX B

### ADDITIONAL STEPS AND PROCEDURES

**In order to participate in the Rights Offering, an Eligible Holder must complete all of the steps outlined below.  If all of the steps outlined below are not completed by the relevant deadline, as applicable, an Eligible Holder shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering.  Please carefully review these Rights Offering Procedures in their entity.**

**1.      Election Period**

The Rights Offering will commence on the Election Commencement Date and will expire at the Election Deadline.  Each Eligible Holder intending to provide New First Lien Loan Commitments in the Rights Offering must affirmatively elect to exercise its Election Rights in the manner set forth in the Election Form by the Election Deadline.

Any exercise of Election Rights by an Eligible Holder after the Election Deadline will not be allowed and any purported exercise received by the Solicitation Agent after the Election Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored, except that the Company Entities shall have the discretion, with the prior written consent of the Requisite Parties, which consent may be delivered via email, to allow any exercise of Election Rights after the Election Deadline.

The Election Deadline may be extended by the Company Entities with the prior written consent of the Requisite Parties or as required by law.  Any such extension will be followed by an announcement distributed through the Solicitation Agent on and during the next Business Day after the day on which the previously scheduled Election Deadline occurred.

**2.      Delivery of Election Documents**

Beginning on the Election Commencement Date, the Election Form and these Rights Offering Procedures will be sent to each holder of First Lien Claims as of the Rights Offering Record Date, which include appropriate instructions for the proper completion, due execution and timely delivery of the executed Election Form and the funding of an Eligible Holder's Aggregate Commitment Amount.  Delivery of the Election Form, these Rights Offering Procedures and instructions is being made to all holders of First Lien Claims as of the Rights Offering Record Date for administrative and convenience purposes.  Notwithstanding such delivery, only Eligible Holders shall be permitted to participate in the Rights Offering, subject to the terms and conditions of these Rights Offering Procedures.

**3.      Exercise of Election Rights**

Each Eligible Holder may exercise all or any portion of such Eligible Holder's Election Rights, but subject to the terms and conditions contained herein.

9

In order to validly exercise its Election Rights, each Eligible Holder (including each Eligible Holder that is a Backstop Related Party) must:

i.   deliver (A) a properly completed and duly executed Election Form, (B) properly completed and duly executed signature pages to each of (x) the New Credit Agreement and (y) the A&R LLC Agreement, (C) a properly completed and duly executed AI Questionnaire, and (D) a properly completed and duly executed IRS Form W-9 or an appropriate IRS Form W-8, as applicable, in each case to the Solicitation Agent so that all of the foregoing are *actually received* by the Solicitation Agent no later than the Election Deadline; and

ii.  fund, or cause to be funded, such Eligible Holder's Aggregate Commitment Amount to the Solicitation Agent by wire transfer of immediately available funds in accordance with the instructions included in the Election Form so that such Aggregate Commitment Amount is *actually received* by the Solicitation Agent no later than the Funding Deadline.  Notwithstanding anything to the contrary herein, each Eligible Holder that is a Backstop Related Party must fund, or cause to be funded, its Aggregate Commitment Amount no later than the deadline for such funding set forth in the Backstop Commitment Letter.

The execution and delivery by a Rights Offering Designee of a signature page to the New Credit Agreement shall relieve any requirement or obligation of the applicable Eligible Holder to execute and deliver a signature page to the New Credit Agreement if no New First Lien Loan Commitments (and related New First Lien Loans) will be provided by such Eligible Holder.  The execution and delivery by a Rights Offering Designee of a signature page to the A&R LLC Agreement shall relieve any requirement or obligation of the applicable Eligible Holder to execute and deliver a signature page to the A&R LLC Agreement if no New Money Reorganized Equity will be delivered to such Eligible Holder.

### 4.   Commitment Amounts

(a)   In the event that the funds received from any Eligible Holder (or any of its Rights Offering Designees) exceed the Aggregate Commitment Amount validly elected to be provided by such Eligible Holder in such Eligible Holder's Election Form (*i.e.*, an overpayment), the New First Lien Loan Commitments (and related New First Lien Loans) provided by such Eligible Holder will be equal to the Aggregate Commitment Amount in such Eligible Holder's Election Form up to such Eligible Holder's *pro rata* share of the Rights Offering Amount.  In the event that the funds received from any Eligible Holder (other than a Backstop Related Party) (or any of its Rights Offering Designees) are less than the Aggregate Commitment Amount in such Eligible Holder's Election Form (*i.e.*, an underpayment), then the New First Lien Loan Commitments that such Eligible Holder elected to provide in such Eligible Holder's Election Form will be deemed to be Unelected Commitments unless otherwise agreed to by the Required Backstop Parties.

(b)   The amounts funded to the Solicitation Agent in accordance with these Rights Offering Procedures will be deposited and held by the Solicitation Agent in a segregated account held in a financial institution designated by the Solicitation Agent until (i) released to OSG on the

Effective Date or (ii) returned to the Eligible Holders as required by Section 6 of this Annex B. The Solicitation Agent shall not use such funds for any other purpose prior to the Effective Date and shall not encumber or permit such funds to be encumbered with any lien or similar encumbrance. None of the funds held by the Solicitation Agent hereunder shall be deemed part of the Company Entities' bankruptcy estates.

### 5. Election Rights' Transfer Restrictions; Revocation

The Election Rights are not transferable or assignable and may only be exercised by Eligible Holders. Notwithstanding the foregoing, any Eligible Holder may transfer or assign any Election Rights after the Rights Offering Record Date to an Affiliate of such Eligible Holder that is also an Accredited Investor. Following any such transfer or assignment to such an Affiliate of such an Eligible Holder, such Affiliate shall be, and shall be deemed to be, the Eligible Holder with respect to such Election Rights, including for purposes of making the applicable certifications in the Election Form and AI Questionnaire (which shall include certifications with respect to the First Lien Loan Principal Amount (as defined in the Election Form) of the First Lien Loans to which such Election Rights relate).

For the avoidance of doubt, any permitted transferor or assignor of Election Rights (a "Permitted Transferor") and any permitted transferee or assignee of Election Rights (a "Permitted Transferee") shall be permitted to complete and return the Election Form, including the AI Questionnaire, to the Solicitation Agent by the Election Deadline.

Once an Eligible Holder has properly exercised its Election Rights, subject to the terms and conditions contained in these Rights Offering Procedures, such exercise will be irrevocable.

### 6. Termination/Return of Payment

All exercises of Election Rights are subject to and conditioned upon the consummation of the Restructuring. Eligible Holders (or their respective Rights Offering Designees) will only provide New First Lien Loan Commitments pursuant to the exercise of their respective Election Rights, fund New First Lien Loans pursuant to such New First Lien Loan Commitments, and receive New Money Reorganized Equity, in any such case upon the substantially contemporaneous consummation of the Restructuring.

In the event that the Restructuring Support Agreement is terminated in accordance with its terms (other than a termination that occurs upon the occurrence of the consummation of the Restructuring) or in the event that the Restructuring Support Agreement would have terminated in accordance with its terms but for the automatic stay of section 362 of the Bankruptcy Code, the Solicitation Agent shall return all funds received from Eligible Holders (or their respective Rights Offering Designees), without interest, as soon as reasonably practicable after such occurrence, but in any event, within five (5) Business Days after such occurrence. If funds received by the Solicitation Agent from any Eligible Holder (or its Rights Offering Designees) in respect of its Aggregate Commitment Amount exceed the Aggregate Commitment Amount elected to be provided by such Eligible Holder in such Eligible Holder's Election Form, then the Solicitation Agent shall return such excess amount to (or at the direction of) such Eligible Holder as soon as

reasonably practicable after the consummation of the Restructuring, but in any event within five (5) Business Days after the consummation of the Restructuring.  In the event that the funds received by the Solicitation Agent from any Eligible Holder (other than a Backstop Related Party) (or its Rights Offering Designees) are less than the Aggregate Commitment Amount in such Eligible Holder's Election Form and, as a result thereof, the New First Lien Loan Commitments that such Eligible Holder elected to provide by exercising its Election Rights are deemed to be Unelected Commitments, then the Solicitation Agent shall return such funds to (or at the direction of) such Eligible Holder as soon as reasonably practicable after the consummation of the Restructuring, but in any event within five (5) Business Days after the consummation of the Restructuring.

Without limiting the foregoing, the Aggregate Commitment Amount of a Backstop Related Party will also be returned to such Backstop Related Party, or at the direction of such Backstop Related Party, if such return is required by the terms of the Backstop Commitment Letter.  The Company Entities agree that the provisions of Section 1(d) of the Backstop Commitment Letter shall apply to all Backstop Related Parties with respect to the return of their respective Aggregate Commitment Amounts.

7.    **Rights Offering Designees**

An Eligible Holder shall have the right to designate any Rights Offering Designee to provide, receive, take delivery of, or have registered in its name some or all of the New First Lien Loan Commitments that such Eligible Holder elects to provide pursuant to the exercise of its Election Rights (and the related New First Lien Loans) and/or New Money Reorganized Equity to which such Eligible Holder is entitled to receive in connection with providing such New First Lien Loan Commitments.  To make any such designation, an Eligible Holder must properly complete and duly execute the form attached as Exhibit E to the Election Form (the "Designee Form") and deliver such executed Designee Form to the Solicitation Agent, together with properly completed and duly executed copies of all signature pages, questionnaires, forms, certificates, instruments, agreements and other documents that are required to be completed and executed by the applicable Rights Offering Designee pursuant to the Designee Form, including the Rights Offering Designee Certification, Acknowledgement and Agreement attached thereto, **so that all of the foregoing is _actually received_ by the Solicitation Agent no later than the Election Deadline**.  If an Eligible Holder validly designates a Rights Offering Designee to provide any of the New First Lien Loan Commitments that such Eligible Holder elects to provide pursuant to the exercise of its Election Rights, then such Rights Offering Designee shall be permitted to fund on behalf of such Eligible Holder the Aggregate Commitment Amount applicable to such New First Lien Loan Commitments.  Notwithstanding any designation of a Rights Offering Designee to provide any of the New First Lien Loan Commitments that an Eligible Holder elects to provide pursuant to the exercise of its Election Rights (and the related New First Lien Loans), such Eligible Holder remains obligated to fund, or cause to be funded, such New First Lien Loan Commitments (and the related New First Lien Loans) no later than the deadline set forth in these Rights Offering Procedures.

If any such designation is made by an Eligible Holder, for administrative convenience purposes, the applicable number or amount of New First Lien Loan Commitments, New First Lien

Loans and/or New Money Reorganized Equity that are designated to be provided by, received by, delivered to or registered in the name of the applicable Rights Offering Designee shall, on the Effective Date, be directly transferred or delivered to, or registered in the name of, such Rights Offering Designee on such Eligible Holder's behalf without further action by such Eligible Holder.

An Eligible Holder will not be required pursuant to these Rights Offering Procedures (or an Election Form) to execute and deliver a signature page to the New Credit Agreement, and the certifications an Eligible Holder provides in Item 11 of the Election Form as applicable to the New Credit Agreement (or signature pages thereto) shall not apply, if, as a result of such Eligible Holder's designation of one or more Rights Offering Designees, such Eligible Holder will not be providing any New First Lien Loan Commitments. Similarly, an Eligible Holder will not be required pursuant to these Rights Offering Procedures (or an Election Form) to execute and deliver a signature page to the A&R LLC Agreement, and the certifications an Eligible Holder provides in Item 11 of the Election Form as applicable to the A&R LLC Agreement (or signature pages thereto) shall not apply, if, as a result of such Eligible Holder's designation of one or more Rights Offering Designees, such Eligible Holder will not be receiving any New Money Reorganized Equity.

A "Rights Offering Designee" means, with respect to any Eligible Holder, (a) any Affiliate of such Eligible Holder, (b) any Backstop Party, and (c) any Affiliate of any of the Backstop Parties.

### 8.    Fractional Units of Reorganized Common Equity

No fractional units of Reorganized Common Equity will issued and/or delivered in connection with the Restructuring, including any of the New Money Reorganized Equity issued and/or delivered in the Rights Offering. All such units will be calculated and rounded up or down to the nearest whole unit (with .5 of a unit being rounded up). No Eligible Holder (or any of its Rights Offering Designees) shall receive any payment or other distribution in respect of any fraction of a unit of Reorganized Common Equity such Eligible Holder (or any of its Rights Offering Designees) does not receive as a result of such rounding down.

### 9.    Validity of Exercise of Election Rights

All questions concerning the timeliness, viability, form and eligibility of any exercise of Election Rights will be reasonably determined by the Company Entities, in consultation with the Requisite Parties. Except as otherwise provided herein, the Company Entities, in consultation with the Requisite Parties, may waive or reject any defect or irregularity in (or permit such defect or irregularity to be corrected within such time as they may reasonably determine) the purported exercise of any Election Rights. Election Forms will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Company Entities reasonably determine, in consultation with the Requisite Parties. The terms of this paragraph shall apply equally and in the same manner to Rights Offering Designees, to the extent applicable.

Except as set forth herein, all calculations, including, to the extent applicable, the calculation of (a) any Eligible Holder's *pro rata* share of the Rights Offering, the Rights Offering Amount, or the New First Lien Loan Commitments that such Eligible Holder can elect to provide by timely and validly exercising its Election Rights in the Rights Offering, (b) any Eligible Holder's Aggregate Commitment Amount, and (c) any Eligible Holder's *pro rata* share of the New Money Reorganized Equity that such Eligible Holder will receive in connection with the timely and valid exercise of its Election Rights in the Rights Offering, shall be reasonably determined by the Company Entities, in consultation with the Requisite Parties.

### 10. Modification of Procedures

With the prior written consent of the Requisite Parties, the Company Entities reserve the right to modify these Rights Offering Procedures or adopt additional procedures to effectuate the Rights Offering; *provided*, that the Company Entities shall provide prompt written notice to the Eligible Holders, distributed through the Solicitation Agent, of any material modification to these Rights Offering Procedures made after the Election Commencement Date. In so doing, and subject to the prior written consent of the Requisite Parties, the Company Entities may execute and enter into agreements and take further action that the Company Entities reasonably determine is necessary and appropriate to effectuate and implement the Rights Offering.

The Company Entities shall reserve the right to confirm that any participant in the Rights Offering is in fact an Eligible Holder, a Backstop Related Party, a Rights Offering Designee, a Permitted Transferee or a Permitted Transferor, including, but not limited to, requiring additional certifications by such participant to that effect and other diligence measures, if any, as the Company Entities deem reasonably necessary.

### 11. Inquiries; Solicitation Agent

Eligible Holders should carefully read and strictly follow these Rights Offering Procedures and the Election Form.

Questions relating to the Rights Offering should be directed to the Solicitation Agent via email to OutputServices@kccllc.com.

The risk of non-delivery or receipt by the Solicitation Agent of all documents and payments is borne by the Eligible Holder electing to exercise its Election Rights and not the Company Entities, the Solicitation Agent, or the Backstop Parties.

### 12.    Failure to Exercise Election Rights

Unexercised (including invalidly exercised) Election Rights will be relinquished on the Election Deadline/Funding Deadline.  If, on or prior to the Election Deadline, the Solicitation Agent for any reason does not receive from an Eligible Holder a properly completed and duly executed Election Form (together with properly completed and duly executed signature pages to the Execution Documents, an AI Questionnaire, and an IRS Form W-9 or an appropriate IRS Form W-8, as applicable), such Eligible Holder shall be deemed to have irrevocably relinquished and waived its right to participate in the Rights Offering.  Further, subject to the other terms of these Rights Offering Procedures, if an Eligible Holder has not funded, or cause to be funded, such Eligible Holder's Aggregate Commitment Amount by the Funding Deadline (or such other deadline set forth in these Rights Offering Procedures for the funding of such Eligible Holder's Aggregate Commitment Amount), then such Eligible Holder shall be deemed to have irrevocably relinquished and waived its right to participate in the Rights Offering.

Any attempt to exercise Election Rights after the Election Deadline shall be null and void and the Company Entities shall not be obligated to honor any such purported exercise received by the Solicitation Agent after the Election Deadline regardless of when the documents or funds relating thereto were sent.

**The method of delivery of the Election Form and any other required documents is at each Eligible Holder's option and sole risk, and delivery will be considered made only when *actually received* by the Solicitation Agent no later than the Election Deadline.  If delivery is by mail, delivery by reputable overnight courier is strongly recommended.  In all cases, an Eligible Holder should allow sufficient time to ensure timely delivery by the Election Deadline.**

---

**The Election Deadline is 5:00 p.m., Eastern Time, on November 13, 2023, which is also the Funding Deadline for all Eligible Holders that are not Backstop Related Parties.  All Eligible Holders (other than Backstop Related Parties) must fund, or cause to be funded, their respective Aggregate Commitment Amounts no later than the Funding Deadline.**

**All Eligible Holders that are Backstop Related Parties must fund, or cause to be funded, their respective Aggregate Commitment Amounts no later than the deadline for such funding set forth in the Backstop Commitment Letter.**

---

**<u>ANNEX C</u>**

**ELECTION FORM**

**ELECTION FORM**[1]

**DUE BY ELECTION DEADLINE**

The Rights Offering Record Date for the Rights Offering is October 10, 2023. The Election Deadline is 5:00 p.m., Eastern Time, on November 13, 2023. The Funding Deadline is 5:00 p.m., Eastern Time, on November 13, 2023.

Please note that, for each Eligible Holder (including each Eligible Holder that is a Backstop Related Party), your properly completed and duly executed Election Form (together with properly completed and duly executed signature pages to the New Credit Agreement and the A&R LLC Agreement (copies of such agreements will be filed with the Plan Supplement, and signature pages to such agreements are attached hereto as **Exhibit C**), an AI Questionnaire (a form of which is attached hereto as **Exhibit D**), and an IRS Form W-9 or an appropriate IRS Form W-8, as applicable) must be *actually received* by the Solicitation Agent no later than the Election Deadline. The execution and delivery by a Rights Offering Designee of a signature page to the New Credit Agreement shall relieve any requirement or obligation of the applicable Eligible Holder to execute and deliver a signature page to the New Credit Agreement if no New First Lien Loan Commitments will be provided by such Eligible Holder. The execution and delivery by a Rights Offering Designee of a signature page to the A&R LLC Agreement shall relieve any requirement or obligation of the applicable Eligible Holder to execute and deliver a signature page to the A&R LLC Agreement if no New Money Reorganized Equity will be delivered to such Eligible Holder.

For Eligible Holders that are **not** Backstop Related Parties, you must fund, or cause to be funded, your respective Aggregate Commitment Amounts no later than the Funding Deadline. For Eligible Holders that **are** Backstop Related Parties, you must fund, or cause to be funded, your respective Aggregate Commitment Amounts by no later than the deadline for such funding set forth in the Backstop Commitment Letter.

The Rights Offering is being conducted without registration under the Securities Act in reliance upon (to the extent applicable) Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder (or another applicable exemption under the Securities Act) and in compliance with any applicable state or local laws pursuant to registration or exemption therefrom. Please be advised that the New Money Reorganized Equity will be subject to dilution following the Effective Date by, among other things, Reorganized Common Equity issued under the Management Incentive Plan.

The Rights Offering is being conducted subject to all of the terms, conditions and other provisions set forth in the Rights Offering Procedures. In the event of any conflict or inconsistency between the terms and provisions of the Rights Offering Procedures and the terms and conditions of this Election Form, the terms and conditions of the Rights Offering

---

[1]   Capitalized terms used in this Election Form and not defined herein shall have the meanings given to such terms in the Rights Offering Procedures to which this Election Form is attached as Annex C thereto (the "Rights Offering Procedures") or, if any such term is not defined in the Rights Offering Procedures, the meaning given to such term in the Restructuring Support Agreement (as defined in the Rights Offering Procedures).

Procedures shall control.  Please consult the Rights Offering Procedures for additional information with respect to this Election Form.

      If you have any questions, please contact the Solicitation Agent via email at OutputServices@kccllc.com.

To exercise Election Rights, complete Items 1, 2, 3, 4, 5 (for Eligible Holders that are Backstop Related Parties only), 8, 9 and 10 below, and read, complete and sign Item 11 below. Information relating to Rights Offering Designees is included in Item 6 below.  Wire instructions are included in Item 7 below.

**Item 1. First Lien Loan Principal Amount.**

The undersigned hereby certifies that, as of the Rights Offering Record Date, the undersigned holds the following aggregate principal amount of First Lien Loans (the "<u>First Lien Loan Principal Amount</u>"):

| First Lien Loans<br>(Aggregate Principal Amount of First Lien Loans in United States dollars)[1] |
|:---:|
| $_____ |

Your aggregate principal amount of First Lien Loans should not include accrued and unpaid interest, but should include all interest and fees that were paid in kind and that have been capitalized as of the Rights Offering Record Date.  Please reach out to the Solicitation Agent with any questions regarding the calculation of your aggregate principal amount of First Lien Loans.

**Item 2. Pro Rata Share of Rights Offering Amount.**

Your *pro rata* share of the Rights Offering Amount is calculated as follows:

| _____<br>(Insert First Lien Loan Principal Amount from Item 1 above) | / | _____<br>$626,793,396.14 | = | _____<br>(*pro rata* share) (Round up or down to nearest one-ten-thousandth decimal place (with .00005 being rounded up)) |
|---|---|---|---|---|

---

[1]   To calculate the aggregate principal amount of any First Lien Loans denominated in pound sterling ("<u>GBP</u>"), multiply the applicable amount in GBP by 1.2267, the rate at which GBP may be exchanged into United States dollars, as published by Bloomberg at approximately 11:00 a.m. (London time) on the Rights Offering Record Date.

**Item 3. Calculation of Maximum Aggregate Commitment Amount.**

The maximum Aggregate Commitment Amount (the "Maximum Aggregate Commitment Amount") for which you are entitled to provide is calculated as follows:

| | X | | = | |
|---|---|---|---|---|
| _____<br>(*pro rata* share from Item 2 above) | | $25,000,000 | | $_____<br>(Maximum Aggregate Commitment Amount) (Round up or down to nearest whole dollar (with $.50 being rounded up)) |

**Item 4. Aggregate Commitment Amount.**

The undersigned hereby elects to provide New First Lien Loan Commitments in an aggregate principal amount equal to $_____ (such amount not to exceed the Maximum Aggregate Commitment Amount from Item 3 above), on the terms and subject to the conditions set forth in the Rights Offering Procedures and the New Credit Agreement. Please note that the foregoing election is an irrevocable election, subject to the terms and conditions contained in the Rights Offering Procedures.

**Item 5. Backstop Related Party Representations.**

*This section is only for Eligible Holders that are Backstop Related Parties. Check only the **ONE** applicable box below:*

| ☐ | The undersigned is a Backstop Party identified in the Backstop Commitment Letter. |
|---|---|
| ☐ | The undersigned is an Affiliate of a Backstop Party identified in the Backstop Commitment Letter. |
| ☐ | The undersigned is a Person who (A) is a holder of First Lien Claims as of the Rights Offering Record Date, (B) is an Accredited Investor, and (C) has entered into any trade, agreement or other arrangement to sell or otherwise transfer any First Lien Loans to a Backstop Party or an Affiliate of a Backstop Party and is exercising the related Election Rights in the name of such Person, but on behalf of such Backstop Party or such Affiliate. |

**Item 6. Rights Offering Designees.**

If you are designating any Rights Offering Designee to provide, receive, take delivery of, or have registered in its name some or all of the New First Lien Loan Commitments that you elect to provide pursuant to the exercise of your Election Rights (and the related New First Lien Loans)

4

and/or New Money Reorganized Equity to which you are entitled to receive in connection with providing such New First Lien Loan Commitments, then you must properly complete and duly execute the form attached as <u>Exhibit E</u> hereto (the "<u>Designee Form</u>") and deliver such executed Designee Form to the Solicitation Agent, together with properly completed and duly executed copies of all signature pages, questionnaires, forms, certificates, instruments, agreements and other documents that are required to be completed and executed by the applicable Rights Offering Designee pursuant to the Designee Form, **so that all of the foregoing is *actually received* by the Solicitation Agent no later than the Election Deadline**.

**Item 7. Payment and Delivery Instructions.**

Each Eligible Holder must fund, or cause to be funded, its Aggregate Commitment Amount designated under Item 4 above to the Solicitation Agent by wire transfer of immediately available funds in accordance with the following wire instructions:

*Domestic and International wire:*

| Account Name: | Computershare Inc AAF for KCC Client Funds |
|---|---|
| Account Address: | 150 Royall Street, Canton, MA 02021 |
| Bank Account No.: | 4426942298 |
| SWIFT No.: | BOFAUS3N |
| Bank Name: | Bank of America |
| Bank Address: | 115 W 42nd St, One Bryant Park, New York, NY 10036 |
| Routing Number: | 026009593 |
| Special Instructions: | Funding for Output Services Rights Offering – [Name of Eligible Holder][2] |

**Item 8. Refund Information.**

Please use the chart below (including for any Rights Offering Designee) to provide the Solicitation Agent with the appropriate wire information to refund any (or all) of your Aggregate Commitment Amount in the event such a refund is necessary. Please be aware that refunds will be issued in accordance with the Rights Offering Procedures.

| Account Name: | |
|---|---|
| Bank Account No.: | |

---

[2]   The Eligible Holder's legal entity name must be included in the wire reference section. Please note that the failure to include the Eligible Holder's legal entity name in the reference field of any domestic or international wire payment may result in the rejection of the corresponding submission related to the Rights Offering.

| | |
|---|---|
| **ABA/Routing No.:** | |
| **Bank Name:** | |
| **Bank Address:** | |
| **Reference:** | |

**Item 9. Registration Information for New First Lien Loan Commitments (and related New First Lien Loans).**

**PLEASE COMPLETE THE SECTIONS BELOW IF NEW FIRST LIEN LOAN COMMITMENTS (AND THE RELATED NEW FIRST LIEN LOANS) ARE TO BE PROVIDED BY THE ELIGIBLE HOLDER.**

**IF THE ELIGIBLE HOLDER IS DESIGNATING A RIGHTS OFFERING DESIGNEE TO PROVIDE ANY NEW FIRST LIEN LOAN COMMITMENTS (AND THE RELATED NEW FIRST LIEN LOANS), PLEASE COMPLETE THE DESIGNEE FORM ATTACHED AS <u>EXHIBIT E</u> HERETO (AND INDICATE "SEE DESIGNEE FORM ENCLOSED HEREWITH" ON THE "NOTES" LINE BELOW).**

Please indicate on the lines provided below the name of the Eligible Holder in whose name the New First Lien Loan Commitments (and related New First Lien Loans) should be registered, the amount of such New First Lien Loan Commitments (and related New First Lien Loans), and the other information called for by the lines provided below, as well as the "account type" for the Eligible Holder:

6

| Name of Eligible Holder: | |
|---|---|
| | (Print or type) |
| Address: | |
| | |
| | |
| Email: | |
| Telephone Number: | |
| Amount of New First Lien Loan Commitments (and related New First Lien Loans): | |
| Notes: | |

**Account Type.** Please indicate the "account type" that may be used in connection with registration of New First Lien Loan Commitments (and related New First Lien Loans) in the name of the Eligible Holder. Please check only one box:

☐ Corporations (C-Corp) and Limited Liability Companies: (associated, associates, association, co, co., company, corp, corporate/partner, enterprise(s), fund, group, incorporated, inc, international, intl, limited, ltd, lifetime limited company, llc, l.l.c., partner, partners, plc, public limited company);

☐ Partnership: (lp, l p, l.p., llp, limited partnership, lifetime limited partnership);

☐ Bank; or

☐ Other.

Please be advised that the Company Entities may seek to clarify any of the above, including the "account types."

**Item 10. Registration Information for New Money Reorganized Equity.**

**PLEASE COMPLETE THE SECTIONS BELOW IF NEW MONEY REORGANIZED EQUITY IS TO BE ISSUED AND/OR DELIVERED TO THE ELIGIBLE HOLDER.**

**IF THE ELIGIBLE HOLDER IS DESIGNATING A RIGHTS OFFERING DESIGNEE TO RECEIVE ANY NEW MONEY REORGANIZED EQUITY, PLEASE COMPLETE THE**

**DESIGNEE FORM ATTACHED AS <u>EXHIBIT E</u> HERETO (AND INDICATE "SEE DESIGNEE FORM ENCLOSED HEREWITH" ON THE "NOTES" LINE BELOW).**

Please indicate on the lines provided below the name of the Eligible Holder in whose name New Money Reorganized Equity should be registered, the amount of such New Money Reorganized Equity (to be expressed as the aggregate amount of New First Lien Loan Commitments attributable to the New Money Reorganized Equity to be delivered to the Eligible Holder), and the other information called for by the lines provided below, as well as the "account type" for the Eligible Holder:

| | |
|---|---|
| Name of Eligible Holder: | |
| | (Print or type) |
| Address: | |
| | |
| | |
| Email: | |
| Telephone Number: | |
| Amount of New Money Reorganized Equity:[3] | |
| Notes: | |

**<u>Account Type.</u>** Please indicate the "account type" that may be used in connection with registration of New Money Reorganized Equity in the name of the Eligible Holder. Please check only one box:

☐ Corporations (C-Corp) and Limited Liability Companies: (associated, associates, association, co, co., company, corp, corporate/partner, enterprise(s), fund, group, incorporated, inc, international, intl, limited, ltd, lifetime limited company, llc, l.l.c., partner, partners, plc, public limited company);

☐ Partnership: (lp, l p, l.p., llp, limited partnership, lifetime limited partnership);

☐ Bank; or

---

[3] Please complete with the aggregate amount of New First Lien Loan Commitments attributable to the New Money Reorganized Equity to be delivered to the Eligible Holder.

☐ Other.

Please be advised that the Company Entities may seek to clarify any of the above, including the "account types."

**Item 11. Certifications and Acknowledgments.**

By signing this Election Form, the undersigned certifies that:

(a) as of the Rights Offering Record Date, the undersigned is the First Lien Lender of record for First Lien Loans in the aggregate principal amount set forth in Item 1 above;

(b) the undersigned (i) has received a copy of the Rights Offering Procedures, the Restructuring Support Agreement, the Plan, the Disclosure Statement and each of the other Definitive Documents distributed with the Solicitation Materials (including the Execution Documents), (ii) has had sufficient time to consider this Election Form, the Rights Offering Procedures, the Restructuring Support Agreement, the Plan, the Disclosure Statement and each of the other Definitive Documents distributed with the Solicitation Materials (including the Execution Documents), and to consult with an attorney if it wished to do so, or to consult with any other Person of its choosing, before signing this Election Form and the Execution Documents, (iii) has delivered to the Solicitation Agent properly completed and duly executed signature pages to each of the Execution Documents, (iv) has willingly completed, executed and delivered this Election Form and the Execution Documents with full understanding of the legal and financial consequences of this Election Form and the Execution Documents, and (v) understands and agrees that, on the Effective Date, without any further action on the part of, or notice to, any Person, (A) its completed, executed and delivered signature pages to each of the Execution Documents shall be deemed automatically released and attached to the applicable Execution Documents, (B) the Execution Documents shall be dated as of the Effective Date and all matters of fact or other informational matters called for by, or to be included in, the Execution Documents shall be inserted therein, (C) the Execution Documents shall become effective, and (D) the undersigned shall become a party to the Execution Documents and be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the Execution Documents as a party thereto;

(c) no other Election Form with respect to the First Lien Loans held by the undersigned as of the Rights Offering Record Date has been submitted or, if any other Election Form has been submitted with respect to such First Lien Loans, then any such earlier Election Form is hereby revoked;

(d) the undersigned has independently and without reliance upon the Company Entities or any of their respective Affiliates, and based on such information as it has deemed appropriate, made its own analysis and decision to elect to provide New First Lien Loan Commitments in the Aggregate Commitment Amount designated under Item 4 above and to receive New Money Reorganized Equity in connection therewith, except that it

9

has relied upon the Company Entities' express representations, warranties, covenants and agreements in the Execution Documents;

(e) the undersigned can bear the economic risk of the transactions contemplated hereby;

(f) understands that (i) the Company Entities and their respective Affiliates may have, and later may come into possession of, material non-public information with respect to the Company Entities and New TopCo and/or their respective securities ("MNPI"), (ii) it has made its own analysis and determination to make the election provided herein, notwithstanding its lack of knowledge of any such MNPI, (iii) neither the Company Entities nor any of their respective Affiliates shall have any liability to the undersigned, and it hereby waives and releases, to the extent permitted by applicable law, any claims it may have against the Company Entities and any of their respective Affiliates, under applicable law or otherwise, with respect to the nondisclosure of any such MNPI and (iv) any such MNPI may not be available to any other Person;

(g) the undersigned has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of undertaking the transactions herein and in the Execution Documents and investing in the New Money Reorganized Equity, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time;

(h) the undersigned is acquiring the New Money Reorganized Equity being acquired by it hereunder for investment for its own account and not with a view to, or for sale in connection with, any distribution thereof;

(i) the undersigned understands that the New Money Reorganized Equity being acquired by it hereunder is a speculative investment which involves a high degree of risk of loss of the entire investment therein, that there will be substantial restrictions on the transferability of such New Money Reorganized Equity and that following the Effective Date there will be no public market for such New Money Reorganized Equity, and that, accordingly, it may not be possible for it to sell or pledge such New Money Reorganized Equity or any interest therein in case of emergency or otherwise;

(j) the undersigned does not have any plan or intention to sell, exchange, transfer or otherwise dispose of (including by way of gift) any of the New Money Reorganized Equity being acquired by it hereunder immediately after the acquisition of such New Money Reorganized Equity; and

(k) the undersigned understands that the New Money Reorganized Equity being acquired by it hereunder have not been registered under the Securities Act in reliance on an exemption therefrom under Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and that any certificates or statements related to book-entry accounts representing or otherwise evidencing any New Money Reorganized Equity shall bear the legends set forth in the A&R LLC Agreement.

**The undersigned hereby acknowledges that, by executing this Election Form, the undersigned (<u>A</u>) is an Eligible Holder and has elected to provide New First Lien Loan Commitments (and related New First Lien Loans) in the Aggregate Commitment Amount designated under Item 4 above and to receive New Money Reorganized Equity in connection therewith and (<u>B</u>) will be irrevocably bound to fund, or cause to be funded, its Aggregate Commitment Amount and that it may be liable to OSG to the extent of any nonpayment.**

| | |
|---|---|
| Name of Eligible Holder: | |
| | (Print or type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than Eligible Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| U.S. Federal Tax EIN/SSN (optional for Non-U.S. persons): | |
| If Non-U.S. person, insert an "X" on this line and attach appropriate IRS Form W-8: | |
| If U.S. person, insert an "X" on this line and attach IRS Form W-9: | |
| Date Completed: | |

**PLEASE RETURN A PROPERLY COMPLETED AND DULY EXECUTED ELECTION FORM (TOGETHER WITH PROPERLY COMPLETED AND DULY EXECUTED SIGNATURE PAGES TO THE NEW CREDIT AGREEMENT AND THE A&R LLC AGREEMENT (COPIES OF SUCH AGREEMENTS WILL BE FILED WITH THE PLAN SUPPLEMENT, AND SIGNATURE PAGES TO SUCH AGREEMENTS ARE ATTACHED HERETO AS <u>EXHIBIT C</u>), AN AI QUESTIONNAIRE (A FORM OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT D</u>), AND AN IRS FORM W-9 OR AN APPROPRIATE IRS FORM W-8, AS APPLICABLE) TO THE SOLICITATION AGENT NO LATER THAN THE ELECTION DEADLINE.**

**YOU MUST COMPLETE AND EXECUTE THE AI QUESTIONNAIRE ATTACHED HERETO AS <u>EXHIBIT D</u>.  IF YOU ARE DESIGNATING ANY RIGHTS OFFERING DESIGNEES TO PROVIDE ANY NEW FIRST LIEN LOAN COMMITMENTS (AND RELATED NEW FIRST LIEN LOANS) OR TO RECEIVE ANY NEW MONEY REORGANIZED EQUITY, PLEASE NOTE THAT BOTH YOU <u>AND</u> EACH OF YOUR RIGHTS OFFERING DESIGNEES MUST COMPLETE AND EXECUTE THE AI QUESTIONNAIRE ATTACHED HERETO AS <u>EXHIBIT D</u>.**

All signature pages, questionnaires, forms, certificates, instruments, agreements and other documents delivered by you (or any Rights Offering Designee) to the Solicitation Agent pursuant to, or in connection with, this Election Form or the Rights Offering Procedures shall be sent by electronic mail, delivered personally, or mailed by overnight courier service to the Solicitation Agent at the following addresses or e-mail addresses:

| |
|---|
| Kurtzman Carson Consultants LLC |
| 222 N. Pacific Coast Highway, Third Floor |
| El Segundo, California 90245 |
| **Email: OutputServices@kccllc.com** |

## EXHIBIT A

**NEW CREDIT AGREEMENT**

[To be filed with the Plan Supplement.]

# EXHIBIT B

## A&R LLC AGREEMENT

[To be filed with the Plan Supplement.]

## <u>EXHIBIT C</u>

## FORMS OF SIGNATURE PAGES

[See Attached]

**[MEMBER]**:


By: _____
Name:
Title:

[_____], as a Lender


By: _____
    Name:
    Title:

**EXHIBIT D**

**ACCREDITED INVESTOR QUESTIONNAIRE**

Dated as of [●], 2023

Reference is hereby made to the Election Form to which this Accredited Investor Questionnaire is attached as <u>Exhibit D</u> (the "<u>Election Form</u>").  This Accredited Investor Questionnaire is being completed, executed and delivered by the undersigned pursuant to the Election Form.

For purposes of this Accredited Investor Questionnaire, the term "Accredited Investor" (pursuant to clause (a) of Rule 501 promulgated under the Securities Act of 1933, as amended (the "<u>Act</u>")) means any person or entity who comes within any of the following categories:

1.      Any bank as defined in section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any investment adviser registered pursuant to section 203 of the Investment Advisers Act of 1940 or registered pursuant to the laws of a state; any investment adviser relying on the exemption from registering with the United States Securities and Exchange Commission under section 203(l) or (m) of the Investment Advisers Act of 1940; any insurance company as defined in section 2(a)(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of the Investment Company Act of 1940; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any Rural Business Investment Company as defined in section 384A of the Consolidated Farm and Rural Development Act; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

2.      Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

3.      Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, or limited liability company, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

4.      Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

5.      Any natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000 (provided, for purposes of calculating net worth under this paragraph (5), that (A) the person's primary residence shall not be included as an asset, (B) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability) and (C) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability);

6.      Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse or spousal equivalent in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

7.      Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Securities Act;

8.      Any entity in which all of the equity owners are accredited investors;

9.      Any entity, of a type not listed in paragraph (1), (2), (3), (7), or (8), not formed for the specific purpose of acquiring the securities offered, owning investments in excess of $5,000,000;

10.     Any natural person holding in good standing one or more professional certifications or designations or credentials from an accredited educational institution that the United States Securities and Exchange Commission has designated as qualifying an individual for accredited investor status;

11.     Any natural person who is a "knowledgeable employee," as defined in rule 3c-5(a)(4) under the Investment Company Act of 1940 (17 CFR 270.3c-5(a)(4)), of the issuer of the securities being offered or sold where the issuer would be an investment company, as defined in section 3 of such act, but for the exclusion provided by either section 3(c)(1) or section 3(c)(7) of such act;

12.     Any "family office," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1): (i) with assets under management in excess of $5,000,000, (ii) that is not formed for the specific purpose of acquiring the securities offered, and (iii) whose prospective investment is directed by a person who has such

knowledge and experience in financial and business matters that such family office is capable of evaluating the merits and risks of the prospective investment; and

13.  Any "family client," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1)), of a family office meeting the requirements in paragraph (12) and whose prospective investment in the issuer is directed by such family office pursuant to paragraph (12)(iii).

The undersigned hereby certifies to the Company Entities (as defined in the Rights Offering Procedures (as defined in the Election Form)) and New TopCo (as defined in the Restructuring Support Agreement (as defined in the Rights Offering Procedures)) that, as of the date of this Accredited Investor Questionnaire, the undersigned is an Accredited Investor under the following category set forth above (*e.g.*, (1) through (13) of the definition of "Accredited Investor" above): _____.

[*Remainder of Page Intentionally Left Blank*]

3

IN WITNESS WHEREOF, the undersigned has executed this Accredited Investor Questionnaire on the date set forth above.

[                    ]

By: _____
Name:
Title:

## EXHIBIT E

## DESIGNEE FORM

**IF THERE IS MORE THAN ONE RIGHTS OFFERING DESIGNEE, THE ELIGIBLE HOLDER AS THE DESIGNATING PARTY MUST COMPLETE AND RETURN A SEPARATE COPY OF THIS EXHIBIT E (TOGETHER WITH THE OTHER REQUIRED DOCUMENTS) FOR EACH SUCH RIGHTS OFFERING DESIGNEE.**

Reference is hereby made to the Election Form to which this Designee Form is attached as Exhibit E (the "Election Form"). This Designee Form is being completed, executed and delivered by the undersigned Eligible Holder and the applicable Rights Offering Designee pursuant to the Election Form. Capitalized terms used in this Designee Form (including the accompanying Rights Offering Designee Certification, Acknowledgement and Agreement) without definitions shall have the meanings given to such terms in the Election Form.

Please complete this form ONLY if the Eligible Holder is designating any Rights Offering Designee to provide, receive, take delivery of, or have registered in its name some or all of the New First Lien Loan Commitments that such Eligible Holder elects to provide pursuant to the exercise of its Election Rights (and the related New First Lien Loans) and/or New Money Reorganized Equity to which such Eligible Holder is entitled to receive in connection with providing such New First Lien Loan Commitments.

In addition, the Rights Offering Designee must also properly complete, duly execute and deliver to the Solicitation Agent (a) signature pages to each of (i) the New Credit Agreement (if the Rights Offering Designee has been designated to provide, receive, take delivery of, or have registered in its name some or all of the New First Lien Loan Commitments that the Eligible Holder elects to provide pursuant to the exercise of its Election Rights (and the related New First Lien Loans)) and (ii) the A&R LLC Agreement (if the Rights Offering Designee has been designated to receive, take delivery of, or have registered in its name some or all of the New Money Reorganized Equity to which the Eligible Holder is entitled to receive in connection with providing New First Lien Loan Commitments), (b) an AI Questionnaire, (c) an IRS Form W-9 or an appropriate IRS Form W-8, as applicable, and (d) the Rights Offering Designee Certification, Acknowledgement and Agreement set forth below, in each case to the Solicitation Agent by no later than the Election Deadline.

Part I below should be completed and executed by the Eligible Holder. Part II below should be completed and executed by the Rights Offering Designee.

**Part I**

| | |
|---|---|
| Name of Designating Eligible Holder: | |
| | (Print or type) |
| Signature: | |
| Name of Signatory: | |
| Title: | |
| Address: | |
| | |
| | |
| Email: | |
| Telephone Number: | |
| Rights Offering Designee to provide New First Lien Loan Commitments: | |
| Amount of New First Lien Loan Commitments (and related New First Lien Loans) to be provided by Rights Offering Designee: | |
| Rights Offering Designee for receipt of New Money Reorganized Equity: | |
| New Money Reorganized Equity to be delivered to Rights Offering Designee:[1] | |
| Date Completed: | |

**Part II**

| | |
|---|---|
| Name of Rights Offering Designee: | _____ |
| | (Print or type) |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than Rights Offering Designee) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| U.S. Federal Tax EIN/SSN (optional for Non-U.S. persons): | _____ |
| If Non-U.S. person, insert an "X" on this line and attach appropriate IRS Form W-8: | _____ |
| If U.S. person, insert an "X" on this line and attach IRS Form W-9 | _____ |
| Date Completed: | _____ |

---

[1] Please complete with the aggregate amount of New First Lien Loan Commitments attributable to the New Money Reorganized Equity to be delivered to the Rights Offering Designee.

**<u>Account Type.</u>** Please indicate the "account type" that may be used in connection with registration of New First Lien Loan Commitments (and related New First Lien Loans) and/or New Money Reorganized Equity in the name of the Rights Offering Designee.  Please check only one box:

☐   Corporations (C-Corp) and Limited Liability Companies: (associated, associates, association, co, co., company, corp, corporate/partner, enterprise(s), fund, group, incorporated, inc, international, intl, limited, ltd, lifetime limited company, llc, l.l.c., partner, partners, plc, public limited company);

☐ Partnership: (lp, l p, l.p., llp, limited partnership, lifetime limited partnership);

☐ Bank; or

☐ Other.

Please be advised that the Company Entities may seek to clarify any of the above, including the "account types."

**Rights Offering Designee Certification, Acknowledgement and Agreement**[6]

By signing below, the undersigned certifies that the undersigned:

(a)     has received a copy of the Rights Offering Procedures, the Election Form, the Restructuring Support Agreement, the Plan, the Disclosure Statement and each of the other Definitive Documents distributed with the Solicitation Materials;

(b)     has had sufficient time to consider the Rights Offering Procedures, the Election Form, the Restructuring Support Agreement, the Plan, the Disclosure Statement and each of the other Definitive Documents distributed with the Solicitation Materials, and to consult with an attorney if it wished to do so, or to consult with any other Person of its choosing, before signing [the New Credit Agreement] [and] [the A&R LLC Agreement];

(c)     has delivered to the Solicitation Agent [a] properly completed and duly executed signature page[s] to [the New Credit Agreement] [and] [the A&R LLC Agreement];

(d)     has willingly completed, executed and delivered [the New Credit Agreement] [and] [the A&R LLC Agreement] with full understanding of the legal and financial consequences of such agreement[s];

(e)     understands and agrees that, on the Effective Date, without any further action on the part of, or notice to, any Person, (i) its completed, executed and delivered signature page[s] to [the New Credit Agreement] [and] [the A&R LLC Agreement] shall be deemed automatically released and attached to such agreement[s], (ii) [the New Credit Agreement] [and] [the A&R LLC Agreement] shall be dated as of the Effective Date, all matters of fact or other informational matters called for by, or to be included in, [the New Credit Agreement] [and] [the A&R LLC Agreement] shall be inserted therein, and [the New Credit Agreement] [and] [the A&R LLC Agreement] shall become effective, and (iii) the undersigned shall become a party to [the New Credit Agreement] [and] [the A&R LLC Agreement] and be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of [the New Credit Agreement] [and] [the A&R LLC Agreement] as a party thereto;

(f)     has independently and without reliance upon the Company Entities or any of their respective Affiliates, and based on such information as it has deemed appropriate, made its own analysis and decision [to elect to provide New First Lien Loan Commitments in the amount designated in Part I of the Designee Form to which this Rights Offering Designee Certification, Acknowledgement and Agreement is attached (such New First Lien Loan Commitments, the "Specified Commitments")] [and] [to receive New Money Reorganized Equity in the amount designated in Part I of the Designee Form to which this Rights Offering Designee Certification, Acknowledgement and Agreement is attached (such New Money Reorganized

---

[6]     Bracketed text should be removed and/or retained, as appropriate.

Equity, the "Specified Reorganized Equity")], except that it has relied upon the Company Entities' express representations, warranties, covenants and agreements in the Execution Documents;

(g)     can bear the economic risk of [the Specified Commitments] [and] [the Specified Reorganized Equity], and transactions contemplated by [the New Credit Agreement] [and] [the A&R LLC Agreement];

(h)     [understands that (i) the Company Entities and their respective Affiliates may have, and later may come into possession of, material non-public information with respect to the Company Entities and New TopCo and/or their respective securities ("MNPI"), (ii) it has made its own analysis and determination to invest in the Specified Reorganized Equity and the enter into the A&R LLC Agreement, notwithstanding its lack of knowledge of any such MNPI, (iii) neither the Company Entities nor any of their respective Affiliates shall have any liability to the undersigned, and it hereby waives and releases, to the extent permitted by applicable law, any claims it may have against the Company Entities and any of their respective Affiliates, under applicable law or otherwise, with respect to the nondisclosure of any such MNPI and (iv) any such MNPI may not be available to any other Person;]

(i)     [has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of undertaking the transactions in the A&R LLC Agreement and investing in the Specified Reorganized Equity, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time;]

(j)     [is acquiring the Specified Reorganized Equity for investment for its own account and not with a view to, or for sale in connection with, any distribution thereof;]

(k)     [understands that the Specified Reorganized Equity being acquired by it is a speculative investment which involves a high degree of risk of loss of the entire investment therein, that there will be substantial restrictions on the transferability of the Specified Reorganized Equity and that following the Effective Date there will be no public market for the Specified Reorganized Equity, and that, accordingly, it may not be possible for it to sell or pledge the Specified Reorganized Equity or any interest therein in case of emergency or otherwise;]

(l)     [does not have any plan or intention to sell, exchange, transfer or otherwise dispose of (including by way of gift) any of the Specified Reorganized Equity immediately after the acquisition of the Specified Reorganized Equity; and]

(m)     [understands that the Specified Reorganized Equity has not been registered under the Securities Act in reliance on an exemption therefrom under Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and that any certificates or statements related to book-entry accounts representing or otherwise evidencing

the Specified Reorganized Equity shall bear the legends set forth in the A&R LLC Agreement.]

In addition, by signing below, the undersigned (1) acknowledges the provisions of the Rights Offering Procedures that apply to Rights Offering Designees and agrees to such provisions, and (2) agrees that, upon request by the Company Entities, the undersigned will promptly complete, execute and/or deliver any signature pages, questionnaires, forms, certificates, instruments, agreements and other documents as may be necessary or advisable to effectuate, implement, and consummate the Restructuring.

**RIGHTS OFFERING DESIGNEE**:

_____

By:
Name:
Title:

7

**<u>EXHIBIT I</u>**

**FUNDING ARRANGEMENTS TERM SHEET**

## EXHIBIT I

### FUNDING ARRANGEMENTS TERM SHEET

This term sheet (this "**Funding Arrangements Term Sheet**") sets forth certain terms and conditions to be included in the Separation Agreement. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Amended and Restructuring Support Agreement, dated as of October 12, 2023, as amended, supplemented or modified in accordance with its terms, to which this Funding Arrangements Term Sheet is attached.

| Funder | Holdings |
| --- | --- |
| **Recipient** | TopCo |
| **Funding Arrangements** | Holdings shall pay to Topco all fees and expenses of (a) McDermott Will & Emery LLP, counsel to the Liquidating Entities, and (b) one (1) local counsel to the Liquidating Entities (each, a "**Counsel**") incurred after the Petition Date and prior to the date on which the Liquidating Entities' plan of liquidation becomes effective in rendering legal services solely to the Liquidating Entities in the Liquidating Entities' voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (any such fees and expenses, "**Counsel Fees**"), so long as (i) any such Counsel Fees have been allowed by a final order of the Bankruptcy Court and (ii) the Liquidating Entities do not have access to funds (excluding Funded Amounts (as defined below)) to pay any such Counsel Fees or any such Counsel Fees have not been paid, or are not required to be paid, by any other Person.  Any Counsel Fees that satisfy clauses (i) and (ii) of the immediately preceding sentence shall be referred to herein as "**Approved Fees**").<br><br>Holdings shall pay the amount of any Approved Fees to TopCo by wire transfer within fourteen (14) days after Holdings' receipt of (x) a written request by TopCo for payment of such Approved Fees, (y) a copy of a reasonably detailed invoice from the applicable Counsel that describes the services rendered, or the expenses incurred, by such Counsel in respect of such Approved Fees, and (z) a copy of a final order of the Bankruptcy Court allowing such Approved Fees.  TopCo shall not be permitted to request payment of Approved Fees more than once in any consecutive four-week period.  Amounts paid by Holdings to TopCo in respect of Approved Fees shall be referred to as "**Funded Amounts**". |
| **Use of Proceeds** | The Funded Amounts shall be used by TopCo solely to pay Approved Fees and for no other purpose. |
| **Conditions and Covenants** | If any of the Liquidating Entities (a) objects to, delays, impedes or takes any other action to interfere, directly or indirectly, with acceptance, implementation or consummation of the Restructuring or (b) initiates, or has initiated on its behalf, any litigation or other Proceeding of any kind (i) with respect to, or otherwise involving, the Restructuring Support |

| | |
|---|---|
| | Agreement, the First Lien Claims (or any liens securing any of the First Lien Claims), the Chapter 11 Cases or the Restructuring, or (ii) against, or otherwise involving, the Debtors, the Reorganized Debtors, New TopCo or any of the Consenting First Lien Lenders, in any such case before or after the Effective Date, then Holdings shall have no obligation to pay any Counsel Fees accruing after the earlier to occur of (A) Counsel becoming aware of the act, occurrence or other matter described in clause (a) or clause (b) above, and (B) Counsel receiving written notice (including by email) from Holdings of the act, occurrence or other matter described in clause (a) or clause (b) above.<br><br>At the reasonable request of the Liquidating Entities, the Company Parties shall reasonably cooperate with the Liquidating Entities in implementing the liquidation of the Liquidating Entities in connection with the voluntary cases under chapter 11 of the Bankruptcy Code relating to the Liquidating Entities; *provided*, *that* in no event shall the Company Parties be required to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to the Company Parties other than the Approved Fees as expressly described in this Funding Arrangements Term Sheet. |
| **Termination** | Holdings' obligation to provide cooperation as set forth in "Conditions and Covenants" above and to pay Funded Amounts shall terminate on the date on which the Liquidating Entities' plan of liquidation becomes effective. |

# EXHIBIT C

**Liquidation Analysis**

**EXHIBIT C**

**Liquidation Analysis[1]**

## LIQUIDATION ANALYSIS

Section 1129(a)(7) of title 11 of the United States Code (the "Bankruptcy Code") requires that each Holder[1] of an Impaired Allowed Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. This requirement is referred to as the "Best Interests Test."

To demonstrate that the Plan satisfies the Best Interests Test under section 1129(a)(7) of the Bankruptcy Code, the Debtors have prepared a hypothetical liquidation analysis (the "Liquidation Analysis"). The Liquidation Analysis estimates the realizable liquidation value of the Debtors' assets and estimates the distribution to creditors resulting from the liquidation thereof. The Liquidation Analysis indicates that Holders of Allowed Claims in each Impaired Class will receive at least as much under the Plan as they would if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that the Plan satisfies the Best Interests Test.

The Liquidation Analysis is predicated on the following assumptions: (a) the Debtors file a chapter 11 proceeding on or about October 2023; (b) the Debtors obtain debtor in possession financing pursuant to the Interim and Final DIP Orders; (c) the chapter 11 case is subsequently converted to a chapter 7 case on or about November 30, 2023 (the "Liquidation Date"); and (d) a chapter 7 trustee (the "Trustee") is appointed to convert all assets into cash and distribute the proceeds of those assets in accordance with the Bankruptcy Code.

The Liquidation Analysis is based on the Company's projected book values with respect to its assets and liabilities as of November 30, 2023, unless otherwise noted. These projected book values rely on estimated actual book values as of July 31, 2023 and are assumed to be representative of the book value of the Debtors' assets and liabilities as of the Liquidation Date.

Under chapter 7, the Debtors' assets would be subject to liquidation, and values would be measured based on the premise that such assets are liquidated in an orderly and expeditious fashion. For purposes of this Liquidation Analysis, it is assumed that the Debtors' operations would cease immediately upon conversion to chapter 7. The Trustee would then consolidate the Debtors' operations, retaining certain minimal operational, accounting, treasury, IT and other management services necessary to wind down the Debtors' estates. The Trustee would collect receivables, convert other assets to cash and dispose of the Debtors' available property through piecemeal sales. The Trustee would commence a three-month marketing process for any salable assets, during which time all of the property of the Debtors' estates would be sold. The amount of proceeds available from the liquidation of the property would be the net proceeds (after accounting for costs associated with conducting the liquidation) from the collection or sale of property of the Estates

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Joint Prepackaged Chapter 11 Plan of Reorganization of OSG Holdings, Inc. and Certain of Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*.

(the "Liquidation Proceeds"). This Liquidation Analysis assumes that the Liquidation Proceeds would be distributed in the order of priority set forth in section 726 of the Bankruptcy Code: (i) first, to the Holders of Allowed Secured Claims; (ii) second, to the Holders of Allowed Superpriority Administrative Claims; (iii) third, to holders of Administrative Expense Claims; (iv) fourth, to the Holders of any Allowed Priority Claims; and (v) fifth, to the Holders of Allowed General Unsecured Claims.

The Liquidation Analysis does not include estimates for: (i) the tax consequences that may be triggered upon the liquidation and sale of property of the Debtors' Estates; (ii) damages as a result of breach or rejection of obligations incurred and leases and executory contracts assumed or entered into; or (iii) recoveries resulting from any potential preference, avoidable transaction or other litigation or avoidance actions. More specific assumptions are detailed in the Notes below.

Estimating recoveries in any hypothetical chapter 7 liquidation is an uncertain process involving the extensive use of estimates and assumptions which, although considered reasonable by management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors or the Trustee. These values have not been subject to any review, compilation or audit by any independent accounting firm. In the event of a chapter 7 liquidation, the actual results may vary materially from the estimates and projections set forth herein. Similarly, the actual amounts of Allowed Claims in a chapter 7 liquidation could materially and significantly differ from the amounts of claims estimated in this Liquidation Analysis.

The following general assumptions were considered by the Debtors and their advisors as assumptions that would be applicable in any hypothetical chapter 7 liquidation.

Underlying this Liquidation Analysis are numerous estimates and assumptions that are subject to significant economic, regulatory, operational, and competitive uncertainties. Many of these uncertainties are beyond the control of the Debtors, their management, and their advisors. This Liquidation Analysis contains numerous estimates regarding the projected financial statements and remain subject to further legal and accounting analysis. This Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon the liquidation of the Debtors in a manner described herein. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATIONS OR WARRANTIES THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims, as of the Liquidation Date, based upon the Debtors' latest financial projections and review of liabilities in the Debtors' books and records. The Liquidation Analysis includes estimates for claims that could be asserted and allowed in a chapter 7 liquidation, including, among others, equipment recovery and disposal, wind down costs, and trustee and professional fees required to facilitate disposition of certain assets, resolution of corporate affairs, settlement of claims and distributions to creditors in a value-maximizing manner. The Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution

to be made on account of Allowed Claims under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Output Services Group, Inc. And Its Debtor Affiliates**
Hypothetical Liquidation Analysis
*($ in millions)*

| | Est. Book Value | Recovery Rate | | Est. Ch7 Recovery | | Footnote |
|---|---|---|---|---|---|---|
| | 11/30/2023 | Low | High | Low | High | |
| **Liquidation Proceeds** | | | | | | |
| **Cash Proceeds Available** | | | | | | |
| Cash and Equivalents | 21.7 | 100% | 100% | 21.7 | 21.7 | 1 |
| **Total Net Cash Available** | **21.7** | | | **21.7** | **21.7** | |
| **Other Asset Proceeds Available** | | | | | | |
| Accounts Receivable, Net | 111.4 | 50% | 65% | 56.0 | 72.4 | 2 |
| Inventory | 13.8 | 40% | 50% | 5.6 | 6.9 | 3 |
| Prepaid Expenses and Other Current Assets | 6.9 | 0% | 10% | - | 0.7 | 4 |
| Fixed Assets, net | 43.1 | 20% | 30% | 8.7 | 13.0 | 5 |
| Intercompany Claims | 217.3 | 0% | 0% | - | - | 6 |
| Deferred Financing | 10.0 | 0% | 0% | - | - | 7 |
| Goodwill and Other Intangible Assets, Net | 194.6 | 0% | 1% | - | 1.0 | 8 |
| Other Assets, net | 2.8 | 0% | 0% | - | - | 9 |
| Investment in Subsidiary | - | 0% | 0% | - | - | 10 |
| Contingent Assets | - | 0% | 0% | - | - | 11 |
| **Total Other Assets** | **600.0** | **12%** | **16%** | **70.2** | **93.9** | |
| **Total** | **621.7** | **15%** | **19%** | **91.9** | **115.6** | |
| **Costs to Liquidate** | | | | | | |
| Chapter 7 Trustee Fees | | | | (2.1) | (2.8) | 12 |
| Chapter 7 Trustee Professionals and Other | | | | (3.1) | (4.2) | 13 |
| Wind Down Costs | | | | (5.9) | (6.2) | 14 |
| **Chapter 7 Total Fees and Expenses** | | | | **(11.1)** | **(13.2)** | |
| **Chapter 11 Administrative Expenses** | | | | | | |
| Accrued Chapter 11 Professional and UST Fees | | | | (13.5) | (16.5) | 15 |
| Post-Petition Payables and Accrued Expenses | | | | (9.8) | (11.9) | 16 |
| Unpaid Section 503(b)(9) Claims | | | | (3.8) | (4.7) | 17 |
| **Total Post-Petition Administrative Expenses** | | | | **(27.1)** | **(33.1)** | |
| **Net Proceeds Available for Distribution** | | | | **53.8** | **69.3** | |
| DIP Loan | | | | 50.0 | 50.0 | 18 |
| **Net Proceeds After DIP** | | | | **3.8** | **19.3** | |
| Revolving Credit Facility | 21.3 | 1% | 3% | 0.1 | 0.6 | 19 |
| First Lien Loan | 648.6 | 1% | 3% | 3.6 | 18.7 | 20 |
| Total Existing First Lien Claims | 669.9 | 1% | 3% | 3.8 | 19.3 | |
| Mezzanine Loans | 84.5 | 0% | 0% | - | - | 21 |
| Total Existing Mezzanine Loan Claims | 84.5 | 0% | 0% | - | - | |
| Priority Claims | - | 0% | 0% | - | - | 22 |
| Total Priority Tax Claims | - | 0% | 0% | - | - | |
| Pre-Petition General Unsecured Claims | 62.6 | 0% | 0% | - | - | 23 |
| Total General Unsecured Claims | 62.6 | 0% | 0% | - | - | |
| Contingent Value Rights (CVR) Agreement Claims | - | 0% | 0% | - | - | 24 |
| Specified Guaranty & Other General Unsecured Claims | 34.5 | 0% | 0% | - | - | 25 |
| Total CVR and Other General Unsecured Claims | - | 0% | 0% | - | - | |
| Intercompany Claims | - | 0% | 0% | - | - | 26 |
| Total Intercompany Claims | - | 0% | 0% | - | - | |
| **Total Claims** | **817.1** | **0%** | **2%** | **3.8** | **19.3** | |

4

## NOTES

The Liquidation Analysis is presented on a consolidated basis for all Debtors. As of the Liquidation Date, all of the Debtors' operations are anticipated to be in North America.

## ASSETS

1) **Cash and Cash Equivalents**: The amounts shown are the projected cash balances available to the Debtors as of the Liquidation Date, based on projected cash flows. Recovery rates for cash and cash equivalents are assumed to be 100%.

    a. **Access to Cash**: The Liquidation Analysis assumes that the Debtors will have access to the cash in their accounts upon conversion of the cases to chapter 7. Any impairment in the Trustee's ability to access cash could adversely affect the Trustee's ability to run an orderly liquidation and further reduce recoveries.

2) **Accounts Receivable, Net**: Receivables were analyzed by aging category, with the assumption that longer dated receivables will have a lower assumed collectability rate. Total recoveries range from 50% to 65%. Additional factors are as follows:

    a. **Collectability**: A significant number of print and mail customers also have provided postage deposits to the Debtors and may assert setoff claims. This analysis assumes that most receivables at the Liquidation Date are post-petition assets and that most postage deposits are pre-petition claims, and thus that such setoff claims will not be allowed. Any viable setoff claims would reduce the collectability of accounts receivable.

    b. **Personnel**: The analysis assumes that the Trustee would be able to retain the necessary personnel to assist in billing and collecting these receivables. If the Trustee did not have sufficient access to cash or for any other reason was not able to retain these key personnel, those factors could negatively impact the recovery of these receivables.

3) **Inventory**: Inventory includes various mailing materials, including paper, envelopes, boxes, printer toner, ink, and other supplies. Recoveries range from 40% to 50%. The highest recoveries are assumed on toner, with lower recovery rates for paper, envelopes and supplies, and no recovery for boxes.

4) **Prepaid Expenses and Other Current Assets**: The Debtors have prepaid certain expenses, including insurance, rent, taxes and miscellaneous expenses. In some cases, creditors may set off such prepayments against outstanding claims. Any recovery from prepaid assets is assumed to be de minimis in a liquidation.

5) **Fixed Assets, net**: Fixed assets are composed of machinery and equipment (M&E), software, leasehold improvements (LHI), computer equipment, signage, furniture and fixtures (F&F) and automobiles. Fixed assets are reported net of depreciation, which is calculated on a straight-line basis over the useful life of the respective assets. Fixed assets are estimated to generate a recovery between 20% and 30% of net book value.

    a. **Capital Leases**: Some fixed assets recorded on the balance sheet are leased pursuant to capital leases. It is assumed that fixed assets subject to capital leases will result in no recovery and that the assets will be returned to the lessors.

    b. **Automobiles**: Automobiles are assumed to have the highest recovery rates.

c. **M&E**: M&E comprises the bulk of fixed assets. Many of the M&E assets are heavy items that are not easily movable and would require significant expense to break down, pack and ship to a buyer.

d. **All Other**: Computer equipment, F&F, and software are assumed to have the lowest recovery rates; and LHI and signage are assumed to have no recovery.

6) **Intercompany Claims**: Intercompany Claims reflect intercompany payables due to the Debtors from non-debtor European subsidiaries. Based on the anticipated sale or wind down of these non-debtor subsidiaries, no recovery is assumed for intercompany claims.

7) **Deferred Financing**: Deferred financing reflects fees incurred and paid with respect to previous refinancing of various debt facilities that are amortized over the life of the respective debt facilities. There is no assumed recovery.

8) **Goodwill and Other Intangible Assets, Net**: Goodwill is not projected to generate any proceeds in a liquidation. Intangible Assets include customer relationships, trade names and trademarks, and developed technology. Recovery rates for Intangible Assets are assumed to be 0% to 0.5%.

9) **Other Assets, net**: Other Current Assets include a D&O policy, original issue discount and lease security deposits, which are projected to generate no recoveries in a liquidation.

10) **Investment in Subsidiaries**: It is assumed that the Debtors' equity investment in the European non-debtor subsidiaries has no value.

11) **Contingent Assets**:  Potential recoveries from avoidance actions and other causes of action were not estimated for purposes of this Liquidation Analysis.  As described below, the entry of an all-trade motion would limit any such recoveries.

## CLAIMS

To the extent there are unencumbered assets at the Debtors (which are estimated to be de minimis), the proceeds from their liquidation are assumed to pay fees and expenses associated with a wind down.

12) **Chapter 7 Trustee Fees:** Pursuant to sections 326 and 330 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the Trustee's services, not to exceed 25% on the first $5,000 or less distributed to creditors, 10% on any distributable amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1 million, upon all moneys disbursed or turned over by the Trustee to parties-in-interest. For purposes of this Liquidation Analysis, these fees are assumed to be 3% of liquidation proceeds realized, excluding Cash.

13) **Chapter 7 Trustee Professionals and Other**: Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including costs of selling the Debtors' assets and winding down operations, would be entitled to payment in full prior to any distribution to Administrative Claims and Other Priority Claims. This Liquidation Analysis

estimates between $3.1 million and $4.2 million for financial, accounting, tax, legal and other professionals.

14) **Wind Down Costs**: Costs to liquidate the Debtors' assets are expected to be incurred over the course of a three-month wind down period. This Liquidation Analysis estimates between $5.9 million and $6.2 million for Wind Down Costs.

    a. **Payroll and Benefits**: For purposes of this analysis, it is assumed that certain of the Debtors' employees are needed to assist in the wind down. Payroll and Benefits includes wages and benefits for employees in accounting and finance, collections, tax, administration, legal, human resources, payroll and operations and information technology.

        i) **Operations Personnel**: Operations personnel will primarily be responsible for assisting the Trustee with preparing for the sale of inventory, F&F, and M&E at the facilities, as well as returning the leaseholds to the landlords or transferring locations to buyers in any lease sales.

        ii) **Other Corporate Personnel**: The corporate personnel will primarily be responsible for oversight of the closure process, finalization of employee benefit matters, cash collections, payroll and tax reporting, accounts payable and other books and records, and responding to certain legal matters related to the wind down.

    b. **Non-Payroll Overhead**: For the purposes of this analysis, it is assumed that certain Non-Payroll Overhead costs must be maintained to efficiently wind down the estates over three months. Non-Payroll Overhead costs include rent on the locations that house material assets, utilities, insurance premiums, third-party service providers (including, but not limited to, security for all buildings), as well as data storage, software licenses, records retention and other expenses.

15) **Accrued Chapter 11 Professional and UST Fees**: The Debtors estimate that professional fees will be incurred consistent with the projections, including those fees subject to Bankruptcy Court approval. Any accrued and unpaid professional fees after conversion to chapter 7 would be paid subject to 11 U.S.C.A. § 726(b). This Liquidation Analysis estimates between $13.5 million and $16.5 million for Accrued Chapter 11 Professional Fees that are unpaid as of the Liquidation Date, as well as quarterly fees due to the United States Trustee (UST).

16) **Post-Petition Payables and Accrued Expenses:** Post-Petition Payables and Accrued Expenses are assumed to be between $9.8 million and $11.9 million as of the Liquidation Date. The Liquidation Analysis assumes the Court granted various first-day motions and other requested relief, including the motion to pay trade claims in the ordinary course. Post-petition payables and accrued expenses are those assumed to have been incurred in the 30 days between the Petition Date and the Liquidation Date.

17) **Unpaid Section 503(b)(9) Claims**: Estimated claims under Bankruptcy Code section 503(b)(9) for goods received in the 20 days prior to filing that remain unpaid as of the Liquidation Date are estimated to be between $3.8 million and $4.7 million.

18) **DIP Facility**: The DIP Facility, including closing and exit fees, is assumed to be fully drawn in the chapter 11 case, to be secured by liens on substantially all of the Debtors' assets and the proceeds thereof, and to constitute a super-priority administrative expense claim against the Debtors' estates. This Liquidation Analysis assumes 100% recovery for the DIP Facility.

19) **Revolving Credit Facility**: The Revolving Credit Facility is a First Lien Claim, along with the First Lien Loan, and is assumed to recover 1% to 3% in a Liquidation scenario.

20) **First Lien Loan**: The First Lien Loan is a First Lien Claim, along with the Revolving Credit Facility, and is assumed to recover 1% to 3% in a liquidation.

21) **Mezzanine Loans**: The Mezzanine Loans are assumed to receive no recovery in a liquidation.

22) **Priority Claims**: Priority Claims are tax, wage and other claims subject to priority status under section 507(a)(8) of the Bankruptcy Code.  Such tax claims, if any, are assumed to receive no recovery in a liquidation. All amounts owed to employees on account of pre-petition wages and benefits are assumed to have been paid pursuant to first day orders; a de minimis amount of unpaid vacation may be owed in certain states. This analysis assumes no recovery for Priority Claims.

23) **Pre-Petition General Unsecured Claims**: Pre-Petition General Unsecured Claims are general unsecured claims related to accounts payable, accrued expenses, postage deposits, and other long-term liabilities. These claims also include contingent liabilities for potential litigation that arose pre-petition and for damages arising from the rejection of leases or contracts; however, no such amounts have been estimated for purposes of this analysis.  This analysis assumes no recovery for Pre-Petition General Unsecured Claims.

24) **CVR Claims**: CVR Claims are claims under that certain Contingent Value Rights Agreement, dated as of August 31, 2022, by and among TopCo and Stretto, Inc., in its capacity as agent for certain equity holders. This analysis assumes holders of these CVR Claims do not receive a recovery.

25) **Specified Guaranty and Other General Unsecured Claims**: These claims are comprised of any claim that is (i) a First Lien Claim that is not a secured claim or (ii) a claim arising under the Specified Guarantee.  This analysis assumes holders of these Specified Guaranty and Other General Unsecured Claims do not receive a recovery.

   a. **Unsecured First Lien Claims**: For purposes of this analysis, unsecured deficiency claims that could be asserted by holders of the First Lien Claims have not been reflected separately from the First Lien Claims.

   b. **Specified Guaranty**: The Specified Guaranty is that certain Guarantee, entered September 17, 2019, by Output Services Group in favor of Communisis Trustee (2011) Company Limited. Communisis Limited, a wholly owned subsidiary of OSG Bidco Limited, operates a defined benefit pension plan in the UK for which service accrual ceased prior to the acquisition on December 9, 2018. The pension plan is closed to all members, and employees do not accrue any further benefits. Benefits under the pension plan are primarily based on years of service and compensation. The GAAP liability accrual for the pension plan is approximately $30.3 million; however, the actual claim by the pension trustee may be materially different.

26) **Intercompany Claims**: Intercompany Claims reflect intercompany payables due to non-debtor European subsidiaries from the Debtors. Intercompany claims are assumed to receive no recovery in a liquidation.

# EXHIBIT D

**Financial Projections**

**Exhibit D**

**FINANCIAL PROJECTIONS**

**Overview to Financial Projections**

As a condition to Confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that entry of a Confirmation Order is not likely to be followed by either a liquidation or the need to further reorganize the Debtors or any successor to the Debtors. In accordance with this condition and in order to assist each holder of a Claim in determining whether to vote to accept or reject the Debtors' *Joint Prepackaged Chapter 11 Plan of Reorganization of OSG Holdings, Inc. and Certain of Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan")[1], the Debtors' management team ("Management"), with the assistance of its financial advisors, developed financial projections (the "Financial Projections") to support the feasibility of the Plan, which were prepared as of October 5, 2023.

The Financial Projections were prepared in good faith by Management with the assistance of its financial advisors and are based on several assumptions made by Management, within the bounds of their knowledge of the Debtors' business and operations, with respect to the future performance of the Debtors' operations. In addition, the Financial Projections contain statements that constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995. Forward-looking statements in these projections include the intent, belief, or current expectations of the Debtors and members of its Management concerning the timing of, completion of, and scope of the current restructuring, the Plan, the Debtors' strategic business plan, bank financing, debt and equity market conditions, and the Debtors' future liquidity, as well as the assumptions upon which such statements are based. Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ, and the actual results may be materially greater or less than those contained in the Financial Projections and from those contemplated by such forward-looking statements. No representations can be made as to the accuracy of the Financial Projections or the Debtors' ability to achieve the projected results. Therefore, the Financial Projections may not be relied upon as a guarantee or as any other form of assurance as to the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance. Accordingly, in deciding whether to vote to accept or reject the Plan, creditors should review the Financial Projections in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions and risks described herein, including all relevant qualifications and footnotes.

---

[1]  Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of OSG Holdings, Inc. and Certain of Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"), to which the Financial Projections are attached as Exhibit D, or the Plan, attached to the Disclosure Statement as Exhibit A, as applicable.

**AS ILLUSTRATED BY THE FINANCIAL PROJECTIONS, THE DEBTORS BELIEVE THEY WILL HAVE SUFFICIENT LIQUIDITY TO PAY AND SERVICE THEIR DEBT OBLIGATIONS, AND TO OPERATE THEIR BUSINESSES. THE DEBTORS BELIEVE THAT CONFIRMATION AND CONSUMMATION OF THE PLAN ARE NOT LIKELY TO BE FOLLOWED BY THE LIQUIDATION OR FURTHER REORGANIZATION OF THE DEBTORS. ACCORDINGLY, THE DEBTORS BELIEVE THAT THE PLAN SATISFIES THE FEASIBILITY REQUIREMENT OF SECTION 1129(a)(11) OF THE BANKRUPTCY CODE.**

The Financial Projections were not prepared with a view toward compliance with published rules of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding projections. The Debtors' independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in this exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Debtors' independent auditor assumes no responsibility for and denies any association with the prospective financial information.

Accordingly, neither the Debtors nor the Reorganized Debtors intend to and disclaim any obligation to: (1) furnish updated Financial Projections to holders of Claims or Equity Interests prior to the Effective Date or to any other party after the Effective Date, except as required by the Plan; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available. The Debtors do not intend to update or otherwise revise the Financial Projections to reflect circumstances that may occur after their preparation, or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions are shown to be in error. Additional information relating to the principal assumptions used in preparing the Financial Projections are set forth below.

**THE FINANCIAL PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS. ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE FINANCIAL PROJECTIONS.**

**Safe Harbor Under the Private Securities Litigation Reform Act of 1995**

The Financial Projections contain certain statements that are "forward-looking" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and Management with respect to the timing of, completion of, and scope of the current restructuring, Plan, Debtors' business plan, and market conditions, and the Debtors' future liquidity, as well as the assumptions upon which such statements are based. While the Debtors believe that the expectations are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties-in-interest are cautioned that any such forward-looking statements are not guarantees of future performance, involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

## Accounting Policies

The Financial Projections have been prepared using accounting policies that are generally consistent with those applied in the Debtors' historical financial statements. In connection with Accounting Standards Codification 852, "Reorganizations" ("ASC 852"), the Debtors note that the Projections reflect the operational emergence from the Chapter 11 Cases but not the impact of fresh start accounting (except for preliminary and illustrative adjustments as noted herein) that will likely be required upon the occurrence of the Effective Date. Therefore, the predecessor period reflects reorganization items required to be presented separately under ASC 852, as "Non-Recurring Costs"; however, fresh start accounting has not yet been applied.

Fresh start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value" on the Effective Date. The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work necessary to quantify the effect upon the Financial Projections, which effect could be material. Additionally, neither the Debtors' actual results nor their Financial Projections reflect the impact of fresh start accounting required upon emergence from bankruptcy in 2022, as the Debtors have not yet completed the work necessary to quantify the effect upon the Debtors' actual results or Financial Projections, which effect could be material. Finally, under Accounting Standards Codification 842, "Leases" ("ASC 842"), lessees are required to reflect virtually all leases (with the exception of short-term leases), including both operating and capital leases (*i.e.*, finance leases), on the balance sheet. Neither the Debtors' actual results nor the Financial Projections reflect the implementation of ASC 842, as the Debtors have not yet completed the work necessary to quantify the effect of implementation of this accounting standard, which effect could be material.

## Summary of Significant Assumptions

The Debtors, with the assistance of various professionals, including their financial advisors, prepared the Financial Projections for the one month ending December 31, 2023 and the four years from 2024 to 2027 (the "Projection Period"). The Financial Projections are based on numerous assumptions with respect to the future performance of the Reorganized Debtors' operations. Although these Financial Projections have been prepared in good faith and are believed to be reasonable, the Debtors can provide no assurance that such assumptions will be realized. As described in detail in Article VI of the Disclosure Statement, a variety of risk factors could affect the Reorganized Debtors' financial results and should be considered. The Financial Projections should be reviewed in conjunction with a review of these assumptions, including the qualifications and footnotes set forth herein.

## General Assumptions

The Financial Projections are based upon the Debtors' operating budget and projections for the period from December 1, 2023 to December 31, 2027, in conjunction with current relevant industry

outlooks. The Financial Projections were prepared using a "bottoms-up" approach, incorporating multiple sources of detailed information, including customer-level forecasts, unit-level price and cost data, and separate projections for each of the Debtors' business segments. The operating assumptions assume the Plan will be confirmed and consummated by November 30, 2023.

The Financial Projections reflect numerous assumptions made by Management with respect to industry performance, general business, economic, market and financial conditions and other matters, all of which are difficult to predict and many of which are beyond the Debtors' control. Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the projection periods presented will likely vary from the projected results. These variations may be material. Accordingly, no definitive representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Reorganized Debtors to achieve the projected results.

The Financial Projections include all of the Debtors. Following the Effective Date, all of the Debtors' operations will be in North America; thus, the Financial Projections include the business plan projections related to only the North American business.

**THE INDEPENDENT AUDITOR FOR THE DEBTORS HAS NOT EXAMINED, COMPILED OR OTHERWISE PERFORMED ANY PROCEDURES ON THE FOLLOWING PROSPECTIVE FINANCIAL INFORMATION AND, CONSEQUENTLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROSPECTIVE FINANCIAL INFORMATION.**

## DEBTORS
## PROJECTED CONSOLIDATED STATEMENTS OF OPERATIONS
## (UNAUDITED)

| ($ in millions) | Pro Forma 1 ME 12/31/2023 | Pro Forma FY 12/31/2024 | Pro Forma FY 12/31/2025 | Pro Forma FY 12/31/2026 | Pro Forma FY 12/31/2027 |
|---|---|---|---|---|---|
| Net Revenue | $ 29.0 | $ 301.0 | $ 333.1 | $ 342.7 | $ 353.4 |
| Cost of Goods Sold (Excl. D&A) | (13.3) | (139.2) | (151.9) | (153.5) | (155.8) |
| **Gross Profit** | **15.6** | **161.8** | **181.2** | **189.2** | **197.5** |
| Gross Profit % | | 53.8% | 54.4% | 55.2% | 55.9% |
| | | | | | |
| Operating Expenditures (Excl. D&A) | (7.8) | (103.4) | (102.6) | (97.2) | (95.8) |
| **Adjusted EBITDA** | **7.8** | **58.4** | **78.5** | **92.0** | **101.8** |
| Adjusted EBITDA Margin % | 27.0% | 19.4% | 23.6% | 26.8% | 28.8% |
| | | | | | |
| Depreciation and Amortization | (3.4) | (42.2) | (45.4) | (50.0) | (51.0) |
| Interest Expense | (2.7) | (31.4) | (25.5) | (20.3) | (18.3) |
| Non-Recurring Costs | (0.9) | (8.7) | (3.2) | (2.0) | (2.0) |
| **Income / (Loss) Before Taxes** | **0.8** | **(23.9)** | **4.4** | **19.7** | **30.5** |
| Income Tax Benefit / (Expense) | (2.1) | (1.6) | (4.8) | (7.7) | (9.2) |
| **Net Income / (Loss)** | **$ (1.3)** | **$ (25.5)** | **$ (0.4)** | **$ 12.0** | **$ 21.3** |

### DEBTORS
### PROJECTED CONSOLIDATED BALANCE SHEETS[2,3]
### (UNAUDITED)

| ($ in millions) | Pro Forma 11/30/2023 | Pro Forma FY 12/31/2023 | Pro Forma FY 12/31/2024 | Pro Forma FY 12/31/2025 | Pro Forma FY 12/31/2026 | Pro Forma FY 12/31/2027 |
|---|---|---|---|---|---|---|
| Cash | $ 20.0 | $ 20.0 | $ 34.4 | $ 45.2 | $ 68.3 | $ 94.9 |
| Accounts Receivable | 111.4 | 103.3 | 75.0 | 75.6 | 76.0 | 76.7 |
| Inventory | 13.8 | 12.7 | 12.7 | 11.9 | 11.8 | 11.8 |
| Prepaid Expenses and Other Current Assets | 6.9 | 7.0 | 7.0 | 7.0 | 6.6 | 6.5 |
| **Total Current Assets** | **152.2** | **143.0** | **129.2** | **139.7** | **162.8** | **190.0** |
| | | | | | | |
| Fixed Assets | 63.1 | 63.5 | 68.4 | 70.2 | 67.3 | 63.5 |
| Deferred Financing | 10.0 | 9.5 | 3.2 | - | - | - |
| Goodwill and Other Intangible Assets | 194.6 | 193.1 | 174.0 | 154.9 | 135.8 | 116.7 |
| Other Assets | 1.6 | 1.6 | 0.9 | 0.9 | 0.9 | 0.9 |
| **Total Assets** | **421.5** | **410.6** | **375.7** | **365.7** | **366.8** | **371.1** |
| | | | | | | |
| Accounts Payable | 19.8 | 19.1 | 19.0 | 18.6 | 18.2 | 18.1 |
| Accrued Expenses | 16.0 | 15.7 | 17.0 | 16.7 | 16.5 | 16.5 |
| Postage Deposits | 65.4 | 62.4 | 54.2 | 53.8 | 53.3 | 52.9 |
| **Total Current Liabilities** | **101.2** | **97.2** | **90.2** | **89.2** | **88.0** | **87.6** |
| | | | | | | |
| Optional ABL Facility | 22.5 | 14.8 | 12.5 | 12.5 | 12.5 | 12.5 |
| New First Lien Facility | 50.0 | 50.0 | 50.0 | 41.6 | 32.1 | 15.7 |
| New Take-Back Debt Facility | 135.0 | 135.0 | 135.0 | 135.0 | 135.0 | 135.0 |
| Accrued Interest | - | 2.0 | 1.8 | 1.4 | 1.1 | 0.7 |
| Capital Leases | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 |
| Other | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| **Total Liabilities** | **328.9** | **319.3** | **309.8** | **300.0** | **288.9** | **271.8** |
| | | | | | | |
| **Total Shareholders' Equity** | **92.6** | **91.3** | **65.9** | **65.6** | **77.8** | **99.3** |
| | | | | | | |
| **Total Liabilities and Shareholders' Equity** | **$ 421.5** | **$ 410.6** | **$ 375.7** | **$ 365.7** | **$ 366.8** | **$ 371.1** |

### DEBTORS
### PROJECTED CONSOLIDATED STATEMENT OF CASH FLOWS

---

[2]   These balance sheet projections do not reflect the potential impact of fresh start accounting under Accounting Standards Codification 852, "Reorganizations" ("ASC 852") (except for preliminary and illustrative adjustments as noted herein) that may need to be applied on the Effective Date. For purposes of these projections, and for illustrative purposes, as of the Effective Date: (i) the book value of Shareholders' Equity is adjusted to reflect the equity value implied by the estimated Total Enterprise Value as set forth in Exhibit E in the Disclosure Statement and the extinguishment of long-term debt, net of new debt issued in exchange; and (ii) the carrying value of Goodwill & Other Intangibles is assumed to be reduced accordingly as a result of the reorganization. However, the implementation of fresh start accounting could, among other things, impact the value of pro forma Shareholders' Equity and Goodwill & Other Intangibles after the reorganization. Differences between the projected and actual amounts could be material.

[3]   See Pro Forma Reorganization results in the Opening Balance Sheet.

**(UNAUDITED)**

| ($ in millions) | Pro Forma 1 ME 12/31/2023 | Pro Forma FY 12/31/2024 | Pro Forma FY 12/31/2025 | Pro Forma FY 12/31/2026 | Pro Forma FY 12/31/2027 |
|---|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | | |
| Net Income / (Loss) | $ (1.3) | $ (25.5) | $ (0.4) | $ 12.0 | $ 21.3 |
| Depreciation and Amortization | 3.4 | 42.2 | 45.4 | 50.0 | 51.0 |
| Amortization of Deferred Financing Costs and Other | 0.6 | 7.1 | 3.4 | 0.2 | 0.2 |
| Accrued Interest | 2.0 | (0.2) | (0.4) | (0.3) | (0.4) |
| Change in Working Capital | 5.2 | 21.2 | (0.7) | (1.1) | (1.1) |
| **Net Cash Provided / (Used) in Operating Activities** | **9.8** | **44.8** | **47.2** | **60.8** | **71.0** |
| **Cash Flows from Investing Activities** | | | | | |
| Capital Expenditures | (1.3) | (18.0) | (18.0) | (18.0) | (18.0) |
| **Net Cash Provided / (Used) in Investing Activities** | **(1.3)** | **(18.0)** | **(18.0)** | **(18.0)** | **(18.0)** |
| **Cash Flows from Financing Activities** | | | | | |
| Principal Payments | - | - | (8.4) | (9.6) | (16.4) |
| Borrowing / (Repayment) of Optional ABL Facility | (7.6) | (2.3) | - | - | - |
| Capital Lease Principal Payments | (0.8) | (10.1) | (10.1) | (10.1) | (10.1) |
| **Net Cash Provided / (Used) in Financing Activities** | **(8.5)** | **(12.4)** | **(18.4)** | **(19.6)** | **(26.4)** |
| **Net Change in Cash Flow** | **-** | **14.4** | **10.8** | **23.1** | **26.6** |
| Cash and Cash Equivalents at the Beginning of Period | 20.0 | 20.0 | 34.4 | 45.2 | 68.3 |
| Net Change in Cash and Cash Equivalents | - | 14.4 | 10.8 | 23.1 | 26.6 |
| **Cash and Cash Equivalents at the End of Period** | **$ 20.0** | **$ 34.4** | **$ 45.2** | **$ 68.3** | **$ 94.9** |
| Availability on Optional ABL Facility | 35.2 | 37.5 | 37.5 | 37.5 | 37.5 |
| **Liquidity at the End of Period** | **$ 55.2** | **$ 71.9** | **$ 82.7** | **$ 105.8** | **$ 132.4** |

**DEBTORS**
**PRO FORMA OPENING BALANCE SHEET**

| ($ in millions) | Pre-Reorganization 11/30/2023 | Exit Financing | Debt Cancellation | Closing Fees and Adjustments | Post-Reorganization 11/30/2023 |
|---|---|---|---|---|---|
| Cash | $ 10.0 | $ 22.5 | $ | (12.5) | $ 20.0 |
| Accounts Receivable | 111.4 | | | | 111.4 |
| Inventory | 13.8 | | | | 13.8 |
| Prepaid Expenses and Other Current Assets | 6.9 | | | | 6.9 |
| **Total Current Assets** | **142.2** | **22.5** | **-** | **(12.5)** | **152.2** |
| Fixed Assets | 63.1 | | | | 63.1 |
| Deferred Financing | 10.0 | | | | 10.0 |
| Goodwill and Other Intangible Assets | 560.6 | | | (365.9) | 194.6 |
| InterCompany Receivables | - | | | | - |
| Investment in Subsidiaries | - | | | | - |
| Other Assets | 4.2 | | | (2.6) | 1.6 |
| **Total Assets** | **780.1** | **22.5** | **-** | **(381.0)** | **421.5** |
| Accounts Payable | 19.8 | | | | 19.8 |
| Accrued Expenses | 16.0 | | | | 16.0 |
| Postage Deposits | 65.4 | | | | 65.4 |
| Other Current Liabilities | 4.3 | | | (4.3) | - |
| **Total Current Liabilities** | **105.5** | **-** | **-** | **(4.3)** | **101.2** |
| Optional ABL Facility | - | 22.5 | | | 22.5 |
| New First Lien Facility | - | 50.0 | | | 50.0 |
| New Take-Back Debt Facility | - | 135.0 | | | 135.0 |
| DIP Facility | 50.0 | (50.0) | | | - |
| Existing First Lien Loans | 607.3 | | (607.3) | | - |
| Existing First Lien Revolver Loans | 20.0 | | (20.0) | | - |
| Existing Mezz Loans | 82.8 | | (82.8) | | - |
| Original Issue Discount | (1.9) | | | 1.9 | - |
| Accrued Interest | 44.9 | | | (44.9) | - |
| Capital Leases | 20.0 | | | | 20.0 |
| Accrued Income Taxes and Other | (16.4) | | | 16.7 | 0.3 |
| **Total Liabilities** | **912.2** | **157.5** | **(710.1)** | **(30.6)** | **328.9** |
| Total Shareholders' Equity | (132.1) | | | 224.7 | 92.6 |
| **Total Liabilities and Shareholders' Equity** | $ 780.1 | $ 157.5 | $ (710.1) | $ 194.1 | $ 421.5 |

## NOTES TO FINANCIAL PROJECTIONS

### I. Projected Statement of Operations

### Note – Net Revenue

Net Revenue is projected to be $324.0 million during FY 2024, growing to $353.4 million during FY 2027. Year over year sales growth is driven through expansion in the Debtors' digital product lines and the Debtors' real estate business line. This growth more than offsets declines in the legacy print & mail business, driven by secular industry decline and cannibalization of the print & mail business by other digital product lines.

### Note – Cost of Goods Sold (Excl. D&A) / Gross Margin

Cost of Goods Sold (Excl. D&A) primarily includes the cost of paper, envelopes, ink, other materials and critical components. Costs also include labor, material, equipment, and other overhead directly attributable to print & mail and related businesses.  Improvement in Gross Profit is primarily driven by increased operating efficiencies in the Debtors' print & mail business, as well as the growth of the high-margin digital product lines.

### Note – Operating Expenditures (Excl. D&A)

Operating Expenditures (Excl. D&A) include all sales and marketing, general and administrative, and employee-related expenses for all plant, printing center and fulfilment center staff, as well as administrative employees at the Debtors' corporate headquarters and regional offices. Costs also include rent and other occupancy costs for its print facilities and other locations, advertising and marketing costs, outbound shipping to customers, information technology and communication costs, supplies for the Debtors' business, fees, and all other administrative overhead. Operating Expenditures (Excl. D&A) are projected to decrease primarily due to the Debtors' technology transformation plan.

### Note – Depreciation & Amortization ("D&A")

Depreciation expense is related to real property, personal property, intangible assets and other assets and is calculated using estimated useful lives of three to fifteen years. Finite-lived intangible assets are amortized over their estimated remaining useful economic lives. All expenses are forecasted using straight line methods during the Projection Period. Intangible assets are recognized on the balance sheet and amortized over their estimated useful lives ranging from four to 23 years in accordance with the Debtors' accounting policies.  Amortization of deferred financing costs is captured in Interest Expense and not in D&A.

### Note – Interest Expense

Interest expense over the Projection Period is based upon the Reorganized Debtors' pro forma capital structure and interest rates as contemplated by the Plan. Interest expense also includes the interest component of capital lease payments, as well as amortization of deferred financing costs. The Debtors have not completed their analysis and implementation of ASC 842, and these Financial Projections do not reflect the associated adjustments to their financial statements

pursuant to Generally Accepted Accounting Principles ("GAAP"). Implementation of ASC 842 may result in material changes to the Financial Projections.

**Note – Non-Recurring Costs**

Non-Recurring Costs are related to operational restructuring initiatives, costs related to the Debtors' technology transformation plan, and reorganization-related professional fees. Non-Recurring Costs are projected to decrease over the projection period as costs associated with the technology transformation are more heavily weighted in the near term, as well as the end of reorganization-related professional fees in 2024.

**Note – Income Tax Benefit / (Expense)**

The Debtors utilized estimates provided by their third-party tax advisor to project estimated federal and state income taxes based on an analysis of the Plan and future income. The income statement assumes tax expenses are equal to projected cash taxes. The actual amount of cash taxes paid could vary significantly pending the final tax analysis of the reorganization and fresh-start accounting adjustments. Tax calculations are based on a multitude of factors, and the preliminary estimates are subject to material change.

**II. Projected Consolidated Balance Sheets**

The Debtors' Projected Consolidated Balance Sheets are set forth after giving effect to the proposed restructuring as contemplated by the Plan. The Projected Consolidated Balance Sheets are adjusted for the Plan and for projected net income and cash flow over the projection period. The Projected Consolidated Balance Sheets have not been prepared in accordance with GAAP and do not consider the impact of fresh-start accounting under ASC 852 (except as otherwise noted herein) or lease accounting under ASC 842, as described previously. When implemented, the effects will result in changes in various asset and liability balances.

The Projected Consolidated Balance Sheets contain certain pro forma adjustments as a result of the Plan consummation. The opening balance sheet also includes the debt and other obligations that will remain outstanding and will be paid in the ordinary course of operations. The projected cash balances include the effects of anticipated changes in working capital-related items. On the Effective Date, actual cash may vary from cash reflected on the Projected Consolidated Balance Sheets because of variances in the projections and potential changes in cash needs to consummate the Plan.

**Note – Cash**

Cash reflects the cash balance of the Debtors, including cash balances from their respective operating accounts. The opening cash balance reflects the net impact from new money funding,

including repayment of the DIP Claims, issuance of the New First Lien Facility, and placement of the Optional ABL Facility.

**Note – Accounts Receivable, net**

Accounts Receivable include receivables related to multiple items such as goods and services provided, and postage and include reserves held for doubtful accounts and credits provided to customers in the ordinary course of business.

**Note – Inventory**

Inventory includes various mailing materials and in-process materials, including paper, envelopes, boxes, printer toner, and ink, and includes inventory-in-transit.

**Note – Prepaid Expenses and Other Current Assets**

Prepaid Expenses and Other Current Assets primarily consist of prepaid rent, insurance, taxes, and other prepaid operating expenses, such as postage, services pursuant to various services agreements, and other miscellaneous expenses.

**Note – Fixed Assets, net**

Fixed Assets is composed primarily of the Debtors' owned and leased locations, furniture, fixtures and equipment, IT hardware and software systems, and leasehold improvements. Fixed Assets are reported net of depreciation, which is calculated on a straight-line basis over the useful lives of the respective assets. The Debtors have not completed their analysis and implementation of ASC 842 (Leases) or ASC 852 (Reorganization), and these Financial Projections do not reflect the associated GAAP adjustments to the financial statements, which may result in material changes.

**Note – Deferred Financing**

Deferred Financing consists of financing costs related to debt issuance which are amortized over the term of the related debt. It is assumed there will be no additions to deferred financing related to the bankruptcy filing.

**Note – Goodwill & Other Intangible Assets, net**

Goodwill & Other Intangible Assets is composed primarily of the Debtors' intangible property, specifically its tradenames, proprietary technology, and customer relationships. The Debtors have not completed their analysis of fresh-start adjustments and the associated GAAP adjustments to its financial statements under ASC 852; however, for illustrative purposes, the Debtors have assumed a reduction in the carrying value of Goodwill & Other Intangible Assets in an amount that results in the book value of Shareholders' Equity being equal to the equity value implied by the estimated Total Enterprise Value as set forth in Exhibit E in the Disclosure Statement. The implementation of fresh start accounting (which requires the reorganization value to be assigned to assets and liabilities based on fair value as of the Effective Date, with the excess amount recognized as goodwill) could materially change the value of pro forma Goodwill & Other Intangibles shown herein. Other Intangible Assets are projected to be fully amortized in 2025.

**Note – Other Assets**

Other assets primarily consist of security deposits for leases and a directors and officers insurance policy assumed to be purchased as part of the contemplated restructuring and amortized over a one-year period.

**Note – Intercompany Receivables**

Intercompany receivables reflect intercompany activity between the Debtors and non-Debtors, including the Debtors' U.K. subsidiaries. For the purposes of this analysis, the Debtors have assumed these receivables have no material value.

**Note – Investment in Subsidiaries**

Investment in Subsidiaries reflects the Debtors' investments in non-Debtor subsidiaries, including the Debtors' U.K. subsidiaries. For the purposes of this analysis, the Debtors have assumed these investments have no material value.

**Note – Accounts Payable**

Accounts Payable represents outstanding payables to third-party trade vendors and service providers.

**Note – Accrued Expenses and Other Current Liabilities**

Accrued Expenses and Other Current Liabilities primarily relate to payroll, employee benefits, employee incentives, sales and income taxes, and other operating expenses. Accrued interest expense is not included in Accrued Expenses.

**Note – Postage Deposits**

Postage Deposits includes deposits by customers to fund the cost of postage, distribution and shipping under ongoing customer contracts.

**Note – Debt - Optional ABL Facility**

As of the Petition Date, the Debtors have not yet completed the placement of the Optional ABL Facility. For illustrative purposes, the Optional ABL Facility is assumed to be a $50 million revolving credit facility with a maturity of February 2028. The facility is assumed to bear annual interest at Term SOFR (subject to a Term SOFR Adjustment) plus 4.50%, paid monthly. The Optional ABL Facility is assumed to have a minimum utilization of $12.5 million (25% of the facility) and an unused fee of 0.50%, paid monthly.

**Note – Debt - New First Lien Facility**

The New First Lien Facility is a $50 million senior secured term loan with a maturity of May 2028. The facility bears annual interest at Term SOFR (subject to a 1.00% floor and a Term SOFR

Adjustment) plus 8.00%, paid quarterly. The New First Lien Facility does not include principal amortization; however, it is subject to an excess cash flow sweep based on excess cash flow in each calendar year that is payable in April of the following year.  It is forecasted that excess cash flow will be swept starting in 2025.

**Note – Debt – New Take-Back Debt Facility**

The New Take-Back Debt Facility is a $135 million secured term loan with a maturity of November 2028. The facility bears annual interest at Term SOFR (subject to a 1.00% floor and a Term SOFR Adjustment) plus 6.25%, paid quarterly; <u>provided</u>, that the Debtors may elect to pay interest accruing at 4.75% per annum in kind by increasing the aggregate principal amount of the New Take-Back Debt Facility. The Financial Projections assume interest on the New Take-Back Debt Facility is paid in cash.  The New Take-Back Debt Facility does not include principal amortization; however, it is subject to an excess cash flow sweep based on excess cash flow in each calendar year that is payable in April of the following year once the New First Lien Facility is fully repaid.  It is forecasted that the excess cash flow mechanism will not occur during the projection period.

**Note – Accrued Interest**

Accrued Interest includes accrued and unpaid interest on the Optional ABL Facility, New First Lien Facility, and New Take-Back Debt Facility.

**Note – Capital Leases**

Capital Leases represent obligations related to certain financing and lease arrangements of property, equipment, and other assets. Capital Leases are assumed to remain constant in the projection period, with new leases replacing principal payments. The Debtors have not completed their analysis and implementation of ASC 842, and these Financial Projections do not reflect the associated GAAP adjustments to its financial statements, which may be material.

**Note – Shareholders' Equity**

Pro forma Shareholders' Equity on the Opening Balance Sheet has been adjusted to reflect the equity value implied by the estimated Total Enterprise Value as set forth in Exhibit E in the Disclosure Statement. The projections do not reflect the full potential impact of fresh-start and lease accounting; as such, these balances are highly preliminary and illustrative in nature.

**III. Projected Consolidated Statement of Cash Flows**

**Note – Changes in Working Capital**

Changes in Working Capital primarily consist of changes in inventory, accounts payable, accounts receivable, accrued expenses and postage deposits. The one month ending 2023 period and FY

2024 assume an increase in working capital driven primarily by accounts receivable. FY 2025 through FY 2027 project relatively minimal change in working capital on a year-over-year basis driven by normalization of prior trends.

**Note – Capital Expenditures**

Capital expenditures are anticipated to remain consistent and are primarily driven by a combination of the following:

- Facility renovations / updates;
- Purchases of property and equipment;
- Capitalized portions of labor and payroll expenses;
- Maintenance requirements; and
- Investments in information technology.

**Note – Principal Payments**

Principal Payments reflect mandatory repayments of the New First Lien Facility pursuant to the excess cash flow sweep.

**Note – Capital Lease Principal Payments**

Capital Lease Principal Payments reflect anticipated principal payments for Capital Lease Obligations projected throughout the forecast period. Capital Leases are projected to continuously renew or be replaced by similar renewals as they expire. The Debtors have not completed their analysis and implementation of ASC 842, and these Financial Projections do not reflect the associated GAAP adjustments to its financial statements, which may be material.

## **EXHIBIT E**

**Valuation Analysis**

## VALUATION ANALYSIS[1]

THE VALUATION INFORMATION CONTAINED IN THE FOLLOWING ANALYSIS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.  THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS.  IN ADDITION, THE VALUATION OF NEWLY-ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE PRICES OF SECURITIES.

THE ESTIMATES OF THE ENTERPRISE VALUE DETERMINED BY HOULIHAN REPRESENT ESTIMATED ENTERPRISE VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.

Solely for purposes of the Plan and the Disclosure Statement, Houlihan Lokey Capital, Inc. ("Houlihan"), as investment banker and financial advisor to the Debtors, has estimated a range of total enterprise values (the "Total Enterprise Values") of the Reorganized Debtors on a going-concern basis and pro forma for the transactions contemplated by the Plan (the "Valuation Analysis"). The Valuation Analysis is based on financial and other information provided to Houlihan by the Debtors' management and third-party advisors, the Financial Projections attached to the Disclosure Statement as **Exhibit E**,[2] and information provided by other sources.

---

[1]   Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in, as applicable, the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of OSG Holdings, Inc. and Its Certain of Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"), to which this Valuation Analysis is attached as **Exhibit E** or the *Joint Prepackaged Chapter 11 Plan of Reorganization of OSG Holdings, Inc. and Certain of Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), attached to the Disclosure Statement as **Exhibit A**.

[2]   The Debtors' management advised Houlihan that the Financial Projections were reasonably prepared in good faith  and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Debtors as of the date provided, all of which are subject to various risks and uncertainties (as more fully described in the Disclosure Statement) which may cause actual results to differ from such Financial Projections.  The Valuation Analysis assumed that the actual performance of the Reorganized Debtors will correspond to the Financial Projections in all material respects.  If the business performs  at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on the Valuation Analysis, estimated potential ranges of valuation of the Reorganized Debtors, and the Enterprise Values thereof.

The valuation analysis herein represents a valuation of the Reorganized Debtors as the continuing operators of the businesses and assets of the Debtors, after giving effect to the Plan, based on the application of standard valuation techniques. The estimated values set forth below: (a) do not purport to constitute an appraisal of the assets of the Reorganized Debtors; (b) do not constitute an opinion on the terms and provisions or fairness from a financial point of view to any holder of the consideration to be received by such Holder under the Plan; (c) do not constitute a recommendation to any holder of Claims or Interests as to how such holder should vote or otherwise act with respect to the Plan; and (d) do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors.

In preparing the estimates set forth below, Houlihan has relied upon the accuracy, completeness, and fairness of financial and other information furnished by the Debtors. Houlihan did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the assets or liabilities of the Debtors or Reorganized Debtors.

The estimated values set forth herein assume that the Reorganized Debtors will achieve their Financial Projections in all material respects. Houlihan has relied on the Debtors' representation that the Financial Projections: (a) have been prepared in good faith; (b) are based on fully disclosed assumptions, which, in light of the circumstances under which they were made, are reasonable; (c) reflect the Debtors' best currently available estimates; and (d) reflect the good faith judgments of the Debtors. Houlihan does not offer an opinion as to the attainability of the Financial Projections. As disclosed in the Disclosure Statement, the future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and Houlihan and, consequently, are inherently difficult to project.

This analysis contemplates facts and conditions known and existing as of the date of the Disclosure Statement. Events and conditions subsequent to this date, including updated projections, as well as other factors, could have a substantial effect upon the Total Enterprise Value. Among other things, failure to consummate the Plan in a timely manner may have a materially negative effect on the Total Enterprise Value. For purposes of this valuation, Houlihan has assumed that no material changes that would affect value will occur between the date of the Disclosure Statement and the assumed Effective Date.

The valuation estimates set forth herein represent valuation analyses generally based on the application of customary valuation techniques to the extent deemed appropriate by Houlihan. In preparing its valuation, Houlihan considered a variety of factors and evaluated a variety of financial analyses, including a (a) comparable companies analysis, (b) discounted cash flow analysis, and (c) precedent transaction analysis. Houlihan also: (a) conducted a "sum-of-the-parts" analysis that applied certain of the financial analyses above to the Debtors' business segments; (b) reviewed certain historical financial information of the Debtors for recent years and interim periods; (c) reviewed certain financial and operating data of the Debtors, including the Financial Projections; (d) discussed the Debtors' operations and future prospects with the Debtors' senior management team and third-party advisors; (e) reviewed certain publicly available financial data for, and considered the market value of, public companies that Houlihan deemed generally relevant in analyzing the value of the Reorganized Debtors; and (f) considered certain economic and industry information that Houlihan deemed generally relevant to the Reorganized Debtors.

Houlihan believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation.   Reliance on only one of these methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion.

Houlihan assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information. The preparation of a valuation analysis is a complex analytical process involving subjective determinations about which methodologies of financial analysis are most appropriate and relevant to the subject company and the application of those methodologies to particular facts and circumstances in a manner that is not readily susceptible to summary description.

The range of the reorganization values presented assumes that the effective date of the Plan is November 30, 2023 (the "Assumed Effective Date") and reflects work performed by Houlihan on the basis of information with respect to the business and assets of the Debtors available to Houlihan as of the date of the Disclosure Statement.   It should be understood that, although subsequent developments may affect Houlihan's conclusions, Houlihan does not have any obligation to update, revise, or reaffirm its estimate.

As a result of the analysis described herein, Houlihan estimates the Total Enterprise Value of the Reorganized Debtors to be within the range of approximately $260 million and $360 million, with a midpoint of $310 million as of the Assumed Effective Date.   The range and the midpoint are based in part on information provided by the Debtors, is solely for purposes of the Plan, and assumes that no material changes occur from the date of the Disclosure Statement through the Assumed Effective Date that affect Total Enterprise Value.

The range of Total Enterprise Values and the midpoint set forth herein are not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, the estimates of Total Enterprise Value represent hypothetical enterprise values of the Reorganized Debtors as the continuing operator of the Debtors' business and assets, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the values set forth herein.   Such estimates were developed solely for purposes of analysis of implied relative recoveries to holders of Allowed Claims and Interests under the Plan.   The value of operating businesses such as the Debtors' businesses are subject to uncertainties and contingencies that are difficult to predict and fluctuate with changes in many factors affecting the financial condition and prospects of such businesses.

Houlihan's estimated range for the Total Enterprise Value of the Reorganized Debtors does not constitute a recommendation to any holder of Claims or Interests as to how such holder should vote or otherwise act with respect to the Plan. The range and the midpoint of the range of Total Enterprise Value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any holder of the consideration being offered to such holder under the Plan or of the terms and provisions of the Plan. Accordingly, because valuation

estimates are inherently subject to uncertainties, none of the Debtors, Houlihan, nor any other person assumes responsibility for the accuracy of the valuation range set forth or any difference between the estimated valuation range or the midpoint set forth herein and any actual outcome or value received for any debt or equity instruments received pursuant to the Plan.

Houlihan is acting as investment banker and financial advisor to the Debtors and will not be responsible for, and will not provide, any tax, accounting, actuarial, legal, or other specialist advice.

# EXHIBIT F

**Corporate Organizational Chart**

OSG Group TopCo, LLC (DE)
OSG Group Holdings, Inc. (DE)
OSG Intermediate Holdings, Inc. (DE)
OSG Holdings, Inc. (NJ)
Output Services Group, Inc. (NJ)
OSG Bidco Limited (England & Wales)
Telereach, Inc. (CT)
The Pisa Group, Inc. (MO)
JJT Enterprises Inc. (dba Optimal Outsource) (CA)
DoublePositive Marketing Group, Inc. (DE)
National Business Systems, Inc. (MN)
The Garfield Group, Inc. (NJ)
SouthData, Inc. (NC)
Words, Data and Images, LLC (MO)
Mansell Group Holding Company (DE)
Diamond Marketing Solutions Group, Inc. (DE)
Applied Information Group, Inc. (NJ)
Payments Business Corp. (f/k/a Paybox Corp.) (DE)
Mansell Group, Inc. (GA)
National Data Services of Chicago, Inc. (IL)
NCP Solutions, LLC (DE)
Communisis Limited (England & Wales)
Globalex Corporation (CA)
WhatCounts, Inc. (WA)
Microdynamics Corporation (IL)
PPS Business Corporation (IL)
E-statement.com corp. (IL)
CU Print
Microdynamics Group Nebraska, Inc. (NE)
Communisis UK Limited (England & Wales)
Communisis Trustee (2011) Company Ltd
Communisis Financing Limited
PS Holdings Limited
Communisis Inc.
John Mansfield Timber Ltd
Life Marketing Consultancy Limited (England & Wales)
Communisis Data Intelligence Limited (England & Wales)
Robot No. 6 Ltd
Microdynamics Transactional Mail, LLC (IL)
Editions Publishing Limited
Communisis International Limited (England & Wales)
Communisis PS Ltd
PS Newco 1 Limited (UK)
Editions Financial Inc.
PSONA Limited (England & Wales)
PSONA 12 Limited (England & Wales)
Robot No. 7 Ltd
Waddington Ltd
Metrogroup PD-WI Acquisition, LLC (DE)
Communisis Data Ltd
Vox Group Limited (UK)
Communisis Security Products Limited
Waddingtons Business Forms Ltd
Waddingtons Games Ltd
Communisis Digital Limited (England & Wales)
Vox Supply Partners DOO
Vox SP Inc. (UK)
Vox Digital Partners Limited (UK)
Raudo Digital Limited (UK)
Vox Supply Partners Limited (UK)
Vox Supply Group Trading (Suzhou) Do Ltd.
Vox Turkey
Vox Europe BV
Communisis Digital Private Limited
Communisis Capital Partner Ltd
Communisis Europe Limited
Communisis Marketing Services LLC
Communisis Ukraine LLC
Communisis Marketing Services d.o.o. Beograd
Communisis Marketing Services Hong Kong Ltd
Communisis Pension Funding Limited Partnership
Communisis Poland
GDE Ltd
Communisis Hellas Marketing
Communisis Romania
Communisis Italia S.r.l.
Communisis Suisse Sàrl in liquidation
Communisis France Sarl
Communisis Sverige AB
Communisis Belgie NV
Communisis Nederland B.V.
Communisis Magyarorszag Kft
Communisis Slovakia SRO
Communisis Ceska Republika SRO
Communisis Adria LLC
Communisis Deutschland GmbH
Communisis Spain SL
Communisis Portugal LDA
Communisis Turkey
Legend
- Filing Entities
- Plan Debtors
- Liquidating Debtors

